**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

Daniel S. Mount, Esq. (Cal. Bar No. 77517)
Kathryn G. Spelman, Esq. (Cal. Bar No. 154512)
Daniel H. Fingerman, Esq. (Cal. Bar No. 229683)
Kevin M. Pasquinelli, Esq. (Cal. Bar No. 246985)
Mount & Stoelker, P.C.
RiverPark Tower, Suite 1650
333 West San Carlos Street
San Jose CA 95110-2740
Phone: (408) 279-7000
Fax:    (408) 998-1473
Email: dmount@mount.com
        kspelman@mount.com
        dfingerman@mount.com
        kpasquinelli@mount.com

Attorneys for Defendants Romi Mayder, Wesley Mayder,
Silicon Test Systems Inc., and Silicon Test Solutions LLC

United States District Court
Northern District of California, San Jose Division

| | |
|---|---|
| VERIGY U.S. INC., a Delaware corporation | ) Case No. 5:07-cv-04330 (RMW) (HRL) |
| Plaintiff, | ) **Defendants' Brief in Response to Order to Show** |
| | ) **Cause Re Preliminary Injunction** |
| vs. | ) |
| | ) Date:    November 9, 2007 |
| ROMI OMAR MAYDER, an individual; | ) Time:    9:00 a.m. |
| WESLEY MAYDER, an individual; | ) Judge:   Hon. Ronald M. Whyte |
| SILICON TEST SYSTEMS INC., a | ) |
| California corporation; SILICON TEST | ) |
| SOLUTIONS LLC, a California limited | ) |
| liability corporation, | ) |
| Defendants. | ) |

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL
REDACTED FOR PUBLIC FILING

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

## Table of Contents

I. Introduction ...................................................................................................................1

II. Background of Publicly-Known Technology ...........................................................2

III. Verigy's Business and Adjacent Markets for Resource-Sharing Equipment......................6

    A. Verigy sells testers, and probe-card-mounted resource-sharing ASIC is a complementary, or adjacent, market .......................................................................6

    B. What was ███ ? (And what was it *not*?)..................................................6

    C. Romi Mayder's employment with Verigy and his role with ███ .....................7

IV. STS's Business .......................................................................................................10

    A. Romi Mayder left Verigy to do work that ████████ .....................10

    B. STS obtained customer requirements directly from its own customers......................11

    C. ████████, so no injunction is appropriate .......................11

V. Verigy Is Not Entitled to Injunctive Relief...........................................................12

    A. Verigy cannot prevail on any of its claims .............................................12

        (1) Verigy fundamentally misunderstands the law of trade secrets ..........................12

        (2) Verigy did not use reasonable efforts to maintain secrecy.............................13

        (3) All of Verigy's "secrets" are publicly known or not used by STS.........................15

    B. An injunction can prevent only *ongoing* or *future* conduct .......................19

    C. Verigy has not demonstrated a likelihood of irreparable harm .......................20

    D. If an injunction is granted, its scope must be appropriately limited ..................20

    E. If an injunction is granted, Verigy must post a bond .................................21

    F. Defendants must have a reasonable opportunity to address any new matter introduced by way of reply.......................................................................21

VI. Conclusion.............................................................................................................22

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1  **I. Introduction**

2      Verigy's application for a preliminary injunction is premised on the assumed use of its secret

3  information.  None of the defendants are using Verigy's secret (or even confidential) information.

4  Since no secret information is being used, Verigy's claims for trade-secret misappropriation, breach

5  of a confidentiality agreement, and unfair competition all fail, and the preliminary injunction must be

6  denied.

7      Romi Mayder worked for Verigy and its predecessors from 1998 until September 21, 2006.

8  ██████████████████████████████████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████████████

10  ████████████████████████████████████

11      Mr. Mayder left Verigy because he believed the ████████ concept had potential.  He hoped

12  to design a product for a particular niche for the testing market for NAND flash memory.

13      Soon after leaving Verigy, Mr. Mayder ███████████████████████████████████████

14  ████████████████████.  Having left his job, and having a newborn baby, he adjusted quickly.

15  He identified a different product niche for NOR flash memory testing, which would require a

16  different product to serve different companies.  He has generated interest in this different market, and

17  has designed a new product directed to NOR flash memory.

18      Thus, STS's current Flash Enhancer product (for NOR flash memory) is significantly different

19  from the original concept for NAND flash memory that Mr. Mayder originally had in mind.  No trade

20  secrets derived from the ████████████████████████ found their way into the Flash Enhancer

21  NOR design.

22      Verigy cannot meet its initial threshold burden to demonstrate the existence of trade secrets

23  under the California Uniform Trade Secret Act.  The putative secrets that Verigy asserts are derived

24  mostly from customers' specified needs and other publicly-available sources — not from Verigy.

25  These customers routinely share their requirements with potential suppliers.  Also, the evidence

26  shows that Verigy and its predecessors have not taken reasonable steps to maintain the secrecy of

27  most of the asserted "secrets."

28

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1    Since Verigy cannot establish (1) that STS is using Verigy's secret information and (2) the

2    existence of a trade secret, it is unlikely to prevail on the merits in this case.  It also cannot show a

3    reasonable possibility of irreparable harm nor that it will suffer hardship without an injunction.

