DANIEL J. BERGESON, Bar No. 105439
dbergeson@be-law.com
JOHN W. FOWLER, Bar No. 037463
jfowler@be-law.com
MELINDA M. MORTON, Bar No. 209373
mmorton@be-law.com
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
Telephone: (408) 291-6200
Facsimile: (408) 297-6000

Attorneys for Plaintiff
Verigy US, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VERIGY US, INC, a Delaware Corporation<br><br>Plaintiff,<br><br>vs.<br><br>ROMI OMAR MAYDER, an individual, WESLEY MAYDER, an individual, SILICON TEST SYSTEMS, INC., a California Corporation, and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive,<br><br>Defendants. | Case No. C07-04330 RMW (HRL)<br><br>**PLAINTIFF'S REPLY AND SUPPLEMENTAL BRIEF RE ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date: December 14, 2007<br>Time: 9:00 a.m.<br>Place: Courtroom 6<br>Judge: Hon. Ronald M. Whyte<br><br>Complaint Filed: August 22, 2007<br>Trial Date: None Set |

**PUBLIC REDACTED VERSION OF HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY DOCUMENT SUBMITTED UNDER SEAL**

# TABLE OF CONTENTS

I. INTRODUCION ........ 1

II. STATEMENT OF FACTS ........ 1

A. Verigy's Protectable Trade Secrets. ........ 1

1. The Combination of Features Embodied in the [redacted] ........ 2

2. [redacted] is a Trade Secret. ........ 3

3. [redacted] is a Trade Secret. ........ 3

4. [redacted] and Therefore a Trade Secret. ........ 4

5. [redacted] Are Trade Secrets. ........ 4

6. The [redacted] is a Trade Secret. ........ 5

B. Defendants Used Verigy's Trade Secrets to Jump-Start Their Business. ........ 5

1. Mayder Misappropriated the Relationship With [redacted] 6

2. Mayder Misappropriated Verigy Documents Because it was Simple. ........ 6

3. Defendants' Protestations Notwithstanding, Defendants' [redacted]. ........ 7

a. [redacted] Was Never "Cancelled." ........ 7

b. [redacted]." ........ 8

c. [redacted]. ........ 9

d. [redacted] ........ 10

4. Defendants' Opposition Papers Are Riddled With False Statements, Demonstrating Defendants' Lack of Credibility and the Likelihood That They Misappropriated Verigy's Trade Secrets ........ 10

a. The "Recreated" Lab Notebook ........ 10

b. Mayder's Misrepresentations About His Product Costs. ........ 12

c. Mayder's Convenient Memory. ........ 13

III. ARGUMENT ........ 14

A. Verigy Has Protectable Trade Secrets ........ 14

1. Verigy Took Reasonable Efforts to Protect Its Trade Secrets ........ 15

2. Even if Every Element of the [REDACTED] is in the Public Domain, the Combination of the Key Elements Constitutes a Trade Secret ..... 17

3. [REDACTED] ..... 18

4. Defendants Misstate the Trade Secret Standard ..... 19

B. Verigy Has Made a *Prima Facie* Case of Misappropriation; Defendants Have Not Met Their Burden ..... 19

C. Verigy Is Likely to Prevail on its Unfair Competition Claim. ..... 21

D. Mayder Breached His Contract With Verigy ..... 21

E. Defendants' Conduct Is Ongoing ..... 24

F. Verigy Will Suffer Irreparable Harm If Defendants' Activities Are Not Enjoined. ..... 24

G. Bond Issue ..... 25

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Federal Cases**

*Bolt Associates, Inc. v. Alpine Geophysical Associates, Inc.* 365 F.2d 742 (3d Cir. 1966) ..... 20

*Chicago Lock Co. v. Fanberg* 676 F.2d 400 (9th Cir. 1982) ..... 19

*Computer Assocs. Int'l., Inc. v. Bryan* 784 F. Supp. 982 (E.D.N.Y. 1992) ..... 25

Corporate Express Office Products, Inc. v. Martinez, No. CV-SA02-87 AHS (ANX), 2002 WL 31961458, at *5-6 (C.D. Cal. March 8, 2002) ..... 25

*Cybertek Computer Products, Inc. v. Whitfield* 203 U.S.P.Q. 1020, 1024 (Cal. Super. Ct. 1977) ..... 17, 18

*Droeger v. Welsh Sporting Goods Corp.* 541 F.2d 790 (C.A. Cal. 1976) ..... 20

F.2d 171, 174 (2nd Cir. 1990), Imperial Chemical Industries Ltd. v. National Distillers & Chemical Corp., 342 F.2d 737, 742 (2nd Cir. 1965) ..... 17

