1  DANIEL J. BERGESON, Bar No. 105439
   dbergeson@be-law.com
2  JOHN W. FOWLER, Bar No. 037463
   jfowler@be-law.com
3  MELINDA M. MORTON, Bar No. 209373
   mmorton@be-law.com
4  BERGESON, LLP
   303 Almaden Boulevard, Suite 500
5  San Jose, CA 95110-2712
   Telephone: (408) 291-6200
6  Facsimile:  (408) 297-6000

7  Attorneys for Plaintiff
   VERIGY US, INC.
8

9                       UNITED STATES DISTRICT COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11                             SAN JOSE DIVISION

12  VERIGY US, INC, a Delaware Corporation     Case No. C07-04330 RMW (HRL)

13                  Plaintiff,                 DECLARATION OF ROBERT
                                               POCHOWSKI IN SUPPORT OF
14       vs.                                   PLAINTIFF'S REPLY AND
                                               SUPPLEMENTAL PAPERS RE:
15  ROMI OMAR MAYDER, an individual;           PRELIMINARY INJUNCTION
    WESLEY MAYDER, an individual; SILICON
16  TEST SYSTEMS, INC., a California Corporation;
    and SILICON TEST SOLUTIONS, LLC, a         Date: December 14, 2007
17  California Limited Liability Corporation,   Time: 9:00 a.m.
    inclusive,                                  Place: Courtroom 6
18                                              Judge: Hon. Ronald M. Whyte
                    Defendants.
19
                                               Complaint Filed:  August 22, 2007
20                                             Trial Date:       None Set

21

22

23
                                  **CONFIDENTIAL**
24
                       **DOCUMENT SUBMITTED UNDER SEAL**
25

26

27

28

---

DECLARATION OF ROBERT POCHOWSKI
CASE NO. C07-04330 RMW (HRL)

I, Robert Pochowski, declare as follows:

1. I am President of Attest Technologies. Prior to my current position, I worked at Agilent Technologies Inc. ("Agilent") from June 2004 to July 2005 as Vice President / General Manager of the California Semiconductor Test Division. After my departure, Agilent spun off a successor-in-interest, Verigy US, Inc. ("Verigy"). I have a B.S.E.E. from Marquette University and a MBA from Santa Clara University. I have been involved in semiconductor device testing for the last 27 years in various roles including engineering, R&D, marketing and management. Except for matters asserted on information and belief, which I am informed and believe to be true, I make this declaration of my personal knowledge and, if called as a witness, I could and would testify competently to the facts set forth herein.

2. When Mayder first approached me about the ▮▮▮▮▮▮▮▮ I asked him if Verigy was doing anything similar or related to the proposed product. Mayder informed me that Verigy was not involved in anything similar, and it was on the basis of these representations that I agreed to work on the product with Mayder. In fact, he never told me that the Picasso ASIC was based on or related to work he had done at Verigy. If I had known that the Picasso ASIC was based on or related to work Mayder did at Verigy, I would not have agreed to work with him. The tester business is a relatively small world and I would not act in a way that would interfere with Agilent or Verigy or infringe upon their intellectual property rights, and I still maintain friendships with several Verigy employees.

3. One of the reasons I was interested in the Picasso ASIC was because I thought it was a unique product. I never told Mayder, as he states in paragraph 27 of his October 11, 2007 Declaration, that "many memory chip manufacturers were already building some types of probe card resource sharing in house (San Disk, Samsung, Hynix), or hiring other companies (Formfactor, TouchDown Technologies, and TSE) to work with them." First, if I had believed that these companies were working on the same product, I would not have invested so much time and effort into developing the Picasso ASIC. Second, I did not have any knowledge of what Samsung, Hynix, Formfactor or TSE are doing in this area or even if they are doing anything in this area.

4. There is a lot of cross-over in the tester business, and although it is my understanding that Verigy's main business is in selling tester machines, they also have interests in probe cards. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. I have personal knowledge of this fact because I am on the board of directors of Touchdown.

5. I am friends with Alan Hart, Edmundo de la Puente and Gayn Erickson. I do occasionally run with Alan Hart and/or Edmundo de la Puente. However, I do not and would not discuss product roadmaps or technical research and development information relating to Verigy with them. I consider this information to be highly confidential and proprietary.

6. In fact, when I worked at Agilent, it was my understanding and experience that documents and information were always treated as confidential unless it was explicitly communicated that it was permitted to publicly share the information or documents. I followed that general policy and it was my experience that my employees followed that general policy as well.

