E-FIELD on ___2/29/08___

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VERIGY US, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROMI OMAR MAYDER; WESLEY MAYDER; SILICON TEST SYSTEMS, INC.; and SILICON TEST SOLUTIONS, LLC, <br><br> Defendants. | No. C-07-04330 RMW <br><br> ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; ORDER GRANTING MOTION TO STRIKE AFFIRMATIVE DEFENSES **(Redacted Version)** <br><br> **[Re Docket No. 5]** <br><br> **[PUBLIC VERSION]** |

On August 22, 2007, Verigy filed this action against its former employee Romi Omar Mayder ("Mayder"), his brother Wesley Mayder, and their company Silicon Test Systems, Inc. ("STS"). The complaint alleges breach of contract, trade secret misappropriation, violation of the Computer Fraud and Abuse Act, violation of the Electronic Communications Privacy Act, violation of California Penal Code § 502, violation of California Bus. & Prof. Code § 17200 and § 17500, common law unfair competition, breach of duty of loyalty, violation of the Lanham Act, intentional interference with prospective economic advantage and unjust enrichment. Verigy also seeks the imposition of a constructive trust.

United States District Court <br> For the Northern District of California

United States District Court
For the Northern District of California

1    On August 24, 2007, this court issued a temporary restraining order based on evidence

2  presented by Verigy that strongly suggested that Mayder had transmitted project documents he had

3  authored at Verigy to a third party, Bob Pochowski, for the purpose of using those documents to

4  launch his own independent business.  The parties have stipulated to extend the terms of the TRO

5  through the hearing on Verigy's motion for a preliminary injunction.

6    Now before the court is Verigy's motion for preliminary injunction.  Defendants oppose the

7  motion.  For the reasons set forth below, the court grants in part Verigy's motion for a preliminary

8  injunction.

## I. BACKGROUND

### A.    The Technology at Issue

11    The technology involves testing flash memory cards.  Integrated circuits are formed on a

12  round semiconductor base about the size of a pizza.  Each wafer contains numerous individual

13  devices called "dice."  Each die is tested twice during fabrication: once before the wafer is cut apart

14  ("wafer sort stage") and again after the dice are separated and individually packaged ("final test

15  stage").  A custom probe card is made for each die design for testing at the wafer sort stage; a device

16  specific interface is made for each type of device at the final test stage.

17    Verigy sells testers that are the size of a small room (███████).  Probe-card-mounted

18  chips are lower cost items, are the size of a postage stamp and ████████████████

19  Defendants contend that the market that Verigy is in is complementary to the probe-card-mounted

20  chip market but not competitive.  ████████████████████

21  ████████████████████████████████████████

22    There are two types of flash memory at issue in this case: NAND and NOR.  NAND is used

23  for less-demanding applications like digital cameras and MP3 music players; NOR is used for high-

24  precision applications like cell phones.  ████████████████████

25  ████████████████████████████████████████

26  ████████████████████████████

27  ████████████████████████████████████████

28

United States District Court
For the Northern District of California

1 ████████████████████████████████████████████████████

2 ████

3 **B.    Mayder's Employment with Verigy**

4     Mayder was employed by Verigy or its predecessors from 1998 to September 21, 2006.[1]  On

5 May 6, 2006, Mayder signed an Agreement Regarding Confidential Information and Proprietary

6 Developments ("ARCIPD").  The agreement required Mayder to keep Verigy confidential

7 information confidential and to disclose and assign to Verigy any "Proprietary Developments" not

8 otherwise exempted under Cal. Labor Code § 2870.  Supplemental Decl. of Romi Mayder ("Mayder

9 Supp. Decl."), Ex. C.

10 **C.    Development of** █████████

11     From November 2005, Mayder worked on the ██████project.  Declaration of Romi Mayder

12 Supp. Response to OSC ("Mayder Decl.") ¶ 13.  ████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████  The parties disagree as to whether the ██████████

17 ████████████████████████████.  STS has submitted evidence that

18 Verigy project documents defined what ████████████████████.

19 ████████████████████████████████████████████████████

20 ██████████  Decl. of Kevin Pasquinelli Supp. Defs' Sur-Reply ("Pasquinelli Decl."), Ex. G.

21 ████████████████████████████████████████████████████

22 ████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████

26

27 ────────────

28 [1] Verigy spun off from Agilent Technology, which in turn spun off from Hewlett-Packard.  Mayder was originally employed by Hewlett-Packard, went with Agilent when it was spun off, and again went with Verigy when it spun off from Agilent.

**D.   Mayder Founds STS**

Sometime after the ███████████████ and while he was still employed at Verigy, Mayder began preparing to start STS, a new business venture by, among other things, registering a domain name for the new company. *See* Mayder Decl. ¶ 32 ("On June 15, 2006 I registered the domain name "silicontests.com . . ."). Following the cancellation of the █████████, Mayder believed that he was free to use the █████████████ for his independent business. He asserts that because Verigy had ████████████████████, he was free to utilize the information he had developed. He also believed that he was permitted to use and modify the documents for his own purposes because they were not marked confidential.

