# EXHIBIT B
# PART 1 OF 3

RUSSO & HALE LLP

ATTORNEYS AT LAW
401 FLORENCE STREET
PALO ALTO, CALIFORNIA 94301
COMPUTERLAW.COM℠

TELEPHONE
(650) 327-9800

April 17, 2008

FAX
(650) 327-3737

**VIA FEDERAL EXPRESS**

John W. Fowler, Esq.
Bergeson, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110

Re: <u>Verigy US, Inc. v. Mayder et al.; USDC Case No. 5:07-cv-04330-RMW (HRL)</u>

Dear Mr. Fowler:

This letter is notification to you and your firm that Wesley Mayder has requested that and our firm has agreed to represent him individually in the above-referenced matter. A Notice of Appearance is attached and will be filed with the Court, assuming that your client chooses not to comply with our request that you dismiss him from this litigation.

I believe that you know that under Rule 11 of the Federal Rules of Civil Procedure, your signature on the pleading filed against Mr. Wesley Mayder constitutes your written affirmation that "the factual contentions have evidentiary support" and that "the claims...and other legal contentions are warranted by existing law...." F.R.C.P., Rule 11 (a full copy of the applicable terms of Rule 11 are attached to this letter as Exhibit "A").

We do not believe there has been compliance with Rule 11. We have interviewed the relevant parties and they are prepared to provide signed declarations, under oath, as to the facts which are set forth in detail in the attached declarations of Wesley Mayder, Romi Mayder, and Jon Davidson (copies of which are attached hereto as Exhibits "B" "C," and "D" respectively). We do not believe there is any law that holds a passive shareholder (having only a non-controlling interest in a corporate defendant) liable for the acts or omissions of that defendant or the acts or omissions of any of the other defendants. A general and unsupported set of allegations about "agency" or "alter ego" or "conspiracy" are not sufficient to overcome obligations imposed under Rule 11 to look at the facts and to look at the law and to apply the law to the facts and the facts to the law.

Under the case law which has been cited to you previously (*see*, letter dated October 31, 2007 from Kevin Pasquinelli, Esq. of Mount & Stoeker), all of the following cases make clear that there is no basis for having Wesley Mayder named as a defendant in this case: *Sanchez v. Lindsey Morden Claims Services* (1999) 72 Cal.App.4th 249; *Bank of California v. Connolly* (1973) 36 Cal.App.3d 350; *Folsom Associates v. Prometheus Dev. Co.* (1990) 223 Cal.App.3d 1; *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503. Again, for convenience, we have attached these cases as Exhibits "E," "F," "G," and "H."

John W. Fowler, Esq.
April 17, 2008
Page Two

      Accordingly, we request that within the next 21 days you comply with Rule 11 by dismissing Mr. Wesley Mayder as a defendant in this case.  If you are unwilling to do so, we ask that you cooperate with us to set an early date next month when Judge Whyte can promptly hear our motions under Rule 56 for summary judgment and under Rule 11 for sanctions including attorneys' fees and costs associated with our having to bring this motion.  Our client is prepared to waive his claim for attorneys' fees and costs against your client if the dismissal occurs promptly and certainly within the next 21 days as Rule 11 requires.  If you are not willing to do that, we can tell you that our client has authorized our firm to take further action including recovery of legal fees and costs against all responsible parties.  Please advise as soon as possible.

                               Very truly yours,

                               Jack Russo

*Attachments*

cc:    Mr. Wesley Mayder (via email)

# EXHIBIT A

USCS Fed Rules Civ Proc R 11

LEXSTAT FED. R. CIV. P. 11

UNITED STATES CODE SERVICE
Copyright © 2008 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH CHANGES RECEIVED MARCH 1, 2008 ***

FEDERAL RULES OF CIVIL PROCEDURE
TITLE III. PLEADINGS AND MOTIONS

**Go to the United States Code Service Archive Directory**

USCS Fed Rules Civ Proc R 11

Review Court Orders which may amend this Rule.
Review expert commentary from The National Institute for Trial Advocacy

Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions

(a) Signature. Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name--or by a party personally if the party is unrepresented. The paper must state the signer's address, e-mail address, and telephone number. Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit. The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention.

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
    (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
    (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
    (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
    (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions.
    (1) *In General.* If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.
    (2) *Motion for Sanctions.* A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.
    (3) *On the Court's Initiative.* On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).
    (4) *Nature of a Sanction.* A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order

to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

(5) *Limitations on Monetary Sanctions.* The court must not impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(B) on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

(6) *Requirements for an Order.* An order imposing a sanction must describe the sanctioned conduct and explain the basis for the sanction.

(d) Inapplicability to Discovery.  This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.

# EXHIBIT B



1   JACK RUSSO (State Bar No. 96068)
    RUSSO & HALE LLP
2   401 Florence Street
    Palo Alto, CA 94301
3   Telephone: (650) 327-9800
    Facsimile: (650) 327-3737
4   Email: jrusso@computerlaw.com

5   Attorneys for Defendant
    WESLEY MAYDER

6

7                       IN THE UNITED STATES DISTRICT COURT

8                  IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                                  SAN JOSE DIVISION

10  VERIGY US, INC., a Delaware Corporation,      Case No. 5:07-cv-04330-RMW (HRL)

11              Plaintiff,                         **DECLARATION OF WESLEY MAYDER**
                                                   **IN SUPPORT OF MOTION FOR**
12      v.                                         **SUMMARY JUDGMENT (F.R.C.P., RULE**
                                                   **56) AND ORDER TO SHOW CAUSE**
13  ROMI OMAR MAYDER, an individual;              **(F.R.C.P., RULE 11)**
    WESLEY MAYDER, an individual; SILICON
14  TEST SYSTEMS, INC., a California
    Corporation; and SILICON TEST
15  SOLUTIONS, LLC, a California Limited
    Liability Corporation, inclusive,

16                                                 Complaint Filed: August 22, 2007
17              Defendants.                        Trial Date: None set

18
    AND RELATED CROSSCLAIMS.
19

20

21

22

23

24

25

26

27

28

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Decl. Wesley Mayder Supp. Mot. Summ. J. & OSC    1    Case No. 5:07-cv-04330-RMW (HRL)

1    I, Wesley Mayder, declare under penalty of perjury as follows:

2    1.    Unless otherwise stated, the matters set forth in this Declaration are true and correct

3    of my personal knowledge, and I could and would competently testify concerning those matters, if

4    I were called as a witness thereto.  I submit this Declaration in support of my motion for summary

5    judgment seeking dismissal from this case.  As I will explain, I have no direct or indirect control

6    over any of the defendants in this case.

7                                **MY EDUCATION**

8    2.    I graduated from Monta Vista High School in Cupertino, California in 1987.  I then

9    attended Foothill College in Los Altos Hills, California from 1988 to 1990.  I then attended De

10    Anza College located in Cupertino, California from 1990-1991.

11    3.    Subsequently, I attended San Jose State University in San Jose, California from

12    1991 to 1992.

13                              **MY WORK EXPERIENCE**

14    4.    I have no experience in the semiconductor industry.  I have worked principally in

15    the mortgage industry for over 15 years since 1992, and in the field of Internet marketing for nearly

16    10 years.

