# EXHIBIT B
# PART 2 OF 3

# EXHIBIT D

JACK RUSSO (State Bar No. 96068)
RUSSO & HALE LLP
401 Florence Street
Palo Alto, CA 94301
Telephone: (650) 327-9800
Facsimile: (650) 327-3737
Email: jrusso@computerlaw.com

Attorneys for Defendant
WESLEY MAYDER

# IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| VERIGY US, INC., a Delaware Corporation, | Case No. 5:07-cv-04330-RMW (HRL) |
| Plaintiff, | **DECLARATION OF JON DAVIDSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (F.R.C.P., RULE 56) AND ORDER TO SHOW CAUSE (F.R.C.P., RULE 11)** |
| v. | |
| ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive, | |
| Defendants. | Complaint Filed: August 22, 2007 Trial Date: None set |
| AND RELATED CROSSCLAIMS. | |

I, Jon Davidson, declare under penalty of perjury as follows:

1.      Unless otherwise stated, the matters set forth in this Declaration are true and correct of my personal knowledge, and I could and would competently testify concerning those matters, if I were called as a witness thereto.

## MY EDUCATION

2.      I graduated from Del Mar High School located in San Jose, California in 1987.

## MY WORK EXPERIENCE

3.      From 1989 to 1992, I worked at California Stools and Dinettes located in San Jose, California as a sales associate.  From 1992 to 1996, I worked at Del Computers in Dallas, Texas.

4.      From 1996 to 2001, I returned to work at California Stools and Dinettes located in San Carlos, California as a sales manager. In 2002, I joined WeDirect as Director of Marketing and am still currently employed by WeDirect. I am not a shareholder in STS nor has STS paid me.

## MY KNOWLEDGE OF ROMI'S WORK

5.      I have known both Romi and Wesley Mayder for a number of years. In September 2006, I began having discussions with Romi Mayder ("Romi") regarding the work that he was doing at STS LLC. Romi and I spoke about potential STS LLC customers, such as SanDisk, whom Romi told me he had met with several times. Romi had explained to me that he was planning to develop a silicon chip that would double the test capacity of memory manufacturers.

6.      In October 2006, Romi and I spoke about discussions that he had with Micron Technologies. I was quite interested in his discussions with Micron since Micron manufactures memory used in Apple's IPOD music (MP3) player. I am a big fan of the Apple IPOD product.

7.      In mid-December 2006, Romi sent an email to Wesley asking about obtaining verification of dates applicable to his lab notebook. Since I had spoken several times with Romi about his work at STS LLC, Wesley knew that I would be a good person for Romi to be referred to. I reviewed Romi's notebook, and based on my recollection of our discussions, I tried to sign with dates corresponding to approximately when we discussed the information. Wesley never directed me to do anything false or anything wrongful, nor would I would do so.

8.      Wesley did not ask me to sign Romi's notebook, Romi did. Wesley had no control over me regarding this activity. I signed Romi's notebook of my own free will; my understanding was and is that what I was doing and what I did was proper.

9.      Without first asking me any questions about the lab notebook or about my discussions with Romi, in 2007, Verigy filed a complaint including against Wesley.

10.     I have been available to answer any questions that Verigy or its lawyers wish to ask me but no attorney from Verigy and no one else from Verigy has asked me any questions about any of the foregoing topics.

//

//

1    I declare under penalty of perjury, under the laws of the State of California, that the

2    foregoing is true and correct and that this declaration was executed on April _____, 2008, in

3    _____, California.

4                                                          _____
                                                                  Jon Davidson

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT E

LEXSEE



Caution
As of: Apr 11, 2008

**LUIS SANCHEZ, Plaintiff and Appellant, v. LINDSEY MORDEN CLAIMS SERVICES, INC., Defendant and Respondent.**

**No. B123946.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION SEVEN**

**72 Cal. App. 4th 249; 84 Cal. Rptr. 2d 799; 1999 Cal. App. LEXIS 492; 99 Cal. Daily Op. Service 3755; 99 Daily Journal DAR 4761**

**May 19, 1999, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied July 28, 1999, Reported at: 1999 Cal. LEXIS 5244.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC179212. John P. Shook, Judge.

**DISPOSITION:** The judgment of the trial court is affirmed. Respondent shall recover its costs on appeal.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant sought review of a judgment of the Superior Court of Los Angeles County (California), which sustained appellee's demurrer to his negligence action on the grounds that, as an insurer-retained adjuster, it owed no duty to appellant in his capacity as the insured.

**OVERVIEW:** Appellant sued appellee, in its capacity as a claims adjuster, based on its alleged negligence in assessing and handling appellant's claim on a cargo insurance policy. The trial court sustained appellee's demurrer in light of the fact that appellee had not contracted with appellant. Specifically, the trial court held that appellee owed no duty of care to appellant in his capacity as an insured. Appellant sought review of that determination. On appeal, the court acknowledged that there was no duty of care between the parties. Rejecting for policy reasons the invitation to create a duty of care between an

insurer-retained adjuster and an insured, the court affirmed the judgment of the trial court.

**OUTCOME:** The court affirmed the judgment of the trial court after determining that public policy mandated against imposing a new duty of care on an insurer-retained adjuster to an insured.

**CORE TERMS:** adjuster, insurer, insured, auditor, duty of care, owed, duty of care, hired, economic loss, insurer-retained, handling, claims adjuster, independent adjuster, appraiser, claimant, repair, cargo, dryer's, private right of action, insurer owes, foreseeability, investigate, owes, investors, duty owed, legal question, questions of duty, policy decisions, policy concerns, judicial function

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
[HN1]The question of whether a duty of care is owed is a legal question that is decided by the court; it is also a question of policy.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Governments > Courts > Authority to Adjudicate*

72 Cal. App. 4th 249, *; 84 Cal. Rptr. 2d 799, **;
1999 Cal. App. LEXIS 492, ***; 99 Cal. Daily Op. Service 3755

[HN2]While courts do not generally make broad policy in the manner of legislatures, they do make policy decisions in the gaps, filling in the open spaces or interstices of the law.

*Insurance Law > Bad Faith & Extracontractual Liability > Remedies > Penalties*
*Torts > Business Torts > Bad Faith Breach of Contract > General Overview*
[HN3]Negligence is not among the theories of recovery generally available against insurers and further, California courts have refused to extend liability for bad faith, the predominant insurer tort, to agents and employees of the insurer.

*Torts > Negligence > General Overview*
[HN4]In California, no duty of care is owed by insurer-retained adjusters to insureds.

*Business & Corporate Law > Agency Relationships > Authority to Act > Business Transactions > General Overview*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > General Overview*
*Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > Agents & Brokers*
[HN5]An agent's mere failure to perform a duty owed to his principal may render him liable to third persons who rely on his undertaking where there is physical damage to person or property. But where the effect is merely to cause economic loss, the law does not yet recognize liability to a third person, except where a duty is created by statute.

*Insurance Law > Bad Faith & Extracontractual Liability > Remedies > Penalties*
[HN6]No private right of action lies under Cal. Ins. Code § 790.03(h) for economic injury. Neither § 790.03 nor § 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in § 790.03(h). A statutory duty authoritatively construed as providing no private right of action supplies no basis for imposing a common law private right of action indistinguishable from the barred statutory claim.

SUMMARY:

CALIFORNIA OFFICIAL REPORTS SUMMARY

In an action by an insured under a cargo policy brought against the claims adjuster retained by the insurer to investigate and adjust plaintiff's loss, in which

plaintiff alleged negligent handling of the claim, the trial court sustained defendant's demurrer without leave to amend and dismissed. (Superior Court of Los Angeles County, No. BC179212, John P. Shook, Judge.)

The Court of Appeal affirmed. The court held that an independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract, and is not liable in tort to the insured for alleged negligent claim handling that causes only economic loss. Policy reasons militate against imposing a duty of care to an insured on an insurer-retained adjuster, as does the law of agency. An agent's failure to perform a duty owed to the principal may render him or her liable to third persons who rely on his or her undertaking where there is physical damage to person or property, but where the effect is merely to cause economic loss, the law does not recognize liability to a third person, except where a duty is created by statute. (Opinion by Neal, J., with Lillie, P. J., and Woods, J., concurring.)

HEADNOTES

CALIFORNIA          OFFICIAL          REPORTS
HEADNOTES
Classified to California Digest of Official Reports

(1) Negligence § 9—Elements—Duty of Care—Statement of Rules. --Whether a duty of care is owed is a legal question decided by the court, and it is a question of policy. While courts do not generally make policy in the manner of legislatures, they do make policy decisions in the gaps, filling in the open spaces or interstices of the law. Courts deciding questions of duty are engaged in this limited legislative aspect of the judicial function. The policy concerns that govern whether a duty of care should be imposed include the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him or her, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm.

(2) Adjusters and Private Investigators § 1—Insurer-retained Adjusters—Liability to Insured—Duty. --In an action by an insured under a cargo policy brought against the claims adjuster retained by the insurer to investigate and adjust plaintiff's loss, in which plaintiff alleged negligent handling of the claim, the trial court properly sustained defendant's demurrer without leave to amend. An independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract, and is not liable in tort to the insured for alleged negligent claim handling that causes only economic loss. Policy reasons militate against im-

72 Cal. App. 4th 249, *; 84 Cal. Rptr. 2d 799, **;
1999 Cal. App. LEXIS 492, ***; 99 Cal. Daily Op. Service 3755

posing a duty of care to an insured on an insurer-retained adjuster, as does the law of agency. An agent's failure to perform a duty owed to the principal may render him or her liable to third persons who rely on his or her undertaking where there is physical damage to person or property, but where the effect is merely to cause economic loss, the law does not recognize liability to a third person, except where a duty is created by statute.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149.]

COUNSEL: Herbert Dodell and Gerald J. Miller for Plaintiff and Appellant.

Arter & Hadden, Wayne S. Grajewski and Michelle McAloon for Defendant and Respondent.

JUDGES: Opinion by Neal, J., with Lillie, P. J., and Woods, J., concurring.

OPINION BY: NEAL

OPINION

[*250] [**800] NEAL, J.

SUMMARY

An independent adjuster engaged by an insurer owes no duty of care to the claimant insured, with whom the adjuster has no contract. The adjuster is not [*251] liable in tort to the insured for alleged negligent claims handling which causes only economic loss.

FACTS AND PROCEEDINGS IN TRIAL COURT

The relevant facts, which appear from appellant Luis Sanchez's first amended complaint, and from a status conference memorandum judicially noticed in the trial court, are as follows: Sanchez was engaged in business, transporting commercial machinery, under the fictitious business name LA Machinery [***2] Moving. Sanchez purchased cargo insurance issued by an underwriter at Lloyd's of London. A commercial dryer was damaged while Sanchez was moving it to Los Angeles. Sanchez made a claim on the cargo policy for repair of the dryer. The damage was capable of repair in one week's time, at a cost of $ 12,000. Sanchez advised that immediate repairs were needed because the dryer's purchaser, Five Star Dye House, was suffering business loss. Lloyd's engaged respondent Lindsey Morden Claims Services, a claims adjuster, to investigate and adjust the loss. Three months passed before the claim was paid and the repairs completed. As a result, the dryer's purchaser sued and in July 1996 obtained a judgment against Sanchez for $ 1,325,000.

Sanchez then sued Lloyds for breach of the cargo policy. Sanchez also sought recovery against Morden, on a negligence theory.

Morden demurred, arguing that it had no contract with Sanchez and owed him no duty of care.

The trial court sustained Morden's demurrer without leave to amend. Sanchez appealed.

DISCUSSION

(1) [HN1]Whether a duty of care is owed is a legal question, decided by the court. (*Bily v. Arthur Young & Co.* (1992) 3 Cal. 4th 370, 397 [11 Cal. Rptr. 2d 51, 834 P.2d 745, 48 A.L.R.5th 835] [***3] [auditor is liable only to his client for negligent preparation of financial statements, and not to third persons who are strangers to the contract].) Further, it is a question of *policy.* (*Bily, supra,* 3 Cal. 4th at p. 397; *Biakanja v. Irving* (1958) 49 Cal. 2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358] [lawyer who renders will void by negligently failing [**801] to have it witnessed owes duty of care to intended sole beneficiary].) [HN2]While courts do not generally make broad policy in the manner of legislatures, they do make policy decisions in the "gaps," filling in the "open spaces" or "interstices" of the law. (Cardozo, Nature of the Judicial Process (Yale U. [*252] Press 1921) pp. 113-114.) Courts deciding questions of duty are engaged in this limited "legislative" aspect of the judicial function.

An early enumeration of the policy concerns governing whether a duty of care should be imposed appears in *Biakanja v. Irving, supra,* 49 Cal. 2d at page 647, which looked to: "the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff [***4] suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm." (*Biakanja, supra,* 49 Cal. 2d at p. 650.)

In the much more recent *Bily* the Supreme Court conducted an expanded policy analysis. *Bily* involved a claim against auditors by investors who allegedly purchased stock relying on negligently prepared financial reports. The court held that the auditors owed no duty of care to the investors.

Consistent with *Biakanja,* the *Bily* court first examined the relationship between the defendant auditors' conduct and the injury, and the blameworthiness of the auditors' conduct. The court noted that auditors' clients exert extensive control over both preparation and dissemination of financial reports, and that audit reports entail discretionary exercises of judgment. Despite these limits on auditor responsibility for the content of finan-

cial reports, auditor liability for negligence could be serious: "Although the auditor's role in the financial reporting process is secondary and the subject of complex professional judgment, [***5] the liability it faces in a negligence suit by a third party is primary and personal and can be massive." (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at p. 400.*)

This disproportion between fault and injury, in the court's view, militated against imposing a duty of care owed from auditors to investors.

*Bily* also weighed the benefits and costs of a duty on auditors, concluding that a duty was unlikely to enhance deterrence of auditor mistakes, and probably would cause auditors to withdraw their services from some market segments and to increase their charges for services in other segments. The court concluded that the costs of imposing a duty outweighed the benefits. (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at pp. 404-405.*)

The court also stressed the unreliability of foreseeability, in isolation, as a grounds for imposing a duty, especially where the injury is "intangible" rather than physical. (*Bily v. Arthur Young & Co., supra, 3 Cal. 4th at pp. 398-399.*)

Finally, the court cautioned about the limits of judicial policymaking competency, stating: "In view of the nature of the problem, we refrain from [*253] [***6] endorsing a broad and amorphous rule of potentially unlimited liability that has been endorsed by only a small minority of decided cases. As we recently stated: 'In the absence of clear legislative direction . . . we are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking.' [Citation.]." (*3 Cal. 4th at p. 406.*)

(2) The considerations paramount in *Bily* likewise argue against imposing a duty of care owed by insurer-retained adjusters ' to claimants.

  1 We do not in this opinion address the duties of so-called "public adjusters," who are retained by insureds or claimants.

Like the auditors, the insurer-retained adjuster is subject to the control of its clients, and must make discretionary judgment calls. The insurer, not the adjuster, has the ultimate power to grant or deny coverage, and [**802] to pay the claim, delay paying it, or deny it. Further, while the insurer's potential liability is circumscribed by the policy limits, and the other conditions, [***7] limits and exclusions of the policy, the adjuster has no contract with the insured and would face liability without the chance to limit its exposure by contract. Thus the adjuster's role in the claims process is "secondary,"

yet imposing a duty of care could expose him to liability greater than faced by his principal the insurer.

Imposing a duty also would subject the adjuster to conflicting loyalties. Insurers and insureds often disagree as to coverage or the amount of loss. An adjuster cannot argue both sides of such disputes, any more than a lawyer can represent opposite sides in a lawsuit. An adjuster owes a duty to the insurer who engaged him. A new duty to the insured would conflict with that duty, and interfere with its faithful performance. This is poor policy. (*Gay v. Broder* (1980) 109 Cal. App. 3d 66, 75 [167 Cal. Rptr. 123] [where home loan borrower sued appraiser hired by lender, court held appraiser owed no duty of care to borrower--social policy precluded subjecting appraiser to a duty conflicting with that owed to the lender who hired the appraiser]; *Felton v. Schaeffer* (1991) 229 Cal. App. 3d 229, 234 [279 Cal. Rptr. 713] [physician [***8] hired by employer to perform preemployment physical owes no duty of care to applicant]; *Keene v. Wiggins* (1977) 69 Cal. App. 3d 308, 316 [138 Cal. Rptr. 3] [doctor hired by workers' compensation insurer to evaluate disability reported employee needed no surgery or treatment; held, physician owed no duty to the employee].)

Further, as in *Bily*, the costs of imposing a duty of care would outweigh the potential benefits.

The deterrent effect of imposing a duty on adjusters is questionable. Adjusters already are deterred from neglect by exposure to liability to the [*254] *insurer* who engaged them, for breach of contract or indemnity. Only some modest additional deterrence, at most, could be expected from imposing a new duty owed directly to insureds.

Imposing a duty also might benefit insureds by providing another source of recovery for injuries caused by negligent claims handling or investigation. However, in most cases this would be redundant, since the insurer also would be liable for unreasonable investigation or claims handling. Thus making the adjuster directly liable to the insured would, again, confer only a marginal additional benefit.

[***9] Weighing against these modest potential benefits of imposing a duty would be several substantial costs.

Insurance is a highly uncertain and risky endeavor, because it requires accurate predictions about the occurrence and cost of future events. Insurers are able to define and limit the risks, and to set premium levels commensurate with the risks, using complex and nuanced contracts (policies). By contrast, adjusters hired by insurers have no contract with insureds, and thus no ability to define or circumscribe their potential risks or liabilities to insureds. If adjusters faced negligence liability to in-

sureds, market forces would tend to drive adjusting activities in-house, where they could be shielded with contractual exclusions, disclaimers, and limitations. Thus, imposing a duty would reduce, perhaps severely, the offering of independent adjuster services. Yet widespread market acceptance has shown these services to be useful and desirable.

Those adjusters continuing to operate independently despite imposition of a new duty of care would attempt to buy insurance against this liability, or create their own cash reserves, adding these costs to their charges, and passing them [***10] on to the insurers who used the adjusters' services. These insurers, in turn, would add the cost to the premiums charged to insureds. The insureds thus would end up paying more for insurance without obtaining more value because, as noted above, adjuster liability would provide only a redundant source of the recovery usually available from the insurer.

Imposing a duty would significantly depart from existing law. Until now no California case has held insurers' adjusters liable to insureds for negligence. Indeed, [HN3]negligence is not among the theories of recovery generally available against *insurers* (See Croskey et al., Cal. Practice Guide: Insurance Litigation 2 (The Rutter [**803] Group 1998) PP 12:818, 11:205, pp. 12C-6, 11-48 to 11-49, rev. # 1, 1996), and further, California courts have refused to extend [*255] liability for *bad faith*, the predominant insurer tort, to agents and employees of the insurer. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal. 3d 809, 824 [169 Cal. Rptr. 691, 620 P.2d 141] [employees of insurer's independent claims agency "are not parties to the insurance contract and not subject to the implied covenant" of good [***11] faith and fair dealing]; *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal. 3d 566, 576 [108 Cal. Rptr. 480, 510 P.2d 1032] [insurance adjusting firm and its employees were "total strangers to the contract of insurance" and not subject to the implied covenant of good faith].)

Adjusters doubtless have relied on the existing state of the law, taking no prudent steps to protect against negligence liability. A new rule would defeat their reasonable expectations. While consistency and predictability are not the sole objects of the law, they are important legal values which enable persons and businesses to confidently and productively plan their affairs.

Further, large litigation or transactional costs, and considerable uncertainty, probably would flow from imposition of a new duty. The nature and extent of insurer duties to insureds has been a prolific source of litigation, despite the best efforts of insurers to eliminate litigation-generating issues by drafting complex, flexible, precise policies. Adjuster liability would be an empty slate, upon which the courts would have to write a whole new body

of "adjuster liability" law. They would have to do so without the aid [***12] of contracts devised by knowledgeable and imaginative private parties to give structure to the risks. Years surely would pass before the new law of "adjuster liability" was to any extent fleshed out and a degree of certainty restored.

In summary, the policy analysis mandated under *Biakanja* and *Bily* militates against imposing [HN4]in California a new duty of care owed by insurer-retained adjusters to insureds.

Our conclusion is also consistent with the general law of agency. An adjuster is an agent hired by a principal, the insurer, to investigate a claim. Agents are not liable to third parties for economic loss: [HN5]"An agent's mere failure to perform a duty owed to his principal may render him liable to third persons who rely on his undertaking where there is physical damage to person or property. (See Rest.2d, Agency, § 354, and Appendix, Rep. Note, p. 587.) But *where the effect is merely to cause economic loss, the law does not yet recognize liability to a third person,* except where a duty is created by statute. [Citation.]" ( 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149, pp. 144-145, italics added.)

