1  JACK RUSSO (State Bar No. 96068)
   RUSSO & HALE LLP
2  401 Florence Street
   Palo Alto, CA 94301
3  Telephone: (650) 327-9800
   Facsimile: (650) 327-3737
4  Email: jrusso@computerlaw.com

5  Attorneys for Defendant
   WESLEY MAYDER

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VERIGY US, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive,<br><br>Defendants.<br><br>AND RELATED CROSSCLAIMS. | Case No. 5:07-cv-04330-RMW (HRL)<br><br>**DECLARATION OF ROMI OMAR MAYDER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (F.R.C.P., RULE 56) AND MOTION FOR RULE 11 SANCTIONS (F.R.C.P., RULE 11)**<br><br>**Date: July 18, 2008**<br>**Time: 9:00 a.m.**<br>**Ctrm: 6**<br>**Before the Hon. Ronald Whyte**<br><br>Complaint Filed: August 22, 2007<br>Trial Date: December 8, 2008 (jury trial)<br>(Defendants have elected to reserve their jury trial rights under F.R.C.P., Rule 38) |

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot.
Rule 11 Sanctions/ Mot. Summ. J.**    1    **Case No. 5:07-cv-04330-RMW (HRL)**

I, Romi Omar Mayder, declare as follows:

1. I am a defendant in this case and have personal knowledge of the all facts set forth herein; if called to testify in this Court as to those facts, my testimony would be as stated herein.

## MY EDUCATION

2. I attended the University of California at Berkeley from 1988 to 1992. I received a bachelor's of science degree in electrical engineering and computer science in 1992. My emphasis was in semiconductor device physics and semiconductor device manufacturing including but not limited to the following: CMOS transistors, Bipolar transistors, GaAs, SOI, Diamond, and MEMs technologies.

## MY WORK EXPERIENCE

3. In 1988, I started my career in the automatic test equipment ("ATE") industry working at Best IC Laboratories located in Sunnyvale, California. Best IC Laboratories' main business was testing memory devices. I assembled and tested probe cards and load boards for major memory manufacturers such as Samsung and Advanced Micro Devices (currently Spansion). Best IC Laboratories was a customer of Advantest, a Verigy Ltd, ("Verigy") competitor.

4. In 1992, I began employment at Anritsu Wiltron Company located in Morgan Hill, California. Anritsu's main business was developing semiconductor testing equipment. One of Anritsu's main customers was Teradyne, a Verigy competitor.

5. In 1994, I began employment at Schlumberger, a Verigy competitor. Schlumberger developed semiconductor test equipment. Schlumberger's customers included the majority of major memory chip manufacturers. Schlumberger was a major competitor of Verigy until it was purchased by Credence Corporation which is another major competitor of Verigy.

6. On June 15, 1998, I began employment with Hewlett Packard after being recruited from Schlumberger. I was paid a $25,000 hiring bonus to join Hewlett Packard. In 2000, Agilent spun off from Hewlett Packard and I continued employment with Agilent. On June 1, 2006 Verigy spun off from Agilent and I continued employment with Verigy until September 21, 2006, at which time I terminated employment The only confidentiality agreement or employment agreement I signed while I worked at either Hewlett Packard or Agilent was the confidentiality agreement for

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Decl. Romi Mayder Supp. Mot.
Rule 11 Sanctions/ Mot. Summ. J.**       2       **Case No. 5:07-cv-04330-RMW (HRL)**

1   Verigy. I did not sign a confidentiality agreement at at Agilent for Agilent, nor did I sign one at
2   Hewlett Packard for Hewlett Packard.
3       7.  While working at Agilent, I reported to Bob Pochowski who was general manager of
4   Agilent's Memory Test Division. In September of 2005, Mr. Pochowski left Agilent to pursue other career
5   opportunities. I never informed Wesley Mayder ("Wesley") that I ever worked for Mr. Pochowski.

