JACK RUSSO (State Bar No. 96068)
TIM C. HALE (State Bar No. 114905)
JOHN KELLEY (State Bar No. 100714)
RUSSO & HALE LLP
401 Florence Street
Palo Alto, CA 94301
Telephone: (650) 327-9800
Facsimile: (650) 327-3737
Email: jrusso@computerlaw.com
       thale@computerlaw.com
       jkelley@computerlaw.com

Attorneys for defendants and counterclaimants
WESLEY MAYDER, ROMI MAYDER,
SILICON TEST SOLUTIONS LLC, and
SILICON TEST SYSTEMS INC

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VERIGY US, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive,<br><br>Defendants.<br><br>AND RELATED CROSSCLAIMS. | Case No. 5:07-cv-04330-RMW (HRL)<br><br>**DECLARATION OF ROMI MAYDER IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION AND MOTION TO MODIFY PRELIMINARY INJUNCTION ORDER**<br><br>**Date: August 15, 2008**<br>**Time: 9:00 a.m.**<br>**Ctrm: 6**<br>**Before the Hon. Ronald Whyte**<br><br>Complaint Filed: August 22, 2007<br>Trial Date: December 8, 2008 (jury trial)<br>(Defendants have elected to reserve their jury trial rights under F.R.C.P., Rule 38) |

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot.**
**Summ. Adj. & Mod. Prelim. Inj.**

**Case No. 5:07-cv-04330-RMW (HRL)**

I, Romi Mayder, declare under penalty of perjury as follows:

1. The matters stated herein are true and correct of my personal knowledge, unless stated on information and belief, which matters I believe to be true. I could and would competently testify to the matters set forth herein if called as a witness.

## MY FAMILY HISTORY IN THE (ATE) TESTING INDUSTRY

2. My father and uncle have worked in the ATE (automatic test equipment) industry since the 1970s. I started working with them in the ATE field when I was 16 years old—more than 20 years ago. Accordingly, I have worked in the ATE (automatic test equipment) industry for over 20 years. I have held positions such as semiconductor process engineer, manufacturing engineer, applications engineer, marketing engineer, project manager, design engineer, expert design engineer, and chief executive officer throughout my career in the ATE industry.

3. I graduated from the University of California at Berkeley in 1992 with a Bachelor of Science degree in electrical engineering. My father, Gary Mayder, graduated from the University of California at Berkeley in 1965 with a master's of science degree in electrical engineering. My grandfather, L. Wesley Mayder, graduated from the University at Berkeley in 1939 with a Bachelor of Science degree in engineering. My mom's brother (my uncle), Isam Qubain, graduated from the University of California at Berkeley with a Bachelor of Science degree in electrical engineering. My Dad's brother (another uncle), Noel Mayder, graduated from the University of California at Berkeley in 1967 with a Bachelor of Science degree in engineering. My mom's brother, (yet another uncle) Edward Qubain, graduated from the University of California at Los Angeles with a Bachelor of Science degree in electrical engineering.

4. In 1974, two of my uncles, Isam Qubain, and Edward Qubain founded Best IC Laboratories in Sunnyvale, California. In 1979, my father, Gary Mayder joined them as a principal owner and V.P. of Engineering. Best IC Laboratories had offices in Austin, Texas, Singapore, and Penang, Malaysia. The business of Best IC Laboratories focused on testing memory devices. Best IC Laboratories was sold to DTS (Digital Test Systems) in 2000. DTS' business was focused mainly on testing logic devices. The purchase of Best IC Laboratories allowed the combined companies to test both memory and logic devices. I worked at Best IC

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot.
Summ. Adj. & Mod. Prelim. Inj.**         1         **Case No. 5:07-cv-04330-RMW (HRL)**

1  Laboratories while I was in high school and also during summers when I was in college.
2  Accordingly, before ever starting work for Verigy (and even before starting work for Agilent as
3  well as for HP), I had over ten years of experience in the ATE field and I had been part of my
4  conversations with my dad, with my uncles and even with my grandfather about the challenge of
5  increasing the throughput of automated test equipment by increasing testing parallelism. I have
6  been thinking about that problem since I was in my teens. I am now 37 years old.

