# EXHIBIT 2





**From:** Mindy Morton [mailto:mmorton@be-law.com]
**Sent:** Wednesday, August 22, 2007 8:35 AM
**To:** Mindy Morton; Daniel S. Mount; Kevin M. Pasquinelli; romi.mayder@silicontests.com; wes@wedirect.com; wes@carseek.com
**Cc:** John Fowler; Gail C. Simmons
**Subject:** RE: Verigy v. Mayder, et al.

Gentlemen,
Enclosed please find the public versions of the declarations in support of the Application for the TRO. We will be sending one additional document, the Morton Declaration, shortly.

Regards,
Mindy Morton

Mindy M. Morton, Esq.
Bergeson, LLP
303 Almaden Blvd.
Suite 500
San Jose, CA 95110-2712
Main: 408 291-6200
Direct: 408 291-6203
Fax: 408 297-6000
Email: mmorton@be-law.com

The information transmitted in this e-mail (including any attachments) is a private communication for the sole use of the above individual or entity and may contain privileged and/or confidential information that may be exempt from disclosure under law. If you are not an intended recipient, do not forward this email. Interception of this message may be a federal crime. Any unauthorized dissemination, distribution, or copy of this communication (including any attachments) is strictly prohibited. If this e-mail has been transmitted to you in error, please notify the person listed above immediately, and delete the original message (including any attachments).

IRS Circular 230 Disclosure: To ensure compliance with requirements posed by the IRS, we inform you that any U.S. federal tax advice in this communication (including attachments) is not intended or written by Bergeson, LLP to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein. 2007 Bergeson, LLP [All Rights Reserved].
2007

1    DANIEL J. BERGESON, Bar No. 105439                    **REDACTED**
     dbergeson@be-law.com
2    JOHN W. FOWLER, Bar No. 037463
     jfowler@be-law.com
3    MELINDA M. MORTON, Bar No. 209373
     mmorton@be-law.com
4    BERGESON, LLP
     303 Almaden Boulevard, Suite 500
5    San Jose, CA 95110-2712
     Telephone:  (408) 291-6200
6    Facsimile:  (408) 297-6000

7    Attorneys for Plaintiff
     VERIGY US, INC.
8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11   VERIGY US, INC, a Delaware Corporation       Case No.

12                        Plaintiff,              **DECLARATION OF IRA LEVENTHAL
                                                  IN SUPPORT OF PLAINTIFF'S
13           vs.                                  EX PARTE APPLICATION FOR
                                                  TEMPORARY RESTRAINING ORDER**
14   ROMI OMAR MAYDER, an individual,
     WESLEY MAYDER, an individual, SILICON
15   TEST SYSTEMS, INC., a California Corporation,
     and SILICON TEST SOLUTIONS, LLC, a
16   California Limited Liability Corporation,
     inclusive,
17
                         Defendants.
18

19

20              **REDACTED PUBLIC VERSION OF**

21                 **HIGHLY CONFIDENTIAL**

22               **ATTORNEYS EYES ONLY**

23           **DOCUMENT SUBMITTED UNDER SEAL**

24

25

26

27

28

1    I, Ira Leventhal, declare as follows:

2    1.    I am the Senior Research and Development Manager at Plaintiff Verigy US, Inc.

3    (Verigy). I have served in that role since June 2006. Verigy is a spin-off from Agilent

4    Technologies, Inc. ("Agilent") and successor-in-interest to certain of Agilent's intellectual

5    property. Agilent is a spin-off from Hewlett Packard Company ("HP") and successor-in-interest

6    to certain of HP's intellectual property. Prior to the spin off of Verigy from Agilent in June 2006,

7    I served in the position of Research and Development Integrating Manager at Agilent for

8    approximately six years. Except for matters asserted on information and belief, which I am

9    informed and believe to be true, I make this declaration of my personal knowledge and, if called as

10   a witness, I could and would testify competently to the facts set forth herein.

11   2.    As the Senior Research and Development Manager at Verigy and Research and

12   Development Integrating Manager at Agilent, I was responsible for research and development of

13   new products for testing of memory chips. Romi Omar Mayder ("Mayder") was an engineer

14   working in my department until he left the employ of Verigy on September 22, 2006. I am

15   familiar with the projects that Mayder worked on during this period by reason of my regular

16   reviews of the progress of each of these projects.

