# EXHIBIT 5

1  DANIEL J. BERGESON, Bar No. 105439                          **REDACTED**
   dbergeson@be-law.com
2  JOHN W. FOWLER, Bar No. 037463
   jfowler@be-law.com
3  MELINDA M. MORTON, Bar No. 209373
   mmorton@be-law.com
4  BERGESON, LLP
   303 Almaden Boulevard, Suite 500
5  San Jose, CA 95110-2712
   Telephone:  (408) 291-6200
6  Facsimile:  (408) 297-6000

7  Attorneys for Plaintiff
   VERIGY US, INC.
8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11  VERIGY US, INC, a Delaware Corporation      | Case No.

12                       Plaintiff,             | **DECLARATION OF IRA LEVENTHAL**
                                                | **IN SUPPORT OF PLAINTIFF'S**
13        vs.                                   | **EX PARTE APPLICATION FOR**
                                                | **TEMPORARY RESTRAINING ORDER**
14  ROMI OMAR MAYDER, an individual,
    WESLEY MAYDER, an individual, SILICON
15  TEST SYSTEMS, INC., a California Corporation,
    and SILICON TEST SOLUTIONS, LLC, a
16  California Limited Liability Corporation,
    inclusive,
17
                         Defendants.
18

19

20              **REDACTED PUBLIC VERSION OF**

21                 **HIGHLY CONFIDENTIAL**

22                **ATTORNEYS EYES ONLY**

23            **DOCUMENT SUBMITTED UNDER SEAL**

24

25

26

27

28

1      I, Ira Leventhal, declare as follows:

2      1.    I am the Senior Research and Development Manager at Plaintiff Verigy US, Inc.

3   (Verigy). I have served in that role since June 2006. Verigy is a spin-off from Agilent

4   Technologies, Inc. ("Agilent") and successor-in-interest to certain of Agilent's intellectual

5   property. Agilent is a spin-off from Hewlett Packard Company ("HP") and successor-in-interest

6   to certain of HP's intellectual property. Prior to the spin off of Verigy from Agilent in June 2006,

7   I served in the position of Research and Development Integrating Manager at Agilent for

8   approximately six years. Except for matters asserted on information and belief, which I am

9   informed and believe to be true, I make this declaration of my personal knowledge and, if called as

10  a witness, I could and would testify competently to the facts set forth herein.

11     2.    As the Senior Research and Development Manager at Verigy and Research and

12  Development Integrating Manager at Agilent, I was responsible for research and development of

13  new products for testing of memory chips. Romi Omar Mayder ("Mayder") was an engineer

14  working in my department until he left the employ of Verigy on September 22, 2006. I am

15  familiar with the projects that Mayder worked on during this period by reason of my regular

16  reviews of the progress of each of these projects.

17     3.    Verigy is a corporation duly organized and existing under the laws of the state of

18  Delaware with its principal place of business in Cupertino, California. Verigy designs, develops,

19  manufactures and sells advanced test systems and solutions for the semiconductor industry. Due

20  to the different architectures and functionalities of semiconductors, semiconductor test equipment

21  and services are generally categorized by the type of semiconductors tested. The two general

22  categories are equipment used to test memory semiconductors, referred to as memory testing, and

23  equipment used to test non-memory semiconductors, which includes testers for testing less

24  complex, discrete semiconductors, and testers designed to test very complex, highly integrated

25  semiconductors commonly referred to as System-on-a-Chip, or SOC, or System-in-a-Package, or

26  SIP, testing.

27     4.    Verigy offers a single platform for each of the two general categories of devices

28  being tested: Verigy's 93000 Series platform, designed to test System-on-a-Chip (SOC), System-

1    in-a-Package (SIP) and high-speed memory devices, and Verigy's Versatest V5000 Series

2    platform, designed to test memory devices, including flash memory and multi-chip memory

3    packages. As part of our single scalable platform strategy, we develop and offer performance and

4    capability enhancements to our platforms as part of our product development roadmap. We also

5    provide a range of services that assist our customers in quickly and cost effectively delivering the

6    innovative, feature-rich products demanded by their end users.

7        5.      Verigy's V5000 Series memory test systems are made up of the following major

8    components: A System Bay, which contains the Liquid Cooling Unit, System Power Supplies,

9    Power Distribution Unit, System Controller, and Subsystem Interface Controller; a Testhead,

10   which contains four quadrants, each containing frontplane and backplane boards, a clock module,

11   two quadrant power supply modules, and up to nine Test Site Modules, each containing four Pin

12   Electronics boards, a Device Power Supply board, an Algorithmic Pattern Generator/Test Site

13   Controller board, and a Pin Electronics Front Plane Interface (PEFPIF) board; a Wafer Sort or

14   Final Test Interface; an optional Matrix for fanning out signals to or receiving signals from

15   multiple devices per tester pin; a Manipulator for positioning the Testhead to interface with a

16   Wafer Prober or packaged part Handler. Probe Cards are connected to the Wafer Sort Interface

17   for contacting wafers. A Device Specific Interface is connected to the Final Test Interface or

18   optional Matrix for contacting packaged parts. An AC Calibration Fixture containing up to 36 AC

19   Calibration boards is connected to the Wafer Sort Interface, Final Test Interface, or optional

20   Matrix, for performing timing calibration on the system. Attached hereto as Exhibit A is a true

21   and correct copy of a diagram showing the Verigy V5000 Series system, in both Wafer Sort and

22   Final Test configurations.

23       6.      While Mayder was assigned to my department he was responsible for several

24   research and development projects for the creation of new products to improve and advance

25   Verigy's silicon chip testing systems. During each of these projects Mayder had access to Verigy's

26   confidential information including his projects as well as other projects being developed by other

27   employees. In addition, Mayder had confidential information regarding the identity of and

28   Verigy's business relationship with third parties including Verigy's past, present, and prospective

1   component suppliers and customers. He also was advised of Verigy's confidential product

2   strategy. Disclosure of any of this confidential information would be harmful to Verigy.

