# EXHIBIT B

OPERATING AGREEMENT
FOR
# Silicon Test Solutions  LLC
A CALIFORNIA LIMITED LIABILITY COMPANY

This Operating Agreement (this "Agreement"), is made as of October 11, 2006, by and among the parties listed on the signature pages hereof (collectively referred to as the "Members" or individually as a "Member"), with reference to the following facts:

A.      The Members will cause to be filed Articles of Organization (the "Articles") for Silicon Test Solutions LLC (the "Company"), a limited liability company under the laws of the State of California, with the California Secretary of State.

B.      The Members desire to adopt and approve an operating agreement for the Company under the Beverly-Killea Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members by this Agreement set forth the operating agreement for the Company upon the terms and subject to the conditions of this Agreement.

## ARTICLE I
## ORGANIZATIONAL MATTERS

1.1     <u>Name</u>.  The name of the Company shall be "Silicon Test Solutions LLC."  The Company may conduct business under that name or any other name approved by the Members.

1.2     <u>Term</u>.  The term of the Company commenced as of the date of the filing of the Articles and, shall continue until terminated by the by the provisions of this agreement or as provided by law.

1.3     <u>Office and Agent</u>.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the Company shall be at <u>1331 Sierra Avenue, San Jose, Ca 95126</u> or such location as the Members may determine.  The registered agent shall be as stated in the Articles or as otherwise determined by the Members.

1.4     <u>Business of the Company</u>.  Notwithstanding the purpose of the Company which is described in the Articles, the Company shall not engage in any business other than the following without the consent of all of the Members:

(a)     the business of <u>Semiconductor Device Testing</u> and

(b)     such other activities directly related to the foregoing business as may be necessary or advisable in the reasonable opinion of the Members to further such business.

## ARTICLE II
## CAPITAL CONTRIBUTIONS

2.1     <u>Capital Contributions</u>.  Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit A attached hereto.  No Member shall be required to make any additional contributions to the capital of the Company.  Additional contributions to the capital of the Company shall be made only with the unanimous consent of the Members.  Except as provided in this Agreement, no Member may withdraw his or her capital contribution.

2.2     <u>Capital Accounts</u>.  The Company shall establish an individual capital account ("Capital Account") for each Member.  The Company shall determine and maintain each Capital Account in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).  Upon a valid transfer of a Member's interest in the Company

("Membership Interest") in accordance with Article VI, such Member's Capital Account shall carry over to the new owner.

   2.3  <u>No Interest</u>.  The Company shall not pay any interest on capital contributions.

## ARTICLE III
## MEMBERS

   3.1  <u>Admission of Additional Members</u>.  Additional Members may be admitted with the approval of all Members.  Additional Members will participate in the management, "Net Profits", "Net Losses" (as such terms are defined in Section 5.1), and distributions of the Company on such terms as are determined by the Members.  Exhibit A shall be amended upon the admission of an additional Member to set forth such Member's name and capital contribution.

   3.2  <u>Withdrawals or Resignations</u>.  Any Member who is under an obligation to render services to the Company may withdraw or resign as a Member at any time upon 30 days prior written notice to the Company, without prejudice to the rights, if any, of the Company or the other Members under any contract to which the withdrawing Member is a party.  In the event of such withdrawal, such Member's Membership Interest shall be terminated, such Member shall thereafter only have the rights of a transferee as described in Section 6.3 and such Membership Interest shall be subject to purchase and sale as provided in Section 7.2.  No other Member may withdraw, retire or resign from the Company.

   3.3  <u>Payments to Members</u>.  Except as specified in this Agreement or pursuant to a transaction permitted by Section 4.6, no Member or person or entity controlled by, controlling or under common control with the Member (each such person or entity is defined as an "Affiliate"), is entitled to remuneration for services rendered or goods provided to the Company.  However, the Company shall reimburse the Members and their Affiliates for organizational expenses (including, without limitation, legal and accounting fees and costs) incurred to form the Company, prepare the Articles and this Agreement and, as approved by the Members, for the actual cost of goods and materials used by the Company.

## ARTICLE IV
## MANAGEMENT AND CONTROL OF THE COMPANY

   4.1  <u>Management and Powers</u>.  In entering into this Agreement, the intent of each Member is to actively engage in the management of the Company.  Accordingly, unless otherwise limited by the Articles or this Agreement, each Member shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs.