4    Accordingly, the court must deny the application for a preliminary injunction.

5    **II. Background of Publicly-Known Technology**

6    Manufacturing or "fabrication" of semiconductor devices requires many steps.  Integrated

7    circuits are formed on a round semiconductor base, usually

8    silicon, called a "wafer," about the size of a pizza.  Each

9    wafer contains many individual devices, called "dice" (or

10   "die," singular).  The figure at right, from U.S. Patent No.

11   6,366,112, shows a wafer and dice.[1]  Later, the wafer is cut

12   apart, and each die is individually packaged in a protective

13   housing.

FIGURE 1
(PRIOR ART)

14   Each die is tested at least twice during fabrication.

15   First, in the "wafer sort" stage, dice are tested on the wafer, before they are cut apart.  Later, the "final

16   test" occurs after the dice are separated from the wafer and individually packaged.  In both stages, the

17   individual die being tested is called the "Device Under Test," or DUT.

18   Verigy makes Automated Test Equipment, which other companies use to test their products,

19   including flash memory products, during fabrication.  A tester may be big enough to fill a small

20   room.  A tester's "test head" does not directly touch the wafer or DUT.[2]  Since each die design is

21   different, the electric leads used to test them must be configured differently for each design.  For the

22   wafer-sort stage, a custom "probe card" is made for each die design.  For the final test stage, after the

23   die has been packaged, a custom "device-specific interface" is made for each type of device and

24   package.

25   During wafer-sort testing, a probe card is mounted in the tester, and a robotic mechanism

26   brings wafers into contact with the electrical leads on the probe card.  This contact is called a

27

Mount & Stoelker, P.C.
RiverPark Tower, Suite 1650
333 West San Carlos Street
San Jose, California 95110-2740
Telephone (408) 279-7000

28   _____
[1] Pasquinelli Declaration, Exhibit A
[2] Swiatowiec Declaration at ¶ 2–3

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1   "touchdown." The tester's "test head" feeds pre-programmed electrical signals into the probe card,

2   which conveys them to each DUT. For flash memory, the test signal is a pattern of ones and zeros,

3   along with commands to "write" the pattern into memory and then "read" it back. If the pattern read

4   back matches the pattern written, the DUT passes the test. Otherwise, the DUT fails the test.[3]

5       Two major types of flash memory are called NOR and NAND — named for the type of logic

6   in the circuitry used to construct them. NOR flash memory is used for high-precision applications,

7   such as cell phones, so this pattern testing must be fast and virtually flawless. NAND flash memory,

8   on the other hand, is used for less-demanding applications like digital cameras and MP3 music

9   players, where some recording errors are tolerable.[4] NOR flash memory also has shorter read cycles

10  and more pins used to address memory locations in the storage cell than NAND flash memory. As a

11  result, NOR flash memory requires faster and more-sophisticated testing resources than NAND flash

12  memory.[5]

13      The cost of testing depends, in part, on the time required to complete the task. Faster testing

14  reduces costs. Testing speed can be improved by increasing the number of DUTs simultaneously

15  tested in each touchdown and reducing the number of required touchdowns. Testers are large,

16  expensive, and fixed machines, so there is great interest in improving probe cards to increase testing

17  speed.[6]

18      Increasing the number of DUTs tested in each touchdown is called "resource sharing" because

19  the resources of the tester are shared.[7] The resources that used to test only one DUT at a time can

20  now test multiple DUTs simultaneously. One simple method of resource sharing uses a circuit on the

21  probe card that "fans out" each test signal to two or more DUTs.[8] A more sophisticated form, called

22  "multiplexing," not only fans out the test signal but also selectively transmits test signals to the dice.

23  A multiplex circuit leverages tester resources by fanning them out while maintaining the uniqueness

24  of each DUT and the ability to disconnect individual failing DUTs. Resource sharing reduces the

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

---

[3] Mayder Declaration at ¶ 4; Blanchard Declaration at ¶ 16
[4] Weber Declaration at ¶ 2; Leventhal Declaration at ¶ 10
[5] Mayder Declaration ¶ 8
[6] See e.g., Weber Declaration at ¶ 3
[7] Swiatowiec Declaration at ¶ 3; Blanchard Declaration at ¶ 19
[8] Swiatowiec Declaration at ¶ 3

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1  number of testing channels that fabrication companies must buy from tester manufacturers, such as

2  Verigy and Teradyne.[9]

3         The technique of resource sharing by splitting signals coming from the test head has been

4  generally known and practiced in the industry for almost 20 years.[10]  Micron, for example, has

5  patents dating from the early 2000s which teach these concepts as part of the "prior art."[11]  These

6  same concepts may be used during wafer sort testing (on a probe card) or in final testing of packaged

7  dice (on a device-specific interface).

8         One common method used to place a resource-sharing circuit on a probe card is to use an

9  "application specific integrated circuit," or ASIC — also colloquially called a "chip."[12]  An ASIC

10  must work within the probe-card's physical environment, so certain specifications must be set to

11  assure they can work together.  The ASIC maker must specify, for example, the amount of current

12  used, the heat generated, and the surface area occupied by the ASIC.  The general process for

13  describing specifications is widely known and is discussed in articles on Agilent's web site.[13]

14         Probe cards have finite surface area, so there is limited physical space available for the chip.

15  The surface area occupied by a chip is called its "footprint."  A smaller footprint is generally

16  desirable.  The less surface area occupied by a chip, the more room left over for other functions.