*Forest Lab., Inc. v. Pillsbury Co.* 452 F.2d 621, 624-25 (7th Cir. 1971) ..... 18

*Hauck M'fg. Co. v. Astec Indus., Inc.* 376 F. Supp. 2d 808 (E.D.Tenn. 2005) ..... 21

*HiRel Connectors, Inc. v. U.S* CV01-11069 WL 3618008, at *1 (C.D. Cal., July 18, 2006) ..... 21

*Iconix, Inc. v. Tokuda* 457 F.Supp.2d 969 (N.D. Cal. 2006) ..... 23

*Imi-Tech Corp. v. Gagliani* 691 F. Supp. 214 (S.D. Cal. 1986) ..... 19, 20, 25

*In re Matter of Innovative Constr. Sys., Inc.* 793 F.2d 875 (7th Cir. 1986) ..... 18

*MAI Sys. Corp. v. Peak Computer* 991 F.2d 511 (9th Cir. 1993) ..... 15

*Mangren Research and Dev. Corp. v. National Chem. Co., Inc.* 39 U.S.P.Q.2d 1339 (7th Cir. 1996) ..... 18

*Metallurgical Indust. Inc. v. Fourtek, Inc.* 790 F.2d 1195 (5th Cir. 1986) ..... 17

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*
923 F. Supp. 1231 (N.D. Cal. 1995) .................. 15

*Vermont Microsystems, Inc. v. Autodesk, Inc.*
88 F.3d 142, 147 (2nd Cir. 1994) .................. 17, 18

**State Cases**

*Abba Rubber Co. v. Seaquist*
235 Cal. App.3d 1 (1991) .................. 19

*Ajaxo v. E*TRADE* Group, *Inc.*
135 Cal. App. 4th 21, 62 n. 38 (2005) .................. 21

*Bernier v. Merrill Air Engineers*
770 A.2d 97 (Me. 2001) .................. 22

*Courtesy Temporary Serv., Inc. v. Camacho*
222 Cal. App. 3d 1278 (1990) .................. 15, 21

*Cubic Corp. v. Marty*
185 Cal. App. 2d 438 (1986) .................. 23

*Readylink Healthcare v. Cotton*
126 Cal.App.4th 1006 (2005) .................. 21

*Whyte v. Schlage Lock Co.*
101 Cal. App. 4th 1443 (2002) .................. 15

**State Statutes**

Cal. Civ. Code § 3426 .................. 19

Cal. Civ. Code § 3426.1(d)(2) .................. 15, 16

California Labor Code § 2870 ("Section 2870") .................. 22, 23, 24

California Business and Professions Code § 17200 .................. 21

## I. INTRODUCTION

Defendants do not, and indeed cannot, controvert the evidence of misappropriation, unfair competition, breach of contract, and false advertising presented by Verigy's application, particularly in the exhibits attached to the Pochowksi declarations. Instead, defendants' opposition papers are riddled with self-serving statements by Mayder that are neither credible nor supported by the evidence. Mayder goes to such great lengths to attempt to show that one of Verigy's confidential documents is not, in fact, confidential (because it is only marked "confidential" on each page of in the document header) that he violated the Court's August 24, 2007 Order by accessing, using, making any use of, and/or attempting to disclose or use an electronic copy of the [REDACTED]

As demonstrated in its moving papers and below, Verigy has met its dual burden of showing a likelihood of success on the merits of its claims and that the absence of an injunction will result in irreparable harm. Verigy is accordingly entitled to a preliminary injunction against Defendants.

## II. STATEMENT OF FACTS

### A. Verigy's Protectable Trade Secrets.

Defendants assert that Verigy has not identified anything deserving of trade secret protection. However, Defendants focus only on the specific aspects of the [REDACTED] [REDACTED] listed by Verigy's Senior Research and Development Manager, Ira Leventhal, in his original declaration and later partially addressed at his deposition. (Opp. at 15-19:16.) Defendants highlight the individual features, contending that they have been in the public domain for years. Defendants also assert that there is simply nothing new about the [REDACTED] [REDACTED] [REDACTED] [REDACTED]. Defendants mischaracterize the nature of these trade secrets, oversimplify what [REDACTED] really was, and conveniently overlook other related trade secrets they have misappropriated.