7. In my experience, memory chip manufacturers are very guarded with information about testing their chips. Although some general chip information is publicly available on their websites or data sheets, the kind of detailed information necessary to make testers work with their chips is generally disclosed only pursuant to a non-disclosure agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

8. On August 6, 2006, I received an email from Mayder enclosing ▮▮▮▮▮▮▮▮▮. A true and correct copy of the email and attachment is attached hereto as Exhibit 1. In the email, sent from Mayder's silicontests.com email address, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ayashi was a new system being introduced by Advantest. Advantest is another company in the chip testing business. I had heard that Ayashi would significantly increase parallel testing at wafer sort and this would likely result in a smaller market for the ▮▮▮▮▮▮▮ I therefore wanted to learn more about the system before making a financial investment. I never asked Mayder to send it to me so I could ▮▮▮▮▮▮▮▮

2
DECLARATION OF ROBERT POCHOWKSI
CASE NO. C07-04330 RMW (HRL)

1  ███████████████████████████ was not then and I am not now aware of Verigy's product
2  roadmap.
3      9.      Mayder initially named the product ████" and we called it the ████
4  internally, but we also used several different names for the ████ in our external
5  presentations to customers, including ████████████████████████████████
6  ████████████████████████████████████████████████████████████
7  ████████████████████████████  It was merely the name we used for
8  external communications.
9      10.     I have reviewed a data sheet from a version of the ████████ I
10 understand Mayder currently calls "Flash Enhancer." Attached hereto as Exhibit 2 is a true and
11 correct copy of the Flash Enhancer data sheet I reviewed. This datasheet reflects that there have
12 been some new features added to the ASIC. However, based on my experience, I believe that
13 these changes are the types of modifications or refinements that customarily occur in response to
14 supplier issues and/or customer requirements over the design cycle of any ASIC as it progresses
15 from inception to first silicon. The key features, ████████████████████████
16 ████████████████████████████████████████████████████████████
17 ████ This "Flash Enhancer" datasheet appears to reflect an expected evolution of the same
18 product Mayder and I worked on in June 2006.
19     11.     In addition to the "Flash Enhancer" datasheet, I reviewed a number of documents
20 relating to the ████████ including (1) the June 12, 2006 RFQ and technical specification,
21 attached to my previous declaration as Exhibit A; (2) Mayder's August 2006 draft patent
22 disclosure, attached to my previous declaration as Exhibit F; (3) the ████████
23 ████████████████████████████████████████████████████████████
24 ████████████████████████ is attached hereto as Exhibit 3); and (4) the
25 ████████████████████████████████████████████ sent to me on
26 November 30, 2006 (a true and correct copy of ████████████ is attached hereto as Exhibit
27 4). These documents show the status of the ████████ certain points in time.
28

12. Based on my review of these documents, the only changes apparent to me that are not contained in the ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ Attached hereto as Exhibit 5 is a true and correct copy of a chart I created showing the features of the ███████████ at these various points in time.

13. Mayder's October 11, 2007 Declaration (specifically paragraphs 8 and 44) inaccurately describes the testing requirements for NOR flash vs. NAND flash. NOR and NAND are both flash memory and are often tested using the same testers and probe cards. In contrast, DRAM, SRAM and MRAM memory chips are very different from NOR and NAND memory chips, and are typically tested using completely different testers and probe cards than the NOR and NAND chips. In addition, the number of pins on a device is typically a function of the type of "interface" the device uses, and not strictly the type of flash memory. A serial interface uses fewer pins than a parallel interface. Both NOR and NAND devices can be made with either type of interface. For example, there are NOR devices in both parallel and serial interfaces. NAND devices can also have a variety of interfaces. There are serial NOR devices with only 8 pins and there are some that have over 64 pins. Therefore, Mayder's claims in paragraph 8 of his Declaration that to test NOR memory chips, the ███████████ would need to have "32 or 64 pins dedicated to addressing," and "four to eight times the number of channels to test the device" are simply not accurate.

14. Furthermore, most of the differences between testing NOR and NAND memory chips are addressed in the tester software and not in hardware such as the ███████████. In fact, when I was involved in developing the ███████████ we were designing the ASIC to work on either NOR or NAND. The only real difference was the number of signal vs. power switches, not the design of the ASIC or its topology.

4

15. Mayder and I discussed development of an ASIC that would test both NAND and NOR from the very beginning. Attached hereto as Exhibit 6 is a copy of a July 24, 2006 draft presentation for potential customers for the ███████ that Mayder created that discusses both NAND and NOR testing.