STS originally developed the █████████, which defendants characterize as █████████ ██████████████████████. While he was still employed by Verigy, Mayder contacted Pochowski in June 2006. Pochowski was a former Agilent employee whom Mayder was aware consulted with Agilent and Verigy management regarding technical research and development information. Mayder Decl. ¶¶ 23-24. In two of his emails, Mayder sent Pochowski RFQ documents for ████████████████████████████████████ ████████████" Decl. Robert Pochowski Supp. TRO, Exs. B, C; see also Mayder Decl. ¶ 28 ("On June 12, 2006, I sent Bob Pochowski a draft RFQ of an SOS [] switch to explore whether we could form a business together.").[2] █████████████ shares the same document layout, section headings and information structure, and identical typographic errors to the █████████

───────────────

[2] As discussed further below, Mayder did not "consider these documents confidential because they were based on publicly available information." Mayder Supp. Decl. ¶ 11. Verigy has submitted a number of objections to Mayder's supplemental declaration, in support of defendants' sur-reply – including a specific objection to paragraph 11. Most of these objections are either (1) that Mayder is setting forth argument or opinion rather than facts in his declaration or (2) that Mayder's statement is contradicted by other evidence. *See* Objections to Defendants' Evidence in Supp. of Sur-Reply. The court has set forth in this opinion the factors upon which it relies. No separate order on the objections is necessary.

United States District Court
For the Northern District of California

1   written by Mayder.  As discussed below, Mayder has since admitted ████████ was based

2   upon the ██████████████████ Among other changes, Mayder modified the document

3   to read ████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ██ On June 26, 2006, he also sent Pochowski a spreadsheet of NAND wafer sort requirements for

8   five of Verigy customers, ████████████████████.  Pochowski Decl., Ex. D.

9   On July 9, 2006, Mayder sent Pochowski a PowerPoint presentation titled "Tester Expander: A New

10  Paradigm."  *Id.*, Ex. D.  Also while still employed by Verigy, Mayder ████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████ *Id.* ¶ 33, Pochowski Decl.,

17  Ex. F.

18       Sometime after July 2006, Pochowski became Mayder's business partner.  Mayder's third

19  business partner was Mayder's brother, defendant Wesley Mayder.  The partnership with Pochowski

20  eventually dissolved over a dispute over the parties' interest percentages in STS.  Mayder Supp.

21  Decl. ¶ 26.  Pochowski left STS in December 2006.  Mayder Decl. ¶ 46.  In fact, Pochowski is the

22  source the information upon which Verigy's bases its allegations ████████████████████

23  ████████████████████.

24       STS asserts that it originally sought out customers for its NAND testing solution but did not

25  find any interest because the potential customers decided to manufacture their own probe card

26  resource sharing circuits.  Mayder Supp. Decl. ¶¶ 18-19.  Deciding that NAND testing was not a

27  good market and, after hearing some interest from potential customers for NOR testing, STS claims

28

United States District Court
For the Northern District of California

1    to have completely redesigned the ███████████████████████████████████████

2    ███████████████████ *Id.* ¶¶ 20-22.

## II. ANALYSIS

### A.    Legal Standard

A district court has discretion to grant or deny a request for preliminary injunctive relief. *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir. 2006). Under the traditional test for granting preliminary injunctive relief, the applicant must demonstrate: "(1) a likelihood of success on the merits; (2) a significant threat of irreparable injury; (3) that the balance of hardships favors the applicant; and (4) whether any public interest favors granting an injunction." *Raich v. Ashcroft*, 352 F.3d 1222, 1227 (9th Cir. 2003). Alternatively, "[t]he moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party." *Stuhlbarg*, 240 F.3d at 839-40 (9th Cir. 2001). These two formulations of the test "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1155 (9th Cir. 2006).

### B.    Likelihood of Success on the Merits

Defendants argue that Verigy's likelihood of success on the merits is small because the information that Mayder distributed to Pochowski did not contain Verigy trade secrets. Further, they contend that the ████████████████████████████████████████████. Thus, defendants argue, even assuming ████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████; and ███████████████████████████████ ████████████████████████.

Verigy, on the other hand, argues that its likelihood of success is high because Mayder admits to ████████████████████████████████████. Even if the court were to

United States District Court
For the Northern District of California

1  find that there are no trade secrets, Verigy asserts that Mayder has breached the confidentiality and

2  proprietary development agreement that Mayder signed with Verigy as part of his employment

3  which is dated only a month before he sent ████████████ associated documents to

4  Pochowski. ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████

9  ████ .

### 1.    Trade Secrets

Plaintiff seeks a preliminary injunction based largely on the merits of its trade secret

misappropriation claim.  Under California law, whether something is a "trade secret" depends on a

two-part analysis.  As defined by the trade secret statute, a trade secret can be any:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use;  and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  The statute also defines "misappropriation" as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;  or
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (A) Used improper means to acquire knowledge of the trade secret;  or
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
> (i) Derived from or through a person who had utilized improper means to acquire it;
> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;  or
> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;  or
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(d).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1

2       **2.**     **Verigy's Efforts to Maintain Secrecy**

3       Defendants argue that Verigy does not use reasonable efforts to maintain secrecy because

4 certain Verigy employees deposed in this matter are uncertain how to apply Verigy's policy for

5 marking and handling confidential and trade-secret documents. This argument is unpersuasive.