17    5.    In October 1999, I established WeDirect, Inc. ("WeDirect"), an online marketing

18    company that optimizes Internet traffic.  I am currently Chief Executive Officer of WeDirect.

19    WeDirect does not have any clients in the semiconductor industry.

20    6.    I have no expertise or experience in the semiconductor industry, and I have no

21    employees with any expertise or experience in the semiconductor industry.  Though WeDirect is an

22    online marketing company, we have no expertise or experience in marketing or promotion for any

23    companies in the semiconductor industry.   None of the other defendants is a client or customer of

24    WeDirect and WeDirect has received no compensation from any of them.

25    7.    Romi Mayder, the other individual named in this case, is my younger brother.

26    Romi has had no operating or other business role whatsoever in WeDirect; he has never worked for

27    WeDirect, is not and was never on the Board of WeDirect, was never a shareholder of WeDirect,

28    and had no role whatsoever in WeDirect's growth.   Similarly, I have had no operating or other

1   business role whatsoever in Romi's business, I have never worked for Romi, am not and was never

2   on any board of directors of any of his companies and I am only a passive shareholder with less

3   than a 25% ownership interest in Silicon Test Systems, Inc., a corporation in which Romi has

4   majority ownership and control over.[1]  I have no control over Romi or over any other defendant.

5                       **Involvement in Silicon Test Systems LLC**

6        8.      In October 2006, Romi presented me with the opportunity to invest in his limited

7   liability company, namely, Silicon Test Solutions LLC ("STS LLC").  Before I had even learned

8   of his ideas, Romi had already filed the Articles of Organization of STS LLC, and the first I had

9   heard of STS LLC was in October 2006.  While Romi did not tell me much about STS LLC's

10   work, I trusted (and still trust) Romi and I wanted to support him because he is my brother, so I

11   agreed to become a passive investor in STS LLC.

12        9.      I never agreed to become and I never did become an active participant in STS LLC.

13   I understood that my proposed investment would require me to sign a written agreement and I did

14   agree verbally to review and sign (but we never finalized and I never signed) any final version of

15   the Operating Agreement of STS LLC, a true and correct draft copy of which is attached hereto as

16   **Exhibit A.**  That document was never signed and it never became a binding agreement.

17        10.     The original idea was that Romi was to sign that Operating Agreement and was to

18   own a 51% share in STS LLC, as was Robert Pochowski, who was then Vice-President of STS LLC

19   and who was to own a 29% share in STS LLC and continue to hold his position as an officer of STS

20   LLC with Romi.  I never became an officer and never had an operating role at all.  Indeed, though

21   Romi signed the Operating Agreement, Mr. Pochowski did not because he disagreed with how the

22   ownership was to be distributed.  He demanded that I not be a passive investor at all in STS LLC.

23        11.     Because Mr. Pochowski never signed the Operating Agreement, I never signed the

24   Operating Agreement as well.  In all events, I never had any type of control over STS LLC or over

25   any of its other two proposed members.  Indeed, I have never had any control over my brother, nor

26   over Mr. Pochowski.

27   _____

[1]   As a shareholder and as Romi's brother, from time to time I have received updates from Romi
28   on his business activities.  However, these have been updates only, and I have not directed
      Romi or his company in any way.

**INVOLVMENT IN SILICON TEST SYSTEMS, INC.**

12.    Silicon Test Systems, Inc. ("STS Inc.") was formed on December 26, 2006 by Romi. I invested $250,000 in STS Inc. on January 3, 2007, receiving 20,000 shares of common stock which was approximately a 20% ownership interest. A true and correct copy of the check that I wrote to STS Inc. is attached hereto as **Exhibit B**. A true and correct copy of the stock certificate that I received in return from STS Inc. is attached hereto as **Exhibit C**. Again, I never was an officer, never was a director and never had any operating role and the same is true today.

13.    My stock investment in STS Inc. is approximately a **20%** share, and it is clearly a minority position with no ability to control STS Inc. in any manner. I have no contractual right (or other ability) to become a board member or to become an officer or to become an employee and I have no interest in doing any of those things given how busy I am with my own business, WeDirect. As a shareholder, I receive information that other STS Inc. shareholders receive, namely, whatever management of STS Inc. (currently just my brother) provides to all STS Inc. shareholders. I have no other rights in STS Inc. nor do I have any right to direct any of the lawyers who represent other defendants.

**THE CORE DISPUTE APPLICABLE TO ME IN THIS CASE**

14.    I dispute the contention of plaintiff Verigy US, Inc. ("Verigy") and its counsel that I should be a defendant in this lawsuit simply because I am Romi's brother and/or simply because I am a shareholder in STS Inc. I do not believe this is appropriate. Nor do I believe it is appropriate to have me as a defendant in this case merely because I have done some favors for my brother in referring him to Jon Davidson or in making a gift to him (valued at less than $500) on the design of his company's web site. I see each of these as favors for my brother and none of them constitutes grounds for me to be named in this lawsuit.

15.    I know that Verigy is contending (falsely) that I "aided and abetted" my brother in doing something that they believe was and is wrongful with regard to his lab notebook. However, I believe they misunderstand what my brother was interested in doing, and I know they misunderstand my referral to Jon Davidson. In mid-December 2006, Romi sent me an email asking if I knew of someone who could provide some verification of dates applicable to his lab

1  notebook. I had not seen his lab notebook and I did not even know what was in his lab notebook,

2  but I did know that because of my lack of personal knowledge about these things, I could not

3  provide any verification for him and he accepted that fact. I therefore suggested that he talk to the

4  one other person I knew who was in and around his offices at the time, namely, Jon Davidson. I

5  knew that Jon and Romi often previously discussed Romi's work at STS LLC. As a favor for my

6  brother, and because I would have provided the same courtesy to any other friend or colleague, I

7  had no trouble allowing Jon Davidson some free time away from his job at WeDirect to talk with

8  Romi about this matter. I believe Jon and Romi were trying to remember the dates of their various

9  conversations. I never directed Jon Davidson to do anything false or anything wrongful, nor would

10  I ever imagine that Jon would ever do so.

11      16.      As to the help on the web design, in January 2007, I asked one employee of

12  WeDirect to help my brother with his web design; again, this was as a favor to him. Originally, an

13  employee of WeDirect named John Prince provided some input on the design of the STS Inc.

14  website; my estimate is that it was "work" valued at under $500. In fact, Romi did not like the

15  original design that John Prince submitted and it was only through a number of iterations with

16  Romi (involving his authorship and decision-making) that an acceptable design was created.

17  Again, the total time and value was minimal and I did provide it as a gift: it was not something that

18  I felt I should charge my brother for and I still feel that way. I would do it for any other family

19  member as well. I did not personally do any of this work, nor did I even review this work. To my

20  knowledge, a Network Solutions server previously hosted the STS Inc. website (which website is

21  now shut down); neither I nor WeDirect has ever hosted any website for STS Inc. or for Romi.