[*256] Our decision is consistent [***13] with the majority of cases in other states, which hold that an independent adjuster hired by the insurer owes no duty of care to the insured. (*Velasquez v. Exchange Ins. Co.* (1986) 132 Misc.2d 896 [505 N.Y.S. 2d 779, 782] [New York]; *Dear v. Scottsdale Ins. Co.* (Tex. 1997) 947 S.W.2d 908, 917 [Texas]; *Hill v. Giuffrida* (S.D. Miss. 1985) 608 F. Supp. 648, 649 [Mississippi].)

Sanchez relies on cases from Alabama (*Baldwin Mut. Ins. Co. v. Brantley* (Ala. 1987) 518 So. 2d 32) and Alaska (*Continental Ins. Co. v. Bayless & Roberts Inc.* (Alaska 1980) 608 P.2d 281). As best we can tell, none of the defendants in the *Baldwin* case was an adjuster hired by the insurer. FCIC (Federal Crop Insurance Corporation), the claims adjuster involved, was not a defendant in the case. Thus the case does not speak to our issue. *Continental* does squarely impose negligence liability on a claims adjuster, but without offering any analysis as to whether or why a duty should be imposed. *Continental* simply relies on an earlier Alaska case where an insurer's agent was held liable to a third party for *property* [***14] *damage,* not economic damage (See *Continental, supra,* 608 P.2d at p. 288.) As shown above, however, agents are not liable to third parties for purely economic loss.

Thus there is no cogent persuasive authority from other jurisdictions to support imposing a duty.

72 Cal. App. 4th 249, *; 84 Cal. Rptr. 2d 799, **;
1999 Cal. App. LEXIS 492, ***; 99 Cal. Daily Op. Service 3755

In addition to the Alaska and Alabama cases, Sanchez relies on several California cases which held that an adjuster could be liable under Insurance Code section 790.03, subdivision (h) for economic injury caused by delay in claim [**804] processing. However, as appellant concedes, the Supreme Court later held that [HN6]*no private right of action* lies under that section, thus abrogating the decisions Sanchez relies on. (*Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal. 3d 287, 304 [250 Cal. Rptr. 116, 758 P.2d 58] ["Neither section 790.03 nor section 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in section 790.03, subdivision (h)."].) The Legislature, of course, could reach a different policy conclusion than we

have and pass a statute imposing a duty of care on insurer-retained [***15] adjusters. However, a statutory duty authoritatively construed as providing *no* private right of action supplies no basis for imposing a *common law* private right of action indistinguishable from the barred statutory claim.

[*257] DISPOSITION

The judgment of the trial court is affirmed. Respondent shall recover its costs on appeal.

Lillie, P. J., and Woods, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 28, 1999.

# EXHIBIT F

LEXSEE



Positive
As of: Apr 11, 2008

**BANK OF CALIFORNIA, as Administrator With the Will Annexed, etc., Plaintiff,
Cross-defendant and Respondent, v. JOSEPH L. CONNOLLY et al., Defendants,
Cross-complainants and Appellants; MILDRED LOUISE LATIMER, Defendant,
Cross-defendant and Respondent; JUDITH ANN SCHLOESSMANN, Defendant,
Cross-complainant and Respondent.**

Civ. No. 12473.

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT,
DIVISION TWO**

36 Cal. App. 3d 350; 111 Cal. Rptr. 468; 1973 Cal. App. LEXIS 1253

December 27, 1973

**DISPOSITION:** [***1] A petition for a rehearing was denied January 15, 1974, and the petition of respondent Latimer for a hearing by the Supreme Court was denied February 27, 1974.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, business associates and heir of deceased, appealed from a judgment in a declaratory relief action brought by plaintiff bank as successor administrator, to determine the rights and obligations of the parties under a written agreement between deceased and defendant business associates.

**OVERVIEW:** Deceased had entered into a profit sharing agreement with defendant business associates, which provided that the three would share equally in one-half of profits realized from certain property owned by the deceased. The city eventually commenced eminent domain proceedings and acquired a portion of the property. Defendant business associates then commenced suit to recover profits from the condemnation. The trial court ruled that agreement was enforceable on theory of assignment of an equitable interest, but only to extent valuable consideration was given, and issued a decree that each defendant business associate was entitled to a percentage of the sale of the property. On appeal, the court found it impossible to determine whether or not the trial court found valuable consideration for the agreement

because the findings failed to reveal what promises, if any, were given in exchange for the agreement, and whether, and to what extent, promises were performed.

**OUTCOME:** The court reversed the judgment for lack of proper findings on consideration; the findings had to be sufficiently definite and certain so that a reviewing court could arrive at a just determination of the merits of the appeal.

**CORE TERMS:** decedent, profit sharing, enforceable, partnership, joint venture, real estate, community property, valuable consideration, creditors' claims, estoppel, airport, joint venturer, adequate consideration, parcel, services rendered, separate property, administrator, expectancy, equitable assignment, purchaser's, partner, declaratory relief action, brokerage, landowner's, borrowed, community real property, community interest, encumbrancer, promissory, fiduciary

**LexisNexis(R) Headnotes**

*Civil Procedure > Declaratory Judgment Actions >
State Judgments > General Overview
Civil Procedure > Pretrial Matters > Consolidation of
Actions*
[HN1]Where two lawsuits are ordered consolidated for trial and actually tried together, there should be but one

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

set of findings of fact, conclusions of law, and judgment, and if duplicate sets have been entered in each case, they will be considered for all purposes as but one.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Rights of Partners > Losses & Profits*
*Business & Corporate Law > Joint Ventures > Formation*
*Contracts Law > Types of Contracts > Joint Contracts*
[HN2]Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects. A joint venture exists where there is an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control. An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer.

*Business & Corporate Law > General Partnerships > Formation > General Overview*
*Business & Corporate Law > Joint Ventures > Formation*
*Contracts Law > Types of Contracts > Joint Contracts*
[HN3]Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.

*Contracts Law > Consideration > Detrimental Reliance*
*Contracts Law > Consideration > Enforcement of Promises > General Overview*
[HN4]A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Civil Procedure > Appeals > Standards of Review > Fact & Law Issues*
*Contracts Law > Consideration > Detrimental Reliance*

*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN5]Generally, whether estoppel exists is a factual question and ordinarily the determination of the trier of fact is binding on appeal unless the contrary conclusion is the only reasonable one to be drawn from the facts. The burden is on the one asserting estoppel to prove its essential elements, leaving nothing to surmise or questionable inference.

*Estate, Gift & Trust Law > Estates Created by Trusts & Wills > Future Interests > General Overview*
[HN6]A mere possibility, such as the expectancy of an heir apparent, is not to be deemed an interest of any kind. Cal. Civ. Code § 700. A mere possibility, not coupled with an interest, cannot be transferred. Cal. Civ. Code § 1045.

*Civil Procedure > Trials > Bench Trials*
*Contracts Law > Consideration > Adequate Consideration*
[HN7]The findings of a trial court must be sufficiently definite and certain so that a reviewing court can arrive at a just determination of the merits of the appeal.

*Family Law > Marital Duties & Rights > Property Rights > General Overview*
[HN8]See Cal. Civ. Code § 5127.

*Family Law > Marital Duties & Rights > Property Rights > Characterization > Separate Property*
*Family Law > Marital Termination & Spousal Support > Dissolution & Divorce > Property Distribution > Presumptions > Community Property*
*Real Property Law > Estates > Present Estates > Marital Estates > Community Property*
[HN9]There is a rebuttable presumption that property acquired on credit during marriage is community so that in the absence of evidence tending to prove that the seller primarily relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption.

*Estate, Gift & Trust Law > Community Property > General Overview*
*Estate, Gift & Trust Law > Personal Gifts > Lifetime Gifts*
*Real Property Law > Estates > Present Estates > Marital Estates > Community Property*

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

[HN10]Although the husband may dispose of community personal property, he cannot make a gift of such property or dispose of it without valuable consideration. Cal. Civ. Code, § 5125 A gift made by a husband in violation of Civil Code section 5125 is voidable in its entirety during the husband's lifetime and to the extent of only one-half after his death.

## SUMMARY:

In an action by the administrator of a decedent's estate seeking a determination of the rights and obligations created by a written agreement between the decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person, the trial court decided, in substance, that the profit sharing agreement was enforceable only as an assignment of an equitable interest in the profits, if any, from the sale of the lands and then only to the extent of the reasonable value of services rendered to the deceased by the associates in connection with the agreement, such amount to be determined in future proceedings in pending actions on their rejected creditors' claims. (Superior Court of San Bernardino County, No. CW-6573, Henry M. Busch, Judge.)

The Court of Appeal reversed, though it approved the trial court's implied finding that the agreement did not create a partnership or joint venture relationship. The court noted particularly that the evidence justified a finding that the element of right to control the undertaking, essential in a joint venture, was absent. It also rejected the associates' contention that the agreement was enforceable as a matter of law on the theory of promissory estoppel. Going to the central issue of whether the agreement was a valid profit sharing agreement enforceable according to its terms, the court concluded that the judgment had to be reversed for lack of definite and certain findings on the issue of consideration. In that connection it pointed out that the findings failed to reveal what promises, if any, were given by the associates in exchange for the agreement, and whether and to what extent the promises were performed. Though the trial court had, in effect, limited the associates to recovery on a quantum meruit theory, the court found the findings equally insufficient to support the judgment on that basis. In discussing other contentions that might arise on retrial, the court noted that there was evidence from which the trial court could have found the decedent and his co-owner were joint venturers, in which case the properties would not constitute assets of the estate, and the co-owner would, assuming the agreement to be enforceable, be a trustee for the benefit of the associates as to their share of the profits. After discussing questions presented by the decedent's widow relating to the community character of the property involved and the decedent's right to

make a disposition thereof, the court concluded that, if there was a valuable consideration, and if the profit sharing agreement was enforceable according to its terms, it would be enforceable not only as to the decedent's community interest but as to the wife's as well. (Opinion by Tamura, J., with Gardner, P. J., and Gabbert, J., concurring.)

## HEADNOTES

## CALIFORNIA    OFFICIAL    REPORTS
HEADNOTES
Classified to McKinney's Digest

(1a) (1b) Appeal § 100—Right of Review—Loss of Right. —Failure to appeal from adverse judgments on creditors' claims rejected by the administrator of a decedent's estate did not render moot an appeal from a judgment in a declaratory relief action commenced by the administrator, where the actions on the creditors' claims had been consolidated for trial with the declaratory relief action on the representation that the issues were the same, and where the same findings of fact, conclusions of law, and judgments were entered in each case. Thus, the appeal from the judgment in the declaratory relief action had to be treated as an appeal from the duplicate judgments entered in the actions on the creditors' claims.

(2) Actions § 79—Consolidation—Effect. —Where two lawsuits are ordered consolidated for trial and actually tried together, there should be but one set of findings of fact, conclusions of law, and judgment, and if duplicate sets have been entered in each case, they will be considered for all purposes as but one.

(3a) (3b) Joint Adventurers § 3(8)—Relationships Under Agreements as Joint Adventures—Sale of Real Property. —In an action by the administrator of a decedent's estate seeking a determination of the rights and obligations created by a written agreement between the decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person, the trial court did not err in failing to find that the agreement created a partnership or joint venture relationship, where there was sufficient evidence to support its implied finding that any such relationship that may have existed with respect to the brokerage business did not extend to investment in the properties covered by the agreement, where the three had never before been involved in such a joint undertaking, where the co-owner of the properties was not associated with the decedent's real estate business, where the capital and expenses for the acquisition of the properties were furnished by the decedent and his co-owner, and they alone were to share any losses, and where, on the

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

evidence adduced, the court was justified in finding that the essential element of right to joint control of the undertaking was absent.

**(4) Joint Adventurers § 1—Definition and Nature.** — Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.

**(5) Joint Adventurers § 2—Necessity for Community of Interest.** —A joint venture exists where there is an agreement between the parties under which they have a community of interest, that is, a joint interest in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.

**(6) Joint Adventurers § 2—Necessity for Community of Interest.** —An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer.

**(7) Joint Adventurers § 3(8)—Relationships Under Agreements as Joint Adventures—Sale of Real Property.** —An agreement by a landowner to share with another profits to be derived from the sale of land does not, without more, create a partnership or joint venture relationship.

**(8) Joint Adventurers § 10(4)(b)—Trial—Questions of Law and Fact.** —Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.

**(9a) (9b) (9c) Estoppel § 24(7.5)—Elements and Requisites of Promissory Estoppel.** —In an action by the administrator of a decedent's estate seeking a determination of the rights and obligations created by a written agreement between the decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person, it could not be successfully contended that the agreement was enforceable as a matter of law on the theory of promissory estoppel, where large sums borrowed by the two associates, assertedly in detrimental reliance on the decedent's promise, were for their personal use and the record did not disclose what they did with the funds, and where, though one of the associates testified that both had turned down attractive offers from other realty firms after the execution of the agreement, the evidence was conflicting as to whether the witness' financial position would have been enhanced by accepting the offers.

**(10) Estoppel § 24(7.5)—Elements and Requisites of Promissory Estoppel.** —A promise which the promissor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promissee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

**(11) Estoppel § 56—Trial and Appeal—Questions of Law and Fact.** —Generally, whether estoppel exists is a factual question, and ordinarily the determination of the trier of fact is binding on appeal unless the contrary conclusion is the only reasonable one to be drawn from the facts.

**(12) Estoppel § 53—Trial and Appeal—Burden of Proof.** —The burden is on the one asserting estoppel to prove its essential elements, leaving nothing to surmise or questionable inference.

**(13a) (13b) Assignments § 27—Equitable Assignments—Consideration.** —A judgment declaring, in substance, that a written agreement between a decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person was enforceable as an equitable assignment of an interest in the profits, had to be reversed, where, though the trial court stated in its conclusions of law that there was "adequate consideration" to the extent "itemized" by the findings, such findings failed to reveal what promises, if any, were given by the associates in exchange for the agreement, and whether and to what extent the promises were performed. Thus it was impossible to determine whether or not the court found valuable consideration for the agreement.

**(14) Trial § 317(1)—Findings of Fact—Form and Sufficiency—Definiteness and Certainty.** —A trial court's findings must be sufficiently definite and certain so that a reviewing court can arrive at a just determination of the merits of an appeal.

**(15) Decedents' Estates § 459—Claims Against Estates Which Must Be Presented.** —As used in Prob. Code, § 707, relating to the filing of creditors' claims against decedents, the word "claim" refers to debts or demands against the decedent which might have been enforced against him during his lifetime by personal actions for the recovery of money and upon which only a money judgment could have been rendered.

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

**(16) Joint Adventurers § 1–Definition and Nature.** — Rights and liabilities of joint venturers, as between themselves, are governed by the same principles which apply to a partnership.

**(17) Joint Adventurers § 11(7)–Rights of Parties on Termination or Dissolution of Relationship.** — Statutory provisions governing the rights of partners upon dissolution of a partnership, including dissolution by death, are applicable to joint venturers. Thus a surviving joint venturer is entitled to possession of the property of the venture and is authorized to wind up its business, which he must settle expeditiously.

**(18) Joint Adventurers § 7–Title to Property.** —A joint venturer holding property for the venture is a trustee for his co-venturer.

**(19) Trusts § 9–Creation.** —A trust may be created where a trust already exists and at the direction of the beneficiary the trustee transfers the trust property upon a different trust, or the beneficiary directs the trustee to hold the property upon a different trust.

**(20) Trusts § 22–Express Trusts–Subject Matter.** — A contingent interest can be held in trust, and an expectancy based upon an existing contract may also be the subject of a trust.

**(21) Husband and Wife § 103(3)–Community Property–Limitations on Power of Disposition–Necessity for Consent of Wife–Effect of Conveyance in Violation of** Civ. Code, § 172a. —A written agreement between a decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person did not operate as a transfer of an interest in real property. Thus it was not subject to attack by the decedent's widow as an invalid attempt by her husband to transfer, without her consent or joinder, an interest in community real property in violation of Civ. Code, § 5127 (formerly Civ. Code, § 172a).

**(22a) (22b) Husband and Wife § 90(0.5)–Determination of Character of Property–Sufficiency of Evidence–Community Property.** —In an action by the administrator of a decedent's estate seeking a determination of the rights and obligations created by a written instrument between the decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person, the trial court properly determined that the decedent's interest in the properties was community property, where one of the parcels was acquired with proceeds of an unsecured bank loan evidenced by a promissory note signed by the decedent and his co-owner, and the bank's loan officer testified the loan was made solely in reliance upon their personal credit, and where, though a bank loan for the purchase of the other parcel was secured by trust deeds on that property and other property in which the interest of the decedent was separate, the bank officer testified the additional security was taken only to comply with banking regulations and that in making the loans the bank relied primarily on the general credit of the borrowers and not on the additional security.

**(23) Husband and Wife § 60–What Constitutes Community and Separate Property–Borrowed Money.** —The proceeds of an unsecured loan made on the personal credit of either spouse are regarded as community property, particularly where the husband is the borrower, but, ordinarily, funds borrowed by hypothecation of a spouse's separate property are also separate property.

**(24) Husband and Wife § 60.5–What Constitutes Community and Separate Property–Purchases on Credit.** —There is a rebuttable presumption that property acquired on credit during marriage is community so that, in the absence of evidence tending to prove that the seller primarily relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption.

**(25) Husband and Wife § 39–What Constitutes Community and Separate Property–Changing Character of Property.** —In an action by the administrator of a decedent's estate seeking a determination of the rights and obligations created by a written agreement between the decedent and his two associates in a real estate brokerage to share profits from the sale of two parcels of land owned by the decedent and another person, the trial court was not compelled to find that the character of the described real property was changed from community to separate by an agreement between the decedent and his wife providing in substance that as to any purchasers or encumbrancers, property standing in the name of either spouse alone should be conclusively presumed to be his or her own. As between the decedent and his wife, such agreement did not purport to change the character of the property held by either spouse, and, in any event, the decedent's associates were neither "purchasers" nor encumbrancers."

**(26) Husband and Wife § 103(4)–Property–Limitations on Power of Disposition–Necessity for Consideration.** —The provision of Civ. Code, § 5125, that a husband may not make a gift of community per-

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

sonal property or dispose of it without valuable consideration, does not place the husband in the position of a fiduciary, thereby requiring that any transfer, sale or disposition of community property must be for an "adequate consideration" substantially equal in value, measured in terms of money, to the value of the property. In negotiating a property settlement with his wife with respect to community property, a husband has the duties of a fiduciary, but extension of the "fiduciary duty" concept to situations other than property settlements with the wife would hamper the exercise of the husband's business initiative, prejudice the rights of those who deal with him, and generally hinder commercial transactions.

**COUNSEL:** Daniel Schnabel for Defendants, Cross-complainants and Appellants.

Westover, Currey & Matsen and Harry E. Westover for Plaintiff, Cross-defendant and Respondent and for Defendant, Cross-complainant and Respondent.

Covington & Crowe and Robert E. Dougherty for Defendant, Cross-defendant and Respondent.

**OPINION BY:** TAMURA

**OPINION**

[*357]  [**473] TAMURA, J.  This is an appeal from a judgment in a declaratory relief action brought by The Bank of California (Bank) as successor administrator with will annexed of the estate of Charles R. Latimer (deceased), against Joseph L. Connolly, Forde C. Seward, Mildred Louise Latimer (decedent's wife), Mike Kelber and Judith Ann Schloessmann (decedent's daughter), to determine the rights and obligations of the parties under a written agreement between Latimer, Connolly and Seward to share profits from the sale of two parcels of land owned by Latimer and Kelber. Defendants Connolly, Seward and Schloessmann cross-complained against the Bank and each other setting forth their respective [***2] contentions concerning the meaning and legal effect of the agreement. Basically, Connolly and Seward contended it was a joint venture or partnership agreement, was a valid profit sharing agreement, or that it constituted a valid gift. It was further their contention that defendant Kelber should be held to be a trustee for them for their share of the profits. Schloessmann contended that the agreement was invalid for lack of consideration, that it was unenforceable insofar ad Seward was concerned because of his breach, and that Connolly was foreclosed from maintaining an action on the agreement because of alleged irregularities in the presentation of his creditor's claim against the estate. Mildred Latimer contended that Latimer's interest in the properties described in the profit-sharing agreement was community property

and that the agreement was invalid as to her community interest.