## GOOD FAITH PREPARATION REGARDING MY LEAVING VERIGY

7       8.  On September 8, 2006, Dan Hanley, Esq., filed the articles of organization on behalf
8   of Silicon Test Solutions, LLC ("STS LLC") with the Secretary of State of California, with me as
9   President, Secretary, and Director. I never informed Wesley of my activities with Dan Hanley.
10      9.  On September 20, 2006, I conducted an exit interview with Verigy's R&D
11  hardware manager at which time I informed him that I was leaving Verigy to start my own
12  business. My last day of employment at Verigy was September 21, 2006.
13      10. On September 22, 2006, Mr. Pochowski and I spoke with one of STS LLC's
14  corporate attorneys, Heather Flick, regarding development of products in the field of ATE resource
15  enhancement. Wesley was not present during this phone call.
16      11. On September 26, 2006, I upgraded the operating system on my home computer to
17  Microsoft XP Professional which permanently removed files from my only computer at the time.
18  During my employment at Hewlett Packard, Agilent, and Verigy, I routinely used my home
19  computer for work related activities.

## GATHERING CUSTOMER REQUIREMENTS

21      12. On September 22, 2006, Mr. Pochowski and I met with Sandisk to discuss their
22  NAND flash memory requirements. Mr. Pochowski and I learned that Sandisk had already
23  developed its own ATE resource enhancement solution for NAND flash memory. Wesley was not
24  present at this meeting.
25      13. On October 3, 2006, Mr. Pochowski and I met with Micron Technology to discuss
26  their NAND Flash requirements. Mr. Pochowski and I learned that Micron had already developed
27  its own ATE resource enhancement solution for NAND flash memory. Wesley was not present at
28  this meeting.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Decl. Romi Mayder Supp. Mot.
Rule 11 Sanctions/ Mot. Summ. J.**     3     **Case No. 5:07-cv-04330-RMW (HRL)**

14.     In November 2006, Mr. Pochowski and I met with Spansion to discuss their NOR Flash memory requirements.  We learned that Spansion was quite interested in working with STS LLC to develop an ATE resource enhancement solution focused on NOR flash memory. Wesley was not present at this meeting.

15.     In November 2006, Mr. Pochowski and I met with Intel to discuss their NOR Flash memory requirements. We learned that Intel was quite interested in working with STS LLC to develop an ATE resource enhancement solution focused on NOR flash memory. Wesley was not present at this meeting. I do not recall Wesley ever attending any STS LLC customer meetings. Wesley had no direct or indirect control over STS LLC, me, or Mr. Pochowski.

16.     In December 2006, Mr. Pochowski was terminated from his employment at STS LLC.  In January 2007, Mr. Pochowski contacted Honeywell and requested them to make a "similar sort of chip" for his other company Attest Technologies.  **Exhibit A** is a true and correct copy of an email which I received from Grenville Hughes summarizing Mr. Pochowski's requested product development for Attest Technologies.

### STS, INC. PLACES ORDER WITH HONEYWELL

17.     On December 26, 2006, the articles of incorporation for Silicon Test Systems, Inc. were filed with the secretary of state of California with me as the President, Treasurer, and Director

18.     In January 2007, Silicon Test Systems, Inc. ("STS, Inc.") placed a purchase order with Honeywell. After receiving the PO, the engineers at Honeywell began to investigate possible high level designs for a resource sharing ASIC which focused on NOR flash memory testing requirements. The customer requirements for the ASIC were provided by STS Inc. to Honeywell from January 2007 to April 2007. I worked with Honeywell on the design and specifications. I have not discussed the details of these customer requirements, designs or specifications with Wesley.

### NO "CONTROL" RELATIONSHIP

19.     To my knowledge, Wesley has no expertise or experience in the semiconductor industry.  I do not believe that WeDirect has any expertise or experience in marketing or promotion for any companies in the semiconductor industry.   None of the other defendants is a client or customer of WeDirect.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Decl. Romi Mayder Supp. Mot.
Rule 11 Sanctions/ Mot. Summ. J.**          4          **Case No. 5:07-cv-04330-RMW (HRL)**

20. I am Wesley's younger brother. I have had no operating or other business role whatsoever in WeDirect; I have never worked for WeDirect, am not and was never on the Board of WeDirect, was never a shareholder of WeDirect, and had no role whatsoever in WeDirect's growth. Similarly, Wesley has had no business role, beyond shareholder, in STS, Inc.; Wesley has never worked for me, is not and was never on the board of directors of STS LLC or STS Inc, and is only a passive shareholder with an approximately 21% ownership interest in STS, Inc., a corporation in which I have majority ownership and control.