## THE TRO STORY

5. I was provided with redacted and incomplete copies of the proposed TRO along with the Pochowski declaration, the Hahn Lai declaration, the Andy Lee declaration, and the Ira Levanthal declaration by email. These five documents along with other documents were sent to me directly from Melinda Morton, Esq., counsel for plaintiff. Attached as Exhibits 1 and 2 are true and correct copies of the two emails that Ms. Morton sent to me on August 22, 2007 with these redacted documents attached.

6. Attached as Exhibit 3 is a true and correct copy of the redacted Pochowski declaration that was provided to me by Ms. Morton. ALL the exhibits of the Robert Pochowski declaration read as follows:

*"FILED UNDER SEAL".*

7. Attached as Exhibit 4 is a true and correct copy of the redacted Hahn Lai declaration that Mr. Morton provided to me. ALL the exhibits of the Hahn Lai declaration read as follows:

*"FILED UNDER SEAL".*

8. Attached as Exhibit 5 is a true and correct copy of the redacted Ira Levanthal declaration that was provided to me by Ms. Morton. ALL the exhibits of the Ira Levanthal declaration read as follows:

*"FILED UNDER SEAL".*

9. Attached as Exhibit 6 is a true and correct copy of the redacted Andy Lee declaration that was provided to me by Ms. Morton. ALL the exhibits of the Andy Lee declaration read as follows:

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ. Adj.**    2    Case No. 5:07-cv-04330-RMW (HRL)

## *"FILED UNDER SEAL".*

10. I have NEVER been served the FULL, unredacted TRO with all of the referenced materials. My previous lawyers at Mount & Stoelker, P.C. never advocated with opposing counsel or otherwise with the Court that the Protective Order designations be lifted so that I could be allowed to read the entire unredacted TRO and certainly not with all of the referenced materials. I fired those lawyers. One of the first things that my new attorneys at Russo & Hale LLP sought was to allow me to read the entire unredacted TRO. This took many cycles with Melinda Morton, Esq. counsel for plaintiff, and I was provided with copies of the emails exchanged where Mr. Russo sought to allow me to have a full, unredacted copy of the TRO. While I might have been shown certain documents at my deposition, I still have not received a full unredacted copy of all of the referenced materials because Ms. Morton has taken the position that her marking of certain items and exhibits as "Highly Confidential" under the Court's Protective Order prevents me from doing so. Thus, I do not know if my past activities under the TRO would have changed if I were allowed to read the FULL Court Order with all of the referenced materials, but I do know that I would have consulted in detail with regard to whether there was any potential for being held in contempt and that consultation never happened because my former lawyers told me that they could really not tell me what was in the various documents that comprise the Court's TRO. Nor was I able to consult with anyone else either. I still have not been able to do so (though I understand that Mr. Russo recently was able to convince Ms. Morton that under his supervision and only in his office can I now read certain items that comprise some of the referenced materials in the Court's TRO. Obviously, this comes far too late in this case and it should have been allowed months if not nearly a year ago. I say this because I have utmost respect for the Court and I never knowingly or intentionally violated any part of the Court's Order as I understood it.

### THE PLAINTIFF'S OVERZEALOUS USE OF THE PROTECTIVE ORDER

11. I was asked to sign Exhibit A of the Protective Order just before my first deposition. Exhibit A of the Protective Order was given to me by Ms. Morton while I was seated to take my deposition. My attorney at the time, Dan Mount, instructed me to sign Exhibit A of the Protective Order in order to start to my deposition. The Protective Order itself was not provided to

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**   3   Case No. 5:07-cv-04330-RMW (HRL)

1  me at the depositon, nor was it provided to me by Ms. Morton or by anyone else after the
2  deposition.
3  12. I frankly do not understand why Ms. Morton or why Mr. Mount did not provide the
4  Protective Order to me before and though I can say, with certainty, that I have not violated the
5  Protective Order, I now understand how the Protective Order has been used by the Plaintiff's
6  counsel in an overzealous fashion to bar me from seeing important items in this litigation including
7  the very purported trade secrets which Plaintiff claims I already know of and which comprise the
8  "metes and bounds" of the Court's original TRO as well as the Court's later-issued Preliminary
9  Injunction.