17   3.    Verigy is a corporation duly organized and existing under the laws of the state of

18   Delaware with its principal place of business in Cupertino, California. Verigy designs, develops,

19   manufactures and sells advanced test systems and solutions for the semiconductor industry. Due

20   to the different architectures and functionalities of semiconductors, semiconductor test equipment

21   and services are generally categorized by the type of semiconductors tested. The two general

22   categories are equipment used to test memory semiconductors, referred to as memory testing, and

23   equipment used to test non-memory semiconductors, which includes testers for testing less

24   complex, discrete semiconductors, and testers designed to test very complex, highly integrated

25   semiconductors commonly referred to as System-on-a-Chip, or SOC, or System-in-a-Package, or

26   SIP, testing.

27   4.    Verigy offers a single platform for each of the two general categories of devices

28   being tested: Verigy's 93000 Series platform, designed to test System-on-a-Chip (SOC), System-

1    in-a-Package (SIP) and high-speed memory devices, and Verigy's Versatest V5000 Series

2    platform, designed to test memory devices, including flash memory and multi-chip memory

3    packages. As part of our single scalable platform strategy, we develop and offer performance and

4    capability enhancements to our platforms as part of our product development roadmap. We also

5    provide a range of services that assist our customers in quickly and cost effectively delivering the

6    innovative, feature-rich products demanded by their end users.

7         5.    Verigy's V5000 Series memory test systems are made up of the following major

8    components: A System Bay, which contains the Liquid Cooling Unit, System Power Supplies,

9    Power Distribution Unit, System Controller, and Subsystem Interface Controller; a Testhead,

10   which contains four quadrants, each containing frontplane and backplane boards, a clock module,

11   two quadrant power supply modules, and up to nine Test Site Modules, each containing four Pin

12   Electronics boards, a Device Power Supply board, an Algorithmic Pattern Generator/Test Site

13   Controller board, and a Pin Electronics Front Plane Interface (PEFPIF) board; a Wafer Sort or

14   Final Test Interface; an optional Matrix for fanning out signals to or receiving signals from

15   multiple devices per tester pin; a Manipulator for positioning the Testhead to interface with a

16   Wafer Prober or packaged part Handler. Probe Cards are connected to the Wafer Sort Interface

17   for contacting wafers. A Device Specific Interface is connected to the Final Test Interface or

18   optional Matrix for contacting packaged parts. An AC Calibration Fixture containing up to 36 AC

19   Calibration boards is connected to the Wafer Sort Interface, Final Test Interface, or optional

20   Matrix, for performing timing calibration on the system. Attached hereto as Exhibit A is a true

21   and correct copy of a diagram showing the Verigy V5000 Series system, in both Wafer Sort and

22   Final Test configurations.

23        6.    While Mayder was assigned to my department he was responsible for several

24   research and development projects for the creation of new products to improve and advance

25   Verigy's silicon chip testing systems. During each of these projects Mayder had access to Verigy's

26   confidential information including his projects as well as other projects being developed by other

27   employees. In addition, Mayder had confidential information regarding the identity of and

28   Verigy's business relationship with third parties including Verigy's past, present, and prospective

1   component suppliers and customers. He also was advised of Verigy's confidential product

2   strategy. Disclosure of any of this confidential information would be harmful to Verigy.

3   Disclosure would benefit Verigy's competitors and potential competitors, including some

4   component suppliers.

5       7.      Agilent, until the sale of its intellectual property to Verigy, and Verigy, since the

6   purchase of the intellectual property, have always taken steps to protect to maintain the

7   confidentiality of confidential and proprietary information, including the following: all Verigy

8   employees, consultants and contractors, are required to sign an Agreement Regarding Confidential

9   Information and Proprietary Developments; customers, vendors and suppliers are required to sign

10  a non-disclosure agreement; access to all of Verigy's offices is restricted and all employees must

11  have a keycard to proceed past the public lobby in Verigy's buildings; all visitors to all of

12  Verigy's offices must sign a log and be escorted by a Verigy employee while on the premises;

13  technical documents such as project data sheets and customer requirements are protected on the

14  computer system and only authorized users can access them; and confidential documents sent to

15  third parties are customarily marked "confidential." In addition, the existence and importance of

16  Verigy trade secrets is addressed and emphasized with new employees in connection with their

17  joining Verigy and again at exit interviews.

18      8.      Mayder was working on the ███████ project in 2006. The purpose of the ███████

19  Project was to develop technology that ████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ██████████████████████████████ when connected to a Verigy V5000 Series memory test

22  system, would substantially increase the parallelism (number of devices that can be

23  simultaneously tested) of the system. During the ███████ project, Mayder learned of Verigy's

24  confidential business plans and strategy regarding ████████████, potential manufacturers

25  and suppliers, materials and implementation, and customer requirements.

26      9.      Mayder was the Technical RFQ Lead and the MTS ("Memory Test Systems")

27  Hardware Design Engineer for the ████████████████████████████████████ ")

28  project, which was part of the ███████ project. The ███████ project was also confidential and

3

1  proprietary Verigy information.  As part of his work on this project, Mayder wrote a document

2  entitled "███████████████."  A true and correct copy of this document is attached hereto

3  as Exhibit B.  This project involved a ███████████████████████████

4  ████████████████████████████████████████████████

5  ██████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████████████.