3   Disclosure would benefit Verigy's competitors and potential competitors, including some

4   component suppliers.

5      7.     Agilent, until the sale of its intellectual property to Verigy, and Verigy, since the

6   purchase of the intellectual property, have always taken steps to protect to maintain the

7   confidentiality of confidential and proprietary information, including the following: all Verigy

8   employees, consultants and contractors, are required to sign an Agreement Regarding Confidential

9   Information and Proprietary Developments; customers, vendors and suppliers are required to sign

10  a non-disclosure agreement; access to all of Verigy's offices is restricted and all employees must

11  have a keycard to proceed past the public lobby in Verigy's buildings; all visitors to all of

12  Verigy's offices must sign a log and be escorted by a Verigy employee while on the premises;

13  technical documents such as project data sheets and customer requirements are protected on the

14  computer system and only authorized users can access them; and confidential documents sent to

15  third parties are customarily marked "confidential." In addition, the existence and importance of

16  Verigy trade secrets is addressed and emphasized with new employees in connection with their

17  joining Verigy and again at exit interviews.

18      8.     Mayder was working on the ▮▮▮ project in 2006. The purpose of the ▮▮▮

19  Project was to develop technology that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ when connected to a Verigy V5000 Series memory test

22  system, would substantially increase the parallelism (number of devices that can be

23  simultaneously tested) of the system. During the ▮▮▮ project, Mayder learned of Verigy's

24  confidential business plans and strategy regarding ▮▮▮▮▮, potential manufacturers

25  and suppliers, materials and implementation, and customer requirements.

26      9.     Mayder was the Technical RFQ Lead and the MTS ("Memory Test Systems")

27  Hardware Design Engineer for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮")

28  project, which was part of the ▮▮▮ project. The ▮▮▮ project was also confidential and

DECLARATION OF IRA LEVENTHAL

1   proprietary Verigy information.  As part of his work on this project, Mayder wrote a document

2   entitled "█████████████████."  A true and correct copy of this document is attached hereto

3   as Exhibit B.  This project involved a ███████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████

7   ██████████████████████.

8       10.  █████████████████████████████████████████

9   ██████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████

12  ███████████████████████████████████████████████

13  ██████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ██████████████████████████████

16      11.  ███████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19      12.  ████████████████████████████████████████████

20  ██████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████

25  ██████████████████████████████████████████████████████

26  █████████████████████████████████████████████████

27  ████████████████████████████████████████████████

28  ███████████████████████████████████████████████████

DECLARATION OF IRA LEVENTHAL

1  ████████████████████████████████████████████████████████

2  ████████████

3      13.    The decision regarding the choice of materials for a device such as the ████████

4  is generally based on device performance, cost, and supply chain issues. ██████████████

5  ████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████

8  ██████████████████████████

9      14.    ██████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ██████ are all confidential and proprietary decisions that are valuable because they are kept

17  confidential.

18      15.    ████████████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  ██████████████████████████████████████████████

21      16.    Current work in this area by Verigy includes ██████████████████████

22  ████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ██████████████████████████████████████████████

27  ██████████████████████████████████████████

28

1
2
3
4
5
6

7    18.   Mayder also worked on an

8
9
10
11
12
13
14
15
16

17    19.

18
19

20    20.

21
22
23

24    21.   I have reviewed Mayder's company website at www.silicontests.com . Mayder's

25    Enhancer™ family of products, as described by the website,

26
27
28

1    22.    ██████████████████████ involved numerous Verigy trade secrets and

2  confidential information. This includes but is not limited to know-how, research, techniques, and

3  information relating to: ██████████████████████████

4  ████████████████████████████████████████████

5  █████████████████████████████████████████

6  ██████████████████████████████████████████████

7  █████████ forecasted business demand; actual product consumption; business

8  processes and tools; product technology roadmaps; product features and performance; product

9  architecture; product development schedules; qualification processes and results; contract

10  manufacturer agreements and business relationship; and manufacturing strategy.

11    23.    Verigy shares confidential and proprietary information concerning products and

12  potential products with some customers under non-disclosure agreements.  In return, some of these

13  customers share their confidential and proprietary information regarding their products with

14  Verigy.  Some of the customers with whom Verigy has shared and received confidential

15  information include ████████████████████████

16  ████████████████████████████████████████

17  ████████████████.

18    24.    The ██████ project is confidential and highly proprietary and release of information

19  relating to the ██████ project or other Verigy trade secret information would cause damage to

20  Verigy.  Release of this information to competitors could cause our customers to buy competitive

21  products instead of Verigy's testing equipment.  Release of this information to customers would

22  damage our customer relationships ████████████████████████

23  █████████████████████████████████████████

24  ████████████████████████████████████████

25  █████████████████████████████████████████

26  █████████████████████████████████████████

27  ████████████████████.

28

1   25.

2

3

4

5

6   26.                              **REDACTED**

7

8

9

10

11   I declare under penalty of perjury under the laws of the United States that the foregoing is

12   true and correct.

13   Executed this 21st day of August, 2007 in Cupertino, California.

14

15                              _Ira Leventhal_
                                Ira Leventhal

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBITS FILED
# UNDER SEAL

# EXHIBIT B

# EXHIBITS FILED
# UNDER SEAL

# EXHIBIT C

# EXHIBITS FILED
# UNDER SEAL