   4.2  <u>Limitations on Power of Members</u>.  Notwithstanding any other provisions of this Agreement, no debt or liability of more than $2,500.00 may be contracted on behalf of the Company without the approval of the Members and the signature of <u>2</u> Members is required to sign contracts and obligations on behalf of the Company.  Additionally, no Member shall have authority to cause the Company to engage in the following transactions without first obtaining the approval of Members holding a majority of the Membership Interests:

   (i)  The sale, exchange or other disposition of all, or substantially all, of the Company's assets occurring as part of a single transaction or plan, or in multiple transactions over a <u>12</u> month period, except in the orderly liquidation and winding up of the business of the Company upon its duly authorized dissolution.

   (ii)  The merger of the Company with another limited liability company or corporation, general partnership, limited partnership or other entity (except that any act which would cause a Member to incur personal liability for the obligations of the Company or its successor shall also require the consent of such Member).

(iii)　　An alteration of the authorized businesses of the Company as set forth in Section 1.4.

(iv)　　Any act which would make it impossible to carry on the ordinary business of the Company.

(v)　　The confession of a judgment against the Company.

(vi)　　Any other transaction described in this Agreement as requiring the approval, consent or vote of the Members.

4.2　　The Company shall open a checking account in which two signatures shall be required for each check written. The two signatures shall be Romi Mayder and Robert Pochowski.

4.3　　Member Approval.  No annual or regular meetings of the Members are required to be held. However, if such meetings are held, such meetings shall be noticed, held and conducted pursuant to the Act.  In any instance in which the approval of the Members is required under this Agreement, such approval may be obtained in any manner permitted by the Act.  Unless otherwise provided in this Agreement, approval of the Members shall mean the approval of Members who hold a majority of the Membership Interests.

4.4　　Devotion of Time.  Each Member shall devote whatever time or effort as he or she deems appropriate for the furtherance of the Company's business.

4.5　　Competing Activities.  The Members and their Affiliates may engage or invest in any activity, including without limitation those that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other activities or to the income or proceeds derived therefrom.  No Member shall be obligated to present any investment opportunity to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company.  Each Member shall have the right to hold any investment opportunity for his or her own account or to recommend such opportunity to persons other than the Company.  The Members acknowledge that certain Members and their Affiliates own and/or manage other businesses, including businesses that may compete with the Company and for the Members' time.  Each Member hereby waives any and all rights and claims which he or she may otherwise have against the other Members and their Affiliates as a result of any of such activities.

4.6　　Transactions between the Company and the Members.  Notwithstanding that it may constitute a conflict of interest, the Members and their Affiliates may engage in any transaction with the Company so long as such transaction is not expressly prohibited by this Agreement and so long as the terms and conditions of such transaction, on an overall basis, are fair and reasonable to the Company and are at least as favorable to the Company as those that are generally available from persons capable of similarly performing them or if Members holding a majority of the Membership Interests held by the Members having no interest in such transaction (other than their interests as Members) approve the transaction in writing.

4.7　　Specific Duties. Until further notice, Romi Mayder shall act Chief Executive Officer. Robert Pchowski  shall act as Vice President. Wesley Mayder is an Investor only and shall not have management responsibilities.

## ARTICLE V
### ALLOCATIONS OF NET PROFITS AND NET LOSSES AND DISTRIBUTIONS

5.1　　Definitions.　　When used in this Agreement, the following terms shall have the meanings set forth below:

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, the provisions of succeeding law, and to the extent applicable, the Treasury Regulations.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the

Company in the aggregate or separately stated, as appropriate, determined in accordance with the method of accounting at the close of each fiscal year employed on the Company's information tax return filed for federal income tax purposes.

"Treasury Regulations" shall mean the final or temporary regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code, and any successor regulations.

5.2     Allocations of Net Profit and Net Loss.

A.     Net Profits & Loss. Net Profits & Losses shall be allocated to the Members for Company Book and tax purposes in proportion to their Membership Interest.

5.3     Distribution of Assets by the Company. Subject to applicable law and any limitations contained elsewhere in this Agreement, Members holding a majority of the Membership Interests may elect from time to time to cause the Company to make distributions. Distributions shall be first to the Members in proportion to their unreturned capital contributions until each Member has recovered his or her capital contributions, and then to the Members in proportion to their Membership Interests.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

6.1     Transfer and Assignment of Interests. No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest (collectively, "transfer") except with the prior approval of all Members, which approval may be given or withheld in the sole discretion of the Members.