17  Probe card dimensions are readily available from several sources, including probe card vendors and

18  flash memory makers, and their dimensions are well known in the industry.[14]  Footprint requirements

19  are derived from this widely-available information.

20         Any kind of chip, including a resource-sharing chip, uses transistors, which are electrically-

21  controlled switches — the fundamental unit of modern electronics.  Two major types of transistors

22  exist: "bipolar" and "field effect" transistors.  Transistors are combined in various configurations to

23  create "logic gates," which are the fundamental unit of digital computation.

24

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

25  _____

26  [9] Swiatowiec Declaration at ¶ 3
    [10] Weber Declaration at ¶ 9; Swiatowiec Declaration at ¶ 4–5
27  [11] See e.g., U.S. Patent No. 6,366,112 (assigned to Micron Technology Inc.); Weber Declaration at ¶ 9
    [12] Swiatowiec Declaration at ¶ 3
28  [13] See e.g., Specifications Guideline, Agilent Technologies, (2000–2001), accessed on October 10, 2007, available at
    http://metrologyforum.tm.agilent.com/spec-guide.shtml (reproduced as Pasquinelli Declaration exhibit B)
    [14] Blanchard Declaration at ¶ 98f; Pasquinelli Declaration, exhibit C (probelogic probe card specifications)

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1    Many types of switches are commonly used and have long been known to the general public

2    as standard. Examples of well-known switches include Micro Electro-Mechanical Systems

3    ("MEMS"),[15] Silicon-On-Insulator ("SOI"),[16] Photomos,[17] Field Effect Transistor ("FET"),[18] relay,[19]

4    and liquid metal switches.[20] The technical specifications for each can generally be found on the

5    manufacturers' web sites.[21] For example, detailed data sheets for switches made by Honeywell, Tyco,

6    Hittite Microwave, RFMD, and Skyworks are publicly available on those companies' web sites.[22]

7    Switches can be configured in many well-known ways. A switch "pole" is a set of contacts

8    for a circuit. A switch "throw" is the number of positions the switch can take. The use of single-

9    pole-quad-throw ("SPQT") switches has been known in electronics for decades and is publicly

10    described in places such as Wikipedia.[23] SPQT switches can be used to form various input and

11    output configurations, such as one input and one output, one input and four outputs, or one input and

12    two outputs.[24]

13    Like any other chip, a resource-sharing chip must be attached to the probe card's circuit board

14    in order to work with the testing system. Many well-known methods exist to attach a chip to a circuit

15    board, such as the use of interposers. "An interposer is a connecting device that's essentially designed

16    to connect one set of electrical pads to another set of electrical pads."[25] Interposers are "well-known

17    in the industry as a means of connecting one set of pads to another set of pads."[26] Other common

18    techniques include the use of flex circuits and solder bumps.[27]

19    Once the resource-sharing chip is attached to the probe card, it must work in connection with

20    the rest of the testing system. The tester is pre-programmed to control the test head and probe card to

21

22    [15] Blanchard Declaration at ¶ 98.a.i.
      [16] Blanchard Declaration at ¶ 98.a.i.

23    [17] Blanchard Declaration at ¶ 98.a.i.
      [18] Blanchard Declaration at ¶ 98.a.i.

24    [19] Blanchard Declaration at ¶ 98.a.i.; *see also* "Relay," Wikipedia (accessed October 10, 2007), available at
      http://en.wikipedia.org/wiki/Relay

25    [20] Blanchard Declaration at ¶ 98.a.i.
      [21] Blanchard Declaration at ¶ 98.a.i.

26    [22] *See e.g.*, Mayder Declaration at ¶¶ 17–18 and exhibits E–F; *see also* Blanchard Declaration at ¶ 98.a.i.
      [23] Pasquinelli Declaration, exhibit D (Wikipedia tutorial on switches)

27    [24] Blanchard declaration at ¶ 98.a.ii.
      [25] Leventhal Deposition at 98:12–14 (reproduced as exhibit K to the Pasquinelli Declaration); *see also* Blanchard
      Declaration at ¶ 98.c.ii.

28    [26] Leventhal Deposition at 98:15–18; *see also* Blanchard Declaration at ¶ 98.c.ii.
      [27] Blanchard Declaration at ¶ 98.c.

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1  carry out testing on the DUT.  Signals are commonly carried to various chips within a system on a

2  "serial bus," which is a channel that carries signals between the functional units of a computer.  Serial

3  buses are widely used in the industry.[28]

4  **III. Verigy's Business and Adjacent Markets for Resource-Sharing Equipment**

5    **A. Verigy sells testers, and probe-card-mounted resource-sharing ASIC is a**

6    **complementary, or adjacent, market**

7    Verigy is in the business of selling testers, which ███████████ and are the

8  size of a small room.  A resource-sharing probe-card-mounted chip might be the size of a postage

9  stamp and ██████████████.[29]

10  ████████████████████████████

11  ████████████████████████████

12  ████████████████████████████

13  ████████████████████████████

14  ████████████████████████

15    The makers of resource-sharing probe cards (or resource-sharing chips to be installed on

16  probe cards) do not directly compete with Verigy, however.[31] ████████████

17  ████████████████████████████

18  ██████████████████████.[32]  These two

19  markets are adjacent and complementary.[33]  A fabrication company needs testers, and it cannot rely

20  on improved probe cards alone in lieu of testers.  Rather, the fabrication company uses resource-

21  sharing equipment in conjunction with its testers to make the whole process more efficient.