**1. The Combination of Features Embodied in the [redacted] [redacted] is A Trade Secret.**

The Leventhal Declarations explain numerous elements of [redacted] project that are Verigy trade secrets. (Leventhal Suppl. Decl., ¶6.) [redacted] It is not necessarily the individual items which are themselves Verigy's trade secrets for, as pointed out by Defendants, many of these individual features are in the public domain. Verigy's principal trade secret in this action is the "combination of features/capabilities mentioned above [redacted] (*See* Leventhal Suppl. Decl. ¶6.)

Defendants' opposition attempts to belittle Leventhal's deposition testimony about Verigy's trade secrets by mischaracterizing that testimony as the final word on the issue. However, Mr. Leventhal was not deposed as Verigy's corporate representative pursuant to Fed. R. Civ. Pro. 30(b)(6), nor was the questioning exhaustive or particularly thorough. (*See, e.g.*, Morton Suppl. Decl., Ex. 4 at 116:15-17.) Defendants' counsel never asked Mr. Leventhal to describe each and every trade secret Mayder misappropriated, merely for him to describe some of the Verigy trade secrets present in the [[redacted] attached as Exhibit B to his declaration. (*Id.*, p. 116: 18-117:8.) Counsel for Defendants then

inquired as to the [redacted] requirements listed above, but failed to ask about the other performance requirements listed in Exhibit B. (*Id.*, p. 118:2 – 122:13.)

**2. [redacted] is a Trade Secret.**

As discussed in Verigy's opening brief at 11, Mayder sent an email to Pochowski on Wednesday, June 14, 2006, enclosing a document Mayder claimed was [redacted] and an updated version of the technical data sheet Mayder previously sent to Pochowski. (Morton Suppl. Decl. Ex.5.) [redacted] (Compare Morton Suppl. Decl. Ex. 5 with Lee Decl., Ex. A; see also Morton Decl., Ex. C.) Mayder admitted in his deposition that [redacted]" and further admitted that he "did a global search and replace from Verigy to Silicon Test Systems" to create the STS document. (Morton Suppl. Decl., Ex. 2 at 186:3-7; 215:16-19; 220:14-221:1.) This confidential document, which is a virtual copy of a document sent to [redacted] for the very same purpose on a virtually identical product a few weeks earlier, is unquestionably a trade secret.[1]

**3. [redacted] is a Trade Secret.**

As discussed in Verigy's opening brief at 10, on Monday, June 12, 2006, Mayder sent an email to Pochowksi containing [redacted]).) Mayder has even admitted in his deposition

---

[1] The Court's August 24, 2007 Order specifically prohibited Mayder from "accessing…downloading…using…making any use of, attempting to disclose or use… Verigy's trade secrets and/or confidential or proprietary information." Mayder admitted to doing just this at his deposition, in direct violation of the Court's August 24, 2007 Order. (*See* Morton Suppl. Decl. Ex. 3 at 313:19-314:25; 318:24-319:11.)

that the Picasso document was based on a document he drafted for Verigy and that he made these modifications on his home computer. (Morton Suppl. Decl., Ex. 2 at 211:6-213:5.)

**4. [redacted] a Trade Secret.**

As discussed in Verigy's opening brief at 12, Mayder sent Mr. Pochowski an Excel [redacted] Indeed, Mayder's own declarant, Dick Weber of Intel, states that Intel's memory testing requirements are shared with Verigy and STS "exclusively under Non-disclosure agreements." (Weber Decl., ¶ 6.)

**5. [redacted] Are Trade Secrets.**

As discussed in Verigy's opening brief at 12, Mayder sent Mr. Pochowski a [redacted] (Morton Suppl. Decl., Ex. 7.) Mayder admitted that he did not ask anyone at Verigy if he could use [redacted] for his STS business. (*Id.* at Ex. 2 at 223:14-18; 225:23-226:8.) Mayder's powerpoint "[redacted]

**6. The [redacted] is a Trade Secret.**

**B. Defendants Used Verigy's Trade Secrets to Jump-Start Their Business.**

Decl. ¶19.) [redacted]

**1. Mayder Misappropriated** [redacted]

Mayder chose to use [redacted] thus avoiding many months of research and development.

**2. Mayder Misappropriated Verigy Documents Because it was Simple.**

Having invested many months in [redacted], Mayder saw an opportunity to capitalize on the work he had already done, leverage the contacts he had made, and develop a substantially identical product upon which he could base his own business. Mayder admits to using key documents which contain or describe Verigy trade secrets to jump-start his business.

[redacted]?

(Morton Suppl. Decl., Ex. 2 at 185:7-15.)