16. In July and August of 2006, I was extremely busy with issues involving my own company, Attest Technologies. During these months, I did not devote much time or energy to Mayder and Silicon Test Solutions ("STS"). Mayder was very concerned with protecting the intellectual property we had been discussing. ███████████████████████████████████████████████████████████████ as soon as possible, and while I agreed that this was a good plan, I did not initiate the process —Mayder did.

17. On September 1, 2006, Mayder and I received █████████████████████████████████████████████████████████████████████████████ The September 1, 2006 ████████████████████ and an initial per chip price of $██. The NRE is a one time, up-front cost that manufacturers charge to cover the costs of researching, designing and testing a new product.

18. On September 19, 2006, ████████████████████ A true and correct copy of the September 19, 2006 email from ████ attached hereto as Exhibit 8.

19. On November 20, 2006, Mayder sent me an email forwarding to me ████ November 19, 2006 revised proposal. A true and correct copy of Mayder's November 20, 2006 email to me is attached hereto as Exhibit 9. The November 19, 2006 proposal shows a ████ ████████████████████████████████

20. It is my understanding that as of at least September 8, 2006, Daniel Hanley, Esq. of San Jose represented Mayder and the STS Companies. Mr. Hanley was the attorney who formed

the LLC for STS on September 8, 2006. Mayder informed me at that time that he was consulting Mr. Hanley regarding issues involved in incorporating STS.

21. On September 25, 2006, Mayder and I met with Thomas Schneck, Esq., to discuss ███████████████████████ Mayder told me that he had concerns about ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

22. I decided I needed to consult my own attorney, and so I contacted Heather Flick, Esq., in early September 2006 to seek her advice regarding my potential investment and partnership with Mayder and to make sure that there weren't any legal issues I should be concerned about. However, I did not retain Ms. Flick until September 20, 2006.

23. Mayder and I did not meet with Ms. Flick on September 6, 2006 and in fact, Mayder never met with her. On September 6, 2006, ██████████████████████████ ████████████████████████████. Attached hereto as Exhibit 10 is a true and correct copy of my Outlook calendar for June-September 2006 (with non-relevant, private meeting redacted). Exhibit 10 confirms my September 6, 2006 meeting with ████████████.

24. Mayder sent some information to Ms. Flick at my request, including a copy of someone else's Agreement Regarding Confidential Information and Proprietary Developments ("ARCIPD"). Mayder never sent his actual ARCIPD to me or to Ms. Flick.

25. On September 28, 2006, Mayder and I participated in a conference call with Ms. Flick so that she could advise me regarding my potential investment in STS. This was the first time (and to my knowledge, the only time) Mayder spoke with Ms. Flick regarding my potential investment in STS and the possible legal issues involved. Ms. Flick made it very clear during that call that she was representing me and not Mayder or STS. ████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1 ▮
2 ▮
3 ▮

4   26.    Mayder never informed Ms. Flick or me that Verigy or Agilent had ever had any projects related to the type of "resource sharing" for which the ▮ designed or that Verigy had engaged in discussions ▮. In fact, in a September 20, 2006 email from Mayder to Ms. Flick and me, ▮

▮ which I now know to be incorrect. Attached hereto as Exhibit 11 is a true and correct copy of Mayder's September 20, 2006 email to Ms. Flick and me.

   27.    ▮

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ___ day of November, 2007 in Sunnyvale, California.


_____
Robert Pochowski

26.     Mayder never informed Ms. Flick or me that Verigy or Agilent had ever had any projects related to the type of "resource sharing" for which the Picasso ASIC was designed or that Verigy had engaged in discussions with Honeywell for a virtually identical ASIC. In fact, in a September 20, 2006 email from Mayder to Ms. Flick and me, Mayder informed us that Agilent

, which I now know to be incorrect. Attached hereto as Exhibit 11 is a true and correct copy of Mayder's September 20, 2006 email to Ms. Flick and me.

27.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of November, 2007 in Sunnyvale, California.

_____
Robert Pochowski

---

7

DECLARATION OF ROBERT POCHOWKSI
CASE NO. C07-04330 RMW (HRL)

# EXHIBIT 1
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 2
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 3
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 4
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 5
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 6
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 7
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 8
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 9
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 10
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL

# EXHIBIT 11
## TO POCHOWSKI DECLARATION

# CONFIDENTIAL

# EXHIBIT FILED UNDER SEAL