6 Measures to protect secrecy need be reasonable under the circumstances, Cal. Civ. Code §

7 3426.1(d), but need not be absolute. Verigy has clearly shown that it has a policy regarding

8 confidential information and that it requires its employees to sign an agreement, the ARCIPD, that

9 defines confidential information and requires them to keep such information confidential. The

10 parties have also provided a copy of the ARCIPD signed by Mayder, which Mayder does not deny

11 having executed. Mayder Supp. Decl., Ex. C. Verigy has also produced evidence that its

12 disclosures to Honeywell were covered by a confidential disclosure agreement dated April 22, 2006.

13 *See* Decl. Michael Stebbins Supp. Plf's Objs. Def's Evidence in Supp. of Sur-reply, Ex. 2

14 (confidential disclosure agreement concerning "Agilent's technical request for an Octal SP4T highly

15 integrated SOIC switch as well as Agilent's disclosures [sic] related to . . . forecasted business

16 demand, actual product consumption, business processes and tools, product technology roadmaps,

17 product features and performance, product architecture, product development schedules . . . future

18 manufacturing strategy."). The measures strongly evidence that Verigy (and, before that, Agilent)

19 used reasonable efforts to protect the secrecy of its Chameleon project. *See, e.g., MAI Sys. Corp. v.*

20 *Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (steps to ensure secrecy of information

21 reasonable where employees were required to sign confidentiality agreements). That defendants

22 have demonstrated that there may be a difference of opinion among Verigy employees as to how to

23 apply Verigy's written confidential information policy does not show that Verigy did not use

24 reasonable efforts to maintain secrecy.

25       Further, defendants argue that Verigy does not use reasonable efforts to maintain secrecy

26 because Verigy discloses many of its trade secrets in patent applications. They also argue that

27 another Verigy project, ███, "meets the same functional requirements as described in the

28 ███████████" Opp'n at 14, but was publicly discussed in detail in an ███████



1   ███████████████████████████████████████ [3] As discussed in further detail below,

2   the court finds that the ██████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ███████████████████████████████

5            **3.      Verigy's Alleged Trade Secrets**

6   ██████████████████████████████████

7   ████████████████████████████████████████████████

8   ██████████████████████████████

9   ██████████████████████████████████████████████████

10  ████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ████████████████████████████████

13  ███████████████████████████████

14  ███████████████████████████████████████████████

15  ██████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ██████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ██████████████████████████████████████████████████

21  ██████████████████████████████████

22  █████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ██████████████████████████████████████

25

26  ─────────────────────

27  [3] Mayder also asserts that he and a fellow Verigy employee originally investigated ██████████████

28  ████████████████████████████████████████████████████████████████████████

United States District Court
For the Northern District of California



Decl. Ira Leventhal Supp. Plf's Reply ("Leventhal Reply Decl.") ¶ 6.  Of the above items, 1-8, 23 and 24 appear to relate to Verigy's research into the business opportunity, while items 9-13 and 16-22 are technology items relating to the technical aspects ████████████████████████████████ ████████████████████████████████████████. Plf's Reply and Supplemental Br. at 2.  Items 14 and 15 appear to relate to particular switches and manufacturers considered for technologies to be used ████████████.

Defendants argue that taken individually, none of the technology items above (9-13 and 16-22) are trade secrets.  Defendants contend that the basic idea behind ████████████████ ████████, is publicly known.  Defendants characterize the ████████████████████████ ████████████████████████████████████████████████████.  They assert that Verigy's ████████████ technology is a compilation based on two "pillars": (1) the combination of publicly-available components; and (2) the customer requirements collected ████████████████████████████████████ ████████████████. *See, e.g.,* Plf's Reply at 18 ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████





1

2

3    *Id.*

4    Wei states that the

5    , lacks two of the three functionalities

6    of the

7

8

9    . *Id.* ¶ 90-92.

10    STS's expert, Richard Blanchard, opines that the

11    . First, he argues that

12

13    . Supplemental Decl. of Richard Blanchard ("Blanchard Supp. Decl.") ¶

14    21. He also points out that although the

15

16

17

18

19

20

21    Wei also states that the

22

23

24

25    Wei Decl. ¶ 96.

26

27

28

United States District Court
For the Northern District of California

1 ████████████████████████████████████████████████████

2 ██████████████████████████

3     Finally, defendants argue that Verigy itself publicly disclosed the technical components of

4 the ███████████████████████████████████████

5 ████████████████. Defendants contend that ████████████████████. Verigy's expert,

6 Wei Wei, explains that the █████████████████████████████████████

7 ███████████████████████████████████████████████.