22      17.      Finally, I learned in March 2007 that STS Inc. was searching for about 1,500 square

23  feet of office space. At about that time, I heard that an office suite located in the same building in

24  San Jose in which my company, WeDirect, rents space might be available in a different suite and

25  on an entirely different floor of the building. I referred Romi to the office manager of the building

26  and made an introduction for my brother to that office manager of the building to determine if the

27  suite was, in fact, available. It was available and Romi on behalf of STS Inc. pursued the

28  opportunity to lease that suite. It is not shared space with WeDirect or with me and at no time have

1  WeDirect or I shared any space with Romi or with STS Inc.  Indeed, though WeDirect and STS

2  Inc. are in the same office building, the two businesses share no space, no phones, no office

3  support, no secretarial and no other resources whatsoever.  Neither WeDirect nor I have paid any

4  bills for STS Inc. or for Romi nor have they for me or WeDirect.  I am paying for Russo & Hale,

5  my own independent legal counsel in this case.

6                        **LAWSUIT BROUGH BY VERIGY**

7         18.    Without really investigating any of the foregoing facts, in August 2007, Verigy filed

8  a complaint against me as a co-defendant in this case.  I frankly believe it was and is a mistake or,

9  if not, it is simply designed to pressure me and/or pressure my brother in some wrongful manner.  I

10 do not understand why I was named as a defendant in this lawsuit, having no role or tie to STS Inc.

11 or STS LLC other than my family tie with Romi and my passive shareholder interest in STS Inc.

12        19.    In October 2007, I was scheduled and ready to give testimony to Verigy, but Verigy

13 cancelled my deposition at that time.  A deposition was again scheduled in November 2007, and I

14 was ready to testify again, but Verigy again cancelled that deposition as well.  To my knowledge,

15 there has been no new deposition date scheduled.

16        20.    In December 2007, STS Inc.'s counsel sent a letter to Bergeson, LLP ("Bergeson"),

17 counsel for Verigy, requesting that I be dismissed from this lawsuit.  A true and correct copy of the

18 letter is attached hereto as **Exhibit D**.  A couple of days later, Jay Fowler, Esq. of Bergeson replied

19 with an email, declining the request for dismissal but providing no factual or legal basis upon

20 which I should or could remain as a defendant.  A true and correct copy of the email is attached

21 hereto as **Exhibit E**.  Bergeson has not yet taken my deposition.

22                        **REQUESTED RELIEF**

23        21.    Based on all of the foregoing, I believe this lawsuit was brought against me without

24 any factual or legal basis and that it was brought without probable cause and for a wrongful

25 purpose; for all of these reasons, I respectfully request that the Court grant my motion for summary

26 judgment and dismiss me as a defendant from this case and that the Court issue an Order for

27 Verigy to show cause why it should not be liable for sanctions under Rule 11 of the Federal Rules

28 of Civil Procedure.

---

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™   **Decl. Wesley Mayder Supp. Mot. Summ. J. & OSC    6**              **Case No. 5:07-cv-04330-RMW (HRL)**

22.     To comply with the procedures of making these requests, I have had my independent legal counsel, Russo & Hale LLP, provide a copy of this declaration with all associated exhibits and with a request that Verigy dismiss me from this action voluntarily and that its failure and refusal to do so will result in this motion and in seeking the foregoing relief including attorney's fees and costs which, I have been told, may well exceed $50,000 if Verigy refuses to do the correct thing and refuses to dismiss me from this action.   Accordingly, I ask that the Court reimburse me all of my reasonable attorney's fees and costs because of Verigy's failure and refusal to do so.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct and that this declaration was executed on April _____, 2008, in _____, California.

                                                    _____
                                                    Wesley Mayder

**EXHIBIT A**

OPERATING AGREEMENT
FOR

## Silicon Test Solutions LLC
### A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of October 11, 2006, by and among the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.    The Members will cause to be filed Articles of Organization (the "Articles") for Silicon Test Solutions LLC (the "Company"), a limited liability company under the laws of the State of California, with the California Secretary of State.

B.    The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

### ARTICLE I
### ORGANIZATIONAL MATTERS

1.1    Name. The name of the Company shall be "Silicon Test Solutions LLC." The Company may conduct business under that name or any other name approved by the Members.

1.2    Term.  The term of the Company commenced as of the date of the filing of the Articles and, shall continue until terminated by the by the provisions of this agreement or as provided by law.

1.3    Office and Agent. The Company shall continuously maintain an office and registered agent in the State of California as required by the Act. The principal office of the Company shall be at 1331 Sierra Avenue, San Jose, Ca 95126 or such location as the Members may determine. The registered agent shall be as stated in the Articles or as otherwise determined by the Members.

1.4    Business of the Company. Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

(a)    the business of Semiconductor Device Testing and

(b)    such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

### ARTICLE II
### CAPITAL CONTRIBUTIONS

2.1    Capital Contributions.  Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit A attached hereto. No Member shall be required to make any additional contributions to the capital of the Company. Additional contributions to the capital of the Company shall be made only with the unanimous consent of the Members. Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2    Capital Accounts. The Company shall establish an individual capital account ("Capital Account") for each Member. The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv). Upon a valid transfer of a Member's interest in the Company

("Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

2.3     <u>No Interest</u>. The Company shall not pay any interest on capital contributions.

## ARTICLE III
## MEMBERS

3.1     <u>Admission of Additional Members</u>. Additional Members may be admitted with the approval of all Members. Additional Members will participate in the management, "Net Profits", "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

3.2     <u>Withdrawals or Resignations</u>. Any Member who is under an obligation to render services to the Company may withdraw or resign as a Member at any time upon 30 days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party. In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a transferee as described in Section 6.3 and such Membership Interest shall be subject to purchase and sale as provided in Section 7.2. No other Member may withdraw, retire or resign from the Company.

3.3     <u>Payments to Members</u>. Except as specified in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

## ARTICLE IV
## MANAGEMENT AND CONTROL OF THE COMPANY

4.1     <u>Management and Powers</u>. In entering into this Agreement, the intent of each Member is to actively engage in the management of the Company. Accordingly, unless otherwise limited by the Articles or this Agreement, each Member shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

4.2     <u>Limitations on Power of Members</u>. Notwithstanding any other provisions of this Agreement, no debt or liability of more than $2,500.00 may be contracted on behalf of the Company without the approval of the Members and the signature of 2 Members is required to sign contracts and obligations on behalf of the Company. Additionally, no Member shall have authority to cause the Company to engage in the following transactions without first obtaining the approval of Members holding a majority of the Membership Interests:

(i)     The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a 12 month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution.

(ii)     The merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member).

(iii)    An alteration of the authorized businesses of the Company as set forth in Section 1.4.

(iv)    Any act which would make it impossible to carry on the ordinary business of the Company.

(v)    The confession of a judgment against the Company.

(vi)    Any other transaction described in this Agreement as requiring the approval, consent or vote of the Members.

4.2    The Company shall open a checking account in which two signatures shall be required for each check written. The two signatures shall be Romi Mayder and Robert Pochowski.

4.3    Member Approval.  No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act. In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act. Unless otherwise provided in this Agreement, approval of the Members shall mean the approval of Members who hold a majority of the Membership Interests.

4.4    Devotion of Time.  Each Member shall devote whatever time or effort as he or she deems appropriate for the furtherance of the Company's business.