Connolly and Seward had filed creditors' claims against the estate based upon the agreement. The claims were denied and each brought an action against the Bank as administrator of the estate. Pursuant to stipulation those two actions were consolidated with the declaratory relief action for purpose [***3] of trial.

[*358]  The court decided, in substance, that the profit sharing agreement was enforceable only as "an assignment of an equitable interest" in the profits, if any, from the sale of the lands and then only to the extent of the reasonable value of services rendered to Latimer by Connolly and Seward "in connection with 'The Agreement,'" such amount to be determined in future proceedings in the pending actions on the rejected creditors' claims. Separate but virtually identical findings, conclusions and judgments were entered in the three actions. Connolly and Seward filed a notice of appeal from the judgment in the declaratory relief action [1] but took no appeal from the judgments entered in the actions on the creditors' claims.

> 1  Seward died before trial but by stipulation the actions were continued in his name. Although Seward's interest is represented in this appeal by Raymond Wilhelm as administrator of the estate of Forde C. Seward, we shall for convenience, continue to use the party designation "Seward."

Deferring for the moment a detailed review of the evidence as it pertains to specific issues, the facts and circumstances giving rise to the controversy [***4] between the parties may be summarized as follows:

Latimer had been a real estate broker in the City of Ontario for many years. Apart from his business interest, he was active in city affairs, having served as Councilman and Mayor of Ontario. He married Mildred Latimer on September 23, [**474] 1963, and they remained husband and wife until his death on January 5, 1969.

Connolly joined Latimer's real estate office in 1957 of 1958. During his association with Latimer, gross commissions from real estate sales were shared equally. Since Latimer used his office to handle business interests unrelated to real estate brokerage as well as to conduct his civic and political activities, he paid all office overhead. Seward joined the office in 1963. Thereafter commissions were divided equally among the three. Latimer continued to pay office overhead. All firm advertisements were in the name of Latimer, Connolly and Seward and the office bore the sign "Latimer, Connolly & Seward Real Estate."

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

Mike Kelber was a long-time friend and business associate of Latimer. They both had interests in the Ontario Savings and Loan Association and had been associated in real estate ventures. [***5] In 1964 Kelber and Latimer acquired a 10-acre parcel in the City of Upland referred to as the 7th and Mountain property and a 67.744-acre parcel adjacent to the Ontario Airport referred to as the airport property. Record title to the properties is in Kelber's name. The 7th and Mountain property was purchased with the proceeds of a $239,000 loan from United California Bank evidenced by [*359] an unsecured note signed by Kelber and Latimer. Acquisition of the airport property was financed by two loans from the United California Bank, one for $420,000 secured by the airport property and the other for $360,000 secured by property in Alta Loma acquired by Latimer and Kelber in 1960.

Connolly and Seward did not contribute any money toward the purchase of the properties but there was evidence that they rendered some service in connection with the acquisitions. The airport property had at one time been listed with Latimer's office but the owner later took it off the market. In August 1964 Kelber learned that the property was again on the market so he alerted Latimer who in turn instructed Connolly to contact the owner. Connolly and Seward made several extended trips to see the [***6] owner and "bird dogged" him as to the price. With respect to the 7th and Mountain property, Connolly learned from friends in Minnesota that the first trust deed held by a Minneapolis lending institution was for sale. He called Kelber's and Latimer's attention to the availability of the trust deed and recommended its purchase. Kelber and Latimer bought the trust deed and obtained title to the property by foreclosure.

The escrow on the 7th and Mountain property closed in August 1964 and the one on the airport property on or about October 5, 1964. On October 6, 1964, Latimer, Connolly and Seward entered into the profit sharing agreement which is the subject of this litigation. [2]

2 The agreement reads as follows:

"October 6th 1964.

"IT IS AGREED AND ACKNOWLEDGED by and between Charles R. Latimer, Joseph L. Connolly and Forde C. Seward, that the three persons named above shall share equally, share and share alike, in one-half of the profits which shall be realized from the following properties, namely;

"1. The 10-acre parcel located at the northwest corner of 7th Street and Mountain Avenue in the City of Upland, California.

"2. The 68 acres adjoining Ontario International Airport which now stands of record in the name od Security Title Insurance Company.

"The parties agree and acknowledge that Latimer has paid interest, taxes and other charges and costs of carrying said property, and he shall be first reimbursed for such charges and costs prior to division of any profits which shall be reqlized [sic] from the same.

"This agreement is binding on the assigns and successors in interest of all and each of the parties.

"(s) CHARLES R. LATIMER/Charles R. Latimer

(s) JOSEPH L. CONNOLLY/Joseph L. Connolly

(s) FORDE C. SEWARD/Forde C. Seward"

[***7] [**475] According to Connolly, Latimer had discussed such an agreement for years, stating he was grateful for all that Connolly and Seward had done for him and wanted to help them; one of the reasons for the agreement was to induce Connolly and Seward to remain and run the real estate business; [*360] Latimer came into the office one morning with a handwritten draft of the proposed agreement which he read to Connolly and Seward and instructed them to take it to Bernard Kelber, Latimer's attorney; Bernard Kelber prepared the agreement in its final form and Connolly and Seward met Latimer at the Ontario Savings & Loan Association where the three signed. Bernard Kelber's testimony concerning the circumstances surrounding the preparation of the agreement was only slightly at variance with Connolly's version. Bernard Kelber testified that Connolly and Seward came to his office stating that Latimer sent them over to have the profit sharing agreement prepared; Kelber telephoned Latimer and prepared the agreement in accordance with Latimer's instructions. Kelber had previously heard Latimer discuss such an agreement and was familiar with its background.

Connolly testified [***8] that prior to the October 6 agreement, he, Latimer and Seward had discussed buying and selling land for capital gains tax advantage, Latimer to furnish the capital and Connolly and Seward their skills, and that they had looked at specific properties, including property at Morro Bay, as possible investments.

Connolly testified that he and Seward were expected to promote the sale of the properties described in the agreement; the two discussed with Latimer and Kelber possible sales and the strategy to be pursued; he (Connolly) made trips to eastern cities at his own expense to

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

interest airlines in the airport property and Seward assisted in the preparation of sales brochures to present to prospective purchasers; he and Seward made attempts to interest chain stores and other potential buyers in the 7th and Mountain property.

During Connolly's association with Latimer, it was understood that Connolly would work on sales of properties owned by Latimer and his family without commission. Connolly testified that after Seward joined the firm, Latimer decided they should receive commissions for sale of Latimer properties but that, with one exception, they received no commissions for such [***9] sales and that after the October 6 agreement, he and Seward gave up substantial commissions on sales of Latimer properties.

After the October 6 agreement, Connolly and Seward borrowed large sums from the United California Bank; Connolly borrowed approximately $81,000 and Seward $63,000. In each instance the loan was arranged by and guaranteed by Latimer. The proceeds were used personally by Seward and by Connolly; none of the funds went to the real estate firm. Connolly testified that neither he nor Seward would have borrowed the monies had it not been for the anticipated profits from the profit sharing agreement and Latimer's repeated assurances that there was going to be plenty of [*361] money for all concerned. Connolly also testified that because of the October 6 agreement, both he and Seward turned down attractive offers to go with other realty firms, but on cross-examination stated he felt he was under no legal obligation to remain with Latimer and that even had he left he would have still been entitled to the benefits of the agreement.

After the October 6 agreement, Latimer spent very little time on his real estate business. Mike Kelber testified that when Latimer [***10] delivered a copy of the October 6 agreement to him, he told Kelber the agreement assured him his real estate office would be maintained whether he was there or not. A few months before Latimer's death, Kelber visited him at the hospital. Latimer told Kelber that upon his release from the hospital he was going to close his real estate office and requested Kelber to inform Connolly and Seward to make arrangements to affiliate with some other realty firm. At that meeting the [**476] subject of the October 6 agreement was again discussed. Latimer told Kelber he "knew what he was doing and this was precisely what he wanted."

Seward left Latimer in October 1968 shortly after he was informed of Latimer's plan to close the office. Connolly remained until Latimer's death.

In July 1968 the City of Ontario commenced eminent domain proceedings to acquire 20.014 acres of the

airport property. The matter went to trial and the jury fixed just compensation at $1,150,000. [3] In Kelber's opinion the value of the entire airport property (including the part condemned) was $3,590,000 and the 7th and Mountain property $500,000, making the total value of the two parcels $4,090,000.

3   The judgment was affirmed in *City of Ontario v. Kelber, 24 Cal.App.3d 959 [101 Cal.Rptr. 428]*.

[***11] The trial court impliedly rejected the various theories advanced by Connolly and Seward respecting the enforceability of the profit sharing agreement. [4] It concluded that profits to be derived from the sale of the lands were "a mere possibility, not coupled with an interest" and that the agreement was enforceable "only on the theory of assignment of an equitable interest and then only to the extent there was 'adequate consideration.'" It then found that "CONNOLLY and SEWARD rendered 'adequate consideration' to decedent LATIMER in certain itemized particulars.

4   The court found against defendant Schloessmann in her attack on the enforceability of the profit sharing agreement.

Based upon the findings and conclusions, the court decreed that Connolly and Seward were each "entitled to that percentage of one-third (1/3) of decedent LATIMER'S share of the net profits to be derived from the sale [*362] of the real properties referred to in 'The Agreement,' which equals, in value, the value of the services rendered by him, as itemized ... above."

The court further decreed that defendant Kelber was not responsible, as trustee or otherwise, to Connolly and Seward for their [***12] share of the profits under the profit sharing agreement; that Connolly's and Seward's rights could only be asserted as contingent claims against the estate of Latimer; that the "value of the services rendered" by Connolly and Seward "as itemized above" shall be determined in their pending actions on the rejected creditors' claims.

The court found that Latimer's interest in the properties described in the profit sharing agreement constituted community property of Latimer and his wife and prescribed a formula for charging their respective community interests for any amounts to which Connolly and Seward would be entitled under the profit sharing agreement. [5]

5   The decree provided in part:

"v) In connection with the allocation of profits between decedent LATIMER'S community property interest in said profits and the commu-

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

nity property interest therein of his widow, MILDRED LOUISE LATIMER, the Probate Court having jurisdiction of the Estate of LATIMER should apportion the share of the profits allocated to CONNOLLY and SEWARD against the total profits in relation to the services rendered by CONNOLLY and SEWARD and whether those services benefited the community property estate of CHARLES R. LATIMER and MILDRED L. LATIMER (which share of the profits for those services should be charged equally to the entire profits) or whether those services benefited CHARLES R. LATIMER'S separate property estate (which share of the profits for those services should be chargeable solely to CHARLES R. LATIMER'S community property interest in said profits and not to the interest therein of his widow, MILDRED LOUISE LATIMER)."

[***13] Connolly and Seward appeal from the judgment. They contend the court erred (1) in concluding the profit sharing agreement was only enforceable as an equitable assignment in that (a) the evidence established as a matter of law the existence of a partnership or joint venture relationship between Latimer, Connolly and Seward, (b) the agreement was enforceable on the theory of promissory estoppel, (c) the agreement was a valid profit sharing [**477] agreement enforceable according to its terms; (2) in concluding that their rights under the agreement can only be asserted as contingent claims against the estate of Latimer; (3) in concluding that Kelber was not a trustee for their benefit for their share of the profits; and (4) in failing to decree the agreement enforceable in full as to Mrs. Latimer's community interest in the properties.

The Bank (as administrator) and Judith Ann Schloessmann respond that [*363] the evidence fails to support any of the theories of enforceability advanced by Connolly and Seward and that the court correctly concluded the agreement was only enforceable as an equitable assignment and then only to the extent of any "adequate consideration" flowing [***14] from Connolly and Seward to Latimer. They further urge that the present appeal has become moot because the judgments entered in the actions on the rejected creditors' claims from which no appeal has been taken are now final.

Mildred Latimer contends that while the court properly found that Latimer's interest in the property was community, it should have decreed that the profit sharing agreement constituted an attempted transfer by the husband of an interest in community real property and as such was enforceable, if at all, only as to Latimer's community interest.

Defendant Mike Kelber filed responsive pleadings in the court below but has not filed a brief on this appeal.

I

(1a) The threshold issue pertains to the effect of the failure to appeal from the judgments entered in the actions on the rejected creditors' claims. The Bank suggests that the finality of those judgments renders the present appeal moot since they resolved the same issues presented in the instant declaratory relief action. The contention is non-meritorious.

The actions on the creditors' claims were consolidated for trial with the declaratory relief action on the representation that the issues were the [***15] same in all three cases. The same findings of fact, conclusions of law, and judgments were entered in each case. (2) [HN1]Where two lawsuits are ordered consolidated for trial and actually tried together, there should be but one set of findings of fact, conclusions of law, and judgment, and if duplicate sets have been entered in each case, they will be considered for all purposes as but one. ( *Bechtold v. Bishop & Co., Inc.,* 16 Cal.2d 285, 287 [105 P.2d 984]; *Israel v. Campbell,* 163 Cal.App.2d 806, 820 [330 P.2d 83]; *Wolfson v. Beatty,* 118 Cal.App.2d 392, 398 [257 P.2d 1017]; *Clinton v. Hogan,* 80 Cal.App.2d 815, 821 [183 P.2d 50].) (1b) The appeal from the judgment in the declaratory relief action must, therefore, be treated as an appeal from the duplicate judgments entered in the actions on the creditors' claims. (Cf. *Wolfson v. Beatty, supra,* 118 Cal.App.2d 392, 398.)

[*364] II

(3a) On the merits, we first consider the contention that the court erred in failing to find that the agreement created a partnership or joint venture relationship. [6]

> 6  Although the court made no affirmative findings on the partnership or joint venture issue, its finding that the agreement was only enforceable as an equitable assignment constituted an implied finding that such a relationship did not exist.

[***16] (4) [HN2]Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects.(3 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 2271-2272.) (5) A joint venture exists where there is an "agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." ( *Holtz v. United Plumbing & Heating Co.,* [**478] 49 Cal.2d 501, 506-507 [319 P.2d 617]; *Connor v. Great Western Sav. &*

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

*Loan Assn.*, 69 Cal.2d 850, 863 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224].) **(6)** An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. ( *Spier* v. *Lang*, 4 Cal.2d 711, 716 [53 P.2d 138].) Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint [***17] venturer. ( *Spier* v. *Lang, supra; Zorich* v. *Petroff*, 152 Cal.App.2d 806, 810 [313 P.2d 118]; *Howard* v. *Societa di Unione etc. Italiana,* 62 Cal.App.2d 842, 848 [145 P.2d 694].) **(7)** An agreement by a landowner to share with another profits to be derived from the sale of land does not, without more, create a partnership or joint venture relationship. ( *Fritz* v. *Gilbert,* 8 Cal.2d 68, 70-71 [63 P.2d 291]; *Mulligan* v. *Wilson,* 94 Cal.App.2d 286, 291-292 [210 P.2d 526]. See *Coward* v. *Clanton,* 122 Cal. 451, 454 [55 P. 147].)

**(8)** [HN3]Whether a partnership or joint venture exists is primarily a factual question to be determined by the trier of fact from the evidence and inferences to be drawn therefrom.( *Nelson* v. *Abraham,* 29 Cal.2d 745, 750 [177 P.2d 931]; *Spier* v. *Lang, supra,* 4 Cal.2d 711, 716; *Epstein* v. *Stahl,* 176 Cal.App.2d 53, 57 [1 Cal.Rptr. 143].) **(3b)** While there was evidence in the case at bench that Latimer, Connolly and Seward may have enjoyed a partnership or joint venture relationship with respect to the real estate brokerage business, there was sufficient evidence to support the trial court's implied finding [***18] that the relationship did not extend to investment in the [*365] properties covered by the profit sharing agreement. During their years of association, Latimer, Connolly and Seward had never been involved in such a joint undertaking. Kelber, with whom Latimer acquired the properties, was not a partner in or otherwise associated with Latimer's real estate business; the capital and all other expenses for the acquisition of the properties were furnished by Kelber and Latimer and they alone were to share any losses. Finally, on the evidence adduced, the court was justified in finding that the essential element of *right* to joint control was absent. Although Connolly testified he and Seward discussed marketing strategy with Kelber and Latimer, the court could have reasonably inferred that the two were invited to participate in those discussions, not because they had a voice in management decisions concerning the properties, but because they were expected to provide their skills and services in promoting the sale of the properties.

There was substantial evidence to support the trial court's implied rejection of the partnership and joint venture theories.

### III

**(9)** The contention [***19] that the agreement was enforceable as a matter of law on the theory of promissory estoppel must also fail.

**(10)** Section 90 of the Restatement of Contracts states: [HN4]"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." The doctrine as expressed in the Restatement is the law of this state. ( *Drennan* v. *Star Paving Co.,* 51 Cal.2d 409 [333 P.2d 757].)

**(9b)** Connolly and Seward contend the detriment suffered in reliance on Latimer's promise consisted of borrowing large sums from the Bank and foregoing lucrative offers to join other realty firms. The borrowed funds, however, were for the personal use of Connolly and Seward. The record does not disclose what they did with the proceeds of the loans, but the fact, if it be a fact, that the funds were lost through imprudent investments or speculation cannot be attributed to Latimer's promise. While Connolly testified to attractive offers from other realty firms, the evidence [**479] was conflicting whether his [***20] financial position would have been enhanced by accepting the offers.

**(11)** Generally, [HN5]whether estoppel exists is a factual question and ordinarily the determination of the trier of fact is binding on appeal unless the contrary conclusion is the only reasonable one to be drawn from the facts. [*366] ( *Albers* v. *County of Los Angeles,* 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129]; *Landberg* v. *Landberg,* 24 Cal.App.3d 742, 759 [101 Cal.Rptr. 335]; *In re Mercantile Guaranty Co.,* 263 Cal.App.2d 346, 356 [69 Cal.Rptr. 361].) **(12)** The burden is on the one asserting estoppel to prove its essential elements, "leaving nothing to surmise or questionable inference." ( *Landberg* v. *Landberg, supra,* 24 Cal.App.3d 742, 759.) **(9c)** On the record, there was no estoppel as a matter of law.

### IV

**(13a)** We proceed to the central issue on this appeal and that is whether the agreement was a valid profit sharing agreement enforceable according to its terms.

In his memorandum opinion, the trial judge held that the profit to be derived from the sale of the lands was a "mere possibility, not coupled with an interest" and nontransferable at law and that consequently the agreement [***21] was only enforceable as an equitable assignment and "then only to the extent that there was adequate consideration for said assignment." He noted that evidence of consideration for the agreement was "not of the strongest," but stated: "... There is no question, but that

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

the decedent was satisfied with the pending business relationship wherein he was free to pursue his 'other' activities. Also it can be found that the decedent relied upon these individuals to actively promote his property as well as the property included in the agreement of October 6, 1964. To this extent then, the Court will find adequate consideration for the equitable assignment. ..."

At common law a mere possibility, such as the expectancy of an heir, was not regarded as such an existing interest as to be capable of sale or assignment.( _Bridge v. Kedon,_ 163 Cal. 493, 495 [126 P. 149]; _In re Garcelon,_ 104 Cal. 570, 584 [38 P. 414]; 4 Pomeroy's Equity Jurisprudence (5th ed.) § 1285, p. 819.) An expectancy or possibility, however, was deemed transferable when coupled with an interest, whether with real or personal estate. (4 Pomeroy's Equity Jurisprudence, _supra,_ § 1285, p. 819.) The common [***22] law rules have been codified in California. Civil Code section 700 [HN6]provides: "A mere possibility, such as the expectancy of an heir apparent, is not to be deemed an interest of any kind." Civil Code section 1045 provides: "A mere possibility, not coupled with an interest, cannot be transferred."

Although a mere possibility not coupled with an interest was non-transferable at common law, assignments of things which have no present existence but rest in possibility were treated as contracts which equity will enforce upon the happening of the contingency if the agreement was fairly [*367] made, supported by valuable consideration, and not against public policy. ( _Bridge_ v. _Kedon, supra,_ 163 Cal. 493, 498; ( _In re Garcelon, supra,_ 104 Cal. 570, 584; _Cheek_ v. _Farmers etc. Nat. Bank,_ 14 Cal.App.2d 176, 179 [57 P.2d 1325]; 4 Pomeroy's Equity Jurisprudence, _supra,_ § 1287, pp. 821, 822; Note 22 Cal.L.Rev. 446, 447. See _In re Goodson,_ 208 F.Supp. 837, 843-845.) Valuable consideration to support an assignment of an expectancy is the same as that required for the formation of a contract. (See _First Nat. Bank_ v. _Pomona Title Mfg. Co.,_ 82 Cal.App.2d [***23] 592, 603 [186 P.2d 693]; 6 C.J.S., § 70, pp. 1121-1123.) Despite Civil Code section 1045, courts in California have continued to enforce assignments of contingent expectancies. ( _Dougherty_ v. _California Kettleman, etc.,_ 9 Cal.2d 58, 89 [69 P.2d 155].)