## **CONTACTING WESLEY**

21. In October 2006, I presented to Wesley the opportunity to invest in STS LLC, a California limited liability company. Before I explained any of my ideas to Wesley, I had already instructed my attorney, Mr. Hanley, to file the Articles of Organization of STS LLC with the California Secretary of State. I informed Wesley that I formed STS LLC in late September 2006. While I did not tell Wesley much about STS LLC's work, Wesley has always trusted me and I wanted to provide him with the opportunity to invest in STS LLC. Hence, he was interested in becoming a passive investor in STS LLC.

22. I explained to Wesley that his investment would require him to sign a written agreement. Wesley never signed a final version of the Operating Agreement of STS LLC. A true and correct draft copy of which is attached as **Exhibit B**. This document was never signed by all the proposed members.

23. The original idea was that I was to sign this Operating Agreement and was to own a 51% share in STS LLC, as was Mr. Pochowski, who was then Vice-President of STS LLC and who was to own a 29% share in STS LLC and to continue to hold his position as an officer of STS LLC, along with me, and Wesley was to be a passive investor and own a 20% share in STS LLC. Wesley never became an officer or a director and never had any operating role. Although I signed the Operating Agreement, Mr. Pochowski changed his mind in December 2006 and thus did not sign because he disagreed with how the ownership would be distributed. He wanted Wesley's proposed ownership for himself and wanted Wesley not to be a passive investor in STS LLC at all.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Decl. Romi Mayder Supp. Mot.
Rule 11 Sanctions/ Mot. Summ. J.**     5     Case No. 5:07-cv-04330-RMW (HRL)

24. I never received the signed Operating Agreement from Wesley nor Mr. Pochowski.

## INVESTMENT IN SILICON TEST SYSTEMS, INC

25. Wesley invested $250,000 in STS, Inc. on January 3, 2007, receiving 20,000 shares of common stock, which gave him an approximately 25% ownership interest. A true and correct copy of the check that Wesley wrote to STS, Inc. is attached hereto as **Exhibit C**. A true and correct copy of the stock certificate that Wesley received in return from STS, Inc. is attached hereto as **Exhibit D**. Wesley is not, and never was, an officer, or director, or employee of STS, Inc., and never had any operating role in STS Inc., and the same is true today.

26. Wesley's current stock investment in STS, Inc. is approximately a 21% share, a minority position. STS, Inc. has signed no contract with Wesley, nor did it make any other agreement with him, regarding employment, board seat, nor any other operating role.

## THE CORE DISPUTE APPLICABLE TO WESLEY

27. Neither Wesley nor WeDirect has ever hosted any website for STS, Inc.

28. Finally, I explained to Wesley in March 2007 that STS, Inc. was searching for about 1,500 square feet of office space. At about that time, I learned from Wesley that he had heard that an office suite located in the same building in San Jose that WeDirect rents space in might be available in a different suite and on an entirely different floor of the building. Wesley referred me to the office manager of the building and made an introduction for me to that office manager of the building to determine if the suite was, in fact, available. It was available, and I, on behalf of STS, Inc., pursued the opportunity to lease that suite.

29. STS, Inc.'s office space is not shared with WeDirect or with Wesley personally. STS, Inc. and WeDirect share no space, no phones, no office support, no secretarial and no other resources. Wesley has not paid any bills for STS, Inc. or for me personally.

## LAWSUIT BROUGHT BY VERIGY

30. In August 2007, Verigy filed a complaint against Wesley as a co-defendant in this case. Before filing the complaint, Verigy never discussed Wesley's role with STS, Inc., STS LLC, or me.

//

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Decl. Romi Mayder Supp. Mot.
Rule 11 Sanctions/ Mot. Summ. J.**      6      Case No. 5:07-cv-04330-RMW (HRL)

1     I declare under penalty of perjury, under the laws of the United States that the foregoing is
2 true and correct and that this declaration was executed on June 10, 2008, in San Jose, California.

3                                                    ___/s/_____
4                                                    Romi Mayder

5     I attest under penalty of perjury that concurrence in the filing of this document has been
6 obtained from Romi Mayder.

7     Dated: June 10, 2008                    ___/s/_____
8                                                      Jack Russo

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Decl. Romi Mayder Supp. Mot.**
**Rule 11 Sanctions/ Mot. Summ. J.**     7     **Case No. 5:07-cv-04330-RMW (HRL)**