**THE CONTEMPT MOTION BROUGHT IN BAD FAITH**

11  13. I believe that Verigy brought the motion of contempt against me in bad faith.
12  Verigy marked several documents referenced by the TRO as

*"FILED UNDER SEAL"*.

14  Accordingly, I believe Verigy intentionally denied me the opportunity to read the FULL,
15  unredacted TRO while at the same time, Verigy aggressively brought a motion to the Court
16  claiming I was violating a Court Order which Verigy knew I was not allowed to read!
17  14. Verigy submitted evidence of a press release allegedly issued by defendants in their
18  sur-reply of the contempt motion. Verigy claims that this press release was a violation of the TRO
19  by the defendants. However, Verigy knows full well that the press release did not come from the
20  defendants but rather from the lawyers at Mount & Stoelker. Attached as Exhibit 7 is a true and
21  correct copy of an email from Mr. Kevin Pasquinelli of Mount & Stoelker to Ms. Morton
22  containing the press release that Mr. Pasquinelli and his firm said was proper and that would be
23  issued. It was one of the defendants, namely me, who withdrew the press release the following
24  morning and who took steps to assure that it was not republished. In effect, I have been blamed
25  for something that my former lawyers told me was acceptable and which I had no idea could
26  become part of a contempt motion or could otherwise be viewed as violating the Court's Order.
27  15. Verigy claimed that I brazenly sent an email asking Verigy to sign an NDA with
28  STS and this was a violation of the TRO. However, the properties window of that document

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**    4    **Case No. 5:07-cv-04330-RMW (HRL)**

1  clearly shows that Kevin Pasquinelli, my former counsel, was the author of the NDA. Attached as
2  Exhibit 8 is a true and correct copy of the NDA (non disclosure agreement) drafted by Kevin
3  Pasquinelli.  Attached as Exhibit 9 is a true and correct copy of the properties window of that
4  document.

5        16.    Ms. Morton claimed that I violated the TRO by downloading and accessing a
6  document from the computer system of Chris Straube.  She stated that the TRO CLEARLY
7  defined that document as trade secret of Verigy since it was attached to the redacted Andy Lee
8  declaration as an exhibit.  However, once again she knew full well that I was not allowed to read
9  the exhibits of the Andy Lee declaration since all the exhibits were marked as

### *"FILED UNDER SEAL".*

11 How was I supposed to know that the document that I downloaded and accessed from the
12 computer system of Chris Straube was actually alleged to be trade secret of Verigy?  I am
13 convinced that Verigy and its counsel knew that marking the various portions of the TRO as
14 "attorney's eyes only" under the Protective Order would lead to a "trap" and that I would end up
15 being caught in that "trap" and that is precisely what has occurred in this case.

### ACTIVITIES UNDER THE TRO

17       17.    Dan Mount informed me, based on Dr. Blanchard's expert opinion, I could
18 continue to develop Flash Enhancer. Also, Dan Mount informed that the TRO was designed to
19 maintain the "status quo."  At the time the TRO was entered, I was already engaged in
20 design/development activity with Honeywell as well as sales activities with Spansion and Intel.
21 Dan Mount informed me that continuing work with Honeywell, Spansion, and Intel under the TRO
22 was proper because that was the status quo that the TRO was supposed to maintain.

23       18.    Again, had I been allowed to see the entire unredacted TRO with all unredacted
24 exhibits and had I been able to have a meaningful conversation with Dr. Blanchard and with
25 others about the scope of the Court's TRO, I am certain that I would have asked my lawyers to
26 seek clarification of the Court's TRO and I am sure that I would not have allowed my former
27 lawyers to agree successively and repetitively to extensions of time in which the TRO remained
28 in force.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**     5     **Case No. 5:07-cv-04330-RMW (HRL)**

**DEFENDANTS' REPLY  MOTION WAS GROSSLY INADEQUATE**

19.     There is an ambiguity in my declaration that I submitted for the contempt motion. The declaration states that Dr. Blanchard told me that my activities under the TRO were proper. However, it was actually Dan Mount of Mount & Stoelker who told me my activities under the TRO were proper based on what Dr. Blanchard had said.  I did not notice this lack of clarity earlier and I am especially sorry that I did not realize sooner how the Protective Order was affirmatively being used in an overzealous fashion by plaintiff's counsel to keep me in the dark.