8      10.  ██████████████████████████████████████

9  ██████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████

12 ██████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████████

16      11.  ██████████████████████████████████████

17 ████████████████████████████████████████████████

18 ██████████████████████████████████

19      12.  ██████████████████████████████████████

20 ████████████████████████████████████████

21 ████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ██████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████

27 ██████████████████████████████████████

28 ████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ███████████

3    13.    The decision regarding the choice of materials for a device such as the ███████

4 is generally based on device performance, cost, and supply chain issues. ████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ███████████████████████

9    14.    ███████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ██████ are all confidential and proprietary decisions that are valuable because they are kept

17 confidential.

18    15.    ████████████████████████████████████████

19 ████████████████████████████████████████████

20 ████████████████████████████████████████

21    16.    Current work in this area by Verigy includes ██████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████

26 ████████████████████████████████████████

27 ██████████████████████████████████████

28

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮

7 18. Mayder also worked on an ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮

17 19. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮

20 20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮

24 21.    I have reviewed Mayder's company website at www.silicontests.com . Mayder's

25 Enhancer™ family of products, as described by the website, ▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮

28

22.    ████████████████████████ involved numerous Verigy trade secrets and confidential information. This includes but is not limited to know-how, research, techniques, and information relating to: ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ forecasted business demand; actual product consumption; business processes and tools; product technology roadmaps; product features and performance; product architecture; product development schedules; qualification processes and results; contract manufacturer agreements and business relationship; and manufacturing strategy.

23.    Verigy shares confidential and proprietary information concerning products and potential products with some customers under non-disclosure agreements. In return, some of these customers share their confidential and proprietary information regarding their products with Verigy. Some of the customers with whom Verigy has shared and received confidential information include ██████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████.

24.    The ██████ project is confidential and highly proprietary and release of information relating to the ██████ project or other Verigy trade secret information would cause damage to Verigy. Release of this information to competitors could cause our customers to buy competitive products instead of Verigy's testing equipment. Release of this information to customers would damage our customer relationships ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████.

1   25.

2

3

4

5

6   26.                                **REDACTED**

7

8

9

10

11      I declare under penalty of perjury under the laws of the United States that the foregoing is

12  true and correct.

13      Executed this 21st day of August, 2007 in Cupertino, California.

14

15                                    _Ira Leventhd_
                                       Ira Leventhal

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBITS FILED UNDER SEAL

# EXHIBIT B

# EXHIBITS FILED UNDER SEAL

# EXHIBIT C

# EXHIBITS FILED UNDER SEAL

1  DANIEL J. BERGESON, Bar No. 105439
   dbergeson@be-law.com
2  JOHN W. FOWLER, Bar No. 037463
   jfowler@be-law.com
3  MELINDA M. MORTON, Bar No. 209373
   mmorton@be-law.com
4  BERGESON, LLP
   303 Almaden Boulevard, Suite 500
5  San Jose, CA 95110-2712
   Telephone:  (408) 291-6200
6  Facsimile:  (408) 297-6000

7  Attorneys for Plaintiff
   VERIGY US, INC.

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12  VERIGY US, INC, a Delaware Corporation        Case No.

13                        Plaintiff,              **DECLARATION OF MANUEL
                                                  GUERZONI IN SUPPORT OF
14        vs.                                     PLAINTIFF'S EX PARTE APPLICATION
                                                  FOR TEMPORARY RESTRAINING
15  ROMI OMAR MAYDER, an individual;              ORDER TO SHOW CAUSE RE
    WESLEY MAYDER, an individual; SILICON         PRELIMINARY INJUNCTION**
16  TEST SYSTEMS, INC., a California Corporation;
    and SILICON TEST SOLUTIONS, LLC, a
17  California Limited Liability Corporation,
    inclusive,
18
                          Defendants.
19

20

21

22

23

24

25

26

27

28

1        I, Manuel Guerzoni, declare as follows:

2        1.    I make this declaration of my personal knowledge and, if called as a witness, I

3  could and would testify competently to the facts set forth herein.

4        2.    I am Human Resources Manager, Americas at Plaintiff Verigy US, Inc. ("Verigy").

5  As HR Services Manager at Verigy, my responsibilities include the maintenance of Verigy

6  business records relating to the employees of Verigy. The employee records accurately show the

7  employment histories including job titles, and dates of employment and include copies of all

8  agreements between the employee and Verigy relating to employment. The entries on these

9  records were made at or near the time of the events in the course of regularly conducted business

10  activities by, or from information transmitted by a person with knowledge of the activity. I have

11  checked the business records relating to the employment of Romi Omar Mayder ("Mayder"), a

12  former Verigy employee. Mayder was employed continuously by Hewlett-Packard Company and

13  Agilent, predecessors in interest to Verigy, and Verigy from June 15, 1998 through September 22,

14  2006.

15        3.    Included in the business records relating to Mayder's employment are the

16  following:

17        Functional Exit Interview Memo, executed by Mayder on September 20, 2006, a true copy

18  of which is attached hereto as Exhibit A (with social security number redacted), in which Mayder

19  lists the most sensitive areas of confidential information he received, including "System

20  Performance" and acknowledges his obligation to retain in confidence Verigy Confidential

21  Information; and,

22        Agreement Regarding Confidential Information and Proprietary Developments (ARCIPD),

23  signed by Mayder on May 6, 2006, a true copy of which is attached hereto as Exhibit B.