6.2     Substitution of Members. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) consent of the Members is given in accordance with Section 6.1, (ii) such person executes an instrument satisfactory to the Members accepting and adopting the terms and provisions of this Agreement, and (iii) such person pays any reasonable expenses in connection with his or her admission as a new Member. The admission of a substitute Member shall not release the Member who assigned the Membership Interest from any liability that such Member may have to the Company.

6.3     Transfers in Violation of this Agreement and Transfers of Partial Membership Interests. Upon a transfer in violation of this Article VI, the transferee shall have no right to vote or participate in the management of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor would otherwise be entitled. Notwithstanding the immediately preceding sentences, if, in the determination of the remaining Members, a transfer in violation of this Article VI would cause the termination of the Company under the Code, in the sole discretion of the remaining Members, the transfer shall be null and void.

## ARTICLE VII
## CONSEQUENCES OF DISSOLUTION EVENTS AND
## TERMINATION OF MEMBERSHIP INTEREST

7.1     Dissolution Event. Upon the occurrence of the death, withdrawal, resignation, retirement, insanity, bankruptcy or dissolution of any Member ("Dissolution Event"), the Company shall dissolve unless all of the remaining Members ("Remaining Members") consent within ninety (90) days of the Dissolution Event to the continuation of the business of the Company. If the Remaining Members so consent, the Company and/or the Remaining Members shall [have the right to] purchase, and [if such right is exercised,] the Member (or his or her legal representative) whose actions or conduct resulted in the Dissolution Event ("Former Member") shall sell, the Former Member's Membership Interest ("Former Member's Interest") as provided in this Article VII.

7.2     Withdrawal. Notwithstanding Section 7.1, upon the withdrawal by a Member in accordance with

Section 3.2 such Member shall be treated as a Former Member, and, unless the Company dissolves as a result of such withdrawal, the Company and/or the Remaining Members shall [have the right to] purchase, and [if such right is exercised,] the Former Member shall sell, the Former Member's Interest as provided in this Article VII.

       7.3      <u>Purchase Price</u>.  The purchase price for the Former Member's Interest shall be the fair market value of the Former Member's Interest as determined by an independent appraiser jointly selected by the Former Member and by Remaining Members holding a majority of the remaining Membership Interests.  The Company and the Former Member shall each pay one-half of the cost of the appraisal.  Notwithstanding the foregoing, if the Dissolution Event results from a breach of this Agreement by the Former Member, the purchase price shall be reduced by an amount equal to the damages suffered by the Company or the Remaining Members as a result of such breach.

       7.4      <u>Notice of Intent to Purchase</u>.  Within thirty (30) days after the fair market value of the Former Member's Interest has been determined in accordance with Section 7.3, each Remaining Member shall notify the Members in writing of his or her desire to purchase a portion of the Former Member's Interest.  The failure of any Remaining Member to submit a notice within the applicable period shall constitute an election on the part of the Member not to purchase any of the Former Member's Interest.  Each Remaining Member so electing to purchase shall be entitled to purchase a portion of the Former Member's Interest in the same proportion that the Membership Interest of the Remaining Member bears to the aggregate of the Membership Interests of all of the Remaining Members electing to purchase the Former Member's Interest.

       7.5      <u>Election to Purchase Less Than All of the Former Member's Interest</u>.  If any Remaining Member elects to purchase none or less than all of his or her pro rata share of the Former Member's Interest, then the Remaining Members can elect to purchase more than their pro rata share.  If the Remaining Members fail to purchase the entire interest of the Former Member, the Company [may] [shall] purchase any remaining share of the Former Member's Interest.  [Any purchase of a Former Member's Interest must be the entire interest.]

       7.6      <u>Payment of Purchase Price</u>.  The Company or the Remaining Members, as the case may be, shall pay at the closing one-fifth (1/5) of the purchase price and the balance of the purchase price shall be paid in four equal annual principal installments, plus accrued interest, and be payable each year on the anniversary date of the closing.  The unpaid principal balance shall accrue interest at 10% per annum, but the Company and the Remaining Members shall have the right to prepay in full or in part at any time without penalty.  The obligation of each purchasing Remaining Member, and the Company, as applicable, to pay its portion of the balance due shall be evidenced by a separate promissory note executed by the respective purchasing Remaining Member or the Company, as applicable.  Each such promissory note shall be in an original principal amount equal to the portion owed by the respective purchasing Remaining Member or the Company, as applicable.  The promissory note executed by each purchasing Remaining Member shall be secured by a pledge of that portion of the Former Member's Interest purchased by such Remaining Member.