22    **B. What was ████? (And what was it _not_?)**

23  ████████████████████████████

24  ████████████████████████████

25  [28] Leventhal Deposition at 95:18–25
[29] Mayder declaration at ¶ 44
26  [30] Leventhal Deposition at, e.g., 27:24 – 29:9 and exhibit 15, VER01199–1201 (reproduced as exhibit E to the Pasquinelli Declaration)
27  [31] Weber Declaration at ¶¶ 4–5; _see also_ Leventhal Deposition at 31:14–16
[32] Leventhal Deposition at 31:14–16
28  [33] Pochowski Deposition at 62:14 – 63:20 (reproduced as exhibit M to the Pasquinelli Declaration); Weber Declaration at ¶¶ 4–5

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**



<sub>34</sub>

NAND is the less-reliable and lower-density form of flash memory for applications like digital cameras.[35] NOR flash memory is used for higher-precision applications, like cell phones, and requires more precise testing.[36] A NOR flash memory die is far more densely packed than a NAND flash memory die, and a resource-sharing chip must have similarly higher density to work with NOR flash memory.[37] This higher density in the resource-sharing chip causes strains, such as increasing the heat output.[38] A chip designed for NAND testing could never be used for NOR testing without being significantly redesigned, since it could not deal with the same stresses.

**C. Romi Mayder's employment with Verigy and his role with** ▮▮▮▮

Romi Mayder worked for Verigy and its predecessors (Agilent and Hewlett Packard) for eight years, from 1998 until September 20, 2006.[39]

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

---

[34] ▮▮▮▮ Project Data Sheet (May 24, 2006), VER00980–81, Exhibit 22 to the Leventhal Deposition (reproduced as exhibit F to the Pasquinelli Declaration)
[35] *See e.g.*, Declarations of Weber at ¶ 2 and Blanchard at 25
[36] *See e.g.*, Declarations of Weber at ¶ 2 and Blanchard at 26
[37] Blanchard Declaration at ¶ 27
[38] Blanchard Declaration at ¶ 40
[39] Mayder Declaration at ¶ 2
[40] *See* Lee Declaration at ¶¶ 6–8; Leventhal Declaration at ¶¶ 12–14; Mayder Declaration at ¶ 19

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

18. ████████  They believed there would be no conflict with Verigy because ████████

19. ████████, and resource-sharing solutions are complementary and "adjacent" to its memory

20. chip tester business — not competitive with it.[50]  Ira Leventhal testified at his deposition that ████

21. ████████[51]  As explained further below, ████████

22.

23. ────────────
[41] Mayder Declaration at ¶ 21

24. [42] Mayder Declaration at ¶ 21; *see* Pasquinelli Declaration, exhibit G, VER00510–17 (meeting slides)

[43] Leventhal Deposition at, e.g., 27:24 – 29:9 and exhibit 15, VER01199–1201 (reproduced as exhibit H to the Pasquinelli

25. Declaration)
[44] *Id.*

[45] Mayder Declaration at ¶ 21

26. [46] Mayder Declaration at ¶ 26
[47] Leventhal Declaration at ¶ 1

27. [48] Mayder Declaration at ¶ 22
[49] Mayder Declaration at ¶ 25

28. [50] Mayder Declaration at ¶ 26; Pochowski deposition at 61:17 – 63:20
[51] Leventhal Deposition at 31:14–16; *see also* notes 31–32 and accompanying text

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1    ███████████████████████████████████, Mr. Mayder quickly changed the focus of his

2    startup company, taking it even further away from anything Verigy might have done.

3    ███████████████████████████████████████████████████████████████████

4    ███████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████

11       At Verigy's request, Mr. Mayder worked long hours in his last two weeks of employment to

12   complete a "knowledge transfer" of information known to him that would be useful for Verigy.  That

13   knowledge transfer occurred for all Verigy projects that Mr. Mayder was then involved with, in hope

14   that Verigy's projects would succeed.[57]

15       After his termination, Verigy asked Mr. Mayder, as an independent consultant, to draft patent

16   disclosures on technology unrelated to this dispute.[58]  Verigy never asked him to sign a nondisclosure

17   or confidentiality agreement in connection with this engagement.  In the course of this work, Verigy

18   emailed to Mr. Mayder many documents that apparently contained confidential and trade-secret

19   information.  Mr. Mayder destroyed or returned these documents to Verigy, despite having signed no

20   agreement to do so.