**3.**

**a.**

7
PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)

”

a

9

PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)

10

PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)

11

PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)

12
PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)

13
PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)

**III. ARGUMENT**

**A. Verigy Has Protectable Trade Secrets**

Verigy demonstrated in its opening brief and above that the Project and the

documentation for the project are Verigy trade secrets. (*See* Mot. at 15-17; *supra* at 1-5.) The [redacted] pricing information and supplier negotiations and proposal are all things that Verigy takes "reasonable efforts to keep secret." (*Id.*) Further, these types of information are axiomatically considered by courts to be trade secret. (*See* Mot. at 16.) Verigy derives economic value from keeping this information secret, as public knowledge would damage Verigy's customer relationships. (Leventhal Decl., ¶ 24.) Indeed, [redacted] (*Id.*)

**1. Verigy Took Reasonable Efforts to Protect Its Trade Secrets**

A company need only take reasonable efforts to maintain the secrecy of its trade secrets. Cal. Civ. Code § 3426.1(d)(2). Reasonable efforts to maintain the secrecy of trade secrets include, among others: advising employees of the existence of a trade secret, limiting access to the secret information, and requiring employees to sign confidentiality agreements. *See, e.g., Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1454 (2002) (confidentiality agreements); *Courtesy Temporary Serv., Inc. v. Camacho*, 222 Cal. App. 3d 1278, 1288 (1990) (informing employees about trade secrets through employee agreements and handbooks and limiting access); *MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511, 521 (9th Cir. 1993) (confidentiality agreements). "Efforts at maintaining secrecy need not be extreme, just reasonable under the circumstances." *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1253 (N.D. Cal. 1995). Verigy took extensive precautions to prevent former employees such as Mayder from usurping Verigy's hard work, including requiring employees to sign confidentiality agreements, informing new and exiting employees about the trade secret status of Verigy's information, and restricting access to Verigy buildings and documents. (*See* Mot. at 5-7; Leventhal Decl., ¶¶ 7, 23; Leventhal Suppl. Decl., ¶¶ 4-5.)

Defendants attempt to invent a new standard in which all company documents are presumed public unless the document is specifically marked confidential. This is not the standard at Verigy, and it is not the industry standard. (Pochowski Suppl. Decl., ¶¶5-7; Leventhal Suppl. Decl., ¶¶4-5.) Especially in Silicon Valley, it is widely known that research and development

efforts and plans are only valuable if they are not widely-known.

It is Verigy's policy, as stated in the opening brief, to mark documents confidential before sending them to third parties. (Mot. at 7.) [redacted] (Leventhal Suppl. Decl., ¶4; Lai Suppl. Decl., ¶ ¶2-6.) [redacted] r. (Leventhal Suppl. Decl., ¶ 4.) All of the documents that Defendants claim are not confidential due to a lack of marking [redacted]." Further, there is nothing in the UTSA requiring documents to be marked "confidential."

Defendants also make the absurd claim that if a document is marked "confidential" only in the header or footer, but not in the body of the document, the document is presumed to be public. (Morton Suppl. Decl., Ex. 2 at 219:15-222:16; Ex. 3 at 311:16-312:22 and Mayder Decl. ¶30.) Defendants make this claim to avoid liability for use of Verigy's "[redacted] which is marked "Confidential" in the header of each page. (Lee Decl., Ex. A.) Mayder claims that documents should be marked in the body of the text, which would require the author to manually type "confidential" on each page. (Morton Suppl. Decl., Ex. 3 at 311:16-312:22.) Such a requirement would be an overly stringent standard. It is Verigy's standard practice to place such markings in headers or footers. (Leventhal Suppl. Decl., ¶ 4.) Further, with respect to the specific document in question, it is obvious that this document was treated by [redacted] (Morton Suppl. Decl., Ex. 21 at 4421.) Mayder received [redacted] less than a month before he co-opted Verigy's [redacted] his own use, so he cannot now claim that he was not on notice that the [redacted] confidential. (*Id.* at 4414.)