8 Further, as set forth in footnote 3 above, Mayder himself notes key deficiencies he uncovered when

9 he sought to ██████████████████████████████. Mayder Decl. ¶ 15████

10 █████████████████████████

11     Defendants have failed to present evidence demonstrating that the particular implementation

12 set forth in the ██████████ was publicly available and thus not secret. Although ██

13 ████████████ may potentially be read to cover ASIC implementations in addition to FPGA

14 applications, it does not appear that sufficient detail to implement ██████████████

15 ███████████████████████████████████████████████████

16 ██████████████████████████████████████

17 ███. Further, it is undisputed that the ███████████████████████

18 This is after Mayder ██████████████████████████████████

19 █████████████████████████████████

20 ██████████████ to Pochowski in June 2006 and after Mayder sent the same to Honeywell for a

21 quote. Although the ███████████████████████████████

22 ████████████████████, it is does not appear relevant to whether

23 ██████████████████████████████████.

24     As with the ██████████████████████████████

25 █████████████████████████████████████████

26 ████████████████████████████████

27 ████████████████████████████████

28 ██████ *See, e.g.,* ███████████████████████



1   The court also concludes that any public discussion of the ███████does not demonstrate

2   that ███████ was not a trade secret. The fact that the █████████████████

3   ███████████████████████████████████████████████████

4   █████████████████████████. Further, Mayder himself acknowledged that

5   the projects were different when he originally sought to █████████████████████

6   ███████████, but ultimately concluded that ███████ would not be a good starting point.

7       The court finds that the individual items that Verigy claims are trade secrets are not

8   themselves trade secrets. Nevertheless, the combination of publicly-known elements can be trade

9   secret provided the combination itself is not generally known. *O2 Micro Intern. Ltd. v. Monolithic*

10  *Power Systems, Inc.*, 420 F. Supp. 2d 1070, 1089-1090 (N.D. Cal. 2006) (Wilkins, J.)

11  ("Combinations of public information from a variety of different sources when combined in a novel

12  way can be a trade secret. It does not matter if a portion of the trade secret is generally known, or

13  even that every individual portion of the trade secret is generally known, as long as the combination

14  of all such information is not generally known."). Here, Verigy has shown for purposes of a

15  preliminary injunction, that the combination of technical items comprising ███████on a single

16  chip was not generally known. The██████████████did not disclose these items in

17  combination in sufficient detail to produce the █████████. Nor did the ███████disclose

18  these items in detail to produce the ████. And ███████ was not even considered a good starting point

19  for███████, so it difficult to imagine how any public discussion of the ███████would have

20  resulted in ██████being generally known.

21           **b.    Second "Pillar": Verigy Customer Requirements**

22       As to the second "pillar," defendants first contend that the customer requirements collected

23  ████████████are publicly available and that Mayder did nothing wrong by using the

24  customer requirements for ██████████. This argument lacks merit, since, as set forth above,

25  Verigy has presented undisputed evidence that █████████████████████████

26  ██████████████████████.

27       Defendants next contend that neither █████████████████████████

28  ████████████████collected by Verigy from █████████████████████

1   ███████████████████████. Rather, they argue, Flash Enhancer is built based upon

2   customer requirements that were collected directly by STS from STS's current customers, Spansion

3   and Intel, for testing NOR devices. The court agrees that Verigy has presented no evidence that the

4   Spansion and Intel requirements upon which the Flash Enhancer design is based were obtained from

5   Verigy. However, the ██████████████████████████████████████were

6   used to formulate the RFQ for ████████████. The evidence is clear that Mayder used the ████████

7   ████ as a template for ██████████████████████As set forth in further detail below, the Flash

8   Enhancer product is based upon████████. Thus, even though the current Flash Enhancer product is

9   directed toward the Spansion and Intel requirements that were collected by STS and not Verigy, it

10  nevertheless appears that the framework for integrating the requirements of STS customers was

11  created using the Verigy customer requirements.

### 4.   Alleged Misappropriation

13       By Mayder's own admission, he used materials he developed for Verigy ████████████████

14  ████████████. He forwarded the ████████████████nearly verbatim to Pochowski while still

15  employed with Verigy (with his company information and project name substituted) and he also

16  clearly admitted in deposition that ██████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████The

20  Picasso documents RFQ Mayder sent to Pochowski and later to Honeywell, were, per Mayder's own

21  admission, based ████████████████. As set forth above, the customer requirements Mayder

22  sent to Pochowski appears to have also included trade secret information that Mayder procured from

23  Verigy. Additionally, the business presentation he sent to Pochowski included diagrams that are

24  also found in Verigy's documents. These items demonstrate that Verigy can show a high likelihood

25  of success on the merits of its claim that Mayder misappropriated trade secret information ████████

26  ████████████████████████████████████████████████████████

27  ██████████████████████████

28

United States District Court
For the Northern District of California

1    Defendants assert two arguments that Mayder's use of these documents for Picasso does not

2  constitute misappropriation because the documents were not confidential: (1) that the █████████

3  ███████████ that Mayder acknowledges modifying for ███████ were marked confidential only in

4  the header and footer but not in the body of the documents; and (2) that when the ████████████

5  ████████████ were transmitted ███████████████████████████, that transmission and follow up

6  communications were not done under any confidentiality obligation on ███████████. The first

7  of these arguments is specious. The second is refuted by ████████████████████████

8  ██████████████████████████████████████████████████ Stebbins Decl., Ex. 2.