4.5    Competing Activities.  The Members and their Affiliates may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom. No Member shall be obligated to present any investment opportunity to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. Each Member shall have the right to hold any investment opportunity for his or her own account or to recommend such opportunity to persons other than the Company.  The Members acknowledge that certain Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. Each Member hereby waives any and all rights and claims which he or she may otherwise have against the other Members and their Affiliates as a result of any of such activities.

4.6    Transactions between the Company and the Members.  Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them or if Members holding a majority of the Membership Interests held by the Members having no interest in such transaction (other than their interests as Members) approve the transaction in writing.

4.7    Specific Duties. Until further notice, Romi Mayder shall act Chief Executive Officer. Robert Pchowski  shall act as Vice President. Wesley Mayder is an Investor only and shall not have management responsibilities.

## ARTICLE V
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1    Definitions.    When used in this Agreement, the following terms shall have the meanings set forth below:

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the

Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year employed on the Company's information tax return filed for federal income tax purposes.

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2     Allocations of Net Profit and Net Loss.

A.     Net Profits & Loss.  Net Profits & Losses  shall be allocated to the Members for Company Book and tax purposes  in proportion to their Membership Interest.

5.3     Distribution of Assets by the Company.  Subject to applicable law and any limitations contained elsewhere in this Agreement, Members holding a majority of the Membership Interests may elect from time to time to cause the Company to make distributions.  Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

6.1     Transfer and Assignment of Interests.  No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (collectively, "transfer") except with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members.

6.2     Substitution of Members.  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) consent of the Members is given in accordance with Section 6.1, (ii) such person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member.  The admission of a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

6.3     Transfers in Violation of this Agreement and Transfers of Partial Membership Interests.  Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member.  Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled.  Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII
## CONSEQUENCES OF DISSOLUTION EVENTS AND
## TERMINATION OF MEMBERSHIP INTEREST

7.1     Dissolution Event.  Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member ("Dissolution Event"), the Company shall dissolve unless all of the remaining Members ("Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company.  If the Remaining Members so consent, the Company and/or the Remaining Members shall [have the right to] purchase, and [if such right is exercised,] the Member (or his or her legal representative) whose actions or conduct resulted in the Dissolution Event ("Former Member") shall sell, the Former Member's Membership Interest ("Former Member's Interest") as provided in this Article VII.

7.2     Withdrawal. Notwithstanding Section 7.1, upon the withdrawal by a Member in accordance with

Section 3.2 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall [have the right to] purchase, and [if such right is exercised,] the Former Member shall sell, the Former Member's Interest as provided in this Article VII.

       7.3     <u>Purchase Price</u>. The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest as determined by an independent appraiser jointly selected by the Former Member and by Remaining Members holding a majority of the remaining Membership Interests. The Company and the Former Member shall each pay one-half of the cost of the appraisal. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

       7.4     <u>Notice of Intent to Purchase</u>. Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Section 7.3, each Remaining Member shall notify the Members in writing of his or her desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Membership Interest of the Remaining Member bears to the aggregate of the Membership Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

       7.5     <u>Election to Purchase Less Than All of the Former Member's Interest</u>. If any Remaining Member elects to purchase none or less than all of his or her pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share. If the Remaining Members fail to purchase the entire interest of the Former Member, the Company [may] [shall] purchase any remaining share of the Former Member's Interest. [Any purchase of a Former Member's Interest must be the entire interest.]

       7.6     <u>Payment of Purchase Price</u>. The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at 10% per annum, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation of each purchasing Remaining Member, and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Remaining Member or the Company, as applicable. Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Member or the Company, as applicable. The promissory note executed by each purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

       7.7     <u>Closing of Purchase of Former Member's Interest</u>. The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

**ARTICLE VIII**
**ACCOUNTING, RECORDS, REPORTING BY MEMBERS**

       8.1     <u>Books and Records</u>. The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at its principal office in California all of the following:

       A.     A current list of the full name and last known business or residence address of each

Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

        B.     A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

        C.     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

        D.     A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

        E.     Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

        F.     The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

        8.2     <u>Reports</u>.  The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency.  The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns.  The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

        8.3     <u>Bank Accounts</u>.  The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person.  Any Member, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.

        8.4     <u>Tax Matters for the Company</u>.  Romi Mayder is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

        9.1     <u>Conditions of Dissolution</u>.  The Company shall dissolve upon the occurrence of any of the following events:

        A.     Upon the happening of any event of dissolution specified in the Articles;

        B.     Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

        C.     Upon the vote of Members holding at least <u>51</u> percent (__%) of the Membership Interests;

        D.     The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or

        E.     The sale of all or substantially all of the assets of Company.

9.2     <u>Winding Up</u>.  Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3     <u>Order of Payment of Liabilities Upon Dissolution</u>.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4     <u>Limitations on Payments Made in Dissolution</u>.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5     <u>Certificates</u>.  The Company shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

**ARTICLE X**
**INDEMNIFICATION**

10.1     <u>Indemnification of Agents</u>.  The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or other agent of the Company or that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

**ARTICLE XI**
**MISCELLANEOUS**

11.1     <u>Counsel to the Company</u>.  Counsel to the Company may also be counsel to any Member or any Affiliate of a Member.  The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules").  The Company has initially selected <u>Daniel E. Hanley</u> ("Company Counsel") as legal counsel to the Company.  Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such written agreement Company Counsel shall owe no duties directly to a Member.  Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, then each Member agrees that Company Counsel may represent either the Company or such Member in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

11.2     <u>Complete Agreement</u>.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

11.3     <u>Binding Effect</u>.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

11.4     <u>Interpretation</u>.  All pronouns shall be deemed to refer to the masculine, feminine, or neuter,

singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

      11.5    <u>Jurisdiction</u>. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.8 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

      11.6    <u>Arbitration</u>. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in <u>San Jose</u>, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law.

      11.7    <u>Severability</u>. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

      11.8    <u>Notices</u>. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which such notice will be given.

      11.9    <u>Amendments</u>. All amendments to this Agreement will be in writing and signed by all of the Members.

      11.10    <u>Multiple Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

      11.11    <u>Attorney Fees</u>. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) postjudgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

      11.12    <u>Remedies Cumulative</u>. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

IN WITNESS WHEREOF, all of the Members of Silicon Test Solutions LLC, A California Limited Liability Company, have executed this Agreement, effective as of the date written above.

MEMBER: Romi Mayder

_____

MEMBER: Robert Pochowski

_____

MEMBER: Wesley Mayder

_____

## EXHIBIT A

### CAPITAL CONTRIBUTION AND ADDRESSES OF MEMBERS
### AS OF

### Silicon Test Solutions, LLC

| Member's Name | Member's Address | Member's Capital Contribution | Member's Membership Interest |
|---|---|---|---|
| Romi Mayder | 1331 Sierra Avenue San Jose, CA 95126 | 200,000 | 51% |
| Robert Pochowski | 817 Logan Court Sunnyvale, CA 94087 | 150,000 | 29% |
| Wesley Mayder | 19171 Oahu Lane Saratoga, CA 95070 | 250,000 | 20% |

### CONSENT OF SPOUSE

The undersigned spouse(s) of the party (Members) to the foregoing Agreement acknowledge(s) on his or her own behalf that: I have read the foregoing Agreement and I know its contents. I am aware that by its provision my spouse grants the Company and/or the other Members an option to purchase all of his or her Membership Interest, including my community interest (if any) in it. I hereby consent to the sale, approve of the provisions of the Agreement, and agree that such Membership Interest and my interest in it are subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement on such Membership Interest or my interest in it.