In holding that the profit sharing agreement in the case at bench was enforceable [**480] only as an equitable assignment, the court relied upon _Bridge_ v. _Kedon, supra,_ 163 Cal. 493, 496, and _Kelly_ v. _Kelly,_ 11 Cal.2d 356, 364 [79 P.2d 1059, 119 A.L.R. 71]. _Bridge_ involved an assignment of the expectancy of an heir and _Kelly_ an assignment by a beneficiary of a spendthrift trust of the corpus of the trust. The transferor in those cases had nothing more than a hope of acquiring funds or property in the future with no present interest in the source of the

expectancy. But the right of a landowner to profits from the sale of his land is more than naked hope; it is an expectancy based upon his present ownership of the land. As stated in 4 Pomeroy's Equity Jurisprudence, _supra,_ at page 820: "... Of course, the mere hope of acquiring future property without any present source from which it [***24] may be obtained is neither an interest nor right, nor anything which has value or can be made the subject of legal relations. But when a party has entered into a contract or arrangement by the ordinary and legitimate and natural operation of which he will acquire property, his existing right thereunder is certainly not a _mere_ naked hope; it is a possibility of acquiring property coupled with a legal interest in the contract." (Original italics.) Anticipated profits by a landowner from the sale of his land would thus appear to be an expectancy which would have been transferable at common law.

However, we need not pursue further the esoteric refinements of equitable assignments. In California the distinction between assignments of expectancies coupled with an interest and those which were formerly only enforceable in equity has largely been reduced to a matter of historical interest. ( _H. S. Mann Corp._ v. _Moody,_ 144 Cal.App.2d 310, 318 [301 P.2d 28]; 5 Cal.Jur.2d, Assignments, §§ 3, 5. See _Bridge_ v. _Kedon, supra,_ 163 Cal. 493, 497-498.) As stated in 5 California Jurisprudence, Second Edition, at page 375: "[The] formal separation of courts of law and of [***25] [*368] equity has never prevailed in California; a single court enforces the substantive law derived from both sources; and the modern rules of practice and procedure have largely eliminated the distinctions which were of great importance in determining and enforcing assigned rights in an earlier period. Also, the modern law of assignments under which the assignability of intangible rights is taken for granted in the business and commercial world is in large part entirely of equitable origin; few modern assignments would have been enforceable in the law courts which originally had exclusive jurisdiction to enforce the common law ...." (Fns. omitted.)

Furthermore, the case at bench does not involve the validity of a present assignment of anticipated profits from the sale of the lands. We are not concerned with the question whether the claim of Connolly and Seward to profits from the land is entitled to priority over that of a creditor or other assignee of Latimer. The question before the court below was simply whether there was a valid profit sharing agreement according to normal contract principles. Agreements by landowners to share profits from the sale of their land in [***26] consideration of capital contribution or for services to be rendered have been held to be valid and enforceable according to their terms. ( _Coward_ v. _Clanton, supra,_ 122 Cal. 451, 454; _Mulligan_ v. _Wilson, supra,_ 94 Cal.App.2d 286,

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

291. *See* Bergson v. H. P. Hood & Sons, 300 Mass. 340 [15 N.E.2d 196, 198, 116 A.L.R. 951]; Hudson v. Wylie (9th Cir.) 242 F.2d 435, 445.) There is no suggestion that the agreement in question was unfairly made or that it is against public policy. If it was supported by valuable consideration and otherwise satisfied the legal requirements for the formation of a contract, it was valid and enforceable according to its terms.

One of the crucial issues below was whether there was valuable consideration for the agreement. However, we cannot determine from the findings how that issue was resolved. In composing the findings, counsel for prevailing parties lifted verbatim from the judge's memorandum opinion [**481] his informal comments on the evidence. The formal findings of fact (P22) recite: "CONNOLLY and SEWARD rendered services to decedent LATIMER in connection with 'The Agreement' limited to the following only:

[***27] "a) Decedent LATIMER was satisfied with the pending business relationship between himself, CONNOLLY and SEWARD wherein he was free to pursue his 'other' activities;

"b) CONNOLLY and SEWARD, after the October 6, 1964, Agreement, at Latimer's request or with his approval, did almost all the active work in their association in the real estate business;

" [*369] c) Decedent LATIMER relied upon CONNOLLY and SEWARD to actively promote his property and, in that connection, services rendered by CONNOLLY and SEWARD to decedent LATIMER relative to sales of decedent LATIMER'S properties prior to October 6, 1964, may be persuasive as to the nature of the 'extraordinary' services to be rendered in the future;

"d) Decedent LATIMER relied upon CONNOLLY and SEWARD to promote the properties that are the subject matter of 'The Agreement.'

"Services rendered by CONNOLLY and SEWARD in connection with 'The Agreement,' are solely limited to the above. (Taken from Memorandum of Opinion, page 2, lines 5 through 14.)"

The "Conclusions of Law," state, inter alia, that Connolly and Seward "rendered 'adequate consideration' to decedent LATIMER in connection with 'The agreement,' limited to the [***28] following: ...," the "following" being a repetition of the findings of fact pertaining to services rendered by Connolly and Seward.

The foregoing findings and conclusions on the issue of consideration lack the certainty essential to a proper review of the contentions of the parties. (14) [HN7]Findings must be sufficiently definite and certain so that a reviewing court can arrive at a just determina-

tion of the merits of the appeal. ( Estate of Ramsey, 107 Cal.App.2d 372, 374-375 [237 P.2d 20].) (13b) Connolly and Seward contend the evidence establishes the existence of valuable consideration for the agreement whereas respondents, despite the court's "Conclusion" that there was "adequate consideration" to the extent "itemized" by the findings, urge that there was no evidence of valuable consideration. [7] The resolution of the competing contentions turns on the court's findings and whether they are supported by the evidence. However, it is impossible to determine whether or not the court found valuable consideration for the agreement. The findings fail to reveal what promises, if any, were given in exchange for the agreement, whether and to what extent the promises were performed. For example: [***29] What is the significance of the finding that "LATIMER was satisfied with the pending business relationship between himself, CONNOLLY and SEWARD wherein he was free to pursue his 'other' activities" and of the finding that after October 6, 1964 the two, at Latimer's request or with his approval "did almost all the active [*370] work in their association in the real estate business"? Did the court intend, by those findings, to find that a consideration for the agreement was the implied promise to remain with Latimer and assume all responsibility for the operation of the real estate office? What is meant by the finding that services rendered to Latimer respecting the sale of decedent's properties prior to October 6, 1964 "may be persuasive as to the nature of the 'extraordinary' [**482] services to be rendered in the future"? Does the finding that "LATIMER relied upon CONNOLLY and SEWARD to promote the properties" mean that there was an implied promise on the part of Connolly and Seward to find a purchaser, ready, willing and able to buy at a price satisfactory to Kelber and Latimer, or merely to make a good faith effort to find buyers, or simply to perform such services as [***30] requested by Latimer in connection with the sale of the properties? A finding on a material issue which is fatally uncertain is equivalent to f failure to find. (4 Witkin, Cal. Procedure (2d ed. 1971) § 338, p. 3140.) The judgment must be reversed for lack of definite and certain findings on the issue of consideration.

7  If there was "adequate consideration" to support an equitable assignment, it would seem necessarily to follow that there was valuable consideration at law. There is no requirement that consideration be adequate to make a contract enforceable at law. ( Blocksidge v. Broadway Sixth Co., 207 Cal.App.2d 628, 632 [24 Cal.Rptr. 622].) The term "good consideration" as used in Civil Code section 1605 equivalent to "valuable consideration" and not adequate consideration in

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

terms of monetary value. ( *Horton* v. *Kyburz*, 53 Cal.2d 59, 65 [346 P.2d 399].)

In passing, we note that the judgment, in effect, decreed that Connolly and Seward are limited to a quantum meruit recovery for the reasonable value of services rendered to Latimer under the agreement. If the contract was void, voidable, or otherwise ineffective, recovery on a quantum meruit theory [***31] for reasonable value of services rendered thereunder might have been appropriate. (See *Brown* v. *Crown Gold Milling Co.*, 150 Cal. 376, 383 [89 P. 86] [employment contract void for uncertainty].) However, if, as the trial court concluded, the contract was enforceable as an equitable assignment, recovery may not be so limited. If the agreement was fairly made, was not against public policy, and was supported by valuable consideration, it would have been enforceable according to its terms. On the present state of the findings, we cannot uphold the judgment on a quantum meruit theory.

Although we have concluded that the judgment must be reversed for lack of proper findings on consideration, we shall discuss other contentions raised by the parties because they will no doubt arise on any retrial.

VI

The trial court determined that Connolly's and Seward's interests under the profit sharing agreement can only be asserted as claims against the estate of Latimer when the properties are sold and profits realized. Connolly and Seward contend that Kelber should have been adjudged a trustee accountable to them for their share of the profits, subject to a lien for any sums [***32] the two may owe the estate. They contend the trial court erred in [*371] concluding that Kelber incurred no responsibility as trustee or otherwise to carry out the terms of the profit sharing agreement.

The Bank (as administrator) and decedent's daughter concede, as they must, that since there was no indebtedness under the agreement during Latimer's lifetime, Connolly and Seward were not required to file creditors' claims. (15) The word "claim" in Probate Code section 707 refers to debts or demands against the decedent which might have been enforced against him during his lifetime by personal actions for the recovery of money and upon which only a money judgment could have been rendered. ( *Newberger* v. *Rifkind*, 28 Cal.App.3d 1070, 1077 [104 Cal.Rptr. 663]; *Erickson* v. *Boothe*, 79 Cal.App.2d 266, 277 [179 P.2d 611].) They contend nevertheless that Connolly's and Seward's interests under the agreement were but contingent contractual claims assertable only against the estate after the contingency had occurred. They urge there was no evidence that Kelber agreed to hold himself accountable as trustee or other-

wise to Connolly and Seward for their share of the net [***33] profits.

On the premise that the profit sharing agreement created a partnership or joint venture, Connolly and Seward contend that one-half the net profits from the sale of the properties would constitute partnership assets and not assets of the estate. ( Corp. Code, § 15026; Prob. Code, § 571; *Estate of Grivel*, 10 Cal.2d 454, 456 [74 P.2d 759].) However, the trial court having rejected the premise upon which Connolly and Seward have constructed their argument and there being substantial evidence to support the trial court's implied findings, the argument advanced by them must fail.

[**483] It does not follow, however, that the trial court's conclusion that Connolly's and Seward's rights are only enforceable as claims against the estate is correct. The validity of the court's conclusion does not turn on whether a partnership or joint venture relationship existed between Latimer, Connolly and Seward, but rather may depend upon whether such a relationship existed between Kelber and Latimer. If Latimer was merely an equitable owner of an undivided half of the properties in question, his interest would clearly be a part of the estate and it would be the right and duty [***34] of the Bank as administrator to take possession, management and control of such interest. ( Prob. Code, §§ 571, 581.)

If Kelber and Latimer were partners, no part of the properties would become assets of the estate. ( Prob. Code, § 571.) If they were joint venturers, the same consequences would flow as if they were partners. (16) Rights and liabilities of joint venturers, as between themselves, are governed by the same principles which apply to a partnership. ( *Zeibak* v. *Nasser*, 12 Cal.2d 1, 12 [82 P.2d 375].) (17) Statutory provisions governing [*372] the rights of partners upon dissolution of a partnership are applicable to joint ventures. ( *Zeibak* v. *Nasser*, supra.) This extends to a dissolution of a joint venture by death of a joint venturer. ( *Price* v. *Slawter*, 184 Cal.App.2d 715, 720 [7 Cal.Rptr. 830]. See *Estate of Peebles*, 27 Cal.App.3d 163, 167 [103 Cal.Rptr. 560].) Upon the death of a partner, the surviving partner is entitled to possession of the partnership property and is authorized to wind up the partnership business. ( Corp. Code, § 15033; Prob. Code, § 571.) He must settle the partnership business expeditiously. *(Estate of Peebles*, [***35] supra.) The same powers and responsibilities extend to a surviving joint venturer. ( *Estate of Peebles*, supra.)

In the case at bench there was evidence from which the court could have found that Kelber and Latimer were joint venturers. There was evidence of the existence of all of the incidents of a joint venture relationship, namely, joint interest in a business undertaking, an un-

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

derstanding as to the sharing of profits and losses, and a right of joint control. ( _Holtz_ v. _United Plumbing & Heating Co., supra,_ 49 Cal.2d 501, 506-507.)

If Kelber and Latimer were joint venturers, no part of the real properties in question would constitute assets of the estate, although the value of Latimer's interest in the joint venture would be inventoried in his estate. Kelber would have been a trustee for the benefit of Latimer, not only because of written memoranda between the two, but because of their joint venture relationship. (18) A joint venturer holding property for the venture is a trustee for his co-venturer. ( _Epstein_ v. _Stahl, supra,_ 176 Cal.App.2d 53, 57.)

As to whether a trust relationship existed between Kelber and Connolly and Seward, there was evidence [***36] that immediately upon the execution of the profit sharing agreement, Mr. Latimer personally delivered a copy to Kelber. Kelber testified that upon being apprised of the profit sharing agreement, he (Kelber) understood he would be accountable to "two more people" for the profits from the sale of the properties. Kelber's testimony was as follows:

"Q. (BY MR. SCHNABEL:) When you got this copy of the contract of October 6th, 1964, you conceived that you as trustee were being advised that Charles Latimer had alienated some portion of his beneficial interest in this trust of which you were trustee; isn't that the fact?

"A. If I understand your question correctly, yes, that would be the fact.

"Q. Now there were two more people you'd have to make an appropriate accounting for in the division of profits; right?

"A. Yes.

[*373] "Q. All right. And did you ever question the legality of this October 6th, 1964 document?

[**484] "A. The legality?

"Q. Yes. Did you ever question the legality or did you deem yourself bound by it?

"A. I felt that I was bound by it, that there were - I had two new partners."

The foregoing evidence would have supported a finding [***37] that Kelber was a trustee not only for the benefit of Latimer but also for the benefit of Connolly and Seward as to their share of the profits under the terms of the profit sharing agreement, assuming the agreement to be enforceable. (19) A trust may be created "where a trust already exists and at the direction of the beneficiary the trustee transfers the trust property upon a

different trust, or the _beneficiary directs the trustee_ to hold the property upon a different trust ...." ( Rest.2d Trusts, § 17, com. h, p. 62; italics supplied.) (20) A contingent interest can be held in trust. ( Rest.2d Trusts, _supra,_ § 85.) An expectancy based upon an existing contract may also be the subject of a trust. ( Rest.2d Trusts, _supra,_ § 86, com. e, p. 210.)

Of course, if the profit sharing agreement is determined to be void, voidable, or otherwise unenforceable for any reason and recovery is allowed on a quantum meruit theory, the claim could only be asserted as a claim against the estate. In such event it would be unnecessary to reach the question whether Kelber was a trustee for Connolly and Seward for their share of the profits under the profit sharing agreement.

## VI

(21) Although Connolly [***38] and Seward disclaim any interest in the lands by virtue of the profit sharing agreement, Mrs. Latimer contends the agreement constituted an invalid attempt by her husband to transfer, without her consent or joinder, an interest in community real property. She urges that under Civil Code section 5127 [8] (formerly Civ. Code, § 172a) the agreement was invalid insofar as it purported to affect he community interest.

8   Civil Code section 5127 (formerly § 172a) provides: "... [The] [HN8]husband has the management and control of the community real property, but the wife, either personally or by duly authorized agent, must join with him in executing any instrument by which such community real property or any interest therein is leased for a longer period than one year, or is sold, conveyed, or encumbered; provided, however, that nothing herein contained shall be construed to apply to a lease, mortgage, conveyance, or transfer of real property or of any interest in real property between husband and wife; provided, also, however, that the sole lease, contract, mortgage or deed of the husband, holding the record title to community real property, to a lessee, purchaser, or encumbrancer, in good faith without knowledge of the marriage relation shall be presumed to be valid. No action to avoid any instrument mentioned in this section, affecting any property standing of record in the name of the husband alone, executed by the husband alone, shall be commenced after the expiration of one year from the filing for record of such instrument in the recorder's office in the county in which the land is situate, and no action to avoid any instrument mentioned in this section, affecting any property standing of record in the name of the husband

alone, which was executed by the husband alone and filed for record prior to the time this act takes effect, in the recorder's office in the county in which the land is situate, shall be commenced after the expiration of one year from the date on which this act takes effect."

[***39] [*374] The only authority cited by Mrs. Latimer is *Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871], involving an assignment by a landowner of a percentage of the oil and gas extracted from his lands. The court held the assignment constituted a transfer of an interest in real property in the nature of "an incorporeal hereditament." *Callahan* turned on the nature of a landowner's rights to oil and gas beneath his land and is therefore inapposite.

While we have found no California case passing squarely upon the question whether a landowner's agreement to share profits from the sale of his land constitutes a transfer of an interest in real property, it has been held that an oral joint venture agreement concerning real property is not subject to the statute of frauds even though the real property was owned by one [**485] of the joint venturers. (*Gross* v. *Raeburn*, 219 Cal.App.2d 792, 796, 799 [33 Cal.Rptr. 432].) This view is generally shared in other jurisdictions. (2 Corbin, Contracts, § 411, pp. 418-421.) Corbin, *supra*, adds at page 421: "... There is even more reason for holding that a contract for the assignment of a share [***40] in the profits of a particular land speculation is not a contract for the sale of an interest in land; it is an assignment of a chose in action." (Fn. omitted.)

We conclude the agreement did not operate as a transfer of an interest in real property.

VII

(22a) We next consider the question whether the trial court properly determined that Latimer's interest in the properties in question was community property. Although Connolly and Seward did not raise this issue in their opening brief, they raise it in their reply brief in response to the Bank's and daughter's contention that the judgment properly restricted enforceability of the profit sharing agreement as to Mrs. Latimer's community interest to the reasonable value of services rendered by Connolly [*375] and Seward to the community and in response to the wife's contention that the agreement was wholly unenforceable as to her community interest.

The properties having been acquired by purchase during Latimer's marriage, his interest was presumed to be community, and the burden of overcoming the presumption by clear and convincing evidence rested with Connolly and Seward. (*See* v. *See*, 64 Cal.2d 778, 783 [51 Cal.Rptr. [***41] 888, 415 P.2d 776].)

Insofar as the 7th and Mountain property was concerned, the evidence supported the trial court's finding that Latimer's interest was community property. The property was acquired with proceeds of an unsecured loan from the United California Bank evidenced by a promissory note signed by Latimer and Kelber. The Bank's loan officer testified the loan was made solely in reliance upon the personal credit of Kelber and Latimer. (23) The proceeds of the loan so made on the personal credit of either spouse are regarded as community property, particularly where the husband is the borrower. ( *Ford* v. *Ford*, 276 Cal.App.2d 9, 13 [80 Cal.Rptr. 435]; 4 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 2727-2728, and cases there cited.)

As to the airport property, its acquisition was financed by a $420,000 loan secured by the property itself and a $360,000 loan secured by the Alta Loma property. The loan proceeds secured by the airport property were obviously community in nature. As to the $360,000 loan, it was conceded that Latimer's interest in the Alta Loma property was his separate property. Ordinarily funds borrowed by hypothecation of a spouse's separate property [***42] are also separate property. ( *Estate of Abdale*, 28 Cal.2d 587, 592 [170 P.2d 918].) (22b) In the case at bench, however, the court found that although the Bank took trust deeds on both the airport property and the Alta Loma property, the loans were made "primarily" on the general credit of Kelber and Latimer. The Bank's loan officer testified the additional security on the Alta Loma property was taken only to comply with banking regulations restricting banks to a loan of up to 60 percent of the appraised value of property given as security. He also testified that in making the loans the Bank relied primarily on the general credit of Kelber and Latimer and not on the additional security of the Alta Loma property.

The foregoing evidence was sufficient to support the trial court's finding that Latimer's interest in the airport property was community. (24) [HN9]There is a rebuttable presumption that property acquired on credit during marriage is community so that "[in] the absence of evidence tending to prove that the seller [in this case the lender] primarily relied upon [*376] the purchaser's separate property in extending credit, the trial court must find in accordance with the [***43] presumption." ( *Gudelj* [**486] v. *Gudelj*, 41 Cal.2d 202, 210 [259 P.2d 656].)