20.     I was informed by my previous counsel, Kevin Pasquinelli, that the defendants' reply brief would explain to the Court that defendants were not given the opportunity to read the FULL, unredacted TRO.  However, I have recently reviewed the Court's version of the defendants' reply brief submitted by defendants.  The brief does not even attempt to explain to the Court that many critical documents referenced by the TRO were marked "FILED UNDER SEAL".

21.     I believed then (and now) that I was in compliance with the Court's TRO but I did not state in my declaration in opposition to the contempt motion that I was in compliance with the TRO because of three reasons:

(a) I could not and did not understand how I could say that I was in compliance with a document which I could not read most of the pages of and I was told that making such a statement was a "legal conclusion" in any event and not for me to state;

(b) My previous counsel told me that I was not qualified to draw such a legal conclusion and thus could not make a statement as such; and

(c) My previous counsel told me that such a statement would not be a statement of fact.  It would be my opinion and opinions are not allowed in declarations.

22.     It is my understanding that the only two people of the defendants' team who have read the full unredacted TRO (up to changing to my new counsel, Russo and Hale, LLP) were Kevin Pasquinelli and Dan Mount.

23.     I was never informed by my previous counsel that I had the right to an evidentiary hearing where I could have explained all these things to the Court.  I was never informed that I had

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**     6     Case No. 5:07-cv-04330-RMW (HRL)

1  the right to a jury trial for the contempt of court motion. I was never informed that my previous
2  counsel stipulated to several extensions of the TRO.
3      24.    Overall, I submit to the Court that I never knowingly or intentionally violated the
4  Court's TRO or any of the other Orders of the Court, that I have never been willfully
5  disobedient, and that I have never understood (until now and only through new counsel at Russo
6  & Hale LLP) what my rights are, what should have occurred in this case, and what did not occur
7  which I believe has caused a miscarriage of justice with regard to the extension of the
8  Preliminary Injunction.

## **PUBLICLY AVAILABLE INFORMATION**

10     25.    I have located and I have read a number of recently published patent applications
11 and other publications which demonstrate that the general concept for Flash Enhancer is publicly
12 disclosed.  I do also know that the general concept I had for what became my STS product pre-
13 dated Verigy, pre-dated Agilent, and pre-dated HP and I never signed any agreement conveying
14 any of my pre-employment inventions to any of those companies.   Nor have I ever appropriated
15 anything from Verigy, nor was my product something that occurred at Verigy or that occurred
16 other than through much hard work by me after leaving Verigy and much hard work by
17 Honeywell and for which STS has paid Honeywell over $650,000 to have that work done for
18 STS.
19     26.    The company that I (and I alone) started and which eventually became STS, Inc. is
20 on the verge of collapse financially because Verigy has been able to bar me and STS from
21 generating any revenues from any potential customers.  Indeed, I have (through my attorneys at
22 Russo & Hale LLP) asked for clarification from opposing counsel that I can engage in my
23 profession of even just providing professional services (for revenue) with third-parties who use
24 automated test equipment but I have been told that the Verigy lawyers have objected to my
25 engaging in my profession (and in which I have over 20 years of experience) because they believe
26 that such service activities would constitute "marketing" in violation of the Court's Preliminary
27 Injunction.  I believe it is, in fact, simply a way to starve me and my family and prevent me and
28 my company from being in a position to defend itself in this litigation.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**     7     Case No. 5:07-cv-04330-RMW (HRL)