24        4.    In the ARCIPD, Mayder agreed that "The product of all work performed by me

25  during and within the scope of my Verigy employment including, without limitation, any reports,

26  documents drawings, computer programs, devices and models, including all copies thereof, will be

27  the property of Verigy and Verigy will have the sole right to use, sell, license, publish or otherwise

28  disseminate or transfer rights in such a work product." (ARCIPD, ¶5.)

5.   Mayder also agreed in the ARCIPD that "Confidential Information also includes information of the foregoing types that I received during any period of employment with Agilent Technologies, Inc., whether such information relates to Agilent or is or was received from third parties under an obligation of confidentiality." (ARCIPD, ¶ 2.)

6.   Mayder also agreed in the ARCIPD to "(a) use ... Confidential Information [as defined] only in the performance of Verigy duties; (b) to hold such Confidential Information in confidence and trust; and (c) to use all reasonable precautions to ensure that such Confidential Information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after my employment with Verigy." (ARCIPD, ¶2).

7.   Mayder also agreed in the ARCIPD "to return all Verigy property to Verigy" upon termination of his employment. (ARCIPD, ¶ 8.)

8.   Mayder also agreed in the APCIPD that "Inventions and discoveries (whether or not patentable), designs, works of authorship, mask works, improvements, data, processes, computer programs and software (herein called "Proprietary Developments") that are conceived or made by me alone or with others while I am employed by Verigy or that relate to the research and development or the business of Verigy ... Are the sole property of Verigy ..." (ARCIPD, ¶3.)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _21_ day of August, 2007 in Cupertino, California.

# EXHIBIT A

VERIGY

## Functional Exit Interview Memo:

*(to be conducted by Manager of exiting employee prior to or on last day worked)*

EMPLOYEE NAME (Last, First, M.I.): *Mayderi, Romi, O*

EMPLOYEE NUMBER: *100267*

SOCIAL SECURITY NUMBER: _____

DATE: *Sept. 20, 2006*

This memo summarizes the exit interview we had on *Sept. 20*. At that time, you informed me that you were leaving Verigy to:

☐ join company _____ in the capacity of _____

at the following location: _____

☐ retire

☑ other: *private enterprise*

*Verigy    June 98, H.P./Agica*

You have worked for Verigy Ltd. since *June 1, 2006* in the following capacities:
*AC calibration expert*

Functional Exit Interview Memo - rev. 090706 - Verigy Ltd.

page 1

VERIGY

During your employment, you have received a variety of Verigy confidential information and technology of which some of the most sensitive areas include:

AC calibration

Timing accuracy

System performance

Interface

Verigy Ltd. also specifically considers other aspects of its business to be confidential, including but not limited to:

a. Names, skills, experiences, job levels, pay or performance levels of Verigy employees;

b. Business strategies, including marketing plans and customer lists;

c. New product R&D and introduction plans;

d. Process yields, manufacturing strategies, and costs;

e. Supplier and distributor information;

f. Company training programs, such as TQC and operating policies;

g. Copies of memos or presentations incorporating confidential information which you may have in your files, including those which you have authored;

h. Patent applications and disclosures.

Your obligation to Verigy Ltd. with respect to the types of information described above, whether disclosed to you or acquired by you in the course of your employment at Verigy, is to retain such information in confidence until it becomes public knowledge or you are given advance written permission by Verigy to disclose or use it.



You were reminded of your responsibility to return all the memos, papers, lab notebooks, sales literature, training materials, etc., which you had obtained as a result of your employment at Verigy. According to you, you have done that. If you later find other documents or equipment relating to your Verigy employment in your possession, it is your responsibility to return them promptly to a Verigy Legal department representative.

We also discussed the possibility that you may have disclosed Verigy confidential information or technology during outside consulting projects or job interviews you have had with other companies, investors, or consultants during your employment here. These instances, if any, are documented below and are believed to be complete. (Write "NONE" if this is not applicable.)   *None*

_____

_____

_____

_____

Received, read, and understood by:

Employee Signature, Date: _____ *Ron Maughn   Sept. 20 2006*

Manager Signature, Date: _____ *Preet Paul Singh      9/20/2006*

*Note to Manager:*
*please give the employee a copy and fax the original to Verigy Americas HR Services at (215) 261-4486*

# EXHIBIT B

# Verigy US, Inc.
## Agreement Regarding Confidential Information and Proprietary Developments (ARCIPD)

| EMPLOYEE NAME (Last, First, M.I.) | EMPLOYEE NUMBER |
|---|---|
| Mayder, Romi O | 00330819 |