       7.7      <u>Closing of Purchase of Former Member's Interest</u>.  The closing for the sale of a Former Member's Interest pursuant to this Article VII shall be held at 10:00 a.m. at the principal office of Company no later than sixty (60) days after the determination of the purchase price, except that if the closing date falls on a Saturday, Sunday, or California legal holiday, then the closing shall be held on the next succeeding business day.  At the closing, the Former Member shall deliver to the Company or the Remaining Members an instrument of transfer (containing warranties of title and no encumbrances) conveying the Former Member's Interest.  The Former Member, the Company and the Remaining Members shall do all things and execute and deliver all papers as may be reasonably necessary fully to consummate such sale and purchase in accordance with the terms and provisions of this Agreement.

**ARTICLE VIII**
**ACCOUNTING, RECORDS, REPORTING BY MEMBERS**

       8.1      <u>Books and Records</u>.  The books and records of the Company shall be kept in accordance with the accounting methods followed for federal income tax purposes.  The Company shall maintain at its principal office in California all of the following:

       A.      A current list of the full name and last known business or residence address of each

Member set forth in alphabetical order, together with the capital contributions, capital account and Membership Interest of each Member;

    B. A copy of the Articles and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto have been executed;

    C. Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

    D. A copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

    E. Copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

    F. The Company's books and records as they relate to the internal affairs of the Company for at least the current and past four (4) fiscal years.

  8.2 <u>Reports</u>.  The Company shall cause to be filed, in accordance with the Act, all reports and documents required to be filed with any governmental agency.  The Company shall cause to be prepared at least annually information concerning the Company's operations necessary for the completion of the Members' federal and state income tax returns. The Company shall send or cause to be sent to each Member within ninety (90) days after the end of each taxable year (i) such information as is necessary to complete the Members' federal and state income tax or information returns and (ii) a copy of the Company's federal, state, and local income tax or information returns for the year.

  8.3 <u>Bank Accounts</u>. The Members shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other person.  Any Member, acting alone, is authorized to endorse checks, drafts, and other evidences of indebtedness made payable to the order of the Company, but only for the purpose of deposit into the Company's accounts.

  8.4 <u>Tax Matters for the Company</u>.  <u>Romi Mayder</u> is designated as "Tax Matters Partner" (as defined in Code Section 6231), to represent the Company (at the Company's expense) in connection with all examination of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

**ARTICLE IX**<br>**DISSOLUTION AND WINDING UP**

  9.1 <u>Conditions of Dissolution</u>.  The Company shall dissolve upon the occurrence of any of the following events:

    A. Upon the happening of any event of dissolution specified in the Articles;

    B. Upon the entry of a decree of judicial dissolution pursuant to Section 17351 of the Corporations Code;

    C. Upon the vote of Members holding at least <u>51</u> percent (__%) of the Membership Interests;

    D. The occurrence of a Dissolution Event and the failure of the Remaining Members to consent in accordance with Section 7.1 to continue the business of the Company within ninety (90) days after the occurrence of such event; or

    E. The sale of all or substantially all of the assets of Company.

        9.2        Winding Up.  Upon the dissolution of the Company, the Company's assets shall be disposed of and its affairs wound up.  The Company shall give written notice of the commencement of the dissolution to all of its known creditors.

        9.3        Order of Payment of Liabilities Upon Dissolution.  After determining that all the known debts and liabilities of the Company have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with their positive capital account balances, after taking into account income and loss allocations for the Company's taxable year during which liquidation occurs.

        9.4        Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall be entitled to look only to the assets of the Company for the return of his or her positive Capital Account balance and shall have no recourse for his or her Capital Contribution and/or share of Net Profits against any other Member except as provided in Article X.

        9.5        Certificates.  The Company shall file with the California Secretary of State a Certificate of Dissolution upon the dissolution of the Company and a Certificate of Cancellation upon the completion of the winding up of the Company's affairs.

## ARTICLE X
## INDEMNIFICATION

        10.1        Indemnification of Agents.  The Company shall indemnify any Member and may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding by reason of the fact that he or she is or was a Member, officer, employee or other agent of the Company or that, being or having been such a Member, officer, employee or agent, he or she is or was serving at the request of the Company as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such persons being referred to hereinafter as an "agent"), to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may hereafter from time to time permit.