21       Verigy's assertion that Mr. Mayder's employment ended on September 22 is incorrect.[59]  His

22   exit interview occurred on September 20, and ███████████████████████████████████████████

23

24

---

25   [52] Mayder Declaration at ¶ 33
     [53] Mayder Declaration at ¶ 33
26   [54] Scheck Declaration at ¶ 12 and Exhibit D
     [55] Schneck Declaration at ¶ 14
27   [56] Schneck Declaration at ¶ 17
     [57] Mayder Declaration at ¶ 36
28   [58] Mayder Declaration at ¶ 40
     [59] Motion at page 4:26 and Leventhal Declaration at ¶ 2

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1    ███████████[60]    During his exit interview, Mr. Mayder returned all remaining Verigy property he

2    had in his possession, such as electronic devices and his Verigy security badge.[61]

3    **IV. STS's Business**

4        **A. Romi Mayder left Verigy to do work that ███████████**

5        Romi Mayder and Bob Pochowski both believed that Verigy would have no conflict with STS

6    because ███████████████████████, and resource-sharing solutions are

7    complementary, or "adjacent," to Verigy's memory chip tester business.[62] ██████████

8    ████████████████████████████████████████████████

9    ████████████████████████████████████████████████

10   ██████████████████████████████████████████████

11   ██████████████

12       Mr. Mayder did not meet with any potential customers before his Verigy employment

13   terminated.[64]  He did make some preparations for his new work, such as registering an Internet

14   domain name and forming STS.[65]  He also communicated with potential suppliers, such as

15   ████████████████████████████████████████

16   ██████████

17   ██████████████████████████████████████████████████

18   ██████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ██████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ██████████████████████████████

23

24



MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

25   [60] Mayder Declaration at ¶ 37 and Exhibit A
     [61] Mayder Declaration at ¶ 37

26   [62] Mayder Declaration at ¶¶ 26, 28; Pochowski deposition at 61:17 – 63:20
     [63] Mayder Declaration at ¶ 25

27   [64] Mayder Declaration at ¶ 38
     [65] Mayder Declaration at ¶¶ 32, 35

28   [66] Mayder Declaration at ¶ 38
     [67] Mayder Declaration at ¶¶ 43–45

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

**B. STS obtained customer requirements directly from its own customers**

Verigy asserts trade-secret status in its customers' technical requirements. These requirements are developed by customers, not by Verigy. Verigy specifically seeks to enjoin STS from using a particular spreadsheet that incorporates some of those requirements. STS is not using that list, however, and Verigy has not adduced any evidence that suggests otherwise. STS obtained requirements directly from its own customers and uses those (not Verigy's list) in its business.

A secret compilation of publicly-known facts may receive trade-secret status in appropriate cases, but each individual fact does not.[68] This is especially true where the individual elements are created by others and not by the list's compiler.[69]

████████████████████████████████████████████████████████, STS has discussed its new Flash Enhancer product with several potential customers, including ████████ ████████.[70] ████████████████████████████████████████. Since those requirements were created by and shared with STS by the customers themselves, there is no basis for Verigy to enjoin their use by STS.

**C.** ████████████████████████████████████, **so no injunction is appropriate**

Verigy's initial concern focused on STS's ██████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████ ████████████████████████████ contains no Verigy trade secrets.[72]

As set forth in extraordinary detail in the accompanying declarations of Romi Mayder and Richard Blanchard, a resource-sharing product for NOR flash memory is remarkably different from a product for NAND flash memory.

Even if Verigy could articulate a trade-secret claim for the ██████ product — it has yet to offer more than innuendo as evidence that its trade secrets were incorporated into ██████ — there is

---

[68] *See American Paper & Packaging Products Inc. v. Kirgan*, 183 Cal. App. 3d 1318 (1986)
[69] *See Id.*
[70] Mayder Declaration at ¶ 42; Weber Declaration at ¶¶ 5–8
[71] Mayder Declaration at ¶¶ 49
[72] Mayder Declaration at ¶¶ 45

Case No. 5:07-cv-04330 (RMW) (HRL)                                    Page 11
Defendants' Brief in Response to Order to Show Cause Re Preliminary Injunction

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1  no *ongoing* conduct to enjoin.[73]  Any liability, if it exists, would be a matter of damages for *past*

2  conduct.  An injunction can prohibit only ongoing or future conduct.[74]

## V. Verigy Is Not Entitled to Injunctive Relief

The purpose of a preliminary injunction is to preserve the *status quo* and prevent irreparable

harm during litigation.[75]  It is black-letter law that an injunction must address current or future

conduct and cannot remediate past harm that is compensable with damages.[76]  The 9th Circuit's

standard for a preliminary injunction requires Verigy to demonstrate that one of two conditions exist:

(1) that Verigy will likely prevail on the merits and that irreparable harm is possible of a preliminary

injunction does not preserve the *status quo*, or (2) there are serious questions about the merits and the

balance of hardships tips sharply in Verigy's favor.[77]  These conditions are the endpoints of a sliding

scale.

There is no question — let alone a likelihood — that Verigy can prevail on its claims.  Verigy

fundamentally misunderstands trade secret law, and that misunderstanding infects the core of all its

arguments.  Verigy has offered no evidence of ongoing or likely future conduct by the defendants that

might cause irreparable harm.  Accordingly, no court action is necessary to preserve the *status quo*

during litigation.  The court should therefore deny Verigy's application for a preliminary injunction.

### A. Verigy cannot prevail on any of its claims

The gravamen of Verigy's complaint is the alleged inappropriate disclosure or use of its trade-

secret information by Romi Mayder.  Its claims for trade-secret misappropriation, breach of a

confidentiality agreement, unfair competition, and false designation all stem from this same alleged

wrongful conduct.  All these claims therefore rise or fall with Verigy's secrets.