Finally, Defendants claim that "Verigy explicitly disclosed to the public much of the information that it now claims as trade secrets." (Opp'n at 14.) Defendants ignore that Verigy did

not disclose [redacted] and the project's cancellation "publicly." Verigy disclosed this information to [redacted] whom it had a signed non-disclosure agreement. (Lee Decl., ¶ 6.) This disclosure is far from "public." *Metallurgical Indust. Inc. v. Fourtek, Inc.* 790 F.2d 1195, 1200 (5th Cir. 1986) (recognizing that disclosures of trade secrets that are made to further owner's economic interest can be a limited disclosure that does not destroy secrecy.). Defendants have not offered any evidence that either [redacted] information to anyone else.[2]

**2. Even if Every Element of the [redacted] in the Public Domain, the Combination of the Key Elements Constitutes a Trade Secret**

Defendants argue at length that because individual elements [redacted] does not have trade secret status. (Opp'n at 15.) Defendants are wrong. California law is clear that "[A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage. . . ." *Vermont Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 147 (2nd Cir. 1994) (applying California law to find component elements of a display list driver for AutoCAD software was a trade secret); *citing Integrated Cash Management Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2nd Cir. 1990), *Imperial Chemical Industries Ltd. v. National Distillers & Chemical Corp.*, 342 F.2d 737, 742 (2nd Cir. 1965), and *Cybertek Computer Products, Inc. v. Whitfield*, 203 U.S.P.Q. 1020, 1024 (Cal. Super. Ct. 1977) (". . . general approach and the basic mechanical elements were not trade secrets, [but] . . . the specific embodiment of the general concepts and approach into a combination of parts was protectible, even though all or some of them might well be known to the industry.")

---

[2] Defendants also claim that Leventhal did not know the confidentiality policy or how to apply it. (Opp'n at 13-14.) However, this assertion is not supported by the record. Mr. Leventhal testified at his deposition that he did not remember the "specific guidance," but that he "adopted a personal policy to ensure that [he adheres] to the company policy." (Morton Suppl. Decl., Ex. 4 at 53:14-54:9.) Mr. Leventhal did not testify that he didn't know the policy—he testified that he couldn't "state the policy verbatim." (*Id.* at (Leventhal depo 49:6-23).)

Verigy's trade secrets are not the specific individual features of [REDACTED] they are the combination of technical features embodied in the [REDACTED] specification which was designed to meet Verigy's specific confidential marketing specification. It is the combination of these elements that constitutes a trade secret under the authorities cited above.

**3. [REDACTED] is Substantially Derived from Verigy's Trade Secrets**

Where an idea is substantially derived from another party's trade secret, use of that idea constitutes misappropriation. *Mangren Research and Dev. Corp. v. National Chem. Co., Inc.*, 39 U.S.P.Q.2d 1339, 1345-46 (7th Cir. 1996). The *Mangren* court determined that defendant could not have produced its mold release agent without using the chemical formula derived from plaintiff's trade secret. (*Id.*) As a result, the defendant was found to have misappropriated plaintiff's secret formula, even though defendant's product was not "identical." (*Id*.) A finding of misappropriation does not require that the defendant "copied or used every element of the trade secret." (*Id*. at 1345.) Misappropriation of trade secrets occurs even when a defendant creates a new product, but would have been unable to do so without the plaintiff's trade secret.

This "doctrine of equivalents" for trade secrets has been recognized and applied in numerous misappropriation cases. For example, in *Vermont,* 88 F.3d at 147, where plaintiff established that defendant's product was substantially derived from the architecture of the plaintiff's product, the court held that the plaintiff did not have to prove that the products were identical. Substantial derivation was all that was necessary to establish trade secret misappropriation. *See also, Cybertek*, 203 U.S.P.Q. at 1023-1025 (substantial appropriation is actionable); *Forest Lab., Inc. v. Pillsbury Co.*, 452 F.2d 621, 624-25 (7th Cir. 1971);*Matter of Innovative Constr. Sys., Inc*., 793 F.2d 875, 886 (7th Cir. 1986) ("Were the law of trade secrets not flexible enough to reach the modifications in the instant case, when it is evident that the formulas were substantially derived from Innovative's, (the law) would indeed be hollow.").

Therefore, Defendants' claims that the [REDACTED] (Wei Decl.,¶¶ 59-60;

*see also* Leventhal Decl. ¶ 2.) Further, almost all of the Flash Enhancer ASIC features were developed while Mayder was still employed at Verigy, and therefore belong to Verigy. The [redacted] Defendants' misappropriating the bulk of the ASIC.