9    ███  ████████████████████████

10    Defendants argue that even assuming the court finds that Verigy can establish that the

11  portions of the ██████████ project Mayder utilized were a trade secret, an injunction should not

12  issue in this case because STS's current Flash Enhancer product does not utilize Verigy trade secrets.

13  Even though Mayder admits to ████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████

15  ███████████████████████████████████████████

16    To the extent it is merely an obvious evolution of a product based on Verigy's trade secrets,

17  STS's Flash Enhancer may nevertheless be the product of trade secret misappropriation. Under

18  California law, minor variations in a product do not negate a claim for misappropriation of trade

19  secrets. *See Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1244 (Fed. Cir. 1989) (applying

20  California law); *see also Am. Can Co. v. Mansukhani*, 742 F.2d 314, 328-29 (7th Cir. 1984)

21  (explaining that a "party may not use another's trade secret, even with independent improvements or

22  modifications, so long as the product or process is substantially derived from the trade secret" and

23  that "[i]f the law were not flexible enough to reach such modifications, trade secret protection would

24  be quite hollow").

25    Defendants argue that the current ███████████ product is significantly different from their

26  original ███████████. Verigy, on the other hand, asserts that ████████████████████████

27  █████████████████████████████████████████████████████████████████

28  ████████████████████████████████.

United States District Court
For the Northern District of California

### a.    Product Name

Verigy repeatedly references communications between ███████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████ Wei Decl. ¶ 32. The court does not find this evidence

particularly helpful. On the one hand, there does appear to be some mingling of the names of the

products that defendants now claim are separate – for example, Mayder appears to begin insisting on

the appellation of ███████████ only after the present action was filed. Decl. of Melinda Morton

Supp. Plf's Reply, Ex. 25 (September 17, 2007 email from Mayder to Honeywell employee in an

email string titled ██████████████████████████

███████████████████"). On the other hand, STS is a small company that may

not necessarily change the name of a project even when significant changes to the project got

underway. Thus, the court must determine based on other evidence whether there are differences

between █████████████████████████████████

██████████████████████████████

### b.    ██████████

Verigy presents evidence that ███████████████, is based largely upon

█████. Further, Verigy contends that any ██████ development performed at Verigy was to

have been assigned to Verigy pursuant to the ARCIPD.

The ARCIPD sets forth that it

> concerns inventions and discoveries (whether or not patentable), designs, works of
> authorship, mask works, improvements, data, processes, computer programs and
> software (herein called "Proprietary Developments") that are conceived or made by
> me alone or with others while I am employed by Verigy or that relate to the research
> and development or the business of Verigy. Such Proprietary Developments are the
> sole property of Verigy and I agree: (a) to disclose them promptly to Verigy; (b) to
> assign them to Verigy; and (c) to execute all documents and cooperate with Verigy in
> all necessary activities to obtain patent, copyright, mask works and/or trade secret
> production in all countries at Verigy US, Inc.'s expense.

Mayder Supp. Decl., Ex. C. ¶ 3. The agreement further provides

United States District Court
For the Northern District of California

1    The product of all work performed by me during and within the scope of my Verigy
     employment including, without limitation, any reports, documents, drawings,
2    computer programs, devices and models, including all copies thereof, will be the
     property of Verigy and Verigy will have the sole right to use, sell, license, publish or
3    otherwise disseminate or transfer rights in such a work product.

4    *Id.* ¶ 5. Although Mayder contends otherwise, there is little question that, whether it was cancelled

5    or not, Mayder's work on ███████ falls within the scope of Proprietary Developments conceived

6    or made by him while he was employed by Verigy. Similarly, at least until the time Mayder left

7    Verigy in September 21, 2001, there is little question based on the evidence presented to date that

8    ███████ does as well. It appears that Picasso was based on the two "pillars" of information discussed

9    above (both of which the court has determined were proprietary to Verigy) and Mayder's further

10   work on ██████, particularly because STS did not collect customer requirements from Intel until

11   November 2006. Thus, the evidence of record demonstrates that Mayder was most likely obligated

12   to assign ████████████████████ to Verigy because (1) ██████████ was a

13   research project commenced at the direction of Verigy, (2) the information upon which ██████ is

14   based was collected, compiled and created by Verigy as part of the ██████████ project, and (3) the

15   ARCIPD required Mayder to disclose and assign to Verigy Proprietary Developments he made

16   while he was employed by Verigy that related to "the research and development or business of

17   Verigy." Therefore, for purposes of this motion, the court finds that features found in ██████ data

18   sheets or other documentation up to September 2006 are likely to belong to Verigy under the

19   ARCIPD.

20       The similarities between the ████████████████████████████

21   ███████ and the ████████████████████████████ are striking.

22   Although the ████████████████████ in the first figure describing the switch

23   configuration while ████████████████, the description is otherwise identical. The Technical

24   Requirements set forth on page 3 of the ██████████ are set forth in the same table with the

25   same row and column designations as the technical requirements in the ██████████.