**EXHIBIT B**

Wesley's Contribution to STS

**WESLEY K. MAYDER**
299 CARLYN AVE.
CAMPBELL, CA  95008-1917

11-4289/1210
1723628408

1343

Date 1/4/07

Pay to the
Order of    Silicon Test Systems                    $ 250,000 00/100

-two hundred fifty thousand——————— Dollars

Wells Fargo Bank, N.A.
California
www.wellsfargo.com

Memo

⑆121042882⑆172362840⑈ 1343

**EXHIBIT C**



NUMBER
01

SHARES

## Silicon Test Systems Inc.

INCORPORATED UNDER THE LAWS OF THE STATE OF CALIFORNIA
Authorized To Issue 90,000 Shares Common Stock At $ 0.01 Par Value

This Certifies That _Wesley Mayder and Moza Mayder_ is hereby issued _twenty thousand_ _fully paid_ and non-cancelable Shares of the Stock of the above named Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed this _5 th_ day of _January_ A.D. _2007_

_Rom Mayder_
SECRETARY

_Rom Mayder_
PRESIDENT

**EXHIBIT D**

# MOUNT & STOELKER, P.C.

**ATTORNEYS**

RIVERPARK TOWER, SUITE 1650
333 WEST SAN CARLOS STREET
SAN JOSE, CALIFORNIA 95110-2740
TELEPHONE: (408) 279-7000
FACSIMILE: (408) 998-1473

October 31, 2007

Jay Fowler, Esq.
Mindy Morton, Esq.
Bergeson, LLP
303 Almaden Blvd., Ste. 500
San Jose, CA  95110

Re:     *Verigy v. Mayder, et al.*
        Demand for Dismissal of Wesley Mayder
        Our File No. SITES001

Dear Mr. Fowler and Ms. Morton,

        This letter is a follow up to our previous discussions regarding the dismissal of
Wesley Mayder in the matter of *Verigy v. Mayder, et al.* We received your initial
complaint about August 23, 2007. In it Verigy asserts that "each of the defendants,
inclusive, is, and at all relevant times herein mentioned was, the agent, partner, joint
venturer, employee, alter ego, and/or conspirator of the remaining defendants." As no
specific factual or legal assertions are made concerning Wesley Mayder (other than his
place of residence), I assume that this clause is Verigy's basis for claiming Wesley
Mayder liable.

        Soon after receipt of the complaint, we requested that Wesley Mayder be
dismissed from the case since he was, and remains, merely an investor in Silicon Test
Systems, Inc. ("STS"). At that time you declined to dismiss Wesley Mayder from the suit.

        Subsequently, in good faith, and under no legal duty to do so, we agreed to
produce all communications between Wesley Mayder and Romi Mayder. This disclosure
demonstrates that Wesley Mayder bears no liability in this suit. Wesley Mayder acted as
any investor in a close corporation would who was committed to its success. Specifically,
he introduced Romi Mayder to the management company for leasing office space and
assisted in the creation of the STS website. As such, he cannot be held vicariously liable
for any acts of STS or Romi Mayder under Verigy's asserted theories.

        Specifically, Wesley Mayder is not an agent or employee of STS. Wesley Mayder
has never held himself out as an agent of STS, and even if he did he would not bear any
liability.[1] Any contracts related to the office lease or web site hosting were negotiated and

---

[1] *Sanchez v. Lindsey Morden Claims Services*, (1999) 72 C.A.4th 249, 253.

Jay Fowler, Esq.
Mindy Morton, Esq.
October 31, 2007
Page 2

signed by Romi Mayder. Wesley Mayder is not a Director of STS, nor is he an officer or employee of STS. As such, vicarious liability based on these alleged theories fails.

Furthermore, Wesley Mayder is not a joint venturer or partner with STS or Romi Mayder. STS is a California corporation, not a partnership. Under California's Uniform Partnership Act[2] there must be a partnership agreement[3] for formation. There is no evidence of such an agreement. In a joint venture the parties agree to share profits and losses for a single transaction or series of transactions.[4]  There is no evidence of such an agreement.[5] Therefore, vicarious liability on these alleged theories also fails.

Verigy's claims of alter ego and conspirator liability also fail. Under an alter ego theory STS must be the "mere instrumentality" of Wesley Mayder, personally. There is no evidence of such acts. Conspirators must share "a common plan or design in its perpetration"[6] of a tort. Here, there is no evidence of such an agreement between Wesley Mayder and any other party.

Therefore, the evidence is entirely insufficient to establish legal liability for Wesley Mayder on any of the theories claimed in the complaint (agent, partner, joint venturer, employee, alter ego, and/or conspirator). As such Wesley Mayder demands dismissal from this lawsuit forthwith.

Regards,

Kevin M. Pasquinelli, Esq.
Mount & Stoelker
Attorneys for Defendant, Wesley Mayder

---

[2] *California Corporations Code* 16100 *et. seq.*
[3] *California Corporations Code* 16100(10).
[4] *Bank of California v. Connolly,* (1973) 36 C.A.3d 350, 364.
[5] *Folsom Associates v. Prometheus Dev. Co,* (1990) 223 C.A.3d 1, 18 (evidence before trial court established without conflict that there was no oral or written joint venture agreement between the parties).
[6] *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* (1994) 7 C.4th 503, 510.

**EXHIBIT E**



From: John Fowler [mailto:jfowler@be-law.com]
Sent: Friday, November 02, 2007 12:18 PM
To: Kevin M. Pasquinelli; Daniel S. Mount
Cc: Mindy Morton
Subject: Verigy v. Mayder

Kevin:

      This responds to your letter to me of October 31. We again decline your request to dismiss Wesley Mayder from this suit. I am not responding to your letter's mischaracterization of Wesley Mayder's roles except to say I disagree and that his involvement in his brother's activities including falsification of documents was more than enough to subject him to personal liability.

Discovery against Wesley Mayder, including taking his deposition, was specifically authorized by Judge Whyte. It's time to pick a date for that deposition. I propose December 3, 4, 5 or 6. Please choose one of those dates.

                            Jay Fowler

John W. (Jay) Fowler, Esq.

Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110-2712
Phone: 408 291-6200
Direct: 408-291-2755
Facsimile: 408 297-6000
Email: jfowler@be-law.com
http://www.be-law.com

---

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

---

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2007 Bergeson, LLP [All Rights Reserved].