(25) For the first time in their reply brief, Connolly and Seward urge that an agreement entered into between the Latimers on August 25, 1964, a copy of which was introduced into evidence, changed the character of the properties from community to separate. The agreement, the text of which is set out in the margin Below, [9] provides in substance that as to "any ... purchasers or en-

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

cumbrancers" property standing in his or her name alone shall be "conclusively presumed to be his [or her] own." As between the parties, however, the agreement does not purport to change the character of property held by either spouse. Moreover, Connolly and Seward were neither "purchasers" nor "encumbrancers." The agreement, therefore, did not compel a finding that Latimer's interest in the two properties was his separate property.

9 "AGREEMENT

"THIS AGREEMENT made and entered into at Ontario, California, this 25th day of August 1964, by and between MILDRED L. LATIMER, wife, and CHARLES R. LATIMER, husband;

"WITNESSETH:

"WHEREAS each of the parties desires to be able to convey, encumber, and in all respects deal with any property that may be now owned or that may be hereafter acquired by either of them, in her or his own name, without the necessity of the other being a necessary party to any instrument conveying, encumbering, or otherwise affecting such property;

"NOW THEREFORE it is mutually agreed:

"I. Each of the parties hereby declares that this agreement is freely and voluntarily made, with a clear and full understanding of the entire transaction, each with independent advice, and without duress, Menace or undue influence whatsoever.

"II. That said CHARLES R. LATIMER hereby declares and agrees that all property heretofore or hereafter acquired by and standing in the name of MILDRED L. LATIMER alone is and shall be conclusively presumed to be her own as to any and all purchasers or encumbrancers whatsoever.

"III. The said MILDRED L. LATIMER hereby declares and agrees that all property heretofore or hereafter acquired by and standing in the name of CHARLES R. LATIMER alone is and shall be conclusively presumed to be his own as to any and all purchasers or encumbrancers whatsoever.

"IN TESTIMONY WHEREOF the parties have hereunto set their hands and seals the date and at the place first above written.

"(s) Mildred L. Latimer

"(s) Charles R. Latimer"

[***44] The question remains as to the effect, if any, of the profit sharing agreement upon the wife's community interest. We have heretofore determined that the wife's contention that the profit sharing agreement was unenforceable against her community property interest because it constituted an attempted transfer of interest in community real property cannot be sustained. [*377] This leaves the question whether the profit sharing agreement constituted an improper disposition of community personal property. (26) [HN10]Although the husband may dispose of community personal property, he cannot make a gift of such property or dispose of it without "valuable consideration." ( Civ. Code, § 5125 [formerly Civ. Code, § 172].) A gift made by a husband in violation of Civil Code section 5125 is voidable in its entirety during the husband's lifetime and to the extent of only one-half after his death. ( Ballinger v. Ballinger, 9 Cal.2d 330, 334 [70 P.2d 629]; Britton v. Hammell, 4 Cal.2d 690, 691 [52 P.2d 221]; Trimble v. Trimble, 219 Cal. 340, 344 [26 P.2d 477]; Fields v. Michael, 91 Cal.App.2d 443, 448 [205 P.2d 402].)

Respondents urge that the position of [***45] a husband in dealing with community property is that of a fiduciary ( Vai v. Bank of America, 56 Cal.2d 329, 338 [15 Cal.Rptr. 71, 364 P.2d 247]), and that therefore any transfer, sale or disposition of community property must be for an "adequate consideration" substantially equal in value, measured in terms of money, to the value of the property. The only cases cited in support of their contention are Frey v. Clifford, 44 Cal. 335 and Clark v. Troy, 20 Cal. 219. Those cases had nothing to do with a husband's disposition of community property. Although they held that there was a [**487] distinction between "good consideration" and "valuable consideration," the latter being "money or the like," that distinction has since been repudiated. "Good consideration" and "valuable consideration" mean the same thing. ( Horton v. Kyburz, supra, 53 Cal.2d 59, 65.)

Although in negotiating a property settlement with his wife with respect to community property, a husband has the duties of a fiduciary ( Vai v. Bank of America, supra, 56 Cal.2d 329, 338; Flores v. Arroyo, 56 Cal.2d 492, 494-495 [15 Cal.Rptr. 87, 364 P.2d 263]), those duties [***46] have not been extended to all of the husband's business dealings with community property. (See Note, The Husband's Fiduciary Duty - More Protection for the California Wife, 14 Stan.L.Rev. 587.) Respondents' contention that community property should not be disposed of by the husband except for adequate consideration finds no support in the decisions. Civil Code section 5125 has never been so construed. The cases equate "valuable consideration" as used in section 5125 with "good consideration" as used in section 1605. ( Gantner v. Johnson, 274 Cal.App.2d 869, 877 [79

36 Cal. App. 3d 350, *; 111 Cal. Rptr. 468, **;
1973 Cal. App. LEXIS 1253, ***

Cal.Rptr. 381]; *Estate of Bray,* 230 Cal.App.2d 136, 141 [40 Cal.Rptr. 750].See *Grolemund v. Cafferata,* 17 Cal.2d 679, 683 [111 P.2d 641]; *Metzger v. Vestal,* 2 Cal.2d 517, 522 [42 P.2d 67].) As one note writer has observed: "Evidently a husband is free to make unwise purchases, to speculate freely in stocks and securities or to use personal property foolishly without the wife's consent, [*378] for in these situations the desirability of freely transferable personal property is thought to outweigh the harm suffered by the wife." (Note, 9 Stan. L.Rev. 400, 404-405.) To [***47] extend the "fiduciary duty" concept to situations other than property settlements with the wife would, as another commentator has stated, "hamper the exercise of his [husband's] business initiative, prejudice the rights of those who deal with him, and generally hinder commercial transactions. ..." (14 Stan.L.Rev., *supra,* pp. 598-599; fns. omitted.)

If there was valuable consideration and if the profit sharing agreement is enforceable according to its terms, it would be enforceable not only as to Latimer's community interest but to the wife's as well.

Judgment is reversed.

Gardner, P.J., and Gabbert, J., concurred.

# EXHIBIT G

LEXSEE



Caution
As of: Apr 11, 2008

**580 FOLSOM ASSOCIATES, Plaintiff, Cross-defendant and Appellant, v.
PROMETHEUS DEVELOPMENT COMPANY et al., Defendants, Cross-
complainants and Appellants. BROBECK, PHLEGER & HARRISON, Objector
and Appellant**

**No. A040222**

**Court of Appeal of California, First Appellate District, Division Two**

**223 Cal. App. 3d 1; 272 Cal. Rptr. 227; 1990 Cal. App. LEXIS 868**

**August 8, 1990**

**NOTICE:** [***1] Opinion certified for partial publi-
cation - Pursuant to California Rules of Court, rule 976.1
and 976(b), this opinion is certified for publication with
the exception of parts I, II and III of Prometheus's ap-
peal.

**SUBSEQUENT HISTORY:** The petition of appellant
580 Folsom Associates for review by the Supreme Court
was denied October 25, 1990.

**PRIOR HISTORY:** Superior Court of the City and
County of San Francisco, No. 860583, Stuart R. Pollak,
Judge.

**DISPOSITION:** The judgment and the order granting
sanctions are affirmed. The order denying attorneys' fees
incurred in the writ proceeding is affirmed as modified.
The request for sanctions on appeal against Brobeck is
denied. Folsom's request for attorneys' fees incurred in
this appeal is granted, and the matter is remanded to the
trial court for a determination of the amount of reason-
able attorneys' fees that should be awarded Folsom to be
paid by Prometheus and Diller. As required by <u>Business
and Professions Code section 6089, subdivision (b)</u>, a
copy of this opinion shall be forwarded to the State Bar.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff property owner,
defendant developer, and law firm appealed from an or-
der of the Superior Court of the City and County of San

Francisco (California), denying plaintiff's costs and at-
torney fees incurred in defending against defendant's
petition for writ of mandate, granting summary judgment
against defendant, and imposing sanctions jointly and
severally against defendant and defense counsel's firm
under <u>Cal. Code Civ. Proc.  § 128.5</u>.

**OVERVIEW:** Plaintiff property owner filed a complaint
against defendant developer seeking to quiet title to real
property and alleging breach of an indemnity agreement.
With its answer, defendant filed a cross-complaint. Plain-
tiff filed a motion for summary judgment or summary
adjudication of issues and sought sanctions against de-
fendant and the law firm representing defendant on the
ground that the allegations of the cross-complaint were
fabrications and that the cross-complaint was filed for
the purpose of frustrating plaintiff's efforts to obtain the
relief to which it was entitled. The trial court granted
plaintiff summary adjudication and ordered sanctions
against the law firm and defendant. The court affirmed,
holding that the lack of evidence to substantiate key alle-
gations of the cross-complaint was sufficient ground for
imposing sanctions for the filing of a frivolous pleading,
because the action was completely without merit. Addi-
tionally, the denial of plaintiff's motion for attorney fees
was properly denied, because the motion was prema-
turely filed.

**OUTCOME:** The order was affirmed. Plaintiff property
owner was not entitled to recover its costs and attorney
fees for defending against defendant's petition for writ of
mandate. Sanctions were properly imposed on defendant

Page 1

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

developer and the law firm representing defendant, because defendant's cross-complaint was frivolous and lacking in merit, in that there was a lack of evidence to substantiate key allegations therein.

**CORE TERMS:** cross-complaint, tab, attorney fees, joint venture, joint venture, frivolous, purchaser, seller, closing date, summary judgment, purchase contract, subtenant, summary adjudication, indemnity agreement, bad faith, partnership, leasehold, purchase agreement, statement of undisputed facts, prevailing party, contingency, planning, declaration, deposition testimony, sublease, tenant, factual allegations, opposing, totally, lease

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1]When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.

*Business & Corporate Law > Joint Ventures > Formation*
*Contracts Law > Types of Contracts > Joint Contracts*
[HN2]A joint venture is an undertaking by two or more persons jointly to carry out a single business enterprise for profit. The elements necessary for its creation are joint interest in a common business; with an understanding to share profits and losses; and a right to joint control. Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Hearings > General Overview*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
[HN3]A cross-defendant seeking summary adjudication need only offer evidence to disprove the allegations of the cross-complaint. Should the cross-complainant wish to offer a different factual assertion from that alleged in the cross-complaint, it must move to amend the cross-complaint prior to the hearing on the summary adjudication motion.

*Civil Procedure > Remedies > Costs & Attorney Fees > Costs > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN4]See Cal. Civ. Proc. Code § 128.5.

*Civil Procedure > Judgments > General Overview*
*Civil Procedure > Appeals > Frivolous Appeals*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN5]An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge. To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice.

*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN6]In accordance with the usual rule on appeal, the judgment or order of the trial court is presumed correct. All intendments and presumptions are indulged to support it on matters to which the record is silent, and error must be affirmatively shown. Where evidence is in conflict, the appellate court will not disturb the findings of the trial court.

*Business & Corporate Law > Joint Ventures > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN7]An action is deemed frivolous or in bad faith if it is found to be totally and completely without merit. A complete lack of evidence to substantiate key allegations of the cross-complaint alleging the terms of a purported joint venture is sufficient ground for imposition of sanctions for the filing of a frivolous pleading.

*Legal Ethics > Professional Conduct > Frivolous Claims*
[HN8]It is the duty of an attorney to counsel or maintain such actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of person charged with a public offense. To employ, for the purpose of maintaining the causes confided to him or her such means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.

Page 2

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN9]The imposition of sanctions in the initial action appears to be the most promising remedy for the problem of frivolous litigation.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
*Civil Procedure > Judgments > Relief From Judgment > General Overview*
*Civil Procedure > Remedies > Writs > Common Law Writs > Mandamus*
[HN10]The denial of a petition for a writ is not a final adjudication of the facts alleged in the petition where neither the denial nor the record discloses a reason therefor. A denial of a writ challenge without opinion is not a determination of a cause. If this were not so, no party would file a petition for writ of mandate and risk a loss of the chance to a full hearing and a determination by written opinion on appeal if the writ were summarily denied. Since a denial of a writ petition without opinion is neither res judicata nor law of the case, it is clear that the party opposing the petition is not a prevailing party. The matter is clearly subject to later review should a party seek such review.

SUMMARY:

CALIFORNIA OFFICIAL REPORTS SUMMARY

After a sale of a leasehold interest in commercial real estate fell through, the seller brought an action against the purchaser and its sole shareholder seeking to quiet title to the property and to recover on an indemnity agreement in the sales contract. Various torts were also alleged. The purchaser cross-complained, alleging that the parties had entered into a joint venture agreement that was breached by the seller. The trial court granted the seller's motion for summary adjudication as to the cross-complaint and the cause of action for breach of contract, and it also granted the seller's motion for sanctions against the purchaser and its counsel jointly under Code Civ. Proc., § 128.5. The purchaser unsuccessfully sought a writ of mandate from the appellate court and then the state Supreme Court to overturn the trial court's orders; the seller's motions for attorney fees incurred in the writ Proceedings were denied by both appellate courts and then by the trial court. (Superior Court of the City and County of San Francisco, No. 860583, Stuart R. Pollak, Judge.)

The Court of Appeals affirmed in all respects, except that the trial court's denial of the seller's motion for attorney fees for the writ proceedings was modified to

permit renewal of the motion if and when the seller became the prevailing party under Civ. Code, § 1717. In the published portions of its opinion, the court held that summary adjudication had properly been granted on the cross-complaint, that the sanctions awarded were proper, and that where, as here, a writ petition is denied without opinion there is no final adjudication and thus no prevailing party. The evidence provided by the parties to the agreement at issue established without conflict that there was never a joint venture agreement as alleged in the cross-complaint, the court held, rejecting the purchasers' claim that they had raised a factual issue as to the existence of an implied joint venture agreement, since the cross-complaint alleged only an actual agreement. Because the key allegations of the cross-complaint were devoid of supporting evidence, sanctions were properly awarded against the purchaser; because the statement of undisputed facts filed by the purchaser's counsel referenced massive quantities of documentation that did not support, directly or indirectly, the alleged facts for which it was cited, counsel were also properly sanctioned for deliberate obfuscation, the court held. It also held that the sanctions award properly included compensation for time spent by the seller's personnel in defending against the cross-complaint. (Opinion by Benson, J., with Smith, Acting P. J., and Peterson, J., concurring.)

HEADNOTES

CALIFORNIA       OFFICIAL       REPORTS
HEADNOTES
Classified to California Digest of Official Reports, 3d Series

(1) Summary Judgment § 26—Appellate Review—Scope. —Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, the appellate court independently reviews them, applying the same three-step analysis required of the trial court. First, the court identifies the issues framed by the pleadings, since the motion must respond to them by establishing a complete defense or otherwise showing that there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. Second, the court determines whether the moving party's showing has established facts that negate the opponent's claim and justify a judgment for the movant. When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.

(2) Joint Ventures § 2—Definition and Elements of Joint Venture. —A joint venture is an undertaking by two or more persons jointly to carry out a single business

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

enterprise for profit. The elements necessary for its creation are: joint interest in a common business; an understanding to share profits and losses; and a right to joint control.

**(3) Joint Ventures § 5—Creation—Parol Agreement—Intent of Parties.** —A joint venture may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties. The existence of a joint venture depends on the intention of the parties.

**(4a) (4b) Joint Ventures § 4—Agreements for Purchase and Sale of Real Property—Existence of Joint Venture—Sufficiency of Evidence to Avoid Summary Judgment.** —In an action by a seller of a leasehold interest seeking to quiet title and recover on an indemnity agreement in the sales contract, the trial court properly granted summary judgment for the seller on the purchaser's cross-complaint for breach of an alleged joint venture agreement between the parties. The evidence established without conflict that the oral or written joint venture agreement alleged by the purchaser did not exist. The negotiators of the purchase agreement all testified that such an agreement was never discussed; there was no evidence that the seller was entitled to share in any profits that might be received by the purchaser; and the seller was entitled to receive the sale price and nothing more. Evidence presented by the purchaser raising inferences of an implied joint venture agreement was insufficient to defeat the summary judgment motion, since the cross-complaint alleged an explicit joint venture agreement and the purchaser had made no motion to amend that allegation.

**(5) Summary Judgment § 6—Motion—Summary Adjudication—Factual Assertions Not Included in Cross-complaint—Necessity of Amendment.** —A cross-defendant seeking summary adjudication need only offer evidence to disprove the allegations of the cross-complaint; should the cross-complaint wish to offer a different factual assertion from that originally alleged, it must move to amend the cross-complaint before the hearing on the summary adjudication motion.

**(6) Costs § 35—Review of Sanctions—Abuse of Discretion.** —On review of an order awarding sanctions under Code Civ. Proc., § 128.5, it is not the province of the court to consider the record on appeal to determine if the appellant's conduct meets the standards of frivolousness. Where the issue is whether the trial court has abused its discretion, a showing is insufficient to reverse the trial court if it presents facts that merely afford an opportunity for a different opinion. An appellate tribunal is neither authorized nor warranted in substituting its judgment for

that of the trial judge; for there to be relief from an alleged abuse of discretion, it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice. The order of the trial court is presumed correct; all intendments or presumptions are indulged to support it on matters as to which the record is silent. Error must be affirmatively shown. Where evidence is in conflict, the appellate court will not disturb the findings of the trial court.

**(7) Costs § 11—Sanctions—Against Party—Frivolous Cross-complaint.** —Under Code Civ. Proc., § 128.5, an action is deemed frivolous or in bad faith if it is found to be totally and completely without merit. A complete lack of evidence to substantiate key allegations of a cross-complaint alleging the terms of a purported joint venture is sufficient ground for imposition of sanctions for filing a frivolous pleading. Thus, in an action against the purchaser of a leasehold interest by the seller to quiet title and recover on an indemnity agreement in the sales contract, sanctions were properly awarded against the purchaser, where numerous factual allegations in the purchaser's cross-complaint asserting that it had formed a joint venture with the seller were utterly devoid of supporting evidence. The trial court's determination that the deposition testimony of the purchaser's sole shareholder proved that none of the alleged oral promises were ever made and contradicted the position taken in the cross-complaint was alone sufficient to sustain the finding that the purchaser could not have had a good faith belief in the truth of allegations. The declaration of a legal expert as to the factual support for the allegations served to excuse the purchasers' attorneys for their part in filing the cross-complaint, but did not help the client who provided the false and misleading information.

**(8) Costs § 35—Review of Sanctions—Relevance of Trial Judge's Oral Statements.** —On appeal by attorneys from an award of sanctions against them under Code Civ. Proc., § 128.5, arguments based on statements made by the trial judge at the hearings below were rejected, and review was based instead on the judge's written order. Section 128.5 calls for written findings of the trial court stating the reasons for imposing sanctions; oral statements by the trial judge do not meet the requirements of § 128.5, and arguments based on such statements are inappropriate.

**(9) Costs § 11—Sanctions—Against Counsel—Frivolous Response to Statement of Undisputed Facts.** —In an action against the purchaser of a leasehold interest by the seller seeking to quiet title and recover on an indemnity agreement in the sales contract, the trial court, after granting summary judgment for the seller on the purchaser's cross-complaint alleging breach of a joint ven-

ture between the parties, properly imposed sanctions on the purchaser's attorneys under Code Civ. Proc., § 128.5. Although the attorneys could not be sanctioned for filing the cross-complaint in reliance on information supplied by their client, the statement of undisputed facts filed in opposition to the seller's revised statement of undisputed facts was frivolous and in bad faith. Most of the mass of documentation provided by the attorneys did not support, directly or indirectly, the alleged facts for which it was cited; the response was a deliberate effort at obfuscation intended to overwhelm the trial judge. Section 128.5 covers bad faith actions or tactics; "actions or tactics" includes opposition to motions; "frivolous" means totally without merit. Here, after completing discovery the attorneys must have known there was no evidence to support the cross-complaint's factual allegations. While an expert opined that an implied joint venture could be reasonably alleged, evidence supporting such a theory was outside the pleadings, which alleged an actual joint venture.

[See 6 Witkin, Cal. Procedure (3d ed. 1985) Proceedings Without Trial, § 41.]

**(10) Courts § 5—Trial Court's Supervisory Authority Over Court Proceedings.** --A trial court is empowered to exercise its supervisory power in such a manner as to provide for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that would tend to hinder, hamper, or delay the conduct and dispatch of its proceedings.