**BOB POCHOWSKI'S CREDIBILITY**

27.  In Mr. Pochowski's original declaration submitted to the Court on August 22, 2007, he stated that he made an "alarming" discovery in December 2006 (shortly after I fired him) by opening the properties page of the WORD documents that I emailed to him. He claimed to have discovered that the documents were authored by Agilent. I was present for his depositions. During his first deposition, he stated the documents contained information that was easily obtainable from customers. However, during his second deposition, he claimed that he knew he was in possession of confidential documents from Agilent back in June 2006 and that the information in the documents was very difficult to obtain and that he considered the information to be confidential. Yet, however, in January 2007 (again, shortly after I fired him) he asked Grenville Hughes of Honeywell if Honeywell would make a "similar sort of chip" (to the Flash Enhancer) for his other company, Attest Technologies. Attached as Exhibit 10 is a true and correct copy of an email sent to me by Grenville Hughes summarizing the requests of Bob Pochowski made in January 2007. Clearly, in January 2007, Mr. Pochowski thought that he and I were not using Agilent confidential information to define the Flash Enhancer. I am not sure what reason why (other than perhaps some type of agreement he has reached with Verigy as Verigy has refused and marked as "joint privileged" all communications with Mr. Pochowski) Mr. Pochowski has changed his testimony about the use or non-use of Agilent confidential information while he was employed as Vice President of Silicon Test Solutions, LLC and even thereafter. Clearly, though, he has changed his story and it is not truthful. (Indeed, both Mr. Pochowski and I sought and obtained legal counsel from Heather Flick, Esq. of San Francisco in September of 2006 for the purpose of assuring that there would be no problem in going forward and she provided that advice to both of us and for the benefit of STS LLC; there is not a single email or other communication from her to me suggesting otherwise and I do have emails that I sent to her in connection with her legal review of this).

**STS COMPETITORS**

38.  There are several competitors of STS who have products that are functionally equivalent to the STS Flash Enhancer. In fact, it was Dave McMann of Intel who stated in his deposition testimony that Intel would not buy additional testers from Verigy if the STS Flash

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Decl. Romi Mayder Supp. Mot. Summ . Adj.   8   Case No. 5:07-cv-04330-RMW (HRL)

1  Enhancer were not available.  In such a hypothetical situation, he stated that Intel would buy the
2  TRE (Tester Resource Expander) solution from Formfactor.  Formfactor is as a strategic partner of
3  Verigy (Agilent).  Attached as Exhibit 11 is a press release written by Formfactor describing their
4  strategic partnership with Verigy (Agilent).  The URL for this press release is as follows:
5  http://findarticles.com/p/articles/mi_m0EIN/is_2004_Sept_9/ai_n6186924.
6  The following is a quote from that Formfactor press release dating from 2004:

> "Our partnership with Agilent leverages FormFactor's wafer probe technologies to produce the high parallelism required for low-cost, high-throughput flash wafer level final test," said Larry Levy, director of flash product marketing for FormFactor, Inc.

**I do not understand why and I cannot understand how Verigy claims that STS will induce irreparable harm to Verigy when one of Verigy's strategic partners is offering a competing solution to the STS Flash Enhancer.**  Attached as Exhibit 12 is a press release from Formfactor advertising the TRE (Tester Resource Expander) solution back in 2003. The following is a quote from that Formfactor press release:

> The combination of the Advantest T5377 and FormFactor PH150 probe cards' TRE capabilities enables expansion of the system's native 64-device-in-parallel capability to test up to 256 devices in parallel utilizing FormFactor's large-area, high-pin-count wafer probe cards.

17  The URL for this press release is is as follows:
18  http://findarticles.com/p/articles/mi_m0EIN/is_2003_Dec_3/ai_110823702.
19        31.    For the aforementioned reasons, I am asking that the Court modify the Preliminary
20  Injunction by allowing me to provide professional services to any company in the field of
21  automated test equipment and that the Court also allow me to sell Flash Enhancer for non-Verigy
22  equipment applications since such sales have no effect on Verigy equipment and cannot possibly
23  give rise to any damage to Verigy.  I would agree to escrow 15% of the gross revenues from such
24  sales into an interest-bearing escrow account pending the outcome of this litigation and I would
25  also agree that such escrow can remain intact until after the Court rules following the trial in this
26  action.  Without these changes, I do not see how defendants will be able to finance a proper
27  defense in this action and I do not understand why Verigy should be allowed to "win" this case
28  simply by starving me and my company from having the funds needed to defend ourselves.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**      9      Case No. 5:07-cv-04330-RMW (HRL)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration has been executed on July 10, 2008 in Palo Alto, California.

_____/s/_____
Romi Mayder

I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Romi Mayder.

Dated: July 10, 2008          By:     _____/s/_____
                                      Jack Russo

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Decl. Romi Mayder Supp. Mot. Summ . Adj.**     10     Case No. 5:07-cv-04330-RMW (HRL)