1. I understand that this Agreement is not a contract for employment with Verigy US, Inc.

2. This Agreement concerns trade secrets, confidential business and technical information, and know-how not generally known to the public which will become known to or acquired or produced by me in connection with my employment by Verigy (hereinafter "Confidential Information"). Confidential Information includes, without limitation, information on Verigy organizations and structure; staffing; finance; strategic plans; information on employee performance, compensation, assignments; information on research and development, manufacturing and marketing; as well as information which Verigy receives from third parties under an obligation of confidentiality.  Confidential Information also includes information of the foregoing types that I received during any period of employment with Agilent Technologies, Inc., whether such information relates to Agilent or is or was received from third parties under an obligation of confidentiality.  I agree:  (a)  to use such Confidential Information only in the performance of Verigy duties; (b)  to hold such Confidential Information in confidence and trust; and (c) to use all reasonable precautions to assure that such Confidential Information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after my employment with Verigy.

3. This Agreement also concerns inventions and discoveries (whether or not patentable), designs, works of authorship, mask works, improvements, data, processes, computer programs and software (herein called "Proprietary Developments") that are conceived or made by me alone or with others while I am employed by Verigy or that relate to the research and development or the business of Verigy. Such Proprietary Developments are the sole property of Verigy, and I agree:  (a) to disclose them promptly to Verigy; (b) to assign them to Verigy; and (c) to execute all documents and cooperate with Verigy in all necessary activities to obtain patent, copyright, mask works and/or trade secret protection in all countries, at Verigy US, Inc.'s expense.  This Agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the employer was used and which was developed entirely on the employee's own time, unless (a) the invention relates (I) to the business of the employer, or (II) to the employer's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the employee for the employer.

4. I agree to honor any valid disclosure or use restrictions on Confidential Information known to me and received from any former employer or any other party prior to my employment by Verigy, and I agree not to bring onto the premises of Verigy any such information in whatever physical form without prior written consent of such former employer or other party.

5. The product of all work performed by me during and within the scope of my Verigy employment including, without limitation, any reports, documents, drawings, computer programs, devices and models, including all copies thereof, will be the property of Verigy and Verigy will have the sole right to use, sell, license, publish or otherwise disseminate or transfer rights in such a work product.

6. I will not remove any Verigy property from Verigy premises without Verigy US, Inc.'s permission.

7. I agree not to disrupt, damage or interfere with the operation or business of Verigy by soliciting, recruiting, contracting with or employing its employees or independent contractors on my own behalf or any other person or entity, both during my employment at Verigy and for a period of two years following termination of my employment.

8. Upon termination of my employment with Verigy, I will return all Verigy property to Verigy unless Verigy authorizes me in writing to retain such property.

9. The provisions of this Agreement will be separately construed. If any of them is held to be unenforceable, the remaining provisions will not be affected.

| EMPLOYEE SIGNATURE | DATE |
|---|---|
| [signature] | May 06, 2006 |

[footnote] Including: California Labor Code, Section 2870; Illinois 785LCS1060/1-3, "Employee Patent Act,"; Washington Rev. Code, Title 49RCW: Labor Regulations, Chapter 49.44.140; Minnesota Statutes, 13A, Section 181.78; and North Carolina General Statutes, Article 10A, Chapter 66, Commerce and Business, Section 66-57.1.

1-WA/2573573.1

DANIEL J. BERGESON, Bar No. 105439                                 **REDACTED**
dbergeson@be-law.com
JOHN W. FOWLER, Bar No. 037463
jfowler@be-law.com
MELINDA M. MORTON, Bar No. 209373
mmorton@be-law.com
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
Telephone:  (408) 291-6200
Facsimile:   (408) 297-6000

Attorneys for Plaintiff
VERIGY US, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VERIGY US, INC, a Delaware Corporation | Case No. |
| Plaintiff, | **DECLARATION OF ANDREW N. LEE IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| vs. | |
| ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive, | |
| Defendants. | |

**REDACTED PUBLIC VERSION OF**

**HIGHLY CONFIDENTIAL**

**ATTORNEYS EYES ONLY**

**DOCUMENT SUBMITTED UNDER SEAL**

1    I, Andrew N. Lee, declare as follows:

2    1.  I make this declaration of my personal knowledge and, if called as a witness, I

3 could and would testify competently to the facts set forth herein.

4    2.  I am the Strategic Commodity Development Manager at Plaintiff Verigy US, Inc.

5 ("Verigy"). Prior to the spin off of Verigy from its predecessor in interest, Agilent Technologies

6 Inc, in June 2006, I served in the same position at Agilent from approximately May 2001. As the

7 Strategic Commodity Development Manager at Agilent and Verigy, I was responsible for

8 procurement activities related to critical parts and components used in Agilent's and Verigy's

9 semiconductor test equipment, including procurement of internally designed application-specific

10 integrated circuits ("ASICS").

11    3.  I began supervising the RFQ process in late 2001 or early 2002, which is when I

12 first created a general confidential Request for Quotation ("RFQ") document for the company.