## ARTICLE XI
## MISCELLANEOUS

        11.1        Counsel to the Company.  Counsel to the Company may also be counsel to any Member or any Affiliate of a Member.  The Members may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the California Rules of Professional Conduct or similar rules in any other jurisdiction ("Rules").  The Company has initially selected Daniel E. Hanley ("Company Counsel") as legal counsel to the Company. Each Member acknowledges that Company Counsel does not represent any Member in the absence of a clear and explicit agreement to such effect between the Member and Company Counsel, and that in the absence of any such written agreement Company Counsel shall owe no duties directly to a Member.  Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the Company, then each Member agrees that Company Counsel may represent either the Company or such Member in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

        11.2        Complete Agreement.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements among the Members.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

        11.3        Binding Effect.  Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective successors and assigns.

        11.4        Interpretation.  All pronouns shall be deemed to refer to the masculine, feminine, or neuter,

singular or plural, as the context in which they are used may require. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated. In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or his or her counsel.

11.5 Jurisdiction. Each Member hereby consents to the exclusive jurisdiction of the state and federal courts sitting in California in any action on a claim arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement. Each Member further agrees that personal jurisdiction over him or her may be effected by service of process by registered or certified mail addressed as provided in Section 12.8 of this Agreement, and that when so made shall be as if served upon him or her personally within the State of California.

11.6 Arbitration. Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in San Jose, California. The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration. Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator. The provisions of Sections 1282.6, 1283, and 1283.05 of the California Code of Civil Procedure apply to the arbitration. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, or not available in a court of law.

11.7 Severability. If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

11.8 Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit A hereto. Any party may, at any time by giving five (5) days' prior written notice to the other Members, designate any other address in substitution of the foregoing address to which such notice will be given.

11.9 Amendments. All amendments to this Agreement will be in writing and signed by all of the Members.

11.10 Multiple Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

11.11 Attorney Fees. In the event that any dispute between the Company and the Members or among the Members should result in litigation or arbitration, the prevailing party in such dispute shall be entitled to recover from the other party all reasonable fees, costs and expenses of enforcing any right of the prevailing party, including without limitation, reasonable attorneys' fees and expenses, all of which shall be deemed to have accrued upon the commencement of such action and shall be paid whether or not such action is prosecuted to judgment. Any judgment or order entered in such action shall contain a specific provision providing for the recovery of attorney fees and costs incurred in enforcing such judgment and an award of prejudgment interest from the date of the breach at the maximum rate allowed by law. For the purposes of this Section: (a) attorney fees shall include, without limitation, fees incurred in the following: (1) postjudgment motions; (2) contempt proceedings; (3) garnishment, levy, and debtor and third party examinations; (4) discovery; and (5) bankruptcy litigation and (b) prevailing party shall mean the party who is determined in the proceeding to have prevailed or who prevails by dismissal, default or otherwise.

11.12 Remedies Cumulative. The remedies under this Agreement are cumulative and shall not exclude any other remedies to which any person may be lawfully entitled.

IN WITNESS WHEREOF, all of the Members of Silicon Test Solutions LLC, A California Limited Liability Company, have executed this Agreement, effective as of the date written above.

MEMBER: Romi Mayder

_____

MEMBER: Robert Pochowski

_____

MEMBER: Wesley Mayder

_____

## EXHIBIT A

### CAPITAL CONTRIBUTION AND ADDRESSES OF MEMBERS
### AS OF

### Silicon Test Solutions, LLC

| Member's Name | Member's Address | Member's Capital Contribution | Member's Membership Interest |
|---|---|---|---|
| **Romi Mayder** | 1331 Sierra Avenue<br>San Jose, CA 95126 | 200,000 | **51%** |
| **Robert Pochowski** | 817 Logan Court<br>Sunnyvale, CA 94087 | 150,000 | **29%** |
| **Wesley Mayder** | 19171 Oahu Lane<br>Saratoga, CA 95070 | 250,000 | **20%** |

### CONSENT OF SPOUSE

The undersigned spouse(s) of the party (Members) to the foregoing Agreement acknowledge(s) on his or her own behalf that: I have read the foregoing Agreement and I know its contents. I am aware that by its provision my spouse grants the Company and/or the other Members an option to purchase all of his or her Membership Interest, including my community interest (if any) in it. I hereby consent to the sale, approve of the provisions of the Agreement, and agree that such Membership Interest and my interest in it are subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement on such Membership Interest or my interest in it.