#### (1) Verigy fundamentally misunderstands the law of trade secrets

Verigy fundamentally misunderstands the law of trade secrets.  It does not even understand

the bedrock principle that *a trade secret must be secret.*  Under the California Uniform Trade Secret

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

---

[73] *U.S. v. Oregon State Medical Society*, 343 U.S. 326, 333 (1952); *see also* section II.B., below

[74] *See Id.*

[75] *See e.g.*, *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984); *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); *LaFreniere v. Regents of the Univ. of Cal.*, 2006 U.S. Dist. LEXIS 47252 (N.D. Cal. 2006)

[76] *U.S. v. Oregon State Medical Society*, 343 U.S. 326, 333 (1952) (quotation marks and footnote omitted)

[77] *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001); *Posdata Co. v. Seyoung Kim*, 2007 U.S. Dist. LEXIS 48359 (N.D. Cal. 2007); *LaFreniere*, 2006 U.S. Dist. LEXIS 47252

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1  Act, by definition, a trade secret cannot be "generally known to the public or other persons who can

2  obtain economic value from its disclosure" and must be "the subject of efforts that are reasonable

3  under the circumstances to maintain its secrecy."[78]

4      Ira Leventhal is Verigy's Senior Research and Development Manager — the person in charge

5  of research, development, and creation of intellectual property.[79] Mr. Leventhal testified that ███

6  ████████████████████████████[80]

7      Disclosure in a patent is incompatible with trade secret protection. While the bedrock

8  principle of trade-secret law is secrecy, the bedrock principle of patent law is public disclosure and

9  dissemination.[81] A patent must *teach the public* how to practice an invention.[82] This is the basic

10  consideration the public receives in exchange for a 20-year monopoly on the invention.

11      Verigy also now claims trade-secret protection for information that it has disclosed publicly

12  by other means — in letters, in magazines, and on its own web site. It does not understand that trade-

13  secret protection is simply unavailable after the secret is thus exposed.[83]

14      (2) Verigy did not use reasonable efforts to maintain secrecy

15      The Uniform Trade Secrets Act's definition of "trade secret" requires reasonable efforts to

16  maintain secrecy.[84] Verigy has not made such efforts with the putative trade secrets asserted in this

17  action.

18      Ira Leventhal, Verigy's Senior Research and Development Manager, testified that, ███



23

---

24  [78] Cal. Civ. Code § 3426.1(d)
    [79] Leventhal Declaration at ¶¶ 1–2
25  [80] Leventhal Deposition at 47:8–14
    [81] *See e.g.*, *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974) (contrasting public disclosure in patents with secrecy
26  required for trade secret protection)
    [82] *See* 35 U.S.C. § 112
27  [83] *See e.g.*, *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal. App. 4th 241 (2004)
    [84] Cal. Civ. Code § 3426.2(d)(2)
    [85] Leventhal Deposition at 47–54
28  [86] Leventhal Deposition at 47–54
    [87] Leventhal Deposition at 53:4–6

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1 ██████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3    If Verigy's high-level managers do not know and cannot apply company policies regarding

4 confidential information, they can offer no guidance to their employees.  The employees, in turn,

5 cannot be expected to handle such information uniformly.  Relying on each individual employee to

6 exercise personal judgment is not a "reasonable effort" to maintain secrecy.  This is cogently

7 demonstrated by Verigy's failure to mark as confidential most of the documents it claims were

8 inappropriately distributed by Mr. Mayder.[89]

9    Deliberate public disclosure cannot be considered a "reasonable effort" to maintain secrecy.

10 Verigy explicitly disclosed to the public much of the information that it now claims as trade secrets.

11 It claims that status for the code-name "████████" and the fact that ███████████████ —

12 after disclosing both in non-confidential written correspondence that went outside the company.[90]

13 Verigy also ██████████████████████████, which is incompatible with trade secret

14 protection.[91]  Ira Leventhal also testified in his declaration that ████████████████████████

15 ████████████████████████████████████████████████████████

16 ██████████████████████ was publicly discussed in detail, however, in the

17 September 2005 lead article of Evaluation Engineering magazine.[92]  Verigy also claims trade-secret

18 status for ████████████████████████ — which was published on Agilent's

19 (Verigy's predecessor in interest) web site.[93]

20    Verigy's claim that published documents contain their trade secrets shows its disregard for

21 protecting them.

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

[88] Pochowski Deposition at 16–23
[89] Mayder Declaration at ¶ 30; Lai Declaration exhibits A–D; Leventhal Declaration exhibit A; Lee Declaration exhibit B
[90] Leventhal Deposition exhibit 25, VER02491 (reproduced as exhibit I to the Pasquinelli Declaration)
[91] Leventhal Deposition at 47:8–14; See e.g., Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470 (1974) (contrasting public disclosure in patents with secrecy required for trade secret protection)
[92] Pasquinelli Declaration, exhibit J, see figure 3
[93] See e.g., Specifications Guideline, Agilent Technologies, (2000–2001), accessed on October 10, 2007, available at http://metrologyforum.tm.agilent.com/spec-guide.shtml (reproduced as Pasquinelli Declaration exhibit B)

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

<u>(3) All of Verigy's "secrets" are publicly known or not used by STS</u>

All, or nearly all, of the putative trade secrets upon which Verigy relies in this motion are publicly known.[94]  The motion relies chiefly on the trade secrets identified by Ira Leventhal.  The information need not be known to the general public.  That status is negated if the information is known or readily ascertainable to others in Verigy's industry.[95]



In his deposition, however, Mr. Leventhal could not identify specific trade secrets in many of these categories.  In the seven categories where he could identify *something*, the information he identified is either well known in the industry or not used in the Flash Enhancer product.