**4. Defendants Misstate the Trade Secret Standard**

Defendants mistakenly claim that trade secret status is negated if the information is "readily ascertainable." (Opp'n at 15.) However, California did not adopt that portion of the UTSA which precluded a finding of misappropriation if a proper means of obtaining the information was available. Rather, California takes the view that if improper means are used to acquire a trade secret, it does not matter that a proper means may have been available. (Cal. Civ. Code § 3426; *Imi-Tech Corp. v. Gagliani*, 691 F. Supp. 214, 231 (S.D. Cal. 1986) ("it is not a requirement of California law that a trade secret 'not be readily ascertainable by proper means by others,' and California law emphasizes punishing the wrongful acquisition of information, even if it could have been obtained legally."), citing *Chicago Lock Co. v. Fanberg*, 676 F.2d 400, 404 (9th Cir. 1982); *Abba Rubber Co. v. Seaquist*, 235 Cal. App.3d 1, 21 (1991) ("whether a fact is 'readily ascertainable' is not part of the definition of a trade secret in California.") Further, it is not even required that a trade secret be "patentably nonobvious or novel." *Imi-Tech Corp.*, 691 F. Supp. at 231. "All that is required is that, except by use of improper means, there would be difficulty in acquiring the information." *Id*.

**B. Verigy Has Made a *Prima Facie* Case of Misappropriation; Defendants Have Not Met Their Burden**

It is undisputed that Mayder has misappropriated and used a number of key Verigy documents. (*See* Sections II.A, B, *supra*.) Defendants attempt to avoid liability by claiming that Verigy misstates the law. Defendants claim that Verigy asserts trade secret status in issued patents, but no such claims have been made.[3] (Opp'n at 12-13.) In fact, Verigy's 2019.210 trade secret statement *specifically* states that it only includes information in patent applications or

patents either prior to publication or that was not included in the published application or patent. (Morton Suppl. Decl., Ex.28.) Verigy has shown at least a likelihood of success that [redacted] are trade secrets and that Mayder used and/or disclosed these secrets.

Where a plaintiff has proved defendants' access to trade secrets and the subsequent design of a substantially similar product, the burden shifts to the defendants to prove independent design. *Droeger v. Welsh Sporting Goods Corp*., 541 F.2d 790, 793 (C.A. Cal. 1976) ("As a number of cases have pointed out, disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention"); *Imi-Tech Corp.*, 691 F.Supp. at 230 (finding defendant had not met burden for preliminary injunction).

Here, Defendants have offered no proof of independent derivation. In fact, Mayder has admitted he used a number of the Verigy trade secret documents. (See Sections II.A, B, *supra*.) Defendants deny using Verigy's customer list, but offer no proof other than Mayder's own self-serving testimony and a citation to the Weber Declaration stating that Intel has discussed its memory testing requirements with STS. (Opp. at 11; Weber Decl. at 6.) These citations are insufficient to carry Defendants' burden. Defendants cannot dispute their use of plaintiff's trade secrets through self-serving denials. *Bolt Associates, Inc. v. Alpine Geophysical Associates, Inc.,* 365 F.2d 742, 749-750 (3d Cir. 1966) ("the [defendants'] burden cannot rest on mere self-serving assertions, but rather, a heavy burden ... to show that the production was the result of independent development"); *Droeger*, 541 F.2d at 793 ("the defendant ... ought to offer more than the verbal testimony of interested witnesses."). Weber's Declaration also fails to meet this burden, as it offers nothing to suggest that Defendants independently derived the confidential customer information before Mayder's first meetings with Intel in November 2006. (Mayder Decl., ¶ 42.) Defendants worked extensively on presentations to customers between July-November 2006 (Pochowski Decl., Ex. E; Pochowski Suppl. Decl., Ex. 6), and no evidence of independent derivation has been offered with respect to those presentations.

---

[3] Defendants claim that Mr .Leventhal made this claim, but he explicitly stated in his deposition

**C. Verigy Is Likely to Prevail on its Unfair Competition Claim.**

To the extent Defendants misappropriated Verigy's trade secrets, Defendants also violated California Business and Professions Code § 17200. However, even if the Court finds that Verigy's confidential information does not meet the statutory definition of a trade secret, Defendants' unfair and deceptive trade practices in using Verigy's confidential information should still be enjoined. *Courtesy,* 222 Cal. App.3d at 1291; *Readylink Healthcare v. Cotton,* 126 Cal.App.4th 1006, 1020-21 (2005) (discussing *Courtesy*).

**D. Mayder Breached His Contract With Verigy**

To the extent that Mayder misappropriated Verigy's trade secrets, he also breached his contract with Verigy. However, Verigy sought an injunction for breach of contract due to use of *both* trade secrets and Confidential Information. (*See* Mot. at 18.) Defendants failed to address this in their Opposition, choosing to assume, despite notice, that Verigy's breach of contract claim rested on misappropriation of trade secrets. (Opp'n at 12.) If the Court finds that the information Mayder misappropriated does not rise to the level of a trade secret, Verigy is still entitled to an injunction against Mayder's breach of contract due to his misappropriation of Verigy's "Confidential Information."