26   *Compare* Lee Decl. Ex. A at 1, 3 *with* Pochowski Decl., Ex. A at 1, 3. There are differences in the

27   values set forth in the rows for some of the minimum, typical and maximum values, but these row

28   descriptions remain essentially unchanged. *Id.* The differences in the values do not appear to be

United States District Court
For the Northern District of California

1   material.  The table row labels in the Technical Requirements section change slightly between the

2   ███████████ and the ███████████████████████████

3   ███████████, with rows being ████████████████████████

4   ███████████████████████  Again, there are variations in the values set forth in each row, but

5   these differences do not appear to be material.  *Compare* Pochowski Decl., Ex. A at 3 *with* Supp.

6   Morton Decl., Ex 7 at 4-5.

7            **c.      ███████ to Flash Enhancer**

8        Defendants assert that ███████ changed considerably after Mayder left Verigy due, in

9   particular, to STS's separate and subsequent solicitation of Intel's requirements for a fan-out tester

10  solution.  The court is not convinced.  Verigy has presented evidence that many of the features that

11  defendants assert are new in Flash Enhancer are relatively unchanged from the ████████████

12  ██████████, when Mayder was still at Verigy.  *See* Supp. Morton Decl., Ex. 7.  To

13  demonstrate this, Verigy traces the development of certain features from the ██████████████

14  ██████████ (Supp. Morton Decl., Ex. 7) which was developed prior to the Intel

15  requirements, to the ██████████████████████████████████████ (*id.*,

16  Ex. 9), and finally to the July 2007 Flash Enhancer Data Sheet (Levinthal Decl., Ex. 1).

17       To demonstrate Intel's unique customer requirements, defendants present a declaration by

18  ████████████████████████████████████

19  ███████████████████████████████████████

20  ████████████████████████████████████████

21  ██████████████████████████████████████

22  ███████████████████████████████████████

23  ██████████████████████████████████████

24  ████████████████████████████████████████

25  ███████████████████████████████████████

26  ████████████████████████████████████████

27  ████████████████████████████

28



United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; ORDER GRANTING MOTION TO
STRIKE AFFIRMATIVE DEFENSES (Redacted Version)—No. C-07-04330 RMW
MAG

United States District Court
For the Northern District of California

1  ███████████████████████████████████████████████████

2  ███████████████████████████████████████████████████

3  ███████████████████████████████████████████████████

4  ███████████████████████████████████████████████████

5  ████████████████████████████████████████████

6  ███████████████████████████

7   There are some differences.  For example, ████████████████████████████

8  ████████████████████████████████████. ████████████████████████████

9  ██████████████████, with the ███████specification having higher values.  There are also a few

10 features that are unique to Flash Enhancer such ██████████████████████████████

11 ███████████████████.  Levinthal Decl., Ex. 1 at 3, 11, 15.  These features are unique, but appear to

12 be enhancements built atop the foundation that was based originally ██████████████████

13 █████████████████████████████████████

14        **d.    NAND versus NOR**

15       Another difference that defendants discuss in their briefing is that both ██████████████

16 ████████████████████████████designed for NAND flash memory testing; the current██████

17 ████████████████, by contrast, is directed toward NOR flash memory.

18       Here, although the parties' experts disagree whether the difference is significant, they appear

19 to agree that NOR testing requires, at minimum, a faster read cycle and a higher number of pins.[7]

20 Wei Decl. ¶ 15, 18, 24; Blanchard Decl. at 8, tbl. 1; Blanchard Supp. Decl. ¶ 14.  Thus, the court

21 agrees with Blanchard's conclusion that there are differences between the "random access read

22 speed" and the "pin density" required for NAND versus NOR testing.  Blanchard Supp. Decl. ¶ 10.

23       Verigy's expert provides analysis of the July 2007 ██████████████████which sets

24 forth ten key features.  Leventhal Reply. Decl., Ex. 1 (data sheet titled "██████████████████

25

26 [7] Not surprisingly, Pochowski testifies that the differences between NAND and NOR are
   insignificant; Mayder testifies that the differences between the two types of memory required a
27 complete redesign of the Flash Enhancer product since the Picasso project.  Because both of these
   witnesses have clear roles and motivations in this case, the court weighs their opinions with
28 skepticism.



1    ████████████████████████████"). Verigy's expert asserts that of the 10

2    features listed on the first page of the data sheet, eight are present in the ██████████

3    ██████████ and that the other two, █████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████. Wei Decl. ¶

6    60.  Of the remaining eight features, Wei notes that there are the following modifications from

7    ██████████████████

8

9

10

11

12

13

14

15

16    *Id.* ¶ 61.

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; ORDER GRANTING MOTION TO
STRIKE AFFIRMATIVE DEFENSES (Redacted Version)—No. C-07-04330 RMW
MAG                                                22



**United States District Court**
**For the Northern District of California**

1  ███████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████

3  ███ ████████████████████████████████████████████████████

4  ████████████████████████

5       The court concludes that there are differences between testing NOR and NAND that manifest

6  as features in the Flash Enhancer that were not ████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████

11       **e.**    **Conclusion**

12       Based upon the evidence before it, the court concludes that STS's ██████product was based

13  upon the ████████████████████████████████████████████████

14  ██████████████████████. As set forth above, Mayder admits to having used the

15  ██████████████████████████████. Further, he submitted ████████████████

16  ████████, a vendor with whom he was familiar because of his work at Verigy on █████████████

17  ████. The misappropriation of the ███████████████████████████████

18  ██████████████████████████combined with the exploitation of Verigy's

19  ██████████████████████████████resulted in defendants obtaining a head start in

20  developing their fan-out testing solutions ████████and Flash Enhancer.