# EXHIBIT C

1  JACK RUSSO (State Bar No. 96068)
   RUSSO & HALE LLP
2  401 Florence Street
   Palo Alto, CA 94301
3  Telephone: (650) 327-9800
   Facsimile: (650) 327-3737
4  Email: jrusso@computerlaw.com

5  Attorneys for Defendant
   WESLEY MAYDER
6
7              IN THE UNITED STATES DISTRICT COURT

8        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                     SAN JOSE DIVISION

10  VERIGY US, INC., a Delaware Corporation,      Case No. 5:07-cv-04330-RMW (HRL)

11              Plaintiff,                         DECLARATION OF ROMI OMAR
                                                   MAYDER IN SUPPORT OF MOTION FOR
12        v.                                       SUMMARY JUDGMENT (F.R.C.P., RULE
                                                   56) AND ORDER TO SHOW CAUSE
13  ROMI OMAR MAYDER, an individual;              (F.R.C.P., RULE 11)
    WESLEY MAYDER, an individual; SILICON
14  TEST SYSTEMS, INC., a California
    Corporation; and SILICON TEST
15  SOLUTIONS, LLC, a California Limited
    Liability Corporation, inclusive,
16                                                 Complaint Filed: August 22, 2007
17              Defendants.                        Trial Date: None set

18
    AND RELATED CROSSCLAIMS.
19

20
21
22
23
24
25
26
27
28

1   I, Romi Omar Mayder, declare as follows:

2      1.      I am a defendant in this case and have personal knowledge of the all facts set forth

3   herein; if called to testify in this Court as to those facts, my testimony would be as stated herein.

4                                **MY EDUCATION**

5      2.      I attended the University of California at Berkeley from 1988 to 1992. I received a

6   bachelor's of science degree in electrical engineering and computer science in 1992.

7                             **MY WORK EXPERIENCE**

8      3.      In 1988, I started my career in the automatic test equipment ("<u>ATE</u>") industry

9   working at Best IC Laboratories located in Sunnyvale, California. Best IC Laboratories' main

10  business was testing memory devices. I assembled and tested probe cards and load boards for

11  major memory manufacturers such as Samsung and Advanced Micro Devices. Best IC

12  Laboratories was a customer of Advantest, a Verigy US, Inc. ("<u>Verigy</u>") competitor.

13     4.      In 1992, I began employment at Anritsu Wiltron Company located in Morgan Hill,

14  California. Anritsu's main business was developing semiconductor testing equipment. One of

15  Anritsu's main customers was Teradyne, a Verigy competitor.

16     5.      In 1994, I began employment at Schlumberger, a Verigy competitor. Schlumberger

17  develops semiconductor test equipment. Schlumberger's customers included the majority of major

18  memory chip manufacturers. Schlumberger was a major competitor of Verigy.

19     6.      On June 15, 1998, I began employment with Hewlett Packard after being recruited

20  from Schlumberger (currently Credence), a Verigy competitor. I was paid a $25,000 hiring bonus

21  to join Hewlett Packard. In 2000, Agilent spun off from Hewlett Packard and I continued

22  employment with Agilent. On June 1, 2006 Verigy spun off from Agilent and I continued

23  employment with Verigy until September 21, 2006, at which time I terminated employment.

24     7.      While working for Agilent, I reported to Bob Pochowski who was general manager

25  of Agilent's Memory Test Division. In September of 2005, Mr. Pochowski left Agilent to pursue

26  other career opportunities. I never informed Wesley Mayder ("Wesley") that I ever worked for Mr.

27  Pochowski.

28     //

1

## GOOD FAITH PREPARATION REGARDING MY LEAVING VERIGY

2      8.      On September 8, 2006, Dan Hanley, Esq., filed the articles of organization on

3  behalf of Silicon Test Solutions, LLC ("STS LLC") with the Secretary of State of California, with

4  me as President, Secretary, and Director. I never informed Wesley of my activities with Dan

5  Hanley.

6      9.      My last day of salaried employment at Verigy was September 21, 2006.

7      10.     On September 22, 2006, Mr. Pochowski and I spoke with one of STS LLC's

8  corporate attorneys, Heather Flick, regarding development of products in the field of ATE resource

9  enhancement. Wesley was not present during this phone call.

10

## GATHERING CUSTOMER REQUIREMENTS

11      11.     On September 22, 2006, Mr. Pochowski and I met with Sandisk to discuss their

12  NAND flash memory requirements.  Mr. Pochowski and I learned that Sandisk had already

13  developed its own ATE resource enhancement solution for NAND flash memory. Wesley was not

14  present at this meeting.

15      12.     On October 3, 2006, Mr. Pochowski and I met with Micron Technology to discuss

16  their NAND Flash requirements.  Mr. Pochowski and I learned that Micron had already developed

17  its own ATE resource enhancement solution for NAND flash memory. Wesley was not present at

18  this meeting.

19      13.     In November 2006, Mr. Pochowski and I met with Spansion to discuss their NOR

20  Flash memory requirements.  We learned that Spansion was quite interested in working with STS

21  LLC to develop an ATE resource enhancement solution focused on NOR flash memory. Wesley

22  was not present at this meeting .

23      14.     In November 2006, Mr. Pochowski and I met with Intel to discuss their NOR Flash

24  memory requirements. We learned that Intel was quite interested in working with STS LLC to

25  develop an ATE resource enhancement solution focused on NOR flash memory. Wesley was not

26  present at this meeting. I do not recall Wesley ever attending any STS LLC customer meetings.

27  Wesley had no direct or indirect control over STS LLC, me, or Mr. Pochowski.

28      //

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Decl. Romi Mayder Supp. Mot. Summ. J. & OSC      3      Case No. 5:07-cv-04330-RMW (HRL)

**STS INC PLACES ORDER WITH HONEYWELL**

15.    In January 2007, Silicon Test Systems, Inc. ("STS Inc.") placed an order with Honeywell to begin the design of STS Inc.'s Flash Enhancer ASIC that focused on NOR flash memory testing requirements.

16.    I worked with Honeywell on the design and specifications. I have not discussed the details of these designs or specifications with Wesley.

**NO "CONTROL" RELATIONSHIP**

17.    To my knowledge, Wesley has no expertise or experience in the semiconductor industry. I do not believe that WeDirect has any expertise or experience in marketing or promotion for any companies in the semiconductor industry.   None of the other defendants is a client or customer of WeDirect.

18.    I am Wesley's younger brother.  I have had no operating or other business role whatsoever in WeDirect: I have never worked for WeDirect, am not and was never on the Board of WeDirect, was never a shareholder of WeDirect, and had no role whatsoever in WeDirect's growth.  Similarly, Wesley has had no business role, beyond shareholder, in STS Inc.: Wesley has never worked for me, is not and was never on the board of directors of STS LLC or STS Inc, and is only a passive shareholder with less than a 25% ownership interest in STS, Inc., a corporation in which I have majority ownership and control.

**CONTACTING WESLEY**

19.    In October 2006, I presented to Wesley the opportunity to invest in STS LLC, a California limited liability company.  Before I explained any of my ideas to Wesley, I had already instructed my attorney, Mr. Hanley, to file the Articles of Organization of STS LLC with the California Secretary of State.  I informed Wesley that I formed STS LLC in October 2006.  While I did not tell Wesley much about STS LLC's work, Wesley has always trusted me and I wanted to provide him with the opportunity to invest in STS LLC. Hence, he was interested in becoming a passive investor in STS LLC.

20.    I explained to Wesley that his investment would require him to sign a written agreement. Wesley never signed a final version of the Operating Agreement of STS LLC. A true and

1  correct draft copy of which is attached as **Exhibit A**.  This document was never signed by all the

2  proposed members.