**(11) Attorneys at Law § 4—Abuse of Process by Misrepresenting Facts.** --In an action against the purchaser of a leasehold interest by the seller seeking to quiet title and recover on an indemnity agreement in the sales contract, counsel for the purchaser, which had cross-complained, alleging that the seller breached a joint venture agreement between the parties, abused the judicial process by representing to the trial court that material referenced in its statement of undisputed facts filed in opposition to the seller's motion for summary judgment on the cross-complaint was sufficient to raise a question of fact concerning the statement of undisputed facts offered by the seller. The error was compounded by the attorneys' attempt to bury the lack of evidentiary support for their position in a mass of immaterial information. An attorney has an obligation to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice. Under Bus. & Prof. Code, § 6068, an attorney has the duty to employ only such means as are consistent with the truth and not to mislead the judge by a false statement of fact or law.

**(12) Costs § 11—Sanctions—Against Counsel—Frivolous Cross-complaint—Compensation for Time Spent by Opposing Party.** --In an action against the purchaser of a leasehold interest by the seller seeking to quiet title and recover on an indemnity agreement in the sales contract, in which action the purchaser cross-complained for breach of a joint venture agreement between the parties, the trial court properly awarded as sanctions under Code Civ. Proc., § 128.5, compensation for time spent by the seller's personnel in defending against the cross-complaint, which was frivolous. The term "expenses" in § 128.5 is not limited to attorney fees and to the costs governed by Code Civ. Proc., § 1032-- otherwise, where a party was entitled to costs under § 1032 and to fees under Civ. Code, § 1717, no sanctions could be awarded against the losing party no matter how frivolous its conduct or how unscrupulous its bad faith.

**(13) Costs § 31—Attorney Fees—Hearing and Determination—Who Is Prevailing Party—Respondent in Writ Proceedings—Necessity of Final Judgment.** --In an action against the purchaser of a leasehold interest by the seller seeking to quiet title and recover on an indemnity agreement in the sales contract, in which action the trial court granted summary judgment for the seller on the purchaser's cross-complaint for breach of an alleged joint venture agreement between the parties, the seller was not entitled to seek attorney fees under Civ. Code, § 1717, from either the trial court or the appellate court, following the purchaser's unsuccessful attempts to obtain a writ of mandate from the appellate court and then the state Supreme Court to overturn the summary judgment and the trial court's award of sanctions against the purchaser. There could be no prevailing party until there was a final judgment. The writ petition was denied without opinion. Such a denial is not a final adjudication, res judicata, or law of the case, and thus the party opposing the petition is not a prevailing party. While the trial court properly denied the seller's motion for attorney fees in the writ proceedings, the court should have provided that its denial was without prejudice to renewal of the motion if and when the seller became the prevailing party.

**COUNSEL:** Pettit & Martin, John B. Clark, James B. Harrington, Sharon L. O'Grady and David M. Rice for Plaintiff, Cross-defendant and Appellant.

Cartwright, Slobodin, Bokelman, Borowsky, [\*\*\*2] Wartnick, Moore & Harris, Jack L. Slobodin, William L. Jacobson, Brobeck, Phleger & Harrison, John E. Sparks and S. Alan Childress for Defendants, Cross-complainants and Appellants and for Objector and Appellant.

**JUDGES:** Opinion by Benson, J., with Smith, Acting P. J., and Peterson, J., concurring.

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

**OPINION BY:** BENSON

**OPINION**

[*7] [**228] This action involves three separate appeals taken from the judgment entered in a single action in the trial court after that court entered summary adjudication of issues in favor of 580 Folsom Associates (Folsom) and against Prometheus Development Company (Prometheus). Appellant Folsom seeks costs and attorneys' fees incurred in defending against a petition for writ of mandate filed in this court by Prometheus. Appellant Brobeck, Phleger & Harrison (Brobeck), trial counsel for Prometheus, seeks to overturn the trial court's order which awarded sanctions jointly and severally against the law firm and Prometheus under Code of Civil Procedure section 128.5. Appellant Prometheus seeks reversal of the order granting summary adjudication of issues and awarding sanctions against it. We shall affirm the judgment and the order granting sanctions. As amended, we shall affirm the order [***3] denying attorneys' fees.

Procedural Background

On July 1, 1986, Folsom commenced this action by filing a complaint against Prometheus and Sanford Diller, the chairman and sole shareholder of Prometheus, seeking to quiet title to real property and alleging breach of an indemnity agreement by Prometheus. The complaint also alleged various tort claims which are not relevant to this appeal. With its answer, Prometheus filed a cross-complaint against Folsom and Ronald Kaufman (Kaufman), a general partner of the Kaufman Family Partnership, which was in turn a general partner of Folsom.

On March 17, 1987, Folsom and Kaufman filed a motion for summary judgment or, in the alternative, for summary adjudication of issues addressing the first, fourth, fifth, sixth and seventh causes of action of the complaint and the entire cross-complaint. This motion was scheduled for hearing on April 15, 1987. The motion also sought sanctions against [*8] Prometheus and/or Brobeck under Code of Civil Procedure section 128.5 on the grounds the allegations of the cross-complaint were fabrications and the cross-complaint was filed for the purpose of frustrating Folsom's efforts to obtain the relief to [***4] which it was entitled.

Hearing on the motion was continued to May 21, 1987. At this hearing, Prometheus objected to new evidence presented by Folsom in its reply brief. The hearing was continued to June 8, 1987 to allow [**229] Prometheus to respond to this new matter. At the continued hearing the court indicated it was inclined to grant Folsom's motion but was concerned that Folsom had not met its burden of proof concerning its entitlement to

money due its sublessees for tenant improvements. Rather than forcing Folsom to start its motion all over again, the court again continued the hearing to allow the parties to present additional evidence. At this June hearing, Prometheus also stipulated it would provide Folsom a quitclaim deed to clear Folsom's title to the property, thus removing that issue from the action and mooting Folsom's fourth, fifth, sixth and seventh causes of action.

At the final hearing on the motion on July 29, 1987, the court granted Folsom's motion as to the first cause of action of the complaint for breach of contract and the entire cross-complaint. Turning to the matter of sanctions, the court very reluctantly "concluded that the actions taken here by Prometheus [***5] were not in good faith" and that sanctions were warranted both for the filing of a cross-complaint containing allegations that were "frivolous and . . . totally and completely without merit," and for submission of pleadings in opposition to Folsom's motion that the court found "contain[ed] lengthy citations to the record which, upon review, either do not relate to the factual proposition[s] for which they are cited, or . . . contain no competent evidence and refer to materials which are clearly incompetent." The court scheduled a further hearing to determine the amount of sanctions that would be assessed and the amount of attorneys' fees that would be awarded to Folsom based upon the contract clause authorizing an award of attorneys' fees to the prevailing party in any action brought to enforce the contract.

Prometheus then filed a petition for a writ of mandate in this court seeking to set aside the trial court's grant of summary adjudication. This court requested a response to the petition from Folsom and gave written advisement to Folsom that a peremptory writ might be issued in the first instance under Code of Civil Procedure section 1088, citing *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893]. [***6] Folsom filed its opposition brief; this court, by order dated September [*9] 17, 1987, denied the petition without issuing an alternative writ or an order to show cause. A petition to the Supreme Court was similarly denied.

Brobeck then filed in the trial court a motion for reconsideration of the order granting sanctions against it. Prometheus separately joined in this motion. This motion was heard at the previously scheduled hearing to determine the amount of attorneys' fees and sanctions. The court denied the motion for reconsideration, awarded Folsom $ 160,000 in attorneys' fees and $ 20,000 in sanctions. This ruling was later embodied in a written order. Folsom then voluntarily dismissed its remaining tort causes of action and final judgment was entered on October 19, 1987. Prometheus and Brobeck filed their appeals. Folsom moved the trial court for ad-

Page 6

ditional attorneys' fees incurred in the writ of mandate proceedings. The court denied this request, and Folsom then filed its appeal.

Factual Background

In September 1979, Kaufman and his wife acquired a renewable longterm lease with purchase options of certain improved real property situated at the corner of Folsom [***7] and Second Streets in San Francisco, known as 299 Second Street. In early 1980, the leasehold was transferred to a newly created partnership called "580 Folsom Associates," plaintiff in this action. An 80 percent share of Folsom was held by the Kaufman Family Partnership and the remaining 20 percent was held by another partnership called "W/P Folsom," the general partners of which are two local architects, Francis Whisler and Piero Patri. Kaufman was the managing partner of Folsom and was vested with general power to conduct the partnership business.

Prometheus is a California corporation engaged in the business of real estate development, management and investment. Sanford N. Diller (Diller) is the president, [**230] chief executive officer and sole shareholder of Prometheus.

Portions of this property were leased by Folsom to various subtenants, the principal one of which was the firm of Whisler Patri, a corporation through which Whisler and Patri conducted their architectural practice. All of the subleases provided for termination by Folsom upon the giving of certain specified notices. The subleases also provided that the subtenants would make certain improvements to the property [***8] to render it suitable for use as office space. The subleases further provided that, in the event of termination of the sublease prior to its expiration, Folsom would reimburse the subtenant, at the time it vacated the premises, for the unamortized cost of these improvements.

[*10] At one time Folsom had given consideration to undertaking development of a high-rise office building on the property but when presented with an acceptable offer to purchase its interest by Prometheus, Folsom decided to sell its interest. Prior to receipt of the offer from Prometheus, Folsom had entertained several offers for purchase of the leasehold by various other prospective developers during 1980 through 1983.

In early 1983, Kaufman decided to begin the application process with the city for a site permit for construction of a highrise building on the property. Whisler and Patri had informed Kaufman that "things [were] getting tighter and tighter in planning and zoning." In order to preserve the development potential of the property, Kaufman began seeking approval of the city planning department for eventual development of the site. Kauf-

man's purpose in submitting an application was to "get in [***9] line" at the planning department so that the development potential, and consequently the resale value of the property, would not be eliminated by future controls on downtown development.

Prometheus's offer to purchase the leasehold interest was unsolicited by Folsom; it was presented to Folsom by realtor John Cecconi of the firm of Coldwell Banker. The offer was in the amount of $ 4,040,000 and provided for an initial deposit of $ 250,000 and an extended escrow period of 18 months, at the conclusion of which the buyer would have the option either of closing the transaction by payment of the balance of the purchase price or of terminating the transaction and forfeiting its deposit.

Following receipt of this offer, negotiation of a formal purchase contract was carried out by Kaufman of Folsom, Cecconi of Coldwell Banker and Dale Frost of Prometheus. These negotiations ultimately resulted in the execution of a real estate purchase contract dated August 16, 1983. The final version of the contract was prepared entirely by Prometheus and consisted of a printed standard-form purchase contract and an addendum setting forth various provisions special to this particular transaction. The [***10] contract was signed by Frost for Prometheus and by Kaufman, Whisler and Patri for Folsom.

Other provisions of the purchase contract which are pertinent to this litigation are the following: (1) a provision permitting Prometheus to extend the escrow period and the closing date a further 12 months for a total of 30 months by payment to Folsom of an additional nonrefundable deposit of $ 250,000; (2) a provision for a socalled "free-look" or "contingency period" of 60 days following the execution of the contract, during which Prometheus would be entitled to terminate the contract without forfeiting its [*11] deposit; (3) a provision requiring Prometheus to execute a quitclaim deed reconveying its interest in the property in the event it should fail to close escrow at the specified time; (4) a provision according Prometheus the "absolute and sole discretion" to modify any plans or proposals previously submitted to the city by Folsom and to determine the content of any plans and specifications to be submitted in the future; (5) a provision requiring that upon close of escrow Prometheus was to reimburse Folsom for the expenses previously incurred by it in processing the permit application; [***11] (6) a provision requiring Prometheus to exercise "due diligence" during the escrow period in pursuing city approval [**231] for a high-rise project on the site consistent with its own plans and specifications; (7) a provision tentatively retaining the architectural firm of Whisler Patri as the project architect subject to Prometheus' right to terminate its services at any time; (8) a provision permitting Prometheus to require termination

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

of the subleases of the existing subtenants at any time during the escrow period, subject to an obligation on Prometheus' part to give Folsom "such written assurances and securities as [Folsom] may reasonably require to protect it against loss, damages, costs and expenses (including but not limited to attorney's fees) as consequences to giving such notices" of termination of the subleases; (9) a provision requiring Prometheus to "also pay to [Folsom] when such notice [of termination] is given the amount due tenants under the lease document[s]" for the unamortized cost of their improvements to the property; (10) a provision permitting assignment of the agreement by either party; and (11) a provision for payment of costs and attorneys' fees to "the prevailing [***12] party" in any litigation brought "to interpret or enforce this Agreement."

During the two months following its execution, the purchase contract was modified in certain minor respects by correspondence among the parties. The only modification relevant to this litigation was an agreement that the contingency period should be extended 30 days, to November 15, 1983, in order to permit Prometheus to satisfy itself concerning certain further contingencies. These contingencies were resolved, and Prometheus elected to proceed with the transaction following the expiration of the contingency period.

Kaufman requested and was given permission to accompany Prometheus' representatives to their initial meetings with the city planning personnel. Kaufman also kept informed of Prometheus's dealings with the city during the contingency period. Kaufman claimed his sole motive during this period was to ensure that Prometheus would do nothing to jeopardize the long-term development potential of the property during the time in which it still remained free to terminate the contract and receive back its deposit.

[*12] In September of 1984, Prometheus decided to exercise its right to require Folsom [***13] to terminate the subleases of the existing subtenants. Prometheus requested that it be relieved of its contractual obligation to render immediate payment to Folsom of the amounts that would become due to the subtenants upon such termination for the unamortized cost of their improvements to the property. In lieu of such immediate payment, Prometheus proposed that it furnish a written commitment on behalf of itself and its principal, Diller, to pay these amounts directly to the subtenants at such times as the subtenants actually vacated the property. Folsom agreed and the parties executed an indemnity agreement generally incorporating Prometheus' proposal and otherwise carrying forward all of the obligations that Prometheus had originally assumed under the purchase contract respecting termination of the subtenancies. This agreement, dated September 28, 1984, provided in pertinent part that Prometheus and Diller would pay to the subtenants "at the time they vacate, any amounts due to such subtenant or subtenants in accordance with their respective subleases," and that these parties would also "indemnify [Folsom] and hold [Folsom] harmless from loss, damages, costs, and expenses (including [***14] but not limited to attorney's fees) [that Folsom] may incur as a consequence of giving such notices."

Folsom gave the requested notices to terminate each of the subtenancies. Some months later, Prometheus requested that the subtenants be asked to stay on as month-to-month tenants of the property. All of the subtenants stayed except the principal subtenant, Whisler Patri, which informed Folsom and Prometheus that it had made a commitment for the lease of other premises following receipt of the notice to vacate.

Shortly before May 8, 1985, the scheduled closing date, Prometheus exercised its contractual right to postpone the closing an additional 12 months to May 8, 1986, by [**232] paying Folsom an additional deposit of $ 250,000.

In the fall of 1985, Rathie, Prometheus's project manager of the property, spoke with Kaufman about a further extension of the closing date for the purchase of Folsom's interest in the property. Rathie suggested a payment of $ 250,000 by Prometheus for the extension; Kaufman counteroffered to accept $ 500,000 for a one-year extension of the closing date; no agreement on a second extension of the closing date was reached by the parties. At an acrimonious meeting [***15] between Diller and Kaufman on January 15, 1986, Diller took the position that Prometheus was entitled to an indefinite closing date without the payment of any additional consideration whatsoever.

Whisler Patri actually vacated the property on January 31, 1986. On February 3, 1986, Folsom's attorneys sent a demand letter to Prometheus [*13] and Diller seeking payment of $ 179,999.82 for W/P Folsom's unamortized tenant improvements and $ 21,315.04 for February rent due plus reimbursement for insurance and taxes paid by Folsom. Also on February 3, 1986, Diller wrote Kaufman in response to Kaufman's January 6, 1986, letter seeking $ 179,999.82 for tenant improvements. Diller sought verification that Whisler had vacated the premises, had left the premises in tenantable condition, had not removed any tenant improvements and that Whisler Patri had complied with all requirements of the sublease. Folsom's counsel replied to this letter by letter dated February 7, 1986, again demanding the money claimed due and requesting permission to send a messenger for the money that day. This letter enclosed certificates from Whisler Patri and Folsom with respect to Whisler Patri's subtenancy as [***16] re-

quested by Prometheus. No invoices for tenant improvements were enclosed on the stated grounds that Prometheus had been furnished the invoices on two prior occasions. There followed a series of correspondence between counsel for each of the parties which added much heat to the controversy but shed no light on it.

By May 8, 1986, the closing date, Prometheus had not received permit approval to construct a highrise office building on the property; Prometheus declined to carry out the purchase of the property. Folsom demanded that Prometheus execute a quitclaim deed of its interest in the property. Prometheus continued to assert an interest in the property and accordingly refused to execute the requested quitclaim deed. This action followed.

Discussion

*Prometheus's Appeal*

In the unpublished portion of this opinion we discuss Prometheus's contention the trial court erroneously granted summary adjudication on the first cause of action of the complaint for breach of contract on the grounds there were triable issues of fact with respect to the construction of the indemnity agreement. Prometheus also claims summary adjudication on its entire cross-complaint was improper on the [***17] ground there were triable issues of fact material to Prometheus's claims. Lastly, Prometheus asserts the trial court abused its discretion in awarding sanctions against it as there was no showing of subjective "bad faith" and its conduct was neither frivolous nor intended solely for the purpose of delay.

The analysis we follow in reviewing the granting of summary adjudication is the same as that used by the trial court. (1) "Since a summary judgment motion raises only questions of law regarding the construction [*14] and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court. First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [para.] Second[ly], we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor . . . . [para.] [HN1]When [**233] a summary judgment motion prima facie justifies a judgment, [***18] the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ( *AARTS Productions, Inc.* v. *Crocker Na-*

*tional Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203], citations omitted.)

I-III *

* See footnote, *ante*, page 1.

. . .

IV

*Whether There Were Triable Issues of Material Fact With Respect to the Issues Raised in Prometheus's Cross-complaint*

Prometheus's cross-complaint alleges causes of action for fraud, injunctive relief, breach of the joint venture agreement, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, declaratory relief, unjust enrichment and quantum meruit. The relevant allegations of the cross-complaint are the following: (1) Kaufman instructed a real estate broker to seek a developer possessing experience in successful development of real property and possessing substantial cash to pursue development of the project at 299 Second Street; (2) Kaufman [***19] intended to make such a developer a joint venturer with Kaufman and Folsom of that property and intended to induce such a developer to contribute substantial cash and personal services to the project for a promised share of the proceeds to be realized from the development of the property; (3) Kaufman and Folsom formed with Prometheus a joint venture which was partly in writing and partly oral; (4) the terms of the joint venture were that: the parties assumed fiduciary obligations to each other; Kaufman and Folsom promised to contribute their claimed friendships, contacts and knowledge of how to obtain city approval of the project to the joint venture; Whisler and Patri promised [*15] to provide assistance in obtaining a permit to develop the property; Prometheus promised to provide cash; each joint venturer promised not to interfere with the other's performance of obligations of the agreement and agreed the joint venture would continue until its successful completion or until accomplishment was in fact impossible; the parties agreed to share profits of the venture; and in furtherance of the joint venture agreement, the parties executed the real estate purchase contract with addendum [***20] and other agreements amending the contract, including an indemnity agreement; (5) when it became apparent no city approval would be forthcoming within the extended term of the purchase contract, Prometheus sought another extension but Kaufman and Folsom, without warning, demanded $ 500,000 for such an extension and if the sum were not paid, threatened to terminate the joint venture causing Prometheus to lose more than $ 1 million in out-of-pocket expenses; (6) when Prometheus did not pay this additional sum, Kaufman and Folsom threatened

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

to deny in public that Prometheus possessed the right to appeal to the Board of Permit Appeals the denial of the permit application for development of the property; (7) Kaufman's and Folsom's undisclosed scheme was to induce an experienced developer to pay cash and perform services for the development from which Kaufman and Folsom would benefit without cost to themselves if the project were successful or, if unsuccessful, would retain the amounts paid and the services rendered by Prometheus for eventual development of the project; (8) in an effort to induce Prometheus to abandon the project, Kaufman and Folsom without warning asserted they were entitled [***21] to lost rental income under the indemnity agreement; and (9) this litigation was commenced to coerce Prometheus to forfeit its interest in the property.

On appeal, Prometheus contends "the relationship between the parties was broader and more complex" than the constricted view of the purchase agreement and indemnity agreement held by the trial court. Prometheus argues "sufficient evidence was put before the trial court to establish triable issues of material fact that the broader relationship between Prometheus and [Folsom] gave rise to fiduciary and [**234] other duties which [Folsom] breached to the injury of Prometheus." Prometheus further contends that under the appropriate standard of liberal construction of its evidence, there is a "germ of a potential cause of action . . . ." ( *Jos. Schlitz Brewing Co. v. Downey Distributor* (1980) 109 Cal.App.3d 908, 917 [167 Cal.Rptr. 510].)