13 The RFQ document is used to solicit price quotes and other technical information from design and

14 manufacturing companies for their design and/or manufacturing services for our integrated circuits

15 under design. I created the RFQ document ███████████████████

16 ████████████████████████████████

17 ████████████████████████████████

18 ████████████████████████████████

19 ██████████

20    4.  I consider this RFQ document to be a confidential, proprietary and trade secret

21 Verigy document that is the product of years of research and experience. I only disclose RFQ's to

22 prospective suppliers of design and/or manufacturing services related to specific integrated

23 circuits, and only such prospective suppliers have signed a non-disclosure agreement.

24    5.  When seeking a quotation with respect to a specific integrated circuit, █████

25 ████████████████████████████████

26 ████████████████████████████ In addition to the RFQ itself,

27 the technical details of each integrated circuit for which we are seeking a quotation are also

28

1   confidential and proprietary, as they describe the technical details of potential products that would

2   allow our competitors would gain an advantage if the documents were released.

3       6.      In April and May 2006, I worked with Romi Omar Mayder ("Mayder") on an RFQ

4   for

5

6

7           This document included a

8                   Mayder emailed several versions of

9       and the third and final version is what was included in the RFQ that went to

10  Attached hereto as Exhibit A is a true and correct copy of my May 5, 2006 email

11

12      7.

13

14      8.

15

16      I declare under penalty of perjury under the laws of the United States that the foregoing is

17  true and correct.

18      Executed this 16th day of August, 2007 in Monument, Colorado.

19

20                              *Andrew N. Lee*
                                _____
                                        Andrew N. Lee

21

22

23

24

25

26

27

28

**REDACTED**

# EXHIBIT A

# EXHIBITS FILED
# UNDER SEAL

# EXHIBIT B

# EXHIBITS FILED
# UNDER SEAL

# EXHIBIT C

# EXHIBITS FILED UNDER SEAL

**REDACTED**

DANIEL J. BERGESON, Bar No. 105439
dbergeson@be-law.com
JOHN W. FOWLER, Bar No. 037463
jfowler@be-law.com
MELINDA M. MORTON, Bar No. 209373
mmorton@be-law.com
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
Telephone:  (408) 291-6200
Facsimile:  (408) 297-6000

Attorneys for Plaintiff
VERIGY US, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| VERIGY US, INC, a Delaware Corporation | Case No. |
| Plaintiff, | **DECLARATION OF ROBERT POCHOWSKI IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| vs. | |
| ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive, | |
| Defendants. | |

**REDACTED PUBLIC VERSION OF**

**CONFIDENTIAL**

**DOCUMENT SUBMITTED UNDER SEAL**

1    I, Robert Pochowski, declare as follows:

2          1.      I am President of Attest Technologies. Prior to my current position, I worked at

3    Agilent Technologies Inc. ("Agilent") from June 2004 to July 2005 as Vice President / General

4    Manager of the California Semiconductor Test Division. After my departure, Agilent spun-off a

5    successor-in-interest, Verigy US, Inc. ("Verigy"). As Vice President / General Manager of the

6    California Semiconductor Test Division at Agilent, I contributed to a patent for a test system.

7    Except for matters asserted on information and belief, which I am informed and believe to be true,

8    I make this declaration of my personal knowledge and, if called as a witness, I could and would

9    testify competently to the facts set forth herein.

10         2.      Romi Omar Mayder ("Mayder") was an engineer working in my division at

11   Agilent. I met Mayder while consulting at Agilent prior to being hired as the General Manager.

12         3.      Agilent designed, developed, manufactured and sold advanced test systems and

13   solutions for the semiconductor industry. It is my understanding and belief that Verigy, as

14   Agilent's successor-in-interest, now designs, develops, manufactures and sells these advanced test

15   systems. These advanced test systems are used in conjunction with wafer probers, probe cards and

16   other semiconductor handling and interface equipment.

17         4.      Mayder approached me on or about the first week of June, 2006 and asked me if I

18   would be interested in investing in a company he was starting called Silicon Test Systems

19   ("STS"). He told me that he had an idea for a new business venture that had something to do with

20   a probe card. A probe card is used in conjunction with a test system to make contact with the

21   individual chips so that they can be tested while still in wafer form.

22         5.      I agreed to meet with Mayder, and we set up a meeting in my office on or about

23   June 8, 2006. At this meeting, Mayder explained that he had an idea for a Silicon on Sapphire, or

24   "SOS" chip for a probe card that would allow customers to connect one tester channel to multiple

25   devices in a parallel fashion. This would improve the productivity of the current commercially

26   available test systems because they could test more devices simultaneously. I did not believe at

27   that time that Verigy was working on anything related to probe cards. I asked Mayder at this first

28

1   meeting whether Verigy was working on anything in this space and he assured me that Verigy was

2   not.

3       6.      Mayder wanted me to invest in STS, and I agreed to explore the idea. At no time

4   did he ask me to sign a non-disclosure agreement ("NDA"). We never formalized my

5   involvement, and ultimately, I did not invest in STS. I did share with Mayder a number of

6   concrete ways to improve the product.