---

[94] *See generally* Blanchard Declaration; Mayder Declaration at ¶¶ 49
[95] *American Paper & Packaging Products Inc. v. Kirgan*, 183 Cal. App. 3d 1318, 1326 (1986)
[96] *See e.g.,* U.S. Patent No. 6,366,112 (assigned to Micron Technology Inc.)
[97] Leventhal Declaration at ¶ 22

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

Each of these switches is well known in the industry and technical specifications for each are easily available on manufacturers websites.[100]  For example, detailed data sheets for switches made by Honeywell, Tyco, Hittite Microwave, RFMD, and Skyworks are publicly available on those companies' web sites.[101]

The use of SPQT switches has been known in electronics for decades and is publicly described in places such as Wikipedia.[102]

It is therefore questionable whether Verigy actually possesses this trade secret.  The point is moot, however, since Flash Enhancer is not implemented with SPQT or relay trees.[105]

---

[98] Leventhal Deposition at 82:10–16 (numbering added) (Exhibit K to the Pasquinelli Declaration)
[99] Leventhal Deposition Transcript at 83:8: – 84:3
[100] Blanchard Declaration at ¶ 98.a.ii.
[101] *See e.g.*, Mayder Declaration at ¶¶ 17–18 and exhibits E–F; *see also* Blanchard Declaration at ¶ 98.a.i.
[102] Pasquinelli Declaration, exhibit L (Wikipedia tutorial on switches)
[103] Leventhal Deposition at 86:3–10
[104] Leventhal Deposition at 83:14; 121:17–23
[105] Blanchard Declaration at ¶ D

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21 He could articulate nothing

22

23 [106] Leventhal Deposition at 94–95
[107] Leventhal Deposition at 95–96
24 [108] Leventhal Deposition at 95–96
[109] Leventhal Deposition at 97–98
25 [110] Leventhal Deposition at 97–8
[111] Blanchard Declaration at ¶ 98.c.i.
26 [112] Leventhal Deposition at 98:9–14
[113] Leventhal Deposition at 99:2–11
27 [114] Blanchard Declaration at ¶ 98.c.ii.
[115] Leventhal Deposition at 101:21 – 102:8
[116] Blanchard Declaration at ¶ 98.c.iii.
28 [117] Leventhal Deposition at 103:17–18
[118] Leventhal Deposition at 106:9 – 107:1

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1   specific about ▮▮▮▮▮▮ that Verigy considered secret, however.[119]  He also acknowledged having

2   no specific reason to believe — from personal knowledge, hearsay, or anything else — that Romi

3   Mayder had known this particular secret.[120]

4       Even if Mr. Mayder had known this particular secret, it does not matter. ▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16      No evidence has been introduced that Mr. Mayder has used this method.

17    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22

23

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

---

[119] Leventhal Deposition at 106–109
[120] Leventhal Deposition at 109:24 – 110:6
[121] Blanchard Declaration at ¶ 98.d.
[122] Blanchard Declaration at ¶ 98.d.; *see also* Leventhal Declaration at 107:2–7 (defining the term device-specific interface)
[123] Leventhal Deposition at 114:12 – 115:20 (emphasis added)
[124] Leventhal Declaration, Exhibit B, page 3
[125] Blanchard Declaration at ¶ 98.e.i.
[126] Leventhal Declaration, Exhibit B, page 3
[127] Blanchard Declaration at ¶ 98.e.i.
[128] Leventhal Declaration, Exhibit B, page 3

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

1  ████████████████████████████████████████████

2  ████████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ██████████████

5  ████████████████████████

6       The footprint requirement refers to the amount of space on the probe card required for a

7  chip.[131]  Probe card dimensions are readily available from several sources, including probe card

8  vendors and flash memory manufacturers, and their dimensions are well known in the industry.[132]

9  Footprint requirements are derived from this widely-available information.

10  ████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████  That document describes neither of these methods, and Flash

16  Enhancer uses neither of these methods.[135]

17  **B.  An injunction can prevent only *ongoing* or *future* conduct**

18       It is black-letter law that an injunction may enjoin *ongoing* or *future* conduct but cannot

19  remediate *past* conduct.  As the Supreme Court wrote in *U.S. v. Oregon State Medical Society*:

20       The sole function of an action for injunction is to forestall future

21  violations.  It is so unrelated to punishment or reparations for those past
     that its pendency or decision does not prevent concurrent or later

22       remedy for past violations by indictment or action for damages by those
     injured.  All it takes to make the cause of action for relief by injunction

23       is a real threat of future violation or a contemporary violation of a
     nature likely to continue or recur.  This established, it adds nothing that

24       the calendar of years gone by might have been filled with

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

---

[129] Blanchard Declaration at ¶ 98.e.i.
[130] Leventhal Deposition at 116:19–23
[131] Leventhal Deposition at 131:7 – 132:2
[132] Blanchard Declaration at ¶ 98.f.; Pasquinelli Declaration, exhibit C (probelogic probe card specifications)
[133] Leventhal Deposition at 133:13–14
[134] Leventhal Deposition at 133:1–25
[135] Blanchard Declaration at ¶ 98.g.