California courts have recognized that a breach of contract action is viable where disclosed information does not qualify as a "trade secret" under the UTSA provided that the information is protected by a confidentiality agreement. *HiRel Connectors, Inc. v. U.S,* CV01-11069, 2006 WL 3618008, at *1 (C.D. Cal., July 18, 2006) ("Plaintiff's claim for breach of contract survives even if it is based solely on disclosure of the information….[that] the Court has already determined are not protectable as trade secrets."); *Ajaxo v. E*TRADE Group, Inc.*, 135 Cal. App. 4th 21, 62 n. 38 (2005) ("A breach of contract cause of action may be available where disclosed information does not qualify as a 'trade secret' under the UTSA…if the information is protected under a confidentiality or nondisclosure agreement."); *see also Hauck M'fg. Co. v. Astec Indus., Inc.,* 376 F. Supp. 2d 808, 814-15 (E.D.Tenn. 2005) (Defendant can breach confidentiality agreement by

---

that "I'm not an expert on the legal definition of trade secrets."

appropriating confidential information that is not a trade secret); *Bernier v. Merrill Air Engineers*, 770 A.2d 97, 103 (Me. 2001) ("The confidential knowledge or information protected by a restrictive covenant need not be limited to information that is protected as a trade secret by the UTSA").

Here, the term "Confidential Information" is defined in the ARCIPD. (Guerzoni Decl., Ex. B.) Thus, if Defendants used or disclosed information that fits within this definition, Defendants breached the ARCIPD. "Confidential Information," as defined in the ARCIPD, includes, without limitation, "information on Verigy organizations and structure;" "strategic plans;" "assignments; information on research and development, manufacturing and marketing; as well as information which Verigy receives from third parties under an obligation of confidentiality." (*Id.*) Mayder agreed to use "Confidential Information only in the performance of Verigy duties." (*Id.*) However, Mayder has admitted to using several documents to jumpstart his STS business, which, by definition, could not have been used for Verigy duties [redacted] (Pochowski Suppl. Decl., Ex. 1; Lai Suppl. Decl.¶¶ 5,6.) Mr. Mayder used specific documents that were developed for a specific Verigy project to jumpstart his own business, thus breaching his contract with Verigy.[4]

Although California Labor Code § 2870 ("Section 2870") places some limitations on the types of inventions that an employee can be required to assign to an employer, these limitations do

---

[4] To the extent that Verigy's research regarding other manufacturers, processes and materials, discussed in Section II, A, B is not found to be a trade secret, Mayder's use of this valuable intelligence is certainly, at a minimum, a breach of his contract.

not apply here. Any inventions that "(1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) Result from any work performed by the employee for the employer" are assignable to an employer pursuant to an employment agreement. Cal. Labor Code § 2870 (a). The ARCIPD quotes the relevant language from Section 2870. (Guerzoni Decl., Ex. B.) The courts have interpreted the first prong broadly. *See, e.g., Cubic Corp. v. Marty*, 185 Cal. App. 2d 438, 496-447, 452-453 (1986) (invention agreement applied to invention even though it covered a product that was neither sold nor developed by employer at time of invention); *Iconix, Inc. v. Tokuda*, 457 F.Supp.2d 969, 990-92 (N.D. Cal. 2006). Further, Mayder bears the burden of showing that his inventions do not come within the scope of Section 2870. Defendants have failed to meet this burden, and indeed, other than oblique references to what they claim Verigy's "business" comprises, Defendants do not even address Section 2870.

Defendants argue that Verigy is not engaged in the probe card business. This argument is misplaced, as Verigy need not show that it was in the business of designing and developing the precise subject matter of Mayder's inventions.[5] *See Cubic Corp.*, 185 Cal. App.3d at 445 (employer not required to show that it was developing, marketing and selling the type of product embodied in invention). The key fact is that Verigy engaged in months of "research or development" for [REDACTED]. (Mayder Decl., ¶¶ 13-17; Wei Decl. App. II.) Mayder attempted to characterize his work on [REDACTED] as something other than research and development, but this distinction is simply not credible—he wrote an invention disclosure for the MEMS embodiment of this project and drafted a technical specification sheet, researched potential manufacturers and participated in drafting a [REDACTED]. (Morton Supp. Decl. Ex. 3 at 307:9-309:25.)