21       On the evidence presented, the court further concludes that Flash Enhancer, even though now

22  directed toward testing NOR memory rather than NAND, is substantially based upon Verigy's trade

23  secrets. It is clear that defendants' current product, Flash Enhancer, is, at the very least,███████████

24  ███████████████████████████████████. It appears, however, that Flash Enhancer has

25  some relatively significant changes from███████████████████████████████, including███████

26  ████████████████████████████████and some features added based on customer

27  requirements that were not originally collected by Verigy. Accordingly, the court cannot say that

28  Flash Enhancer is solely an embodiment of Verigy's trade secrets. However, Flash Enhancer

1    product clearly benefitted from the lead time that Mayder did not have to expend to get to the

2    starting point represented ████████. Further, by having the customer requirements Verigy

3    collected from ████████████████████████████████████ in hand when

4    approaching Intel and Spansion, it appears that defendants may have had an unwarranted

5    competitive advantage.  Understanding the requirements of other vendors may have permitted

6    defendants to make a more convincing presentation to STS customers and thus win business they

7    might not have been able to secure had they started without the information obtained from Verigy.

8         **C.     Threat of Irreparable Injury**

9         Defendants contend that Verigy will not be damaged ████████████████

10   ████████████████████████████████████████████

11   ████████████ does not utilize Verigy's claimed trade secrets.  As set forth above, the court

12   has concluded that the ████████████ was developed using ████████████.

13        While it is true that Verigy is not currently using the trade secrets ████████████

14   ████████, Verigy also chose not to enter the market with a product based ██

15   ████████████████████████████████████████████

16   ████████████. Verigy suffers an injury to the extent that STS received a head start on

17   developing a technology that is being sold ████████████████████████████

18   ████████████████████████. Further, because

19   the court concludes ████████████████ are based upon the ████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████. Nevertheless, it appears that Mayder

23   given his skill and experience could have eventually developed the Flash Enhancer without the

24   benefit of any Verigy trade secret by referring to publicly-available references regarding fan-out

25   technology and collecting and integrating STS customer requirements without the benefit of

26   exposure to the Verigy customer requirements.

27

28

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; ORDER GRANTING MOTION TO
STRIKE AFFIRMATIVE DEFENSES (Redacted Version)—No. C-07-04330 RMW
MAG                                                         24

United States District Court
For the Northern District of California

### D.    Balance of Hardships

The court must determine the balance of hardship between the parties. An injunction should not be granted if its impact on the enjoined party would be more severe than the injury the moving party would suffer if it is not granted. *County of Alameda v. Weinberger*, 520 F.2d 344, 349 (9th Cir. 1975).

Defendants contend that STS will be severely impacted by an injunction because STS is about to launch a ████████████████, while Verigy will not be damaged ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████ It further presents some evidence that STS's customer████████████████████ ████████████████████████████████████████████████ Supp. Weber Decl. ¶ 7. Weber asserts that it could take ██████████████ to work with another vendor to design, develop, fabricate and test a custom ASIC meeting the appropriate requirements. *Id.* The court has some concern that because Verigy is not selling a comparable product, that the injunction will prevent a useful tool from being available, however it appears from Weber's declaration that other vendors are offering a similar solution to STS, even if that solution is not yet at the same stage of development as Flash Enhancer.[8] The court finds that the balance of hardships tips in favor of Verigy to the extent that STS would use its past, present or future products for NAND testing. The balance of hardships tips less sharply, however, to the extent that the Flash Enhancer is used for NOR testing, as Verigy does not currently sell its products for NOR testing.

### E.    Conclusion

Verigy has raised serious questions as to defendants' alleged misappropriation of trade secrets as well as Mayder's breach of the ARCIPD. Verigy has also demonstrated the immediate potential of irreparable harm from the defendants' use of the trade secret information and technology discussed above in STS products. Thus, based on the evidence before it, the court finds that a

---

[8] Verigy and STS may also be able to resolve this problem by agreeing upon a division of revenues gained from the sale of Flash Enhancer.

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION; ORDER GRANTING MOTION TO STRIKE AFFIRMATIVE DEFENSES (Redacted Version)—No. C-07-04330 RMW
MAG                                                                                      25

1  limited injunction is appropriate to temporarily prohibit the sale, licensing or distribution of STS's

2  Flash Enhancer product and any product based on Flash Enhancer ████████.

3      **F.    Duration of the Injunction**

4      As discussed above, the court has concluded that defendants obtained a head start on the

5  development of ████████ the Flash Enhancer product.  Accordingly, the court finds it appropriate

6  to delay the distribution of the Flash Enhancer for the amount of time STS saved in its development

7  process by use of Verigy's trade secret information.  Based on the declaration of Dick Weber, it

8  appears that Flash Enhancer is due to ship sometime in the first quarter of 2008.  Supp. Weber Decl.

9  ¶ 4.