3      21.    The original idea was that I was to sign this Operating Agreement and was to own a

4  51% share in STS LLC, as was Mr. Pochowski, who was then Vice-President of STS LLC and

5  who was to own a 29% share in STS LLC and to continue to hold his position as an officer of STS

6  LLC, along with me.  Wesley never became an officer and never had an operating role.  Although I

7  signed the Operating Agreement, Mr. Pochowski changed his mind in December 2006 and thus did

8  not sign because he disagreed with how the ownership would be distributed.  He wanted Wesley's

9  proposed ownership for himself and wanted Wesley not to be a passive investor in STS LLC at all.

10     22.    Because Mr. Pochowski never signed the Operating Agreement, Wesley never

11  signed the Operating Agreement. My understanding is that Wesley never had any type of control

12  over STS LLC or over any of its other two proposed members.

13              **INVESTMENT IN SILICON TEST SYSTEMS, INC**

14     23.    Wesley invested $250,000 in STS Inc. on January 3, 2007, receiving 20,000 shares

15  of common stock, which gave him an approximately 20% ownership interest.  A true and correct

16  copy of the check that Wesley wrote to STS Inc. is attached hereto as **Exhibit B**.  A true and

17  correct copy of the stock certificate that Wesley received in return from STS Inc. is attached hereto

18  as **Exhibit C**.  Wesley is not, and never was, an officer, or director of STS Inc., and never had any

19  operating role in STS Inc., and the same is true today.

20     24.    Wesley's stock investment in STS Inc. is approximately a **20%** share, a minority

21  position.. STS Inc has signed no contract with Wesley, nor did it make any other agreement with

22  him, regarding employment, board seat, or other operating role.

23              **THE CORE DISPUTE APPLICABLE TO WESLEY**

24     25.    Neither Wesley nor WeDirect has ever hosted any website for STS Inc.

25     26.    Finally, I explained to Wesley in March 2007 that STS Inc. was searching for about

26  1,500 square feet of office space.  At about that time, I learned from Wesley that he had heard that

27  an office suite located in the same building in San Jose that WeDirect rents space in might be

28  available in a different suite and on an entirely different floor of the building.  Wesley referred me

1  to the office manager of the building and made an introduction for me to that office manager of the

2  building to determine if the suite was, in fact, available.  It was available, and I, on behalf of STS

3  Inc., pursued the opportunity to lease that suite.

4      27.    STS Inc.'s office space is not shared with WeDirect or with Wesley personally.

5      28.    STS Inc. and WeDirect share no space, no phones, no office support, no secretarial

6  and no other resources.  Wesley has not paid any bills for STS Inc. or for me.

7                   **LAWSUIT BROUGHT BY VERIGY**

8      29.    In August 2007, Verigy filed a complaint against Wesley as a co-defendant in this

9  case. Before filing the complaint, Verigy never discussed Wesley's role with STS, Inc., STS LLC,

10  or myself.

11      I declare under penalty of perjury, under the laws of the United States that the foregoing is

12  true and correct and that this declaration was executed on April ___, 2008, in San Jose, California.

13

14

15                                       Romi Mayder

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

OPERATING AGREEMENT
FOR
## Silicon Test Solutions  LLC
A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of October 11, 2006, by and among the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.        The Members will cause to be filed Articles of Organization (the "Articles") for Silicon Test Solutions LLC (the "Company"), a limited liability company under the laws of the State of California, with the California Secretary of State.

B.        The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

## ARTICLE I
## ORGANIZATIONAL MATTERS

1.1        Name.  The name of the Company shall be "Silicon Test Solutions LLC."  The Company may conduct business under that name or any other name approved by the Members.

1.2        Term.  The term of the Company commenced as of the date of the filing of the Articles and, shall continue until terminated by the by the provisions of this agreement or as provided by law.

1.3        Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the Company shall be at 1331 Sierra Avenue, San Jose, Ca 95126 or such location as the Members may determine.  The registered agent shall be as stated in the Articles or as otherwise determined by the Members.

1.4        Business of the Company.  Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

(a)        the business of Semiconductor Device Testing and

(b)        such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II
## CAPITAL CONTRIBUTIONS

2.1        Capital Contributions.  Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit A attached hereto.  No Member shall be required to make any additional contributions to the capital of the Company.  Additional contributions to the capital of the Company shall be made only with the unanimous consent of the Members.  Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2        Capital Accounts.  The Company shall establish an individual capital account ("Capital Account") for each Member.  The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).  Upon a valid transfer of a Member's interest in the Company

("Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

  2.3  <u>No Interest</u>. The Company shall not pay any interest on capital contributions.

**ARTICLE III**
**MEMBERS**

  3.1  <u>Admission of Additional Members</u>. Additional Members may be admitted with the approval of all Members. Additional Members will participate in the management, "Net Profits", "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members. Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

  3.2  <u>Withdrawals or Resignations</u>. Any Member who is under an obligation to render services to the Company may withdraw or resign as a Member at any time upon 30 days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party. In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a transferee as described in Section 6.3 and such Membership Interest shall be subject to purchase and sale as provided in Section 7.2. No other Member may withdraw, retire or resign from the Company.

  3.3  <u>Payments to Members</u>. Except as specified in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company. However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

**ARTICLE IV**
**MANAGEMENT AND CONTROL OF THE COMPANY**

  4.1  <u>Management and Powers</u>. In entering into this Agreement, the intent of each Member is to actively engage in the management of the Company. Accordingly, unless otherwise limited by the Articles or this Agreement, each Member shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

  4.2  <u>Limitations on Power of Members</u>. Notwithstanding any other provisions of this Agreement, no debt or liability of more than $2,500.00 may be contracted on behalf of the Company without the approval of the Members and the signature of 2 Members is required to sign contracts and obligations on behalf of the Company. Additionally, no Member shall have authority to cause the Company to engage in the following transactions without first obtaining the approval of Members holding a majority of the Membership Interests:

    (i)  The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a 12 month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution.

    (ii)  The merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member).

(iii)    An alteration of the authorized businesses of the Company as set forth in Section 1.4.

(iv)    Any act which would make it impossible to carry on the ordinary business of the Company.

(v)    The confession of a judgment against the Company.

(vi)    Any other transaction described in this Agreement as requiring the approval, consent or vote of the Members.

4.2    The Company shall open a checking account in which two signatures shall be required for each check written. The two signatures shall be Romi Mayder and Robert Pochowski.

4.3    <u>Member Approval</u>.  No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act.  In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act.  Unless otherwise provided in this Agreement, approval of the Members shall mean the approval of Members who hold a majority of the Membership Interests.

4.4    <u>Devotion of Time</u>.  Each Member shall devote whatever time or effort as he or she deems appropriate for the furtherance of the Company's business.

4.5    <u>Competing Activities</u>.  The Members and their Affiliates may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom. No Member shall be obligated to present any investment opportunity to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. Each Member shall have the right to hold any investment opportunity for his or her own account or to recommend such opportunity to persons other than the Company.   The Members acknowledge that certain Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time. Each Member hereby waives any and all rights and claims which he or she may otherwise have against the other Members and their Affiliates as a result of any of such activities.