The parties agree on the elements necessary to show the existence of a joint venture. (2) "[HN2]'A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit.' The elements necessary for its creation are: (1) joint interest [***22] in a common business; (2) with an understanding to share profits and losses; and (3) a right to [*16] joint control. (3) 'Such a venture or undertaking may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties.'" ( *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 819 [195 Cal.Rptr. 421], citations omitted.) "The existence of a joint venture depends upon the intention of the parties." ( *Boyd v. Bevilacqua* (1966) 247 Cal.App.2d 272, 285 [55 Cal.Rptr. 610].)

In support of its motion for summary judgment on the cross-complaint, Folsom offered uncontroverted proof that no factual basis existed for any of the material allegations of the cross-complaint. It was established: (1) the initial contact between Prometheus and Folsom was arranged by Cecconi of Coldwell Banker, not Kaufman; (2) there was no plan or scheme by Kaufman or Folsom to inveigle Prometheus into a joint venture nor any false representations made by Folsom to Prometheus; (3) none

of the persons who participated in the negotiations of the parties, Frost for Prometheus, Cecconi [***23] of Coldwell Banker or Kaufman for Folsom, had ever mentioned or heard mentioned a joint venture nor had entertained any notion that the transaction they were discussing might be characterized as a joint venture between Folsom and Prometheus; (4) neither Diller, who was an attorney as well as a developer, nor any of the other participants conceived of the notion of characterizing the transaction as a joint venture until this idea was suggested by Prometheus's counsel in the course of preparing the cross-complaint; (5) neither Kaufman, Whisler nor Patri agreed to assist Prometheus in the planning or permit process; (6) no assistance was rendered by Whisler Patri other than in its role as project architect before its termination by Prometheus nor by Kaufman other than during the "free look" or contingency period provided for in the purchase agreement; (7) no promises of any kind were made by Folsom, Kaufman or Whisler Patri other than those appearing in the written purchase contract; (8) no party to the transaction agreed to assume fiduciary obligations of any kind toward one another; (9) the only sharing of profits from the transaction agreed to by the parties consisted of Prometheus's [***24] acquisition of the property and Folsom's receipt of the deposits and the purchase price specified in the purchase agreement; (10) there was no agreement that the term of the purchase agreement would continue until successful completion of the project or that it would continue at all beyond the closing date as provided in the contract; (11) the only demands for additional payments by Folsom consisted of requests for costs due because of the termination of the subtenancies; and (12) no threats to sabotage the project were ever communicated to Prometheus or the city planning officials by Kaufman or Folsom other than the threat to commence litigation made to Prometheus after Prometheus denied liability for lost rent.

[*17] Indeed, some of the alleged "evidence" offered by Prometheus to support the allegation that the parties entered a joint venture does not even remotely support the point for which it was tendered. For example, Prometheus claims Kaufman referred to the relationship as a joint venture. The document relied on consists of Kaufman's notes of a telephone conversation which took place some two years before Prometheus was introduced to Kaufman. The notes refer to a foreign [***25] developer as a possible purchaser of the property. The reference to joint venture is a reference to Whisler Patri who had a partnership interest in 580 Folsom Associates. Prometheus also points to Kaufman's efforts to find a [**235] major tenant for the new building and his control of the marketing of the property. Again all the acts referred to occurred in December 1980 and February 1982, prior to Prometheus' involvement.

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

Diller testified in deposition that the factual allegations of the cross-complaint were true. He admitted, however, he did not participate in any negotiations between the parties concerning the terms of the purchase agreement. When asked during deposition to state a factual basis for his conclusionary statements that the allegations were accurate, he testified the factual allegations were "a conclusion of counsel" regarding "the legal consequences that flow from the facts of this case," or words to that effect.

Prometheus claims Kaufman continued to work informally to further the permit process even after Prometheus assumed the lead role. Among the evidence offered by Prometheus in support of this statement are pages 1998 through 2015 and pages 2022-2091 of the joint [***26] appendix. Nothing in these pages shows Kaufman did anything to further the permit process after the end of the contingency period on November 15, 1983. In fact, the record cited by Prometheus discloses that on December 1, 1983, Stephen Koch of Prometheus wrote that Prometheus was taking primary responsibility for the permit process and that on December 22, 1983, Kaufman wrote to Patri asking about the process to change the name on the application to Prometheus. Also on December 22, 1983, Kaufman wrote Patri complaining about receiving a late invoice from Whisler Patri for work on the permit application and stating that because Prometheus had already reimbursed Folsom for its work, Folsom had to absorb one half the bill.

No evidence shows Folsom exercised control over the project after expiration of the contingency period provided in the contract. Kaufman testified he ceased any involvement in the permit process at the end of the contingency period and had no further contact with city personnel on the subject property after that time. Kaufman stated he participated during the contingency period because he wanted to protect the development potential of the [*18] property while [***27] Prometheus could still walk away from the contract without payment of any money.

Whisler Patri's work on the project also ended after the contingency period. Whisler Patri had been tentatively retained as the project architect under the purchase contract. On February 1, 1984, however, Prometheus informed Whisler Patri that Prometheus had retained a different firm to serve as project architect.

Prometheus claims that in a note dated September 1984, Karen Kaufman asked her father what was happening with "your" permits. The record contains no testimony concerning the document but the contents of the document suggest that it is notes of a telephone conversation between Koch of Prometheus and Karen Kaufman. Nor do we find evidence in the record to support

Prometheus' claim that Folsom sought to oust Prometheus from the property before expiration of the escrow period. Prometheus admits that a draft letter by Kaufman in which he threatened to notify city planning officials that Prometheus no longer controlled the property was never sent to anyone. Stripped of the hyperbole, Prometheus's claim that Folsom acted in bad faith toward Prometheus is based on nothing more than Folsom's assertions [***28] that it intended to enforce its claimed rights to money for tenant improvements and lost rent which Prometheus refused to pay.

**(4a)** Prometheus admits in its opening brief on appeal that it "did not attempt to show an *explicit* written or oral joint venture agreement" in its opposition to the motion for summary adjudication on the cross-complaint. On appeal, Prometheus argues, as it did in the trial court, that the evidence of the acts and statements of the parties it presented in the trial court was sufficient to raise inferences of an *implied* joint venture relationship between the parties. Prometheus misconstrues its burden to defeat Folsom's motion for summary adjudication on the cross-complaint. The cross-complaint alleges the parties "formed a joint venture, in part written and in part oral, for the development of the project [**236] property." **(5) [HN3]** A cross-defendant seeking summary adjudication need only offer evidence to disprove the allegations of the cross-complaint. Should the cross-complainant wish to offer a different factual assertion from that alleged in the cross-complaint, it must move to amend the cross-complaint prior to the hearing on the summary adjudication motion. ( [***29] *AARTS Productions, Inc.* v. *Crocker National Bank, supra,* 179 Cal.App.3d 1061, 1064; *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 611 [163 Cal.Rptr. 477].)

**(4b)** The evidence before the trial court establishes without conflict that there was no oral or written joint venture agreement between Prometheus [*19] and Folsom. The three negotiators of the purchase agreement each testified that such an agreement was never discussed by the parties. There is no evidence Folsom was entitled to share in any profits that might be received by Prometheus from the project. As seller of the property, Folsom was entitled to receive the sale price and nothing more. We conclude summary adjudication was properly granted on the cross-complaint. ( *Connor* v. *Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 862-863 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224]; *Ragghianti* v. *Sherwin* (1961) 196 Cal.App.2d 345, 351-352 [16 Cal.Rptr. 583].)

*Prometheus's and Brobeck's Appeals*

**V**

*Whether Prometheus Should Have Been Sanctioned*

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

[***30]  As a final ground for appeal Prometheus challenges the order granting sanctions against it.

[HN4] Code of Civil Procedure section 128.5 (hereafter section 128.5) provides in pertinent part:

"(a) Every trial court may order a party, the party's attorney, or both to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay . . . .

"(b) For purposes of this section:

"(1) 'Actions or tactics' include, but are not limited to, the making or opposing of motions or the filing and service of a complaint or cross-complaint . . . .

"(2) 'Frivolous' means (A) totally and completely without merit or (B) for the sole purpose of harassing an opposing party.

"(c) . . . An order imposing expenses shall be in writing and shall recite in detail the conduct or circumstances justifying the order."

(6) Under the appropriate standard of review of an order awarding sanctions under section 128.5, it is not the province of this court "to consider the record on appeal to determine if appellant's conduct meets the standards of frivolousness . . . . [para.] . . . Where the issue on appeal [***31] is whether the trial court has abused its discretion, the showing necessary to reverse the trial court is insufficient if it presents facts which merely afford an [*20] opportunity for a different opinion: [HN5]*An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.* To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice; . . .' ( *Brown v. Newby* [1940] 39 Cal.App.2d [615], 618 [103 P.2d 1018].)" ( *Winick Corp. v. County Sanitation Dist. No. 2* (1986) 185 Cal.App.3d 1170, 1175-1176 [230 Cal.Rptr. 289], italics in original.) "[HN6]In accordance with the usual rule on appeal, the judgment or order of the trial court is presumed correct. All intendments and presumptions are indulged to support it on matters to which the record is silent, and error must be affirmatively shown. [Citation.] Where evidence is in conflict, the appellate court will not disturb the findings of the trial court." [***32] ( *Ellis v. Roshei Corp.* (1983) 143 Cal.App.3d 642, 645, fn. 2 [192 Cal.Rptr. 571].)

The trial court entered a detailed order setting forth its findings on the issue of sanctions against Prometheus and Brobeck. [1] [**237] This order found the [*21] cross-complaint filed by Prometheus to [**238] be

frivolous and in bad faith because it was so totally without merit as to support an inference of bad faith.

1  In its written order, the trial court made the following findings: "1. The cross-complaint filed by Prometheus and Diller and the separate statement filed by Prometheus and Diller in opposition to the revised statement of undisputed facts are frivolous and in bad faith within the meaning of C.C.P. § 128.5 in the following respects.

"a. The cross-complaint filed by Prometheus and Diller in this action is so totally and completely without merit as to support an inference that the cross-complaint was filed in bad faith.

"b. There is no evidence of any joint venture agreement, as alleged in the cross-complaint. The allegations of a joint venture in the cross-complaint are factually untrue and legally incorrect.

"c. The cross-complaint did not simply advance the legal position argued by Brobeck, Prometheus and Diller on their motion for reconsideration – that the Purchase Contract constituted a joint venture agreement. Had it done so, the determination that no joint venture existed could have been made upon demurrer or upon a motion for judgment on the pleadings. Instead, the cross-complaint makes a series of factual allegations as to which cross-complainants have adduced no evidentiary support. These false factual allegations required Folsom and Kaufman to engage in wide-ranging and expensive discovery, causing the litigation to become far more onerous and expensive than it should have been.

"d. The determination that the cross-complaint was filed in bad faith is further supported by the fact that Prometheus and Diller were in a position to know the falsity of their allegations. This is not a case where evidence resting within solely the control or knowledge of Folsom or Kaufman was needed to establish the truth or falsity of the allegations of the cross-complaint.

"e. Numerous portions of the cross-complaint contain false statements of fact as to which Prometheus and Diller could not have entertained a good faith belief that they were true, as follows:

"(i) Paragraph 8 of the cross-complaint states it was the purpose of Folsom and Kaufman to make an experienced developer a joint venturer who would contribute cash and personal services in exchange for a share of the proceeds of the de-

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

velopment. There is absolutely no evidence that Ronald Kaufman or Folsom ever had such a plan.

"(ii) Paragraph 9 states that Folsom and Prometheus formed a joint venture, in part written and in part oral. In fact, Prometheus and Diller now concede that the only writing comprising the asserted joint venture is the Purchase Contract; there is no evidence of any partially oral joint venture as is described in the cross-complaint or of any oral agreement between the parties.

"(iii) Paragraph 10(a)-(b) states that Prometheus and Diller, on the one hand, and Kaufman and Folsom on the other, committed and agreed to assume fiduciary duties to each other; that Kaufman and Folsom 'promised to commit to the venture their claimed friendships and contacts;' that 'Whisler and Patri committed themselves individually, as architects able and willing to provide invaluable assistance in permit approval matters, to draw on their experience and knowledge to the purposes of the joint venture.' There is no competent evidence to support these allegations, and no evidence that there were any oral promises or commitments made beyond those contained in the written documents. The testimony of Diller attached to the reply memorandum in further support of the motion for reconsideration is cogent evidence that no oral promises of the kind alleged in the cross-complaint were ever made, and contradicts the position taken by Prometheus and Diller in the cross-complaint.

"(iv) Paragraph 10(d) states that '[c]ross-complainants and cross-defendants further promised each other and agreed that the joint venture would continue until it should appear that successful completion of the plan was either accomplished or in fact impossible . . . .' This statement is completely false. There is no evidence to support a good faith belief of the truth of this statement. The uncontroverted evidence shows that the parties intended the transaction to close on a specific date, May 8, 1986, and not at some undetermined date upon the agreement of all parties that development of the property was either accomplished or impossible.

"f. The declaration of Professor Hetland does nothing to establish that Prometheus, Diller and their counsel acted in good faith. Professor Hetland's declaration argues that the court should treat the Purchase Contract as constituting a joint venture, and that such an allegation could be made in good faith. That, however, is not what happened here. The allegation of joint venture made in the cross-complaint is made, not on the theory that the Purchase Contract should be treated as a joint venture, but on the theory that the acts and conduct of the parties prior to or in addition to their execution of the Purchase Contract caused the formation of the joint venture.

"g. A further and additional ground for sanctions pursuant to C.C.P. § 128.5 exists in the evidence cited in the separate statement filed in opposition to the revised statement of undisputed facts. This document includes citation to large quantities of material which does not support, directly or indirectly, the alleged facts for which they are cited.

"h. In light of the above, the Court in its discretion finds that an award of reasonable expenses incurred by Folsom and Kaufman as a result of the filing of the cross-complaint and of the separate statement pursuant to Civ. Proc. Code § 128.5 is warranted.

"i. These expenses are awarded jointly and severally, against Prometheus, Diller and Brobeck. In that way, the Court leaves to Prometheus, Diller and their counsel the determination as to how responsibility for the expenses should be allocated between client and counsel."

[***33]    (7) Our laborious review of the record confirms ample support exists for the imposition of sanctions against Prometheus and Diller. In earlier discussion directed to whether triable issues were raised by the allegations of the cross-complaint (see pt. IV, ante) we highlighted numerous instances of the false allegations alluded to in the sanction order. It would serve no useful purpose to repeat the litany of material factual allegations found utterly devoid of supporting evidence. They are more than sufficient to justify the trial court's exercise of discretion. Indeed, Judge Pollak's determination [*22] that the deposition testimony of Sanford Diller ". . . is cogent evidence that no oral promises of the kind alleged in the cross-complaint were ever made and contradicts the position taken by Prometheus and Diller in the cross-complaint" is sufficient, standing alone, to sustain the finding they could not have held a good faith belief in the truth of the cross-complaint allegations.

Prometheus and Diller seek to justify their position by reliance on the declaration of Professor Hetland wherein he states: "The testimony of Sanford Diller and the documents provide ample factual [***34] support for the allegations of the cross-complaint." This statement was made in the context of Professor Hetland's opinion that the allegations of the cross-complaint were

Page 13

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

consistent with those he would expect a competent attorney to make. Thus, while serving to excuse Brobeck's part in filing the unmeritorious cross-complaint due to the attorneys' reliance on information provided by the client, it is not helpful to the client who provided the false and misleading information in the first instance. In short, the trial court having correctly determined the Prometheus/Diller testimony and documents were insufficient to raise a question of fact concerning the factual allegations of the cross-complaint and, indeed, were in several material respects completely false, the declaration of Professor Hetland does not controvert these judicial findings in any respect and thus provides no evidence of good faith on which Prometheus and Diller may rely.

Under *section 128.5*, [HN7]an action is deemed frivolous or in bad faith "if it is found to be totally and completely without merit." ( *Winick Corp.* v. *County Sanitation Dist. No. 2, supra*, 185 Cal.App.3d 1170, 1177.) [***35] A complete lack of evidence to substantiate key allegations of the cross-complaint alleging the terms of a purported joint venture is sufficient ground for imposition of sanctions for the filing of a frivolous pleading. ( *Finnie* v. *Town of Tiburon* (1988) 199 Cal.App.3d 1, 14 [244 Cal.Rptr. 581].) We conclude sanctions were properly awarded against Prometheus and Diller.

*Brobeck's appeal*

The sole issue raised on appeal by Brobeck is that the order of the trial court awarding sanctions jointly against it and Prometheus was erroneously granted. We review this issue under the provisions of *section 128.5* and under the standard of review set forth in the previous section discussing sanctions awarded against Prometheus.

(8) To the extent Brobeck's arguments are based on statements made by the trial judge at the hearings on the motion for summary judgment and the [*23] issue of sanctions, we reject the arguments. *Section 128.5* calls for written findings of the trial court stating the reasons for imposing sanctions. Oral findings do not meet the requirements of *section 128.5*. ( *Conservatorship of Durham* (1988) 205 Cal.App.3d 548, 552 [252 Cal.Rptr. 414].) [***36] Arguments based upon oral statements of the trial judge are inappropriate. We shall review the trial court's order based upon the written order.

[**239] The emphasis of Brobeck's argument is that it could not be sanctioned for filing the cross-complaint under the objective standard because it cannot be said that a reasonable attorney would find the cross-complaint to be totally and completely without merit and it cannot be sanctioned under the subjective standard without a finding of fault and Prometheus's fault cannot

be imputed to it. ( *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 [183 Cal.Rptr. 508, 646 P.2d 179].) Brobeck points to the trial court's finding that Prometheus and Diller were in a position to know the falsity of their allegations and could not have entertained a good faith belief in those allegations and to the undisputed declaration of its partner, Robert S. Daggett, that he relied on Prometheus and Diller to provide the factual allegations contained in the cross-complaint. Brobeck also cites the declaration of Professor Hetland which opines that a reasonable attorney would find the cross-complaint filed by Brobeck [***37] appropriate.

(9) We have no quarrel with Brobeck's position that it should not be sanctioned for filing the cross-complaint. After all, it was uncontested in the trial court that Brobeck initially relied on alleged factual information it received from Prometheus to draft the cross-complaint. However, Brobeck's arguments discount the fact that the trial court awarded sanctions on two grounds: in addition to finding that the allegations of the cross-complaint were not true, the trial court found that Prometheus's separate statement in opposition to Folsom's revised statement of undisputed facts was frivolous and filed in bad faith within the meaning of *section 128.5*. Subparagraph 1(g) of the order granting sanctions explains: "This document includes citation to large quantities of material which does not support, directly or indirectly, the alleged facts for which they are cited." [2]

> 2 Brobeck complains the sanction order violates *section 128.5* in failing to "recite in detail" the conduct justifying the sanctions, citing *Garcia* v. *Sterling* (1985) 176 Cal.App.3d 17, 23 [221 Cal.Rptr. 349]. In *Garcia* the disapproved order stated merely the "motion to strike was '. . . totally devoid of merit, frivolous and not brought in good faith . . . .'" Unlike *Garcia*, here, the offending conduct is set forth with specificity.

[***38] Brobeck argues that the trial court's rejection of the evidence is based upon the trial court's "single minded approach" to the joint venture issue. [*24] Brobeck states it offered extensive evidence of the pre-Prometheus dealings of Folsom as evidence of Folsom's intention to find a joint venture partner.

In support of the opposition response to Folsom's statement of undisputed facts, Brobeck cited over 800 pages of evidence. Our review of this material supports the trial court's finding that large portions of the material do not support the facts for which they are cited.

We take as an example the discrete issue presented in Folsom's statement 95 which reads: "Folsom, Kaufman, Prometheus and Diller all understood that, unless Prometheus and Folsom agreed to an extension of the

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

May 8, 1986 closing date, Prometheus' right to develop the 299 Second Street [property] would cease unless Prometheus closed the Purchase Contract on or before May 8, 1986." In support of the statement, Folsom offered: the declaration of Kaufman in which he stated that neither he nor Folsom ever stated or implied that the closing date in the contract would be extended beyond May 8, 1986, without a payment [***39] of money for an extension and Prometheus did not pay for a further extension beyond May 8, 1986; Diller's admission that he understood the contract to provide that Prometheus had to purchase the property by a date certain; and Diller's admission that he discussed with Rathie, Prometheus's then project manager of the property, the contents of a letter written by Rathie to Kaufman in November of 1985 offering $ 250,000 for a 12-month extension of the contract closing date to May 8, 1987.