7       7.      On June 12, 2006, Mayder sent me an email including an attachment that he

8   described as a first draft of an RFQ, or request for quotation, for ███████████████

9   ████████. To the best of my knowledge, ████████████████████████████

10  ████████████████████████████. I believe ████████ had

11  communicated with STS before I had any contact with ████████ regarding STS, as the June 12,

12  2006 email from Mayder indicates that ████████ had already provided pricing. It is my

13  understanding and belief that the contact person at ████████ was ████████. STS

14  continued to work with ████████ throughout my involvement with STS. Attached hereto as

15  Exhibit A is a true and correct copy of Mayder's June 12, 2006 email to me with the attached draft

16  RFQ.

17      8.      The draft RFQ attached to Exhibit A stated that the ████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████.

23      9.      On June 14, 2006, Mayder sent me an email with two attachments. The first

24  attachment was called ████████████████ and the second attachment, a revision of the

25  document attached to Exhibit A, was called ████████████ Attached hereto as Exhibit B is

26  a true and correct copy of Mayder's June 14, 2006 email to me with attachments. In his email,

27  Mayder asked me to send these two files to ████████████ to start the process with

28  them. I do not believe that ████████ had signed an NDA at this time. The RFQ lists me as "STS

1    Global Commodity Manager," but this is not a position I ever occupied or agreed to. The RFQ is

2    a nine page document that includes detailed requirements and questions for the potential

3    manufacturer. The document called ███████████ was intended as the appendix to the

4    RFQ. I never sent these documents to ███████.

5        10.    Attached hereto as Exhibit C is a true and correct copy of a June 20, 2006 email

6    from Mayder to ████████████████ and copied to me, with attachments. It is my

7    understanding and belief, based in part on the ███████████████ website at

8    ████████████████████████████ serves as a consultant and/or sales and

9    marketing representative for ██████. In the email, Mayder asks ███████ forward the

10   RFQ to the appropriate people at ██████. The attached documents are revisions of the two

11   documents attached to Exhibit B.

12       11.    Attached hereto as Exhibit D is a true and correct copy of a June 26, 2006 email

13   from Mayder to me, attaching NAND wafersort requirements for various potential customers. The

14   attachments include a ████████████████████████████████

15   and ████████████████████████████████████.

16       12.    Attached hereto as Exhibit E is a true and correct copy of a July 9, 2006 email from

17   Mayder to me. This email includes a powerpoint presentation, the ██████████████

18   ██████ and an updated of the technical data attached to Exhibit A.

19       13.    Attached hereto as Exhibit F is a true and correct copy of an August 27, 2006 email

20   from Mayder to me attaching ████████████████ for the ██████ chip.

21       14.    Attached hereto as Exhibit G is a true and correct copy of a September 24, 2006

22   email from Mayder to me regarding our upcoming meeting ████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████████████████

26   ███████████████████.

27       15.    Attached hereto as Exhibit H is a true and correct copy of a September 20, 2006

28   email from Mayder to me asking me to work with ███████ to change the date on the NDA we

1  were negotiating from September 13, 2006 to October 1, 2006. Mayder's email states that he

2  wants the date changed because "On Spet [sic] 13, 2006, I was still employed at Verigy."

3      16.    I continued to explore investing in STS and I continued to give Mayder my advice

4  concerning ways to improve the product. As part of this exploration, Mayder and I met with a

5  number of potential clients, including ████████████████. Mayder shared

6  technical data similar to the documents in Exhibits A and E with these companies.

7      17.    In or about September 2006, Mayder informed me that his brother, Wesley Mayder,

8  would be investing in his company. This was not my original understanding when I was asked to

9  invest in STS in June. In or about December 2006, Mayder informed me that he did not want me

10 to invest in his company.

11     18.    · Shortly after my discussions with Mayder concerning STS ended, I carefully went

12 through my correspondence regarding STS to make sure I had a complete and accurate record of

13 the relationship. I made an alarming discovery during this review. The properties windows for

14 the documents in Exhibits A, B and C all indicated that the documents were in fact Agilent

15 documents.

16     19.    Specifically, Exhibit A's email attachment's properties indicate that it was

17 originally called "RFQ for ███████ ASIC," and the author was Romi Mayder for Agilent

18 Technologies, Inc. ████████████████████████████████

19 ████████████████████████████████████████

20 ████████████████████ Attached hereto as Exhibit I is a true and correct

21 copy of the properties for this document.

22     20.    The properties of the document called ████████████ that is part of

23 Exhibit B indicate that the document was originally called ██████ and the author was Andy

24 Lee of Agilent Technologies, Inc. ████████████████████████████

25 ████████████████████████████████████████.