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY**
**FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

transgressions. Even where relief is mandatory in form, it is to undo existing conditions, because otherwise they are likely to continue. In a forward-looking action such as this, an examination of a great amount of archeology is justified only when it illuminates or explains the present and predicts the shape of things to come.[136]

Even assuming that Verigy possesses trade secrets relevant to this action, it has offered no evidence that any defendant is *currently* using those trade secrets. Some evidence proffered by Verigy arguably showed that Mr. Mayder may have inappropriately shared Verigy's confidential documents *in the past*. Verigy also offers no evidence to suggest that conduct is still occurring or might recur in the future. Nothing in Verigy's motion is relevant to Mr. Mayder's (or any other defendant's) current or potential future conduct.

**C. Verigy has not demonstrated a likelihood of irreparable harm**

Verigy has not demonstrated that it would suffer any harm (irreparable or otherwise) if no preliminary injunction is entered. Its argument on this point is solely limited to abstract statements of law and discusses no facts.[137]

Verigy asserts, without evidentiary support, that its trade secrets ███████████████. It offers no evidence of any such ████████████, however.[138] Verigy concludes, without factual support, that these alleged secrets have economic value because they are not readily known to the public.[139] It declines to describe exactly how such information achieves value ████████████████.

**D. If an injunction is granted, its scope must be appropriately limited**

The California Uniform Trade Secret Act does not authorize enjoining the disclosure or use of information that is not a trade secret. It provides that "Actual or threatened misappropriation may be enjoined."[140] Misappropriation is defined to be inappropriate disclosure or use of a trade secret.[141] A trade secret, in turn, must be *secret*.[142]

---

[136] *U.S. v. Oregon State Medical Society*, 343 U.S. 326, 333 (1952) (quotation marks and footnote omitted)
[137] Motion at 20
[138] Motion at 5:2–4
[139] Motion at 5:9–11
[140] Cal. Civ. Code § 3426.2(a)
[141] Cal. Civ. Code § 3426.1(b)
[142] Cal. Civ. Code § 3426.1(d)

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

**HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING**

Information obtained from sources other than Verigy cannot be Verigy trade secrets, since such information is not unknown to others.[143]  It would therefore be inappropriate to enjoin the disclosure or use of any information identified as coming from other sources — such as all the information identified as coming from other sources in the declarations of Mr. Mayder, Dr. Blanchard, Mr. Weber, and Mr. Swiatowiec.

If the court does enjoin the defendants from any conduct, it must "carve out" an exception with respect to the information identified in those declarations.  It must also create an exception for any information whose secrecy Verigy did not protect with reasonable measures.  This includes the contents of all documents that Verigy elected not to mark as confidential, including exhibits A–D to the Lai declaration, exhibit A to the Leventhal Declaration, and exhibit B to the Lee declaration.

**E. If an injunction is granted, Verigy must post a bond**

Verigy is not entitled to injunctive relief unless it first posts a bond to cover any "costs and damages" the defendants might suffer as a result of being "wrongfully enjoined or restrained."[144]  The court has discretion to determine the amount of the bond.[145]

It is not possible at this time for the defendants to suggest an appropriate amount for the bond, in the event that the court enters an injunction.  The size of the bond would depend on the scope of the injunction.  The defendants therefore request that, if an injunction is entered, the court require Verigy to post an appropriate bond.  The defendants further request an opportunity to present arguments and evidence with respect to an appropriate amount once the precise scope of a proposed injunction is known.

**F. Defendants must have a reasonable opportunity to address any new matter introduced by way of reply**

Verigy's counsel has suggested that Verigy intends to offer new matter — including new facts and new legal argument — in its reply papers.  Verigy should have presented such matter in its opening papers.

---

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

[143] Cal. Civ. Code § 3426.1(d)(1)(a)
[144] Fed. R. Civ. Proc. 65(c)
[145] *See Id.* and N.D.Cal. Civil L.R. 65.1-1

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY
FILED UNDER SEAL — REDACTED FOR PUBLIC FILING

1  It is inappropriate for Verigy to "raise a new issue for the first time in [its] reply" because that

2  deprives the defendants of their constitutional due-process right to a full and fair opportunity to be

3  heard.[146]  That is why courts follow the simple rule that "Arguments not raised by a party in its

4  opening brief are deemed waived."[147]

5  If Verigy does raise new matter in its reply, this court should ignore it.  If the court wants to

6  consider the new matter, however, it should give the defendants a fair opportunity to respond.  The

7  defendants request two weeks to review the new matter and file a sur-reply as well as any supporting

8  papers they deem appropriate.

9  **VI. Conclusion**

10  Verigy has not demonstrated the existence of any trade secrets.  The information it identifies

11  as trade secrets is publicly known, either because others created it or because Verigy failed to keep it

12  secret.  It has not demonstrated that the defendants are currently disclosing or using any information

13  that it contends are trade secrets.  All of the claims at issue in this proceeding fall with these failures.

14  Accordingly, Verigy's application for a preliminary injunction must be denied.

16  Dated: October 11, 2007          Mount & Stoelker, P.C.
17                                   Daniel H. Fingerman

18                                          /s/
                                    Attorneys for Defendants Romi Mayder, Wesley Mayder,
19                                  Silicon Test Systems Inc., and Silicon Test Solutions LLC

MOUNT & STOELKER, P.C.
RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE (408) 279-7000

[146] *State of Nevada v. Watkins*, 914 F.2d 1545, 1560 (9th Cir. 1990)
[147] *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) (citing *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999))