---

[5] Defendants claim in their brief that Verigy does not compete with STS, and use the Leventhal Deposition as support. This citation is misleading, as Mr. Leventhal actually testified who "some" of Verigy's competitors were, and Defendants' counsel never followed up to determine if STS or any other companies involved with probe cards are competitors. (Morton Suppl. Decl., Ex. 4 at 31:7-16.)

Even if the Court were to assume that Verigy's activities did not constitute "research and development," Mayder cannot defeat the second prong of Section 2870: that his product "results from *any* work performed by the employee for the employer." Cal. Lab. Code § 2870 (a) (emphasis added). [REDACTED] (Morton Decl., Ex. 15.) Mayder's admission points to the only logical conclusion: that Mayder breached his contract with Verigy and should be enjoined from continuing to do so.

**E. Defendants' Conduct Is Ongoing**

Despite Defendants' claim to the contrary, their conduct is ongoing. As discussed above, [REDACTED] and Defendants are continuing to develop, market, advertise and negotiate with customers regarding this product. (Morton Suppl. Decl., Ex. 3, 346:14-347:14.) [REDACTED] (*Id.*) Defendants are also actively seeking investors for this misappropriated product (*Id.* at Ex. 3, 360:11-363:4), and continue to make claims on the STS website. In short, Defendants' misappropriation, unfair competition, false advertising, false designation and breach of contract have continued, unabated, since the entry of the Temporary Restraining Order on August 24, 2007, and a preliminary injunction is necessary to restrain this ongoing and harmful conduct.

**F. Verigy Will Suffer Irreparable Harm If Defendants' Activities Are Not Enjoined.**

Defendants argue that Verigy has not demonstrated it will suffer irreparable injury because it has not demonstrated that its trade secrets were developed at substantial effort and expense or that they have economic value. (Opp'n at 20.) In doing so, defendants are essentially arguing that Verigy has not established that its trade secrets meet the definition of the UTSA, not that Verigy has failed to establish irreparable harm. In fact, in Section III.A of its Opening Brief as well as in Sections III.A, B above, Verigy has established beyond the shadow of a doubt that its trade secrets qualify for protection under the UTSA.

Moreover, defendants' argument ignores that this Court has already ruled in the August 24, 2007 Order that "plaintiff is likely to suffer irreparable harm including harm to its competitive position, loss of future sales, disclosure of confidential business information, and loss of goodwill in the marketplace." (August 24 Order at 5: 4-7.) This Court's Order is consistent with the legion of cases holding that losses that are difficult to quantify, such as "customer losses, [loss] of future sales, damages to long-term relationships with its customers, loss of referrals and loss of goodwill in the marketplace" constitute irreparable harm. *Corporate Express Office Products, Inc. v. Martinez*, No. CV-SA02-87 AHS (ANX), 2002 WL 31961458, at *5-6 (C.D. Cal. March 8, 2002); *Imi-Tech Corp.* 691 F. Supp. at 231 (harm to a plaintiff's competitive position lacks an adequate remedy at law); *Computer Assocs. Int'l., Inc. v. Bryan*, 784 F. Supp. 982, 1009 (E.D.N.Y. 1992) (injunction against marketing of competing, copied program granted because loss of trade secrets is not measurable in money damages"). That Verigy has suffered such loss is established by Ira Leventhal, who stated in his initial declaration that Defendants' use of Verigy's trade secret and confidential information "would cause damage to Verigy, "would damage our customer relationships," and "could cause our customers to demand that Verigy develop these products and suffer lost revenue and profits." (Leventhal Decl., ¶ 24.) Mr. Leventhal identified one such customer who had already complained that Verigy was not implementing Defendants' solution. (*Id.*) As demonstrated by the Leventhal Declaration, if defendants' conduct is not enjoined, Verigy is likely to continue to lose contracts and customer goodwill which, as this Court has already found, establishes irreparable harm.

**G. Bond Issue**

Defendants ask this Court to "require Verigy to post an appropriate bond." (Opp'n at 21.) Defendants ignore that Verigy has already posted a $100,000.00 bond, and defendants offer no arguments or evidence as to why this bond is insufficient. Verigy submits that it is.

## IV. CONCLUSION

For the foregoing reasons, Verigy respectfully requests that the Court grant Verigy's application for a preliminary injunction.

Dated: November 16, 2007

BERGESON, LLP

By:______________________________

Melinda M. Morton
Attorneys for Plaintiff
Verigy US, INC.

26

PLAINTIFF'S REPLY AND SUPP. BRIEF RE: OSC RE: PRELIMINARY INJUNCTION
CASE NO. C07-04330 RMW (HRL)