10      The parties, of course, dispute how long any such injunction should last.  Verigy, although

11  taking that position that any injunction should not be limited in duration, points out that the ████

12  project lasted from ██████████████████████████████Defendants, by

13  contrast, contend that two weeks is appropriate.  They assert that Verigy's expert, Wei, agreed with

14  them at deposition that all that defendants could have obtained by ██████████████████

15  ████ was a two-week jump on development.  The court finds that defendants' estimate overlooks

16  necessary tasks.  The statement by Wei on which defendants rely indicates that ████████████

17  █████████████████████████████████████████████

18  █████████████████████████████████████████████

19  ███████████████████. Blanchard Supp. Decl., Ex. B, Wei Depo. 96:1-97:11.  Wei

20  states: ███████████████████████████████████████

21  █████████████████████████████████████████████

22  ████████████████████████████████████

23  █████████████████████████ *Id.* at 97:4-11.  Wei's statement does

24  not lead the court to the conclusion that the sole advantage that defendants obtained was a two-week

25  head start in developing ████████ and Flash Enhancer.

26      The court finds the ████ project development time to be a more accurate reference point to

27  determine the appropriate amount of time for an injunction.  As set forth above, the evidence

28  demonstrates that Mayder worked on the ████████████████████████████████

United States District Court
For the Northern District of California

1  ████████████████████████████████ Mayder Decl. ¶¶ 13, 19. Mayder's own

2  declaration establishes that he was involved in the project through several "course changes," which

3  included investigating prior Verigy projects like ████ to use as a starting point for ████

4  ███████████████████████████, then moved to investigating at least

5  two different standard "off the shelf" electronic components for placement on the card. *Id.* ¶ 15-17.

6  Thereafter, Mayder wrote the ████████████████████. *Id.* ¶ 19.

7       It took Mayder at Verigy approximately ████████████████████████

8  ████████████████████████████████████. However, in light of

9  the fact that there is publicly-available information regarding implementation of fan-out technology

10 and the fact that STS's products are directed toward different customer requirements, the court finds

11 a five-month injunction to be appropriate. Setting the duration of the injunction at five months

12 rather than eight months also accommodates for the fact that STS has concentrated on design and

13 development of the Flash Enhancer product, while ████████████████████████

14 ████████████████████. Accordingly, the court will enjoin defendants for a period of five

15 months from the date of this order from marketing, distributing, selling, licensing, leasing,

16 transferring or disposing of ████████████████████████

17 ████████████████████████████████

18 **G.    Security Requirement**

19      Verigy has already posted a bond of $100,000 with respect to the TRO the court granted in

20 August 2007. Although defendants contend that a bond should be posted, they do not contest the

21 amount of the bond presently in place, nor do they suggest an appropriate amount. Because the

22 court has determined that the scope of the injunction shall be limited to five months, the court finds

23 the currently-posted amount to be appropriate security.

24                          **III.  ORDER**

25      For the foregoing reasons, the court grants in part and denies in part Verigy's motion for a

26 preliminary injunction as follows:

27 1.     Defendants ROMI OMAR MAYDER ("Mayder"), WESLEY MAYDER, SILICON TEST

28        SYSTEMS, INC. and SILICON TEST SOLUTIONS, LLC (the "STS Entities") as well as

*(left margin, vertical text)* United States District Court / For the Northern District of California

their agents, servants, employees, attorneys, and any other persons in active concert or participation with them who receive actual notice of this Preliminary Injunction Order, by personal service or otherwise, are hereby restrained and enjoined for a period of five (5) months from the date of this order from directly or indirectly marketing, distributing, selling, licensing, leasing, transferring or disposing ███████████████████████████ ████████████████████████████████████████████████████████ ███████

2.   Plaintiff's motion to strike defendants' affirmative defenses is granted.  Defendants shall have 20 days to amend their answer to plead facts sufficient to support their affirmative defenses.

3.   Defendants shall show cause why they should not be held in contempt for violating the court's temporary restraining order dated August 24, 2007 by continuing to use and disclose Verigy's Trade Secret information by continuing to work with Intel regarding STS's Flash Enhancer solution.  Defendants shall respond to Verigy's motion, originally filed on December 5, 2007, Docket No. 132, no later than March 21, 2008.  Verigy's reply shall be due no later than March 21, 2008.  The parties shall appear on April 11, 2008 at 9:00 a.m. for a hearing on the matter.

DATED:      2/29/08

_Ronald M Whyte_
RONALD M. WHYTE
United States District Judge

United States District Court
For the Northern District of California

**United States District Court**
**For the Northern District of California**

1     **Notice of this document has been electronically sent to:**

2     **Counsel for Plaintiff:**

3     Melinda Morton           mmorton@be-law.com
       Daniel J. Bergeson        dbergeson@be-law.com

4     John W. Fowler          jfowler@be-law.com

5     **Counsel for Defendants:**

6     Daniel Harlan Fingerman     dfingerman@mount.com
       Daniel S. Mount          dmount@mount.com

7     Kevin Martin Pasquinelli     kpasquinelli@mount.com

8

9     Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

10

11     **Dated:** _____2/29/08_____         _____/s/ MAG_____
                                                 **Chambers of Judge Whyte**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28