4.6    <u>Transactions between the Company and the Members</u>.  Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them or if Members holding a majority of the Membership Interests held by the Members having no interest in such transaction (other than their interests as Members) approve the transaction in writing.

4.7    <u>Specific Duties</u>. Until further notice, Romi Mayder shall act Chief Executive Officer. Robert Pchowski   shall  act  as  Vice  President.  Wesley  Mayder  is  an  Investor  only  and  shall  not  have  management responsibilities.

## ARTICLE V
## ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1    <u>Definitions</u>.       When used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean the income, gain, loss, deductions, and credits of the

Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year employed on the Company's information tax return filed for federal income tax purposes.

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

    5.2    Allocations of Net Profit and Net Loss.

    A.    Net Profits & Loss. Net Profits & Losses shall be allocated to the Members for Company Book and tax purposes in proportion to their Membership Interest.

    5.3    Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, Members holding a majority of the Membership Interests may elect from time to time to cause the Company to make distributions. Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

    6.1    Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (collectively, "transfer") except with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members.

    6.2    Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) consent of the Members is given in accordance with Section 6.1, (ii) such person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member. The admission of a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

    6.3    Transfers in Violation of this Agreement and Transfers of Partial Membership Interests. Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII
## CONSEQUENCES OF DISSOLUTION EVENTS AND
## TERMINATION OF MEMBERSHIP INTEREST

    7.1    Dissolution Event. Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member ("Dissolution Event"), the Company shall dissolve unless all of the remaining Members ("Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company. If the Remaining Members so consent, the Company and/or the Remaining Members shall [have the right to] purchase, and [if such right is exercised,] the Member (or his or her legal representative) whose actions or conduct resulted in the Dissolution Event ("Former Member") shall sell, the Former Member's Membership Interest ("Former Member's Interest") as provided in this Article VII.

    7.2    Withdrawal. Notwithstanding Section 7.1, upon the withdrawal by a Member in accordance with

Section 3.2 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall [have the right to] purchase, and [if such right is exercised,] the Former Member shall sell, the Former Member's Interest as provided in this Article VII.

    7.3    _Purchase Price_. The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest as determined by an independent appraiser jointly selected by the Former Member and by Remaining Members holding a majority of the remaining Membership Interests. The Company and the Former Member shall each pay one-half of the cost of the appraisal. Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

    7.4    _Notice of Intent to Purchase_. Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Section 7.3, each Remaining Member shall notify the Members in writing of his or her desire to purchase a portion of the Former Member's Interest. The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest. Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Membership Interest of the Remaining Member bears to the aggregate of the Membership Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

    7.5    _Election to Purchase Less Than All of the Former Member's Interest_. If any Remaining Member elects to purchase none or less than all of his or her pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share. If the Remaining Members fail to purchase the entire interest of the Former Member, the Company [may] [shall] purchase any remaining share of the Former Member's Interest. [Any purchase of a Former Member's Interest must be the entire interest.]

    7.6    _Payment of Purchase Price_. The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing. The unpaid principal balance shall accrue interest at 10% per annum, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty. The obligation of each purchasing Remaining Member, and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Remaining Member or the Company, as applicable. Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Member or the Company, as applicable. The promissory note executed by each purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

    7.7    _Closing of Purchase of Former Member's Interest_. The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day. At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest. The Former Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.


## ARTICLE VIII
## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

    8.1    _Books and Records_. The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at its principal office in California all of the following:

        A.    A current list of the full name and last known business or residence address of each

Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

        **B.**    A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

        **C.**    Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

        **D.**    A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

        **E.**    Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

        **F.**    The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

        **8.2**    <u>Reports</u>. The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency. The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

        **8.3**    <u>Bank Accounts</u>. The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person. Any Member, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.

        **8.4**    <u>Tax Matters for the Company</u>. <u>Romi Mayder</u> is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

**ARTICLE IX**
**DISSOLUTION AND WINDING UP**

        **9.1**    <u>Conditions of Dissolution</u>. The Company shall dissolve upon the occurrence of any of the following events:

        **A.**    Upon the happening of any event of dissolution specified in the Articles;

        **B.**    Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

        **C.**    Upon the vote of Members holding at least <u>51</u> percent (__%) of the Membership Interests;

        **D.**    The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or

        **E.**    The sale of all or substantially all of the assets of Company.

9.2    Winding Up. Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up. The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

9.3    Order of Payment of Liabilities Upon Dissolution. After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

9.4    Limitations on Payments Made in Dissolution. Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article X.

9.5    Certificates. The Company shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## ARTICLE X
## INDEMNIFICATION

10.1    Indemnification of Agents. The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or other agent of the Company or that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

## ARTICLE XI
## MISCELLANEOUS

11.1    Counsel to the Company. Counsel to the Company may also be counsel to any Member or any Affiliate of a Member. The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules"). The Company has initially selected Daniel E. Hanley ("Company Counsel") as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such written agreement Company Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, then each Member agrees that Company Counsel may represent either the Company or such Member in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

11.2    Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members. To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

11.3    Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

11.4    Interpretation. All pronouns shall be deemed to refer to the masculine, feminine, or neuter,

singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

11.5    Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.8 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

11.6    Arbitration. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in San Jose, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law.

11.7    Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

11.8    Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which such notice will be given.

11.9    Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

11.10    Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

11.11    Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) postjudgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

11.12    Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

IN WITNESS WHEREOF, all of the Members of Silicon Test Solutions LLC, A California Limited Liability Company, have executed this Agreement, effective as of the date written above.

MEMBER: Romi Mayder

_____

MEMBER: Robert Pochowski

_____

MEMBER: Wesley Mayder

_____

## EXHIBIT A

### CAPITAL CONTRIBUTION AND ADDRESSES OF MEMBERS
### AS OF

### Silicon Test Solutions, LLC

| Member's Name | Member's Address | Member's Capital Contribution | Member's Membership Interest |
|---|---|---|---|
| Romi Mayder | 1331 Sierra Avenue San Jose, CA 95126 | 200,000 | 51% |
| Robert Pochowski | 817 Logan Court Sunnyvale, CA 94087 | 150,000 | 29% |
| Wesley Mayder | 19171 Oahu Lane Saratoga, CA 95070 | 250,000 | 20% |

### CONSENT OF SPOUSE

The undersigned spouse(s) of the party (Members) to the foregoing Agreement acknowledge(s) on his or her own behalf that: I have read the foregoing Agreement and I know its contents. I am aware that by its provision my spouse grants the Company and/or the other Members an option to purchase all of his or her Membership Interest, including my community interest (if any) in it. I hereby consent to the sale, approve of the provisions of the Agreement, and agree that such Membership Interest and my interest in it are subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement on such Membership Interest or my interest in it.

**EXHIBIT B**

Wesley's Contribution to STS

WESLEY K. MAYDER
299 CARLYN AVE.
CAMPBELL, CA  95008-1917

1343

Date 1/4/07

Pay to the
Order of   Silicon Test Systems   $ 250,000 00/100

— two hundred fifty thousand   Dollars

Wells Fargo Bank, N.A.
California
www.wellsfargo.com

Memo

⑆121042882⑈172362840  1343