Prometheus's response to statement 95 refers the reader to a previous response to another statement of undisputed fact. It states: "Disputed. See the additional facts responsive to claim no. 53 and the record [**240] there cited." ³ The response to No. 53 reads: "The obligations of the parties as joint venturers were broader than explicit provisions of the purchase agreement on closing. Defendant-cross-complainants believe they were entitled, and in truth they had an enforceable right, to a time reasonable under the circumstances to bring the venture to success through obtaining of city development authorization. Kaufman and plaintiff likewise were obliged to use their best efforts in assisting the project [***40] to successful conclusion and obliged also to commit no acts contrary to the best interests of the venture."

    3  In other words the same 637 pages of material offered by Prometheus to dispute statement 53 is also offered to dispute statement 95.

Folsom's statement 95 concerns the parties' understanding of Prometheus's rights under the contract which would cease on the closing date, May 8, 1986. Most of the evidence offered by Prometheus to dispute this [*25] statement dealt again with the issue of whether there was a joint venture. ⁴ What evidence Prometheus presented about the understanding of the parties as to the closing date supports, rather than disputes, Folsom's fact statement by showing Prometheus clearly understood its rights under the contract expired on May 8, 1986, unless it paid to extend the closing date.

    4  The joint venture issue was specifically raised in Folsom's statement of undisputed facts numbers 67, 68 and 69.

    [***41] The material cited by Brobeck in response to statement 95 includes documents and exhibits collected and submitted to the trial court under 39 separate

tabs (tabs 30-68, inclusive) constituting, by actual count, a total of 637 pages. The overwhelming mass of this unnecessary and irrelevant documentation, as the trial court accurately observed, ". . . does not support directly or indirectly, the alleged facts for which they are cited." A few examples will serve to illustrate the point: ⁵ tab 31 includes a copy of the 40-page master lease by which Folsom held the leasehold estate on the property, the lease of which had been admitted by Prometheus in its answer; tab 33 includes Kaufman's deposition testimony concerning the master lease and the Kaufman Family Partnership Agreement, together with a copy of the 40 page Kaufman Family Partnership agreement, amendments to that agreement, and a copy of the 15-page 580 Folsom Associates Partnership agreement, again in a situation where there was no dispute about these documents; tab 49 includes 73 pages of Kaufman's deposition testimony and 102 pages of exhibits concerning other offers to purchase the property, including copies of option contracts [***42] dated November 1981 and April 1983 which were not signed by the potential buyers.

    5  For those readers who may have interest in a more detailed summary of the content of the 39 tabs, we have included a topical description of these materials in an appendix to this opinion.

Nowhere in the 637 pages of material is a question of fact raised concerning whether Prometheus understood there was a date certain when Prometheus's rights under the contract would end; most importantly, except in a few instances, the material does not even remotely bear on the discrete issue raised by statement 95, and when it does, it favors Folsom's position.

Brobeck asserts the trial court did not make a finding that the opposition to the statement of undisputed facts was filed for the purpose of deceiving the court and this court cannot draw such an inference. Brobeck is incorrect. The trial court specifically found the pleading to be filed in bad faith and to be frivolous. Indeed, it was. Brobeck's prepared response in opposition to Folsom's [***43] revised statement of undisputed facts is, in many respects (as exemplified by its response to statement 95), no more than an [*26] indiscriminate assemblage of a mass of documents having little or no bearing on the discrete issues raised. It is a deliberate, patent effort at obfuscation intended to overwhelm the trial judge charged with responsibility to determine fairly and impartially whether triable issues of fact exist. Sadly, it is a tactic too often employed in civil litigation, calling for an exorbitant expenditure of judicial time [**241] to sift through bales of irrelevant information in an attempt to glean a kernel of substance. It is a game the judicial system can no longer afford to play, if it ever could.

Section 128.5 covers bad faith actions or tactics. "Actions or tactics" is defined to include the opposing of motions; "frivolous" means totally without merit. While it was uncontested in the trial court that Brobeck *initially* relied on the factual information it received from Prometheus and Diller to draft the cross-complaint, Brobeck attorneys sat through all the discovery depositions noticed by Folsom and at some point it had to become clear to Brobeck, as it [***44] became clear to the trial judge and became clear to this court, that its clients had no evidence to support the factual allegations of the cross-complaint.

Brobeck's reliance on the declaration of Professor Hetland is inappropriate. The professor stated the theory of implied joint venture was one that a reasonable attorney would be expected to make. The cross-complaint, however, did not allege an implied joint venture; it specifically alleged the parties formed a joint venture which was partly in writing and partly oral. Professor Hetland did not address the fact that the theory Brobeck offered in opposition to the motion for summary judgment was outside the pleadings. Faced with the knowledge it did not have evidence to support the factual allegations of the cross-complaint, Brobeck chose the tactic of presenting a mass of material offered to prove a theory of the case which was outside the pleadings. Brobeck deliberately caused the trial court hours of work reviewing irrelevant matter which did not prove the statement for which the evidence was proffered. This conduct constitutes deliberate misleading of the court.

(10) "A trial court is empowered to exercise its supervisory power [***45] in such a manner as to provide for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper, or delay the conduct and dispatch of its proceedings . . . . (11) An attorney has an obligation to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice." ( *Mungo v. UTA French Airlines* (1985) 166 Cal.App.3d 327, 333 [212 Cal.Rptr. 369], internal quotation marks and citations omitted.)

[*27] "Under Business and Professions [Code] section 6068, [HN8]'It is the duty of an attorney: . . . [para.] (c) To counsel or maintain such actions, proceedings, or defenses only as appear to him or her legal or just, except the defense of person charged with a public offense. [para.] (d) To employ, for the purpose of maintaining the causes confided to him or her such means only as are *consistent with truth,* and never to seek to mislead the judge or any judicial officer by an artifice or *false statement of fact or law.*'" ( *Young v. Rosenthal* (1989) 212 Cal.App.3d 96, 126 [260 Cal.Rptr. 369], [***46] italics in original.) Brobeck's conduct in this matter constituted an abuse of the judicial process when it represented to the trial court that the material referenced in its opposition statement was sufficient to raise a question of fact concerning the statements offered by Folsom. It did not do so and thus Brobeck misled the court. Brobeck attorneys then compounded their error by attempting to bury the lack of evidentiary support for their position in a mass of immaterial information.

This problem of the filing of frivolous pleadings for improper purposes has increased to the point that it has attracted the attention of academics and the courts. Our Supreme Court recently discussed the problem of frivolous litigation in an opinion considering a malicious prosecution action. The court noted in dictum that [HN9]the imposition of sanctions in the initial action appears to be the most promising remedy for the problem. ( *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 873-874 [254 Cal.Rptr. 336, 765 P.2d 498].)

In *National Secretarial Service, Inc. v. Froehlich* (1989) 210 Cal.App.3d 510, 525, footnote 13 [***47] [258 Cal.Rptr. 506], the court found the defendants used the legal system "in an attempt to club a legitimate creditor into submission by forcing and extending this litigation when they in fact had no valid [**242] defenses." The court stated: "It is perhaps time that the courts, both trial and appellate, begin to speak and react more forcefully with respect to cases such as this one. Such an abuse of the legal system for no other purpose than to avoid paying a legitimate claim simply can no longer be tolerated. It is not fair to the opposing litigant who is victimized by such tactics and it is not fair to the greatly overworked judicial system itself or those citizens with legitimate disputes waiting patiently to use it. In those cases where such abuse is present, an award of substantial sanctions is proper." ( *Id.* at p. 526, fn. omitted.)

(12) Finally, Brobeck argues the trial court improperly awarded as sanctions compensation for time spent by Kaufman and Folsom personnel in defending against the cross-complaint. Brobeck contends the "expenses" to be awarded as sanctions under section 128.5 cannot include other than [*28] costs including attorney's [***48] fees. If this were true it would mean that where, as here, a party is entitled to attorneys' fees under Civil Code section 1717 and costs under Code of Civil Procedure section 1032, then no sanctions could be awarded against the losing party no matter how frivolous its conduct or how unscrupulous its bad faith. We refuse to adopt such an interpretation of section 128.5. The term "expenses" has not been so limited by other courts. ( *National Secretarial Service, Inc. v. Froehlich supra,* 210 Cal.App.3d at pp. 526-527; *Finnie v. Town of Tiburon, supra,* 199 Cal.App.3d 1, 17.)

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

We conclude the trial court did not abuse its discretion in awarding sanctions in the modest amount of $ 20,000 against Prometheus, Diller and Brobeck. [6]

> 6  The trial court gave as its reason for the joint award: "In that way, the Court leaves to Prometheus, Diller and their counsel the determination as to how responsibility for the expenses should be allocated between client and counsel." We note that after the trial court's order was entered, the appellate court in *Young v. Rosenthal, supra, 212 Cal.App.3d at pages 128-129*, held that parties subject to a joint sanctions award are judgment debtors within the meaning of *Code of Civil Procedure sections 882* and *883*. The party paying such an award is entitled to pro rata contribution from the other party against whom sanctions were jointly awarded.

[***49] *Folsom's Appeal*

I

*Whether Folsom Is Entitled to Attorneys' Fees Incurred in the Writ Proceedings*

Paragraph 18 of the purchase agreement signed by the parties provides: "In the event an action is commenced by either party to interpret or enforce this Agreement, the prevailing party shall be entitled to recover attorneys' fees and costs." Folsom appeals from the trial court's denial of its motion for attorneys' fees incurred in opposing Prometheus' petition for writ of mandate filed in this court and its subsequent petition filed in the Supreme Court. Folsom asserts it is legally entitled to recover the fees and costs incurred in the mandamus proceeding and that the judgment of the trial court should be modified accordingly. Folsom asks us to remedy the gap in the Rules of Court which it perceives as preventing it from recovering attorneys' fees and costs under the circumstances of this case.

After the trial court issued its order granting summary adjudication on Folsom's first cause of action and on the cross-complaint and awarding [*29] sanctions against Prometheus and Brobeck, Prometheus filed a petition for writ of mandate in this court seeking to set aside the rulings [***50] of the trial court. This court sought opposition to the petition from Folsom and advised Folsom we might issue a peremptory writ in the first instance. ( *Palma v. U.S. Industrial Fasteners, Inc., supra, 36 Cal.3d 171.*) The preparation of this opposition entailed attorneys' fees of more than $ 29,000. This court denied the petition without stating any reason and without issuing an alternative writ or an order to show cause.

Prometheus then filed a petition for review in the Supreme Court seeking the same extraordinary relief. Folsom incurred [**243] attorneys' fees of over $ 13,000 for the preparation of the answer to this petition.

Folsom attempted to file a motion for attorneys' fees in this court while the petition was pending in the Supreme Court. This court had lost jurisdiction, however, since under *rule 24(a) of the Rules of Court* an order denying a petition for extraordinary relief without issuing an alternative writ or an order to show cause becomes final immediately after filing. Folsom then filed a motion for attorneys' fees in the Supreme Court seeking a total of $ 63,078.30 in fees.

While the attorneys' fee motion was still [***51] pending in the Supreme Court, Folsom filed, in the trial court, a motion for attorneys' fees incurred in the writ proceedings. The trial court denied the motion without prejudice. The Supreme Court ultimately denied the petition for review without stating a reason and, in the same order, stated: "The motion for attorney fees is denied." Thereafter, Folsom renewed its motion for attorneys' fees in the trial court and the motion was denied without comment.

Folsom argues that because this court denied the petition for writ of mandate without previously issuing an alternative writ or an order to show cause, it was impossible under the Rules of Court for Folsom to seek attorneys' fees in this court since the order was final immediately and we lost jurisdiction. Folsom asks us to fashion a remedy for this apparent inadvertent omission in the Rules.

(13) Folsom claims it is clear that it was the prevailing party in the writ proceedings and under *Civil Code section 1717* Folsom has a substantive legal right to attorneys' fees in the writ proceeding. We disagree that Folsom prevailed in the writ proceedings. We find no omission in the Rules of Court since we hold that Folsom was not the prevailing [***52] party in the writ proceedings and was not entitled to attorneys' fees upon the denial of the petitions in this court and in the Supreme Court. Folsom's motions for [*30] attorneys' fees filed in the Supreme Court and in the trial court were premature. Only when a final judgment has been entered in this matter, whether after further appellate review or not, will there be a prevailing party.

"[HN10]The denial of a petition for a writ is not a final adjudication of the facts alleged in the petition where neither the denial nor the record discloses a reason therefor." ( *Donia v. Alcoholic Bev. etc. Appeals Bd.* (1985) 167 Cal.App.3d 588, 594 [213 Cal.Rptr. 447].) A denial of a writ challenge without opinion is not a determination of a cause. If this were not so, no party would file a petition for writ of mandate and risk a loss of the

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

chance to a full hearing and a determination by written opinion on appeal if the writ were summarily denied. ( *People v. Medina (1972) 6 Cal.3d 484, 490 [99 Cal.Rptr. 630, 492 P.2d 686].)* Since a denial of a writ petition without opinion is neither res judicata nor law of the [***53] case, it is clear that the party opposing the petition is not a prevailing party. The matter is clearly subject to later review should a party seek such review. For this reason the trial court correctly denied Folsom's motion for attorneys' fees in the writ proceedings. ( *Palma v. U.S. Industrial Fasteners, Inc., supra,* 36 Cal.3d at pp. 182-183.) We conclude the order of the trial court denying attorneys' fees in the writ proceedings was correct on grounds the motion was prematurely filed. We shall modify the order, however, to provide that it is denied without prejudice to renewal of the motion if and when Folsom becomes the prevailing party in this litigation.

The judgment and the order granting sanctions are affirmed. The order denying attorneys' fees incurred in the writ proceeding is affirmed as modified. The request for sanctions on appeal against Brobeck is denied. Folsom's request for attorneys' fees incurred in this appeal is granted, and the matter is remanded to the trial court for a determination of the amount of reasonable attorneys' fees that should be awarded Folsom to be paid by Prometheus and Diller. As required [***54] by Business and Professions Code section 6089, subdivision [**244] (b), a copy of this opinion shall be forwarded to the State Bar.

[*31] Appendix

Tab 30 – Diller testimony that there was no written joint venture agreement other than the purchase agreement, that as of May 8, 1986, he had not sought full legal advice so he had no opinion as to whether or not there was a joint venture between Prometheus and Folsom, and he first believed there was a joint venture after he consulted with counsel which was long after the purchase agreement was signed.

Tab 31 – a copy of the 40-page master lease by which Folsom held the leasehold estate on the property.

Tab 32 – Whisler's memorandum stating why he joined the partnership with Kaufman, dated November 1979.

Tab 33 – Kaufman's deposition testimony concerning the master lease and the Kaufman Family Partnership agreement, together with copies of the 40-page Kaufman Family Partnership Agreement and amendments to that agreement and a copy of the 15 page partnership agreement of 580 Folsom Associates.

Tab 34 – Kaufman's note dated January 18, 1982 stating Whisler/Patri would stay in a joint venture.

Tab 35 – Kaufman's draft proposal to lease [***55] the property to an anchor tenant dated February 1982.

Tab 36 – Kaufman's testimony about when he decided to apply for a site permit.

Tab 37 – Kaufman notes of July 1980 and July 1981.

Tab 38 – Whisler/Patri's preliminary planning code analysis dated December 1980 concerning 580 Folsom.

Tabs 39 and 40 – Kaufman's letter to his attorneys dated September 1980 concerning the law firm becoming an anchor tenant of the property which described Kaufman as the developer.

Tabs 41, 42, 43 and 46 – documents and testimony concerning the application for a site permit by Folsom dated between 1981 and September 1983.

Tabs 44 – a single page of deposition testimony of Kaufman identifying exhibit 94 to the deposition.

Tab 45 – a single page of deposition testimony, the relevance of which escapes us.

Tab 47 – 1980 letter from Kaufman to Del Monte Corporation about leasing space in the property.

Tab 48 – a 1982 letter from a realtor registering a client for the property.

Tab 49 – 73 pages of deposition testimony of Kaufman and 102 pages of exhibits concerning other offers to purchase the property, including copies of option contracts dated November 1981 and April 1983 which were not signed [***56] by buyers.

Tab 50 – a letter from Kaufman to one of the lessors of the property informing him that Kaufman had filed an environmental evaluation with the city planners and planned to file for a site permit.

Tab 51 – letter of intent dated March 1983 from Coldwell Banker on behalf of the Northern Group to Kaufman about purchase of the leasehold interest for $ 4,040,000.

Tab 52 – letter of intent from Coldwell Banker dated July 14, 1983, on behalf of Prometheus offering to purchase the leasehold interest.

Tab 53 – a Whisler/Patri memo to the file.

Tab 54 – a letter from Frost to Kaufman in which Frost suggests Dean Macris should attend the next staff meeting or that they could meet with Macris separately; a transmittal letter dated August 30, 1983, from Environmental Impact Planning Corporation to Kaufman; a Whisler/Patri memo to Kaufman dated September 2, 1983, about soil investigation of the property and addi-

223 Cal. App. 3d 1, *; 272 Cal. Rptr. 227, **;
1990 Cal. App. LEXIS 868, ***

tional communications between Kaufman and Prometheus about soil investigation; a proposed amendment to an [*32] addendum to the purchase agreement stating Prometheus's remedies should Folsom [**245] default on the master lease and a signed version of the same document.

Tab 55 — [***57] memo from Kaufman to Patri asking whether the transfer of the site permit application from Folsom's to Prometheus's name would "take them (us) 'out of line' at the Planning Department."

Tab 56 — 25 pages of Kaufman's deposition testimony and 70 pages of exhibits to the deposition including: an engineering certificate of the amount of square footage of the property; a memo from Whisler/Patri explaining the new Downtown Plan, a copy of the same memo showing a received date by Prometheus; a letter from Kaufman to the environmental consultant; a letter dated September 12, 1983, from Patri to Macris asking that the height restriction be raised for the property; correspondence about the floor area ratio for the building being cut from 7:1 to 6:1; correspondence and memos about planning for the project among Kaufman, Whisler/Patri and Prometheus; Frost's letter to Cecconi extending the due diligence period; another Whisler/Patri review of the Downtown Plan, a Whisler/Patri memo saying all memos which go "out of the house" should be first sent to Kaufman for review; an invoice for work from Whisler/Patri to Kaufman dated October 13, 1983; Whisler/Patri's proposal for services to Koch dated [***58] November 22, 1983; a draft of a letter from Whisler/Patri to Koch which was sent to Kaufman for his prior review; letter from Kaufman to Patri dated December 22, 1983, complaining about late billing which caused Folsom to lose reimbursement from Prometheus for half the amount of the bill; a second copy of the memo from Kaufman to Patri asking if the transfer of the permit application from Folsom to Prometheus would cause the application to be taken "out of line"; several notes identified by Kaufman as having been written by his daughter, Karen.

Tab 57 — Kaufman's deposition testimony that he understood any payment Prometheus made for an extension of the closing date beyond May 8, 1983, would be kept by Folsom and not applied to the purchase price; testimony about a November 5, 1985 letter from Prometheus proposing to pay $ 250,000 to extend the closing date and Folsom's counteroffer to extend the date for $ 500,000 dated November 12.

Tabs 58 and 59 — Kaufman's deposition testimony about his December 2d meeting with Diller and Rathie to discuss the difference in the amounts to be paid for an extension of the closing date.

Tab 60 — letter from Kaufman to his attorney reporting on [***59] the December 2, 1985, meeting with Prometheus.

Tab 61 — Kaufman's letter to Diller enclosing a copy of the indemnity agreement and withdrawing his offer to extend the closing date for $ 500,000.

Tab 62 — Kaufman sent copies of his letter to Diller about the January 15th meeting to Kaufman's attorney, Whisler and Patri.

Tab 63 — January 23, 1986, letter from Diller to Kaufman.

Tab 64 — letter of Diller responding to Kaufman's request for lost rent due to cancellation of Whisler/Patri sublease.

Tabs 65, 66 and 67 — Kaufman's draft response to Diller's letter concerning Whisler/Patri's sublease; letter sent by Folsom's attorney to Prometheus demanding payment of the lost rent and other sums.

Tab 68 — Folsom's attorney's letter dated August 7, 1986, to Prometheus's attorney which notified Prometheus that it did not have standing to appeal to the Board of Permit Appeals concerning the property because it failed to perform the purchase contract terms.