26 Attached hereto as Exhibit J is a true and correct copy of the properties for this document.

27     21.    I have also reviewed the properties for the ██████████ that is part of Exhibit

28 D. The properties of this document indicate that the author was Hanh Lai of Agilent

1   Technologies, Inc. and ███████████████████████. Attached hereto as

2   Exhibit K is a true and correct copy of the properties for this document.

3       I declare under penalty of perjury under the laws of the United States that the foregoing is

4   true and correct.

5       Executed this 16th day of August, 2007 in Sunnyvale, California.

6

7                                                      Robert Pochowski

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT FILED UNDER SEAL

# EXHIBIT B

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT C

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT D

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT E

# EXHIBIT FILED UNDER SEAL

# EXHIBIT F

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT G

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT H

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT I

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT J

# EXHIBIT FILED
# UNDER SEAL

# EXHIBIT K

# EXHIBIT FILED
# UNDER SEAL

1    DANIEL J. BERGESON, Bar No. 105439                    **REDACTED**
     dbergeson@be-law.com
2    JOHN W. FOWLER, Bar No. 037463
     jfowler@be-law.com
3    MELINDA M. MORTON, Bar No. 209373
     mmorton@be-law.com
4    BERGESON, LLP
     303 Almaden Boulevard, Suite 500
5    San Jose, CA 95110-2712
     Telephone: (408) 291-6200
6    Facsimile: (408) 297-6000

7    Attorneys for Plaintiff
     VERIGY US, INC.

8

9                        UNITED STATES DISTRICT COURT

10                     NORTHERN DISTRICT OF CALIFORNIA

11                            SAN JOSE DIVISION

12   VERIGY US, INC, a Delaware Corporation          Case No.

13                    Plaintiff,                     **DECLARATION OF KEN HANH DUC
                                                     LAI IN SUPPORT OF PLAINTIFF'S**
14          vs.                                      **EX PARTE APPLICATION FOR
                                                     TEMPORARY RESTRAINING ORDER**
15   ROMI OMAR MAYDER, an individual;                **TO SHOW CAUSE RE PRELIMINARY
     WESLEY MAYDER, an individual; SILICON           INJUNCTION**
16   TEST SYSTEMS, INC., a California Corporation;
     and SILICON TEST SOLUTIONS, LLC, a
17   California Limited Liability Corporation,
     inclusive,
18
                      Defendants.
19

20

21
                         **REDACTED VERSION OF**
22
                        **HIGHLY CONFIDENTIAL**
23
                        **ATTORNEYS EYES ONLY**
24

25               **DOCUMENT SUBMITTED UNDER SEAL**

26

27

28

                         DECLARATION OF KEN HANH DUC LAI

1      I, Ken Hanh Duc Lai, declare as follows:

2      1.      I make this declaration of my personal knowledge and, if called as a witness, I

3   could and would testify competently to the facts set forth herein.

4      2.      I am a product marketing manager in the memory test division at Plaintiff Verigy

5   US, Inc. (Verigy). Prior to the spin off of Verigy from its predecessor in interest, Agilent

6   Technologies Inc, in June 2006, I served as an applications manager at Agilent from November

7   1999. As the applications and product manager at Agilent and Verigy, I was responsible for

8   supporting our customers and the memory test division with applications related work. I worked

9   with Romi Omar Mayder ("Mayder") on the ███████ project.

10      3.      Attached hereto as Exhibit A is a true and correct copy of ██████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ██████████████████████. I consider this ████████████████████ to be a

15   confidential, proprietary and trade secret Verigy document that is the product of years of research

16   and experience. This document is never shared with any third parties. In fact, any information on

17   this spreadsheet that was compiled from third-party customers would likely be considered their

18   proprietary and confidential materials. Verigy and/or Agilent have signed non-disclosure

19   agreements with these third parties to ensure that information like this remains confidential.

20      4.      Attached hereto as Exhibit B is a true and correct copy of ███████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████, and I created these documents

24   using ████████████████.

25      5.      Attached hereto as Exhibit C is a true and correct copy of ████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28

1 ███████████████████████████████████████████, and I created these documents

2 using the ██████████████████████

3      6.     Attached hereto as Exhibit D is a true and correct copy of ████████████

4 ██████████████████████████████████████████████████████████████████████

5 resource extension for our client Toshiba. These visio documents are graphical renderings of the

6 ████████████████████████████████████████████, and I created these documents

7 using ██████████████████████

8      7.     I consider all of the ██████████ attached as Exhibits B, C and D to be confidential,

9 proprietary and trade secret Verigy documents. These documents are never shared with any third

10 parties. ████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████████

13 ███████████████████.

14      I declare under penalty of perjury under the laws of the United States that the foregoing is

15 true and correct.

16      Executed this 17th day of August, 2007 in Cupertino, California.

17

18                              _____

19                                Keh Hanh Duc Lai

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBITS FILED UNDER SEAL

# EXHIBIT B

# EXHIBITS FILED UNDER SEAL

# EXHIBIT C

# EXHIBITS FILED UNDER SEAL

# EXHIBIT D

# EXHIBITS FILED UNDER SEAL