# EXHIBIT 1

AO88  (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

Northern    DISTRICT OF California

Verigy US, Inc., a Delaware Corporation

## SUBPOENA IN A CIVIL CASE

V.

Romi Omar Mayder, an individual; Wesley
Mayder, an individual; Silicon Test
Systems, Inc., a California Corporation;
Silicon Test Solutions, LLP

Case Number:[1]  C07-04330

TO:  Mount & Stoelker PC, River Park Tower, Suite 1650, 333 W. San Carlos, San
Jose, California 95110 Ph: 408.279.7000

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE | DATE AND TIME |
|---|---|
| Bergeson, LLP, 303 Almaden Blvd., Suite 500, San Jose, CA 95110 | August 29, 2008 9:00 a.m. |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _[signature]_    Attorneys for Plaintiff | August 5, 2008 |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER

Colin G. McCarthy, Esq., Bergeson, LLP, 303 Almaden Blvd., Suite 500, San
Jose, CA 95110 Ph: 408-291-6200

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

AO88 (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|

| SERVED | | |
|---|---|---|
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**ATTACHMENT A**

**DEFINITIONS**

1.     "DOCUMENT" is intended to be understood in its broadest sense and without limitation, refers to the original and any copies of every tangible form of recorded information, including, without limitation, all writings, drawings, graphs, charts, photographs, phone records, video or audiotapes, websites, webpages, and any other data compilations from which information can be obtained, either directly or with the aid of a machine or device, whether printed, recorded, reproduced by any process, or written or prepared by hand, including the following: correspondence, letters, e-mails, memoranda, telexes, reports, COMMUNICATIONS, agreements, contracts, diaries, calendars, minutes or records of conferences, reports or summaries of interviews, reports or other records of investigations, opinions or reports of consultants, surveys, reports or other records (including recordings) of oral conversations, computer printouts and computer databases, PowerPoint presentations, manuals, advertisements, circulars, trade letters, press releases, drafts and revisions of any documents, original or preliminary notes, workpapers, ledgers, bills, invoices, shipping documents, receipts, orders, books, records and files.

2.     "DOCUMENT" or "DOCUMENTS" includes data stored on network back-up storage devices and/or tapes and/or ELECTRONIC STORAGE DEVICES.

3.     "COMMUNICATION(S)" means any oral or written utterance, notation, or statement of any nature whatsoever, specifically including, but not limited to letters, e-mails, personal or telephonic conversations, discussion, interviews, or consultations; any type of telegraphic, telecommunicated, or telecopied message; any type of electronically received, transmitted, or stored message, note, letter, memorandum, or correspondence; and any writing that evidences or reflects such communication, whether internal or to or from third parties or affiliates.

4.      "PERSON," as well as pronouns referring thereto, includes not only natural persons, but also corporations, companies, limited liability companies, firms, partnerships, associations, joint ventures, and any other entity or units thereof.

5.      "IDENTIFY" or "IDENTIFIED" means, (a) when used with respect to a PERSON, that YOU are requested to state the PERSON's full name, present or last known residence and/or business address, present or last known residence and/or business telephone numbers, present or last known employer, and present or last known position in business; and, (b) when used with respect to  DOCUMENT(S), that YOU are requested to state the type (e-mail, letter, fax, etc.), title, date, author(s) and recipient(s) of the DOCUMENT(S).

6.      "RELATING TO" or "RELATED TO" a given subject matter means concerning, comprising, constituting, reflecting, relating to, referring to, stating, describing, recording, pertaining to, evidencing, noting, embodying, containing, mentioning, studying, analyzing, discussing, and evaluating.

7.      "THIS LAWSUIT" means the legal action entitled Verigy US, Inc., vs. Romi Omar Mayder, et al., United States District Court, Northern District of California, San Jose Division, Action No. C07-04330 RMW (HRL).

8.      "PLAINTIFF" or "VERIGY" means and refers to the plaintiff Verigy US, Inc.  VERIGY also means and refers to VERIGY's predecessor in interest, Agilent Corporation.

9.      "DEFENDANTS" means and refers to each defendant named herein, including Romi Omar Mayder, Wesley Mayder, Silicon Test Systems, Inc., and Silicon Test Solutions, LLC, and, where applicable, their officers, directors, managers, employees, agents or attorneys.

10.      "ROMI MAYDER" means and refers to defendant Romi Omar Mayder.

11.      "WES MAYDER" means and refers to defendant Wesley Mayder.

12.      "STS" means and refers to defendant Silicon Test Systems, Inc., and/or defendant Silicon Test Systems, LLC and/or Silicon Test Solutions, Inc.

13.    "TRO" means and refers to the Order Granting Plaintiff Verigy US, Inc.'s Application for Temporary Restraining Order and Order Authorizing Expedited Discovery; Order to Show Cause Re: Preliminary Injunction, dated August 24, 2007, issued by the Hon. Ronald M. Whyte, United States District Court, Northern District of California.

14.    "PRELIMINARY INJUNCTION" means and refers to the Order Granting in Part Plaintiff's Motion for a Preliminary Injunction, etc., dated February 29, 2008, issued by the Hon. Ronald M. Whyte, United States District Court, Northern District of California.

15.    "CONTEMPT ORDER" means and includes the Order Granting Plaintiff's Motion to Find DEFENDANTS in Contempt of Court for Violating the TRO, dated May 20, 2008, issued by the Hon. Ronald M. Whyte, United States District Court, Northern District of California.

16.    "ELECTRONIC STORAGE DEVICES" includes, without limitation, personal computers, compact discs, DVD discs, USB flash drives, Personal Digital Assistants ("PDA"), cellular phones, hard drives, MP3 players, email accounts, Internet-based data storage accounts, portable email devices, external storage devices, or other electronic media.

17.    "MOUNT & STOELKER," "YOU," or "YOUR" means and refers to Mount & Stoelker, P.C., and, where applicable, its officers, directors, managers, employees, agents or attorneys.

## INSTRUCTIONS

1.    When producing the DOCUMENTS, designate which DOCUMENTS are being produced in response to each of the following requests, and if a request contains sub-categories, designate which DOCUMENTS are being produced in response to each sub-category.

2.    If YOU withhold under claim of privilege DOCUMENTS which are responsive to this DOCUMENT request, please provide the following information as to each withheld DOCUMENT:

(a)     The subject of the DOCUMENT;

(b)     The title, heading, or caption of the DOCUMENT, if any;

(c)     The identifying number(s), letter(s), or combination thereof, if any, and the significance or meaning of such number(s), letter(s) or combination thereof;

(d)     The date appearing on the DOCUMENT, or if no date appears thereon, the date or approximate date on which the DOCUMENT was prepared;

(e)     The general nature or description of the DOCUMENT (*i.e.*, whether it is a letter, memorandum, minutes of a meeting, etc.) and the number of pages of which it consists;

(f)     The identity of the PERSON who signed the DOCUMENT, and, if it was not signed, the identity of each PERSON who prepared it;

(g)     The identity of each PERSON to whom the DOCUMENT was addressed or sent, and the identity of each PERSON to whom a copy thereof was sent; and

(h)     The identity of each PERSON who has custody of either the original or a copy of each such DOCUMENT.

3.     YOU are requested to produce all responsive DOCUMENTS in YOUR actual or constructive possession or under YOUR control or in the actual or constructive possession or control of YOUR attorneys, employees, or agents, which were created during, or which refer or relate, to the relevant time period of this request.

4.     A DOCUMENT shall be deemed to be in YOUR "control" if YOU have the right to secure the DOCUMENT or a copy thereof from another PERSON having possession or custody thereof.

5.     If a DOCUMENT is responsive to a request for production and is in YOUR control, but is not in YOUR possession or custody, YOU are requested to identify the PERSON with possession or custody.

6.     If ANY such DOCUMENT was at ANY time in YOUR possession, custody, or control, but is no longer in such possession, custody, or control, state whether such

4

DOCUMENT is missing, lost, destroyed, discarded, or has been transferred, voluntarily or involuntarily, to ANY other PERSON or otherwise disposed of; describe the circumstances surrounding, and authorization given, if ANY, for such disposition; and identify the PERSON or PERSONS responsible for such disposition and the PERSON or PERSONS to whom such DOCUMENT was transferred, if ANY.

7.     All DOCUMENTS shall be produced in the order and in the manner that they were or are kept in the ordinary course of business and shall be reproduced in their original file folders, binders, or other covers or containers, unless that is not possible.  ANY DOCUMENTS which must be removed from their original folders, binders, or covers or containers in order to be produced shall be identified in a manner so as to clearly specify where such DOCUMENTS originated.  Per FRCP 34(e), VERIGY requests that electronically stored information be produced in searchable Adobe Portable Document Format ("pdf") unless otherwise indicated.

8.     If a DOCUMENT cannot be produced in full, YOU are required to produce it to the extent possible, and specify what is being withheld and the reason it is being withheld.

9.     The obligation to produce the DOCUMENTS requested herein is of a continuing nature; if, at any time after compliance, YOU should acquire possession, custody, or control of any additional DOCUMENTS coming within the scope of any of the individual categories of the REQUEST, YOU are requested to furnish such DOCUMENTS to the attorneys for VERIGY.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS RELATING TO or supporting the statement by MOUNT & STOELKER to ROMI MAYDER that DEFENDANTS "could continue to act in the manner that resulted in the contempt filing," as described on page 17 of DEFENDANTS' Memorandum of Points and Authorities in Support of Motion for Summary Adjudication

and for Modification of Preliminary Injunction, Docket No. 261 filed in THIS LAWSUIT (a copy of which is hereby attached for reference) including, but not limited to, COMMUNICATIONS between YOU and DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS RELATING TO or supporting the statement by YOU to ROMI MAYDER that MOUNT & STOELKER "could really not tell me what was in the various documents that comprise the Court's TRO," as described in the Declaration of Romi Mayder, filed July 10, 2008, Docket No. 261-2 in THIS LAWSUIT ("MAYDER DECLARATION" - a copy of which is hereby attached for reference), including, but not limited to, COMMUNICATIONS between YOU and DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS RELATING TO the press release issued by DEFENDANTS referenced in paragraph 14 and Ex. 7 to the MAYDER DECLARATION, including, but not limited to, COMMUNICATIONS between YOU and DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 4:**

All DOCUMENTS RELATING TO the proposed NDA with VERIGY referenced in paragraph 15 and Exs. 8 and 9 to the MAYDER DECLARATION, including, but not limited to, COMMUNICATIONS between YOU and DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 5:**

All DOCUMENTS RELATING TO or supporting the statement by YOU to ROMI MAYDER that DEFENDANTS could "continue to develop Flash Enhancer," referenced in paragraph 17 of the MAYDER DECLARATION, including, but not limited to, COMMUNICATIONS between YOU and DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 6:**

All DOCUMENTS RELATING TO or supporting the statement by YOU to ROMI MAYDER that that "continuing work with Honeywell, Spansion, and Intel under the TRO was proper because that was the status quo that the TRO was supposed to maintain,"

Subpoena In A Civil Case – Attachment A (Mount & Stoelker)

referenced in paragraph 17 of the MAYDER DECLARATION, including, but not limited to, COMMUNICATIONS between YOU and DEFENDANTS.

**REQUEST FOR PRODUCTION NO. 7:**

All COMMUNICATIONS between YOU and DEFENDANTS relating to Dr. Blanchard, referenced in paragraph 19 of the MAYDER DECLARATION.

**REQUEST FOR PRODUCTION NO. 8:**

All COMMUNICATIONS between YOU and DEFENDANTS relating to the Contempt Motion, as referenced in paragraphs 19-24 of the MAYDER DECLARATION.

**REQUEST FOR PRODUCTION NO. 9:**

All COMMUNICATIONS between YOU and DEFENDANTS relating to the TRO, as referenced in the MAYDER DECLARATION.

**REQUEST FOR PRODUCTION NO. 10:**

All COMMUNICATIONS between YOU and DEFENDANTS relating to the Preliminary Injunction motion and briefing, as referenced in the MAYDER DECLARATION.

1  JACK RUSSO (State Bar No. 96068)
   TIM C. HALE (State Bar No. 114905)
2  JOHN KELLEY (State Bar No. 100714)
   RUSSO & HALE LLP
3  401 Florence Street
   Palo Alto, CA 94301
4  Telephone: (650) 327-9800
   Facsimile: (650) 327-3737
5  Email: jrusso@computerlaw.com
          thale@computerlaw.com
6          jkelley@computerlaw.com

7  Attorneys for Defendants and Counterclaimants
   ROMI MAYDER, SILICON TEST SYSTEMS, INC.,
8  SILICON TEST SOLUTIONS, LLC and WESLEY
   MAYDER

9
                IN THE UNITED STATES DISTRICT COURT
10
            IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
11
                          SAN JOSE DIVISION
12

13  VERIGY US, INC., a Delaware Corporation,      Case No. 5:07-cv-04330-RMW (HRL)

14              Plaintiff,                         **DEFENDANTS' NOTICE OF MOTION
                                                   AND MOTION FOR SUMMARY
15      v.                                         ADJUDICATION AND FOR
                                                   MODIFICATION OF PRELIMINARY
16  ROMI MAYDER, an individual; WESLEY            INJUNCTION; MEMORANDUM OF
    MAYDER, an individual; SILICON TEST           POINTS AND AUTHORITIES**
17  SYSTEMS, INC., a California Corporation;
    and SILICON TEST SOLUTIONS, LLC, a            Judge:   Hon. Ronald M. Whyte
18  California Limited Liability Corporation,      Date:    August 15, 2008
    inclusive,                                     Time:    9:00 a.m.
19                                                 Dept.:   6
20              Defendants.
                                                   Complaint Filed: August 22, 2007
21                                                 Trial Date: December 8, 2008 (jury trial)
                                                   (Defendants have elected to reserve their jury
22                                                 trial rights under F.R.C.P., Rule 38)

23  AND RELATED CROSSCLAIMS.

24

25

26

27

28

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    Case No. 5:07-cv-04330-RMW (HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

NOTICE OF MOTION ................................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 2

ARGUMENT ........................................................................................................... 5

I.    DEFENDANTS ARE ENTITLED TO SUMMARY
      ADJUDICATION ON PLAINTIFF'S LANHAM ACT CLAIM ............................ 7

      A.    The Standard for Summary Judgment
            Or Adjudication is Well-Settled .................................................................. 7

      B.    Verigy's Lanham Act Claim Requires "Bodily
            Appropriation," a Standard That Verigy
            Cannot Meet as a Matter of Law ................................................................ 7

      C.    The Court Should Summarily Adjudicate That
            Information Contained in Published Patents or
            Patent Applications Cannot Constitute Trade Secrets ................................ 7

II.   DEFENDANTS ARE ENTITLED TO SUMMARY ADJUDICATION
      THAT INFORMATION CONTAINED IN PUBLISHED PATENTS OR
      PATENT APPLICATIONS CANNOT CONSTITUTE TRADE SECRETS ......... 10

III.  THE PRELIMINARY INJUNCTION SHOULD BE
      MODIFIED IN LIGHT OF *EBAY v. MERCEXCHANGE* ................................... 11

      A.    *eBay* Changed the Rules for the Granting of Injunctive Relief. .................. 11

      B.    *eBay* Applies Equally in the Preliminary Injunction Context ...................... 12

IV.   THE PRELIMINARY INJUNCTION SHOULD BE MODIFIED
      BECAUSE IT PROVIDES VERIGY WITH GREATER RELIEF
      THAN VERIGY COULD OBTAIN FOLLOWING TRIAL. ................................. 15

V.    TO PROMOT PUBLIC ACCESS TO
      IMPORTANT TECHNOLOGYAND
      TO BALANCE ALL OF THE EQUITIES,
      THE PRELIMINARY INJUNCTION
      SHOULD BE MODIFIED ................................................................................. 16

CONCLUSION .........................................................................................................20

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    i                    Case No. 5:07-cv-04330-RMW (HRL)

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Am. Med. Response, Inc. v. City of Stockton*
4
    2005 U.S. Dist. LEXIS 37336 (E.D. Cal. Sept. 16, 2005)..........................15

5
*Bursese v. Paypal, Inc.,*
6
    2007 U.S. Dist. LEXIS 12785 (N.D. Cal. Feb. 12, 2007) ..........................7

7
*Christopher Phelps & Assocs. L.L.C. v. Galloway*
    462 F.3d 532 (4th Cir. 2007) ..........................14

8
*Cleary v. Newscorp,*
9
    30 F.3d 1255 (9th Cir. 1994) ..........................8

10
*Conmar Prods. Corp. v. Universal Slide Fastener Co.,*
11
    172 F.2d 150 (2d Cir. 1949) ..........................10

12
*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
13
    539 U.S. 23, 123 S.Ct. 2041 (2003)..........................8-9

14
*eBay, Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388, 126 S.Ct. 1837 (2006)..........................11, 12

15
*Fogarty v. Fantasy, Inc.*
16
    510 U.S. 517, 114 S. Ct. 1023 (1994)..........................20

17
*Finisar Corp. v. DIRECTV Group, Inc.,*
18
    2006 U.S. Dist. LEXIS 76380 (E.D. Tex. July 7, 2006)..........................14

19
*Forcier v. Microsoft Corp.,*
20
    123 F.Supp.2d 520 (N.D. Cal. 2000) ..........................10

21
*Foster v. American Machine & Foundry Co.*
    492 F.2d 1317 (2d Cir. 1974) ..........................13

22
*Hologic, Inc. v. Senorx, Inc.*
23
    2008 U.S. Dist. LEXIS 36693 (N.D. Cal., Apr. 25, 2008) ..........................13

24
*International Jensen, Inc. v. Metrosound U.S.A., Inc.*
25
    4 F.3d 819 (9th Cir. 1993) ..........................18

26
*KSR Int'l. Co. v. Teleflex, Inc.,*
    __ U.S. __, 127 S.Ct. 1727 (2007)..........................12

27
*MercExchange, L.L.C. v. eBay, Inc.,*
28
    500 F.Supp.2d 556 (E.D. Va. 2007) ..........................12

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.

ii

Case No. 5:07-cv-04330-RMW (HRL)

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*
    518 F.Supp.2d 1197 (C.D. Cal. 2007) ................................................................. 14

*MyGym L.L.C. v. Engle*
    2006 U.S. Dist. LEXIS 88375 (D. Utah Dec. 6, 2006) .......................................... 13

*Nissan Fire & Marine Ins. Co. Ltd v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ............................................................................. 7

*On-Line Technologies, Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
    386 F.3d 1133 (Fed. Cir. 2004) .......................................................................... 10

*Paice L.L.C. v. Toyota Motor Corp.*
    2006 U.S. Dist. LEXIS 61598 (E.D. Tex. Aug. 16, 2006) .................................... 13

*Reno Air Racing Ass'n v. McCord*
    452 F.3d 1126 (9th Cir. 2006) ........................................................................... 14

*Shaw v. LindHeim*,
    919 F.2d 1353 (9th Cir. 1990) ............................................................................ 8

*Sonista, Inc. v. David Hsieh*,
    2005 U.S. Dist. LEXIS 31397 (N.D. Cal. Nov. 21, 2005) ..................................... 7

*Stutz Motor Car of America, Inc. v. Reebok Int'l. Ltd.*,
    909 F.Supp. 1353 (C.D. Cal. 1995) ................................................................... 10

*Tank Tech, Inc. v. Neal*,
    2007 U.S. Dist. LEXIS 53066 (D. Mo. July 23, 2007) ....................................... 10

*The Northern Cheyenne Tribe v. Norton*
    503 F.3d 836 (9th Cir. 2007) ............................................................................ 14

*Torpso Hockey Intern., Inc. v. Kor Hockey Ltd.*
    491 F.Supp.2d 871 (D. Minn. 2007) .................................................................. 13

*z4 Techs., Inc. v. Microsoft Corp.*,
    434 F.Supp.2d 437 (E.D. Tex. 2006) ................................................................. 14

**Statutes**

Cal. Civ. Code Section 3426.1(d) ......................................................................... 10

Cal. Civ. Code Section 3426.2(b) ......................................................................... 18

Cal. Bus. & Prof. Code Section 16600 .................................................................. 2

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                iii               Case No. 5:07-cv-04330-RMW (HRL)

## NOTICE OF MOTION AND MOTION

TO PLAINTIFF VERIGY US, INC. AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT DEFENDANTS HEREIN SHALL AND HEREBY DO move the Court for (a) summary adjudication as to Verigy US, Inc.'s ("Verigy") Ninth Claim for Relief, under the Lanham Act, (b) summary adjudication as to the public disclosure of certain alleged trade secrets, such that they cannot qualify as trade secrets, and (c) modification of the Preliminary Injunction. This Motion is made on the grounds that (a) under no reasonably plausible set of facts can Verigy prove the "bodily appropriation" required for its Lanham Act claim, (b) Verigy and third parties have now made public, through publications of numerous patents and patent applications, much of Verigy's claimed trade secret information, (c) under current law, where such information is public yet its owner fails to practice the applicable invention, the public is unfairly deprived of the benefits of that public information by an injunction that prohibits its use, and (d) because the Preliminary Injunction provides Verigy with greater relief than it could obtain following trial, it should also be modified in a reasonable and equitable manner that will allow Defendants to have sufficient funds to cover their defense costs in this case; otherwise Plaintiff will have succeeded in putting Defendants out of business even before Defendants would have had a fair opportunity to present their case at trial in this action.

This Motion is supported by the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Romi Mayder, the accompanying Declaration of Dr. Richard Blanchard, the accompanying Declaration of Jack Russo, such other matters that are on file with the Court, and such matters as will be presented at the hearing on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiff Verigy's Ninth Claim for Relief is a "reverse passing off" claim under the Lanham Act that cannot be proven as a matter of law. The test for reverse passing off is a rigorous one, and the Ninth Circuit requires that the plaintiff prove "bodily appropriation" by the defendant. Here, it is undisputed that Defendants did not bodily appropriate a product of Verigy's, remove Verigy's name, and slap their own name on it. Indeed, the claim itself is based upon so-called

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    1                    Case No. 5:07-cv-04330-RMW (HRL)

1   taking of the "Verigy Project," defined as internal research and development, not as a product.

2   Verigy has no product equivalent to Defendant STS's Flash Enhancer, and there is no showing of

3   "bodily appropriation" of any such product.

4          Moreover, Verigy and others have recently published substantial information regarding

5   Verigy's alleged trade secrets in the form of patents and patent applications, such that such

6   information can no longer be considered trade secret (assuming it so qualified in the first place).

7   Yet Verigy itself has no products that practice those inventions. Under the reasoning of *eBay v*

8   *MercExchange*, an injunction prohibiting the use of such public information is improper, and the

9   Preliminary Injunction should be modified in light of these publications to allow Defendants to

10  bring a product to market in exchange for a reasonable royalty payment being placed in escrow

11  pending a final determination of liability in this action. Furthermore, based upon the findings that

12  the Court made in the Preliminary Injunction itself and additional evidence, the Preliminary

13  Injunction provides Verigy with greater relief than it could obtain following trial, and it is

14  effectively being used to deny Defendants the opportunity to fully defend themselves in this case.[1]

15  Therefore, the Preliminary Injunction should be modified for this additional reason.

### STATEMENT OF FACTS

17         Defendant Romi Mayder's experience as an engineer in the semiconductor industry dates

18  back to his adolescence, when he was first employed in his father and uncle's business. With over

19  20 years' experience in the industry, during which time he earned a degree in Electrical

20  Engineering from U.C. Berkeley, Mr. Mayder had the opportunity to work at length in the

21  automated test equipment field, and to appreciate and understand the challenge of increasing the

22  throughput of automated test equipment by increasing testing parallelism. The sole product of Mr.

23  Mayder's current business, defendant Silicon Test Systems, Inc. ("STS"), offers one solution to

---

[1]   Of course, it is well-settled in California that no form of non-competition obligation can be
imposed on any of the Defendants. *See* Cal.Bus.&Prof.Code Section 16600. Yet, that is
precisely what Plaintiff has aimed to do and has accomplished through litigation that has
stopped the commercial release of a product that was never subject to and could not be subject
to any type of contractual or other non-competition obligation even had that been attempted
and paid for by the Plaintiff when Defendant Romi Mayder worked for Verigy. Under
applicable state (and federal) law, as further discussed below, such a continued injunction is
not in the public interest and is contrary to strong policies under both state and federal law.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                2                Case No. 5:07-cv-04330-RMW (HRL)

1  this throughput challenge.   Declaration of Romi Mayder ("R. Mayder Decl."), submitted herewith,

2  at ¶¶2-4.

3       In its Complaint against Mr. Mayder and STS, Verigy has asserted that Mr. Mayder and

4  STS have misappropriated Verigy's purported trade secrets to develop STS's Flash Enhancer

5  product.[2]  Complaint at ¶¶23-26, 41-49.  This is not so.  In fact, Defendants will show that a recent

6  search of additional publicly available information reveals that most if not all of Verigy's alleged

7  trade secrets are, in fact, (i) publicly available or well known in the semiconductor test industry,

8  (ii) readily ascertainable, or (iii) the type of information that would be specified by the

9  requirements of a particular customer of the semiconductor test industry.  Declaration of Dr.

10  Richard A. Blanchard [Etc.] ("Dr. Blanchard Decl."), submitted herewith, at ¶8.

11       On August 24, 2007, this Court entered a Temporary Restraining Order (the "TRO")

12  against Defendants, and issued an Order to Show Cause for a Preliminary Injunction.  Neither

13  Romi Mayder nor any of the other Defendants was shown a full, unredacted copy of this TRO; in

14  fact, crucial portions of the TRO and other referenced materials, including exhibits to the

15  declarations relied upon by the Court[3] in issuing this TRO and other referenced materials, were

16  designated "Highly Confidential –Attorneys' Eyes Only" by Verigy, and, under the terms of the

17  Protective Order entered on August 29, 2007, Defendants, including Romi Mayder, were not

18  permitted to view these critical documents.  R. Mayder Decl. at ¶¶5-10.  Thus, Romi Mayder and

19  ---

[2]    Plaintiff Verigy has also named as defendants Romi Mayder's cancelled limited liability
20   company, Silicon Test Solutions LLC, which he briefly attempted to form with Robert
   Pochowski and Defendant Wesley Mayder, his older brother.  Verigy has swept in Wesley
21   Mayder, who has no training or experience in the semiconductor industry, and whose sole
   contribution to STS, Inc. has been as a passive, minority shareholder.  Indeed, Verigy's sole
22   claim against Wesley Mayder is that he and his brother are "in business together."  Complaint
   at ¶4.  Wesley Mayder is not mentioned anywhere else in Verigy's Complaint.  Defendants
23   have previously sought several times to convince Verigy of the lack of merit of its claims
   against Wesley Mayder; because of Verigy's intransigence, Defendants have filed a Motion for
24   Summary Judgment and Motion for Rule 11 Sanctions, scheduled to be heard on August, 8,
   2008.

25  [3]    In the TRO, the Court stated that it based its decision to grant plaintiff's *ex parte* application
   for the TRO on "the Complaint, the declarations of Robert Pochowski, Ira Leventhal, Manuel
26   Cuerzoni, Ken Hanh Duc Lai, Andrew N. Lee, and Melinda M. Morton and the memorandum
   of points and authorities submitted in support of the *ex parte* application."  Temporary
27   Restraining Order ("TRO"), August 24, 200, docket no. 22 at 5:1-3.  The TRO also states that
   "Copies of the complaint and **public-redacted version** of the TRO papers were sent
28   electronically to defendants on August 22, 2007."  *Id.* at 4:19-20 [emphasis added].

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    3                    Case No. 5:07-cv-04330-RMW (HRL)

1   the other Defendants had injunctive relief entered against them without being able to view fully

2   and understand the scope of that injunction because of Verigy's overreaching confidentiality

3   assertions, creating a distinct lack of due process.[4]

4          The TRO identified certain information as Verigy's "Trade Secret Property." This

5   identification in the TRO, and the terms enjoining Defendants from it use, were however, identified

6   by reference to a series of "attached" or referenced documents that were either (a) redacted or (b)

7   designated as "Confidential," "Highly Confidential" or both. *See, e.g.* TRO at 5:17-26, which details

8   the activities Defendants are restrained and enjoined from undertaking with respect to the "Trade

9   Secret Property," but which itself is identified with reference to "Exhibit A" to the TRO. Exhibit

10  "A" is itself extensively redacted,[5] and refers to many exhibits submitted along with Verigy's *ex*

11  *parte* application, including:

        (s)    Exhibits B and C to the Leventhal Declaration submitted in support of Verigy's
12             Application for a TRO;
        (t)    Exhibits A, B, C and D to the Lai Declaration submitted in support of Verigy's
13             Application for a TRO;
14      (u)    Exhibits A and B to the Lee Declaration submitted in support of Verigy's
               Application for a TRO; and
15      (v)    Exhibits A, B, C, D, E, and F to the Pochowski Declaration submitted in support of
16             Verigy's Application for a TRO.

17  *Id.* at pp. 10:1-7. Each of these Exhibits was redacted from the versions which were served on

18  Defendants, and Romi Mayder was never served with the full, unredacted version of the TRO with

19  all of the referenced materials, nor was he allowed to view it, until he retained new counsel, Russo

20  & Hale LLP, which negotiated with Verigy's counsel for Mr. Mayder's right to view the full,

21  unredacted TRO. Declaration of Jack Russo ("Russo Decl."), submitted herewith, at ¶¶3 and 4,

22  Exhibits 2 and 3. This did not occur until June 2008, almost ten months after the entry of the

23  TRO, and several weeks after the entry of the Order finding Romi Mayder and STS, Inc. in

24  contempt of the TRO. *Id.* R. Mayder Decl. at ¶10.

25  _____

26  [4]   Verigy subsequently may have shown Romi Mayder exhibits at this deposition, but (a) this
        neither cured the harm in marking portions of the TRO and material referenced in it highly
27      confidential and (b) Verigy has failed to show that even now defendants can see *all* of the
        materials referenced by the TRO.

28  [5]   *Id.* at pp. 9-14.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    4                    Case No. 5:07-cv-04330-RMW (HRL)

1    The TRO was originally set to expire on September 7, 2007 at 5:00 p.m.  TRO at 7:9-12.

2  Then-current counsel for Defendants, however, stipulated to three extensions of the TRO.  Stip. re

3  Change to the Existing Order and Order, September 6, 2008, docket no. 31 at 2:13-17; Stip. & Order

4  re Briefing & Hr'g Schedule for Prelim. Inj., September 12, 2007, docket no. 33 at 1:21-25; Stip. and

5  Order re: Briefing & Hr'g Schedule for Prelim. Inj., October 30, 2007, docket no. 86 at 1:25-2:2.

6    With these extensions, and owing to the scheduling constraints of the Court, the Order to

7  Show Cause was not heard until mid-January, 2008 and it was February 29, 2008 before the Court

8  issued its "limited injunction…to temporarily prohibit the sale, licensing or distribution of STS's

9  Flash Enhancer product and any product based on Flash Enhancer [words omitted as

10  'Confidential']."  Preliminary Injunction Order ("PI Order"), February 29, 2008, docket no. 171, at

11  25:25-26:2. This limited Preliminary Injunction against Defendants was to have five-month

12  duration.  *Id.* at 27:14-16. *As of the time of the Preliminary Injunction's entry, however,*

13  *Defendants had already been enjoined from an even greater range of activities for a period of over*

14  *six months – from August 24, 2007 until February 29, 2008 – under the TRO.*

15    On December 3, 2007, Verigy filed a Motion for Order to Show Cause re: Contempt

16  against Romi Mayder and STS.  This Order to Show cause was granted as part of the Court's

17  ruling on the Preliminary Injunction, and it specified a particular basis upon which the contempt

18  was alleged:

19    Defendants shall show cause why they should not be held in contempt for violating the
      court's temporary restraining order dated August 24, 2007 by continuing to use and
20    disclose Verigy's Trade Secret information *by continuing to work with Intel regarding*
      *STS's Flash Enhancer solution.*

21

22  *Id.* at 28:8-11 (emphasis added).

23    Without either Romi Mayder or STS ever having been served with a full, unredacted

24  version of the TRO they were charged with violating, the motion for contempt was heard, and, on

25  May 22, 2008, the Court issued its Order Granting Plaintiff's Motion to find Defendants[6] in

---

26  [6]  Recognizing (at least indirectly) that Defendant Wesley Mayder was never properly part of this
      case,  Plaintiff did not "charge" Defendant Wesley Mayder, but subsequent "confusion" in the
27    briefing and with prior counsel representing Defendants resulted in Wesley Mayder becoming
      part of the contempt proceeding—even though he too never received or read a full unredacted
28    copy of the TRO. This problem was recently resolved through stipulations signed by all but
      only as to Defendant Wesley Mayder.  In truth, the same problem applies to all Defendants.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.

5

Case No. 5:07-cv-04330-RMW (HRL)

1    Contempt of Court for Violating the TRO.  But Verigy failed to carry its burden of proving that

2    Romi Mayder or STS had violated the terms of the TRO with respect to the alleged violation for

3    which they were ordered to show cause:

4        Although Verigy has presented evidence that defendants met with Intel following the
          issuance of the TRO, and the court could reasonably infer that the interactions described by

5        Mr. McMann occurred during November 2007, Verigy has failed to present *clear and*
          *convincing* evidence that this is the case. McMann's deposition testimony as presented does

6        not establish the time frame pertaining to his testimony and thus does not suffice to
          demonstrate that defendants were marketing Flash Enhancer to Intel after the TRO was

7        issued or that Intel received prototypes of the Flash Enhancer product after August 24, 2007.

8    Order Grant. Pl.'s Mot. to Find Defs. In Contempt of Court for Violating the TRO, May 22, 2008

9    ("Order re Contempt") at 11:3-9 (emphasis in original).  Instead, the Court found that "defendants

10   violated the order by continuing to develop Flash Enhancer during the effective period of TRO…,"

11   *id.* at 10:11-12, but the Preliminary Injunction did not prohibit further development of Flash

12   Enhancer.  *See* PI Order at 28:1-3 ("are hereby restrained and enjoined for a period of five (5)

13   months from the date of this order from directly or indirectly marketing, distributing, selling,

14   licensing, leasing, transferring or disposing of issued its "limited injunction…to temporarily

15   prohibit the sale, licensing or distribution of [words omitted as 'Confidential'].")  Therefore, even

16   though Verigy failed to carry its burden with regard to Romi Mayder's and STS's "continuing to

17   work with Intel regarding STS's Flash Enhancer solution" for which they were ordered to show

18   cause in the Preliminary Injunction, *id.* at 28:8-11, Romi Mayder and STS were held in contempt

19   for conduct that was not prohibited by the Preliminary Injunction.

20       Nonetheless, the Order re Contempt extended the term of the Preliminary Injunction by an

21   additional four months, from five months to a total of nine months.  Unless relief is granted, by the

22   time this case goes to trial in December, 2008, Romi Mayder and STS will have been enjoined

23   from selling the Flash Enhancer product for over fifteen (15) months – from August 24, 2007 until

24   November 29, 2008 – despite the Court's finding that a five-month prohibition on sales was

25   warranted, and despite the Court's further findings that "the individual items that Verigy claims

26   are trade secrets are not themselves trade secrets" and that Romi "Mayder given his skill and

27   experience could have eventually developed the Flash Enhancer without the benefit of any Verigy

28

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.              6                    Case No. 5:07-cv-04330-RMW (HRL)

1    trade secret…." PI Order at 14:7-8 and 24:20-21. More importantly, such an injunction is now

2    financially preventing Defendants from being able to fully defend themselves in this action.

3                                        **ARGUMENT**

4    **I.    DEFENDANTS ARE ENTITLED TO SUMMARY**
        **ADJUDICATION ON PLAINTIFF'S LANHAM ACT CLAIM.**
5
              Verigy's Ninth Claim for Relief is for an alleged Lanham Act violation based on
6
     Defendants having allegedly taken the "Verigy Project" and marketed and advertised it as their
7
     own. Under the law, Verigy's Ninth Claim for Relief fails.
8
9             **A.    The Standard for Summary Judgment or Adjudication is Well-Settled.**

10            The standard for when summary judgment or summary adjudication may be granted is

11   well-settled. As the Ninth Circuit has stated:

12            In order to carry its burden of production, the moving party must
              either produce evidence negating an essential element of the nonmoving
13            party's claim or defense or show that the non-moving party does not
              have enough evidence to carry its ultimate burden of persuasion at
14            trial. In order to carry its ultimate burden of persuasion on the motion,
              the moving party must persuade the court that there is no genuine issue
15            of material fact.

16   *Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).

17            Facts are material if they may affect the outcome of the case. *Sonista, Inc. v. David Hsieh*,

18   2005 U.S. Dist. LEXIS 31397, at *3 (N.D. Cal. Nov. 21, 2005). Further, when the motion is well

19   supported, the non-moving party must present specific facts that demonstrate that contradiction is

20   possible. *Bursese v. Paypal, Inc.*, 2007 U.S. Dist. LEXIS 12785, at *9 (N.D. Cal. Feb. 12, 2007).

21   That is, the responding party must set forth specific facts by affidavit or other admissible evidence

22   demonstrating that there is an issue for trial. *Id.* Here, under the facts as admitted by Verigy and

23   the law regarding when a "reverse passing off" claim may lie, Verigy's Lanham Act claim fails as

24   a matter of law.

25            **B.    Verigy's Lanham Act Claim Requires "Bodily Appropriation,"**
                    **A Standard That Verigy Cannot Meet as a Matter of Law.**
26
              Verigy's Ninth Claim for Relief is predicated on the following assertion: "Upon
27
     information and belief, defendants have falsely designated themselves as the source of origin of
28
     the Verigy Project which is incorporated, in whole or in part, within the STS Device." *See Russo*

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                7                Case No. 5:07-cv-04330-RMW (HRL)

1   Decl. at Ex. 1, ¶86 (hereinafter, the "Complaint"). According to Verigy, the "Verigy Project"

2   "involved research and development using technology to increase the parallelism of Verigy's

3   testers." Complaint at ¶14. That is, Verigy's Ninth Claim for Relief is premised upon the use of

4   some subset of Verigy information being used within products produced by Defendants. Nowhere

5   has, nor can, Verigy allege that it has created a *product* that Defendants have treated as their own

6   by removing any Verigy designation as the source of origin and replacing it with their own. Under

7   these facts, no Lanham Act claim can stand.

8        Verigy has based its Lanham Act claim on Section 43(a), dealing with false advertising, 15

9   U.S.C. §1125(a). Section 43(a) prohibits the use of false designations origin and false

10  representations in the advertising and sale of goods and services. *Cleary v. News Corp.*, 30 F.3d

11  1255, 1259 (9th Cir. 1994). Some examples of false designation of origin are known as "reverse

12  passing off" or "reverse palming off." Reverse passing off or reverse palming off occurs when a

13  *product* is mislabeled to mask the creator's contribution." *Id.* at 1260. (Emphasis added).

14       The Ninth Circuit has adopted what it has labeled a "rigorous test" for proving reverse

15  passing off under the Lanham Act: "It is not enough that the misattributed material is 'substantially

16  similar'; instead, there must be 'bodily appropriation.'" *Id.* at 1261, *citing Shaw v. Lindheim*, 919

17  F.2d 1353, 1364 (9th Cir. 1990). **Rather, under *Shaw* and its progeny, a reverse passing off claim**

18  **in the Ninth Circuit can stand under only two circumstances: "[r]everse passing off is**

19  **accomplished 'expressly' when the wrongdoer removes the name or trademark on another**

20  **party's product and sells *that product* under a name chosen by the wrongdoer."** *Id.* **"Implied"**

21  **reverse passing off occurs when the wrongdoer simply removes or otherwise obliterates the**

22  **name of the manufacturer or source and sells *the product* in an unbranded state."** *Id.*

23  **(emphasis in original).**

24       In a case directly on point, the United States Supreme Court rejected a Section 43(a)

25  Lanham Act claim for protection of ideas instead of tangible goods. In *Dastar Corp. v. Twentieth*

26  *Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041 (2003) the plaintiff was the authorized

27  distributor of a television series on videotape, the copyright on which had expired, such that the

28  works were in the public domain. A rival company, the defendant, produced a video set of the

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    8                    Case No. 5:07-cv-04330-RMW (HRL)

1    same television series by purchasing, copying and editing the original public domain version of the

2    television series. The plaintiff then sued under Section 43(a), claiming that defendant was

3    engaged in reverse passing off.

4            Writing for the Court, Justice Scalia found that no Lanham Act claim of "reverse passing

5    off" could lie for communicative ideas as opposed to tangible products. The Court found that had

6    the defendant actually purchased some of the videotapes sold by plaintiff and merely repackaged

7    them as its own, with its own label or trademark, then a "reverse passing off" claim would lie. *Id.*

8    at 2046-47. Since the defendant did not do so, however, but allegedly took the same ideas or

9    content that plaintiff was using in its own videotapes, the Court addressed the meaning of the word

10   "origin" within the Section's phrase, "false designation of origin." Specifically, the Court dealt

11   with whether "origin" meant the producer of the physical items containing the television series, in

12   which case the defendant was the origin, or whether "origin" under Section 43(a) was meant to

13   reach the creator of the underlying work that was taken or copied. *Id.* at 2047.

14           The Court concluded that "origin" could not refer to the creators of the underlying ideas or

15   expression in a communicative work, but rather "refers to the *producer of the tangible goods* that

16   are offered for sale, and not to the author of any idea, concept, or communication embodied in

17   those goods." *Id.* at 2050. The Court held that to find otherwise would be to use the Lanham Act

18   to create a species of perpetual patent and copyright protection, an improper result. *Id.*

19           Here, Verigy has brought a Section 43(a) false designation of origin claim, for reverse

20   passing off, based on "research and development" work that it alleges "comprise" the "Verigy

21   Project." It has alleged that the incorporation of that research and development into STS's product

22   constitutes "reverse passing off." But, under the Ninth Circuit's "bodily appropriation" test, and the

23   United States Supreme Court's ruling in *Dastar*, no claim for a Lanham Act violation can lie on these

24   facts and no plausible set of facts can otherwise change this: Defendants did not take some tangible

25   product of Verigy's, because Verigy has no such tangible product incorporating the "Verigy Project"

26   ever existed. Rather, as Verigy has admitted, its false advertising claim is based upon the alleged

27   taking of ideas or concepts not any implementation, not any product and certainly not any

28

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

**Defs.' Mot. Summ. Adj. & Mod.**
**Prelim. Inj. Mem. P. & A. Supp.**

9

Case No. 5:07-cv-04330-RMW (HRL)

1    mislabeling of any tangible goods.  As such, summary adjudication for Defendants on the Ninth

2    Claim for Relief should be granted.

3    **II.    DEFENDANTS ARE ENTITLED TO SUMMARY ADJUDICATION
         THAT INFORMATION CONTAINED IN PUBLISHED PATENTS OR
4        PATENT APPLICATIONS CANNOT CONSTITUTE TRADE SECRETS.**

5            Both before and since the Court entered the Preliminary Injunction in this action, a great

6    deal of information related to Verigy's alleged trade secret list has been published in the form of

7    patents or patent applications.  The Court should grant summary adjudication that, as a matter of

8    law, material contained in a public patent or patent application cannot constitute trade secrets of

9    Verigy, and that none of the information contained in the patents and patent applications submitted

10   to the Court in connection with this Motion, through the Declaration of Dr. Richard Blanchard and

11   the exhibits thereto, can constitute trade secrets of Verigy.

12           The law is well-settled that "[a]fter a patent has issued, the information contained within it

13   is ordinarily regarded as public and not subject to protection as a trade secret." *On-Line*

14   *Technologies, Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004);

15   *Conmar Prods. Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 155-56 (2d Cir. 1949) (L.

16   Hand); *Tank Tech, Inc. v. Neal*, 2007 U.S. Dist. LEXIS 53066, at *25 (D. Mo. July 23, 2007).

17   Once information is published in a patent or a patent applications it becomes "readily

18   ascertainable," it can be generally known to competitors, and, therefore, cannot meet the trade

19   secret definition.  *Id.*; Cal. Civ. Code §3426.1(d).

20           "It is well established that the disclosure of a trade secret in a patent places the
             information comprising the secret into the public domain. [Citation omitted.] Once the
21           information is in the public domain and the element of secrecy is gone, the trade secret is
             extinguished and 'the patentee's only protection is that afforded under the patent law.'
22           [Citation omitted.]"

23   *Forcier v. Microsoft Corp.*, 123 F.Supp.2d 520, 528 (N.D. Cal. 2000), *citing Stutz Motor Car of*

24   *America, Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353, 1359 (C.D.Cal.1995).

25           Accordingly, Defendants[7] are entitled to summary adjudication that any information

26   published by Verigy or others in patents or patent applications cannot be considered trade secrets

27

28   7    Though Defendant Wesley Mayder expects to be dismissed from this case pursuant to his co-
          pending Rule 11 and Rule 56 motion, it is clear that he has never had access to any of the

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ᵗᵐ

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.          10          Case No. 5:07-cv-04330-RMW (HRL)

1    in this action.  Defendants are further entitled to summary adjudication that (a) each of the patents

2    or patent applications submitted by declaration on this Motion are in the public domain and (b) to

3    the extent they contain any of Verigy's alleged trade secrets, such information cannot qualify as

4    trade secrets in this action.

5    **III.   THE PRELIMINARY INJUNCTION SHOULD BE
     MODIFIED IN LIGHT OF *EBAY V. MERCEXCHANGE*.**

6

7    **A.    *eBay* Changed the Rules for the Granting of Injunctive Relief.**

       In a far reaching decision, the United States Supreme Court changed the process for

8    evaluating a request for permanent injunctive relief upon a finding of patent infringement.  *eBay,*

9    *Inc. v. MercExchange*, 547 U.S. 388, 126 S.Ct. 1837 (2006).  Prior to the *eBay* decision, courts

10   almost uniformly granted a request for permanent injunctive relief against an infringing device or

11   method upon a finding of patent infringement, as the Federal Circuit did prior to the appeal to the

12   Supreme Court.  *eBay* at 393-94.  But the Supreme Court overturned that approach as being too

13   simplistic, and as not adequately applying the traditional four-part test for granting permanent

14   injunctive relief, namely:

15

       (1) the plaintiff has suffered an irreparable injury;

16

       (2) the remedies at law are inadequate to compensate for that injury;

17

       (3) considering the balance of hardships on the parties if injunctive relief were granted or not;

18

       (4) the public interest would not be disserved by a permanent injunction.

19
     *Id.* at 391.

20
       The Supreme Court rejected an almost automatic grant of permanent injunctive relief, and

21   in doing so rejected a presumption of irreparable harm as automatically flowing from a finding of

22   infringement.  The Supreme Court did not, however, directly address whether a presumption of

23   irreparable harm should also be discarded in the preliminary injunction context.

24
       On remand, in applying these four factors, the District Court denied MercExchange's

25

26   alleged trade secrets of Verigy and that, as a matter of law, he has never appropriated and
     could never have misappropriated any of Verigy's alleged trade secrets.  *See* Declaration of
27   Welsy Mayder filed on June 10,2008  (Docket # 231-21).  As such, the entire Complaint and
     each cause of action as allegedly applicable to him should be dismissed as to him as there are
28   simply no facts which would support any type of claim against him individually.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    11                    Case No. 5:07-cv-04330-RMW (HRL)

1    request for a permanent injunction:[8] First, the District Court found that MercExchange had not

2    established irreparable harm, or that money damages would not adequately compensate it.

3    *MercExchange L.L.C. v. eBay, Inc.*, 500 F.Supp.2d 556, 569 (E.D. Va. 2007). The Court noted in

4    particular the lack of commercialization of the patents by MercExchange. Second, the District

5    Court expressed concern that the patents at issue, or at least one of them, appeared to be a

6    combination invention made up of a number of non-unique parts, and that such patents might well

7    be suspect in light of the Supreme Court's ruling in *KSR Int'l Co. v. Teleflex, Inc.*, ____U.S. ___,

8    127 S.Ct. 1727 (2007). Third, the District Court found that given MercExchange's pattern of

9    licensing its patents and using them as swords in litigation, rather than productizing them, money

10    damages would afford an adequate remedy. *eBay*, 500 F.Supp.2d at 582-83. In particular, the

11    Court noted the lack of MercExchange's presence in the online auction industry. Fourth, the Court

12    found that the balance of hardships did not weigh in either party's favor, but felt that on the

13    equities, a forced royalty rather than an injunction was more equitable, particularly given

14    MercExchange's history of seeking royalties on its patents. The District Court also found that the

15    public interest tipped slightly in favor of the defendant, finding:

16        Although the public plainly benefits from a strong patent system protection from
17    an infringer may be vital when a patent held by a small patent holder is infringed
       upon by a multi-billion dollar corporation such as eBay, the strongest arguments
18    in equity exist when such small patent holder utilizes its patent to benefit the
       public, that is, either seeks to develop the patent on its own or develop the patent
19    through licensing arrangements.

20    *Id.* at 587. Lastly, the District Court addressed and rejected cross-claims of unclean hands by

21    both parties as a basis for granting or denying injunctive relief, but emphasized that a court may

22    always consider the equities involved in deciding whether to grant such relief.

23        **B.**    ***eBay* Applies Equally in the Preliminary Injunction Context.**

24        As this Court recently noted, there has been some difference of opinion among the various

25    circuits as to whether the *eBay* decision should be applied in the preliminary injunction context.

26

27    [8]    Moreover, the jury finding in *eBay* was that eBay willfully infringed the MercExchange's
       business method patents, yet the District Court determined that such a finding of willfulness
28        was not sufficient to automatically grant injunctive relief.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.    12    Case No. 5:07-cv-04330-RMW (HRL)

1   *Hologic, Inc. v. Senorx, Inc.*, 2008 U.S. Dist. LEXIS 36693, at *43 (N.D. Cal. Apr. 25, 2008). This

2   Court concluded based upon its reading and understanding of the *eBay* decision that a presumption

3   of irreparable harm could not be applied in the preliminary injunction context as well, and that

4   preliminary injunctive relief required a showing of irreparable harm and could not be found

5   through an automatic presumption thereof. *Id.* at *45.

6        Decisions both of this Court and nearly all other federal courts since *eBay* have required

7   much more than a showing of speculative irreparable harm in both the permanent injunction and

8   preliminary injunction contexts. Indeed, well prior to the *eBay* decision, federal courts have

9   warned against the use of injunctive relief as a "club" with which a plaintiff could gain unfair

10  negotiating leverage, particularly where, as here, the plaintiff was not practicing its patented

11  invention and where a compulsory royalty payment would adequately compensate the plaintiff.

12  *Foster v. American Machine & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir. 1974).

13       This Court, too, has followed the approach of ordering a compulsory license and royalty

14  payment in lieu of preliminary injunctive relief, particularly where the plaintiff was not practicing

15  the invention and where the public could benefit from allowing the invention to be marketed.

16  *Hologic*, 2008 U.S. Dist. LEXIS 36693, at *51. Indeed, where there is an absence of evidence of

17  public harm that would be caused by marketing of an invention, the public's interest in making use

18  of the invention should tip in the defendant's favor. *Id.* at *57-58.

19       Other courts weighing in since the *eBay* ruling by the Supreme Court have followed an

20  approach of not applying a presumption of irreparable harm in the preliminary injunction context,

21  or, where, as here, the plaintiff is not practicing the invention and money damages would

22  adequately compensate the plaintiff. *See, e.g., Torspo Hockey Intern., Inc. v. Kor Hockey Ltd.*,

23  491 F.Supp2d 871, 881 (D. Minn. 2007) (no presumption of irreparable harm in plaintiff's seeking

24  preliminary injunction relating to a *design* patent, and only speculative assertions regarding harm

25  to reputation); *MyGym L.L.C. v. Engle*, 2006 U.S. Dist. LEXIS 88375, at *11 (no presumption of

26  irreparable injury at preliminary injunction stage for trademark claim); *Paice L.L.C.  v. Toyota

27  Motor Corp.*, 2006 U.S. Dist. LEXIS 61598, at * (E.D. Tex. Aug. 16, 2006) (no presumption of

28  irreparable harm for patent infringement, particularly where plaintiff can be compensated with

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

**Defs.' Mot. Summ. Adj. & Mod.**
**Prelim. Inj. Mem. P. & A. Supp.**        13        Case No. 5:07-cv-04330-RMW (HRL)

1  money); *The Northern Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007) (applying the

2  reasoning of *eBay* in refusing to presume irreparable harm in the environmental law context); *Reno*

3  *Air Racing Ass'n. v. McCord*, 452 F.3d 1126 (9th Cir. 2006) (applying the *eBay* approach in a

4  Lanham Act case, relating to a request for permanent injunctive relief); *Christopher Phelps &*

5  *Assocs. L.L.C. v. Galloway*, 462 F.3d 532, 543 (4th Cir. 2007) (applying *eBay* in the copyright

6  context and rejecting the view that upon a finding of copyright infringement an injunction should

7  automatically follow); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.* 518 F.Supp.2d 1197,

8  1208-10 (C.D. Cal. 2007) (*eBay* applies in copyright case, no presumption of irreparable harm).

9         In *z4 Techs., Inc. v. Microsoft Corp.*, 434 F.Supp.2d 437 (E.D. Tex. 2006), after a jury verdict

10  of willful infringement by Microsoft in connection with its Windows XP operating system, the

11  District Court denied z4's request for a permanent injunction.  In reaching this decision, the Court

12  noted in particular Justice Kennedy's concurrence in *eBay* in which he suggested that where the

13  patented invention is but a small portion of the infringer's product, then money damages may well be

14  the proper remedy in contrast to an injunction. *Id.* at 441.  The Court further found that z4 would not

15  suffer lost profits (since it was entitled to a royalty from Microsoft for all infringing uses), brand

16  recognition or market share, and that the public could suffer if Microsoft were enjoined from

17  deploying the Windows XP operating system. *See also, Finisar Corp. v. DIRECTV Group, Inc.*,

18  2006 U.S. Dist. LEXIS 76380, at *4 (E.D. Tex. July 7, 2006) (District Court refused to grant a

19  permanent injunction where the patentee did not practice the patent, the defendant and its employees

20  would be harmed by an injunction, and the public would be deprived of a valuable service).

21         The reasoning behind *eBay* and its progeny applies with equal force in the preliminary

22  injunction context, and where trade secrets rather than a patent are at issue.   Indeed, since trade

23  secrets, unlike patents and copyrights, do not appear to carry with them a presumption of

24  irreparable harm upon a finding of misappropriation, the application of *eBay* would appear even

25  more appropriate. **This Court itself has previously noted that (a) "Verigy is not currently**

26  **using the trade secrets [words omitted as 'Confidential']" and (b) "[t]he balance of hardships**

27  **tips less sharply, however, to the extent that the Flash Enhancer is used for NOR testing, as**

28  **Verigy does not currently sell its products for NOR testing." PI Order at 24:11 and 25:15-17.**

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com sm

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    14                    Case No. 5:07-cv-04330-RMW (HRL)

1  **Therefore, under *eBay*, and to promote the public interest in having access to innovative**

2  **technology, especially in the NOR market, the Preliminary Injunction should be modified.**

3  **Defendants have submitted a proposed form of Order that makes clear that equitably**

4  **Defendants are prepared to escrow fifteen percent (15%) of all product sales[9] pending the**

5  **outcome of the trial in this action and to continue to do so pending any subsequent appellate**

6  **proceedings so as to assure that remedies which may be available to Plaintiff—if Plaintiff can**

7  **prove any of its claims in this case— are available to Plaintiff.   Defendants would further**

8  **agree that this approach would also allow Plaintiff to withdraw any further preliminary**

9  **injunction bond in this case. This escrow approach is consistent with the Court's suggestion**

10  **in the Preliminary Injunction.  *See* P.I. Order at p. 25, fn. 8.**

11  **IV.  THE PRELIMINARY INJUNCTION SHOULD BE**
    **MODIFIED BECAUSE IT PROVIDES VERIGY WITH GREATER**
12  **RELIEF THAN VERIGY COULD OBTAIN FOLLOWING TRIAL.**

13       A preliminary injunction should not grant the moving party greater relief than would be

14  available to it following trial.

15       The burden on the City "is a heavy one where, as here, granting the preliminary
16       injunction will give [the City] substantially the relief it would obtain after a trial on the
         merits." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991) *Indus.,*
17       *Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991) (citations omitted); *see also*
         *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963) ("[I]t is not
18       usually proper to grant the moving party the full relief to which he might be entitled if
         successful at the conclusion of a trial.")

19  *Am. Med. Response, Inc. v. City of Stockton*, 2005 U.S. Dist. LEXIS 37336 (E.D. Cal. Sept. 16,

20  2005).  Even assuming, *arguendo*, that Verigy were able to prove that its alleged trade secrets

21  were not fully disclosed in filings with the U.S.P.T.O. and not readily ascertainable, the Court has

22  previously made findings concerning the extent of any head-start advantage that Defendants might

23  have obtained.

24       [I]n light of the fact that there is publicly-available information regarding implementation
         of fan-out technology and the fact that STS's products are directed toward different
25       customer requirements, the court finds a five-month injunction to be appropriate.  Setting
         the duration of the injunction at five months rather than eight months also accommodates
26

27  [9] This number was not chosen arbitrarily as it represents a very robust (and more than reasonable)
    royalty for a non-patented hardware device that never has ever been productized by Plaintiff.
28  *See* Declaration of Dr. Richard Blanchard at ¶10.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.          15          Case No. 5:07-cv-04330-RMW (HRL)

1       for the fact that STS has concentrated on design and development of the Flash Enhancer
product....

2  PI Order at 27:6-11.  Despite these findings, by the time this Motion is heard, Defendants will have

3  been enjoined from selling Flash Enhancer for very nearly a year, and by the time this case is tried,

4  that period will have been extended to over fifteen months, unless the Preliminary Injunction is

5  modified.  Furthermore, Dr. Blanchard has found that even if one were to make assumptions favoring

6  Verigy's claims, a six-month injunction would be more than sufficient to overcome any alleged

7  head-start advantage.  Dr. Blanchard Decl. at ¶9.  It is simply unfair to grant Verigy interim relief that

8  is between two and three times greater than the full relief it might receive *if* it were to prevail at trial.

9
### V.  TO PROMOTE PUBLIC ACCESS TO IMPORTANT TECHNOLOGY AND TO BALANCE ALL OF THE EQUITIES, THE PRELIMINARY INJUNCTION SHOULD BE MODIFIED.

10

11

12       When Defendants have already been enjoined from selling Flash Enhancer for nearly

13  eleven months despite the Court's finding that a five-month injunction would be adequate, and

14  when Defendants were deprived of the ability to understand the full scope and content of the TRO

15  due to Verigy's designation of crucial exhibits and referenced materials as highly confidential

16  material, such that Defendants could not read and understand the TRO, the Preliminary Injunction

17  should be modified, and Defendants should be permitted to market Flash Enhancer in exchange for

18  escrowing a reasonable compulsory royalty payment for a limited time.

19       First, there is no showing that Verigy is currently selling any product that employs the

20  alleged trade secrets.  Consequently, there is no possibility that Verigy will suffer loss of brand

21  recognition.  Indeed, if the Preliminary Injunction were modified to permit Defendants to sell their

22  Flash Enhancer product for *non-Verigy* devices, then Verigy could not claim loss at all in

23  connection with any brand it presumably has.[10]

24       Second, monetary damages are adequate to compensate Verigy in the event that it

25  ultimately prevails on its claims, and in that regard, Defendants stand ready, willing and able to

26  put into escrow as much as fifteen percent (15%) of any revenues obtained from sales of the Flash

27  [10]  Indeed, as discussed earlier, the notion that Verigy has developed any "brand recognition"

28       related to internal research and development, namely the "Verigy Project," appears speculative at best and logically attenuated.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.          16          Case No. 5:07-cv-04330-RMW (HRL)

1   Enhancer product, such that Verigy would have a fund to turn to if it were to prevail in this action

2   after trial.   R. Mayder Decl. at ¶27.  Such a fifteen percent (15%) royalty provides more than

3   sufficient security for Verigy, because it is higher than the range of royalty rates that Dr.

4   Blanchard has observed to be customary in the semiconductor industry, even for multiple patents.

5   Dr. Blanchard Decl. at 10.

6           In my opinion, even if all of the alleged trade secrets that Verigy claims in
            connection with this case were found to be actual trade secrets and were found to
7           have been infringed by defendants, a fifteen percent (15%) royalty rate would be
            far in excess of any royalty rate that would be adequate to compensate Verigy for
8           the use of all such trade secrets based upon my experience and my knowledge of
            standards for royalty rates in the semiconductor industry.
9

10  *Id.* at 10.  Indeed, as the Court itself found, Verigy is not practicing in the NOR memory field, P.I.

    Order at 25: 14-17, and certainly is not creating test devices for non-Verigy machines.    No
11
    irreparable harm can possibly attach to such activities by Defendants, since Verigy is making no
12
    use of its alleged trade secrets in the NOR memory field.  At a minimum, a narrower injunction
13
    that excepted out such fields would properly address the equities existent in this case.
14
            Third, the equities in this matter require modification of the Preliminary Injunction.  Although
15
    the Court found that Defendants had willfully violated the TRO, Defendants were denied the
16
    opportunity to read and understand the TRO, and they were in fact advised by their former counsel
17
    that they could continue to act in the manner that resulted in the contempt finding.  R. Mayder Decl. at
18
    ¶17.  Even Defendants' expert, Dr. Blanchard, whose advice was never sought by Defendants' prior
19
    counsel, views the meaning of some portions of the TRO to be difficult to understand and in need of
20
    further clarification.  Dr. Blanchard Decl. at ¶¶5-6.  Furthermore, Dr. Blanchard views much of what
21
    Verigy is claiming as its trade secrets as information that is (i) publicly available or well known in the
22
    semiconductor test industry, (ii) readily ascertainable, or (iii) the type of information that would be
23
    specified by the requirements of a particular customer of the semiconductor test industry.  Dr.
24
    Blanchard Decl. at ¶8.  In that one of the consequences of the contempt finding was a four-month
25
    extension on the Preliminary Injunction, Defendants have been unfairly enjoined for a period longer
26
    than what the Court itself recognized was the likely head-start period.  Verigy should not be permitted
27
    to obtain through the Preliminary Injunction greater relief than it could obtain at trial.
28

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                    17                    Case No. 5:07-cv-04330-RMW (HRL)

1    Fourth, in balancing the hardships in the case, the Court should take note of Verigy's

2    status as a large public company and the fact that is is of considerably greater size and financial

3    resources in comparison with Defendants. Because the economic impact of the Preliminary

4    Injunction falls so heavily on Defendants, and because Verigy is much better capitalized, the

5    Preliminary Injunction should be modified. *See, e.g.*, *International Jensen, Inc. v. Metrosound

6    U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must

7    consider the impact granting or denying a motion for a preliminary injunction will have on the

8    respective enterprises. Thus the relative size and strength of each enterprise may be pertinent to

9    this inquiry. *Sardi's Restaurant*, 755 F.2d at 726.")

10    Fifth, the Court itself noted that the public could benefit from the sale of the Flash Enhancer

11    and that while other vendors might be in the field of parallel testing addressed by that device, no

12    other company is as far along in making the device available. PI Order at 25:10-14. Where, as here,

13    Verigy is not offering third parties any product similar to Flash Enhancer, the balance of hardships

14    should tip *sharply* in favor of Defendants, particularly in the NOR market, and especially because

15    Verigy can be fully compensated by monetary damages if it were to prevail at trial.

16    Sixth, in addition to *eBay* and its progeny, California's trade secret statute itself recognizes

17    the appropriateness of substituting a reasonable royalty for a categorical injunction. The California

18    statute provides that "[i]f the court determines that it would be unreasonable to prohibit future use, an

19    injunction may be condition future use upon payment of a reasonable royalty for no longer than the

20    period of time the use could have been prohibited." Cal. Civ. Code §3426.2(b). Given Defendants'

21    willingness to escrow more than a reasonable royalty amount during the pendency of the entire case,

22    even beyond when the Preliminary Injunction is currently set to expire (in November 2008),

23    modifying the Preliminary Injunction will provide adequate protection for Verigy.

24    Particularly in light of (a) the substantial amount of additional information that has now

25    become public regarding the alleged trade secrets at issue, including public filings with the

26    U.S.P.T.O. by Verigy, (b) Verigy's not selling products using its alleged trade secrets, and (c) the

27    harm to the public in not being able to obtain the benefits of information that is readily

28    ascertainable through public disclosures while the Preliminary Injunction is in place, Defendants

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ™

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                 18                 Case No. 5:07-cv-04330-RMW (HRL)

1    respectfully assert that the Preliminary Injunction should be modified as follows:

2        1.    Defendants may develop, market, advertise, sell, license, and in all other ways

3    otherwise commercially exploit the Flash Enhancer product and any enhancements thereto

4    for all devices and/systems in exchange for escrowing fifteen percent (15%) of the gross

5    revenues obtained from such sales pending the outcome of this case; and,

6        2.    Without limiting the generality of the foregoing, Defendants may develop, market,

7    advertise, sell, license, and in all other ways otherwise commercially exploit the Flash

8    Enhancer product and any enhancements thereto for either (a) non-Verigy systems and (b)

9    any customers producing NOR and/or NAND memory devices and/or systems in exchange

10    for escrowing fifteen percent (15%)of the gross revenues obtained from such sales pending

11    the outcome of this case; and,

12        3.    Without limiting the generality of any of the foregoing, Defendants may develop

13    and further test the Flash Enhancer product and any enhancements thereto with and in

14    cooperation with beta users, provide samples of Flash Enhancer and any enhancements

15    thereto to beta users, and communicate fully with such beta users concerning the operation,

16    performance, testing, modification, and future sales or licensing of Flash Enhancer and any

17    enhancements thereto, and any related matters so long as fifteen percent (15%) of the gross

18    revenues obtained from such sales is escrowed account pending the outcome of the trial (and

19    any subsequent appeals) in this matter.

20        The above approaches—and each of them—will provide the proper equitable balance for

21    assure that the public receives access to important new innovations and that Verigy receives

22    security for what, under *eBay* and under  other applicable federal and state law, can be the

23    reasonable royalty which Verigy can (and does) seek in this case.  Anything narrower than this

24    puts Defendants in the position of not being able to defend themselves in this action and, in effect,

25    provides Verigy with the "victory" it seeks to achieve without first having won the actual trial in

26    this case and without first having convinced this Court that Rule 65 can and should be used to

27    extend injunction relief even beyond what this Court has already found otherwise—and all before

28    Defendants were ever given a full and fair opportunity to read and under the Court's Orders!

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Defs.' Mot. Summ. Adj. & Mod.
Prelim. Inj. Mem. P. & A. Supp.                19                Case No. 5:07-cv-04330-RMW (HRL)

## CONCLUSION

For the reasons set forth above, the Court should grant summary adjudication (a) to Defendants on Verigy's Ninth Claim for Relief, (b) that, as a matter of law, public patents and patent applications do not contain any trade secret information, and (c) that, as a matter of law, all of the public patents, patent applications, and other published materials attached to the accompanying Declaration of Dr. Richard Blanchard do not contain any trade secret information. Further, the Court should modify the pending Preliminary Injunction to allow the public to benefit from the practice of publicly available information while protecting Verigy with the escrow approach outlined above.[11]

Respectfully submitted,

Dated: July 10, 2008                    By:    _/s/ Jack Russo_

Jack Russo, SBN 98068
Tim C. Hale, SBN 114905
John Kelley, SBN 100714

RUSSO & HALE LLP
401 Florence Street
Palo Alto, CA 94301
Telephone: (650) 327-9800
Facsimile: (650) 327-3737
Email: jrusso@computerlaw.com
thale@computerlaw.com
jkelley@computerlaw.com

ATTORNEYS FOR DEFENDANTS AND COUNTERCLAIMANTS ROMI MAYDER, WESLEY MAYDER, SILICON TEST SYSTEMS, INC., and SILICON TEST SOLUTIONS, LLC

---

[11] The escrow approach has been used in many intellectual property cases and where interim relief is granted and it is clear that this Court has authority to do precisely this. *See, Fogarty v. Fantasy, Inc.* 510 U.S. 517, 114 S. Ct. 1023 (1994).

1   JACK RUSSO (State Bar No. 96068)
    TIM C. HALE (State Bar No. 114905)
    JOHN KELLEY (State Bar No. 100714)
2   RUSSO & HALE LLP
    401 Florence Street
3   Palo Alto, CA 94301
    Telephone: (650) 327-9800
4   Facsimile: (650) 327-3737
    Email: jrusso@computerlaw.com
5         thale@computerlaw.com
         jkelley@computerlaw.com
6

7   Attorneys for defendants and counterclaimants
    WESLEY MAYDER, ROMI MAYDER,
    SILICON TEST SOLUTIONS LLC, and
8   SILICON TEST SYSTEMS INC

9           IN THE UNITED STATES DISTRICT COURT

10      IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

11              SAN JOSE DIVISION

|  |  |
|---|---|
| 12 VERIGY US, INC., a Delaware Corporation, | Case No. 5:07-cv-04330-RMW (HRL) |
| 13          Plaintiff, | **DECLARATION OF ROMI MAYDER IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION AND MOTION TO MODIFY PRELIMINARY INJUNCTION ORDER** |
| 14           v. | |
| 15 ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive, | |
| 16 | |
| 17 | |
| 18 | |
| 19          Defendants. | **Date: August 15, 2008** |
| 20 | **Time: 9:00 a.m.** |
| | **Ctrm: 6** |
| 21 | **Before the Hon. Ronald Whyte** |
| 22 | |
| 23 | Complaint Filed: August 22, 2007 |
| | Trial Date: December 8, 2008 (jury trial) |
| 24 | (Defendants have elected to reserve their jury trial rights under F.R.C.P., Rule 38) |
| 25 | |
| 26 AND RELATED CROSSCLAIMS. | |
| 27 | |
| 28 | |

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Decl. Romi Mayder Supp. Mot.
Summ . Adj. & Mod. Prelim. Inj.

Case No. 5:07-cv-04330-RMW (HRL)

I, Romi Mayder, declare under penalty of perjury as follows:

1. The matters stated herein are true and correct of my personal knowledge, unless stated on information and belief, which matters I believe to be true. I could and would competently testify to the matters set forth herein if called as a witness.

## MY FAMILY HISTORY IN THE (ATE) TESTING INDUSTRY

2. My father and uncle have worked in the ATE (automatic test equipment) industry since the 1970s. I started working with them in the ATE field when I was 16 years old—more than 20 years ago. Accordingly, I have worked in the ATE (automatic test equipment) industry for over 20 years. I have held positions such as semiconductor process engineer, manufacturing engineer, applications engineer, marketing engineer, project manager, design engineer, expert design engineer, and chief executive officer throughout my career in the ATE industry.

3. I graduated from the University of California at Berkeley in 1992 with a Bachelor of Science degree in electrical engineering. My father, Gary Mayder, graduated from the University of California at Berkeley in 1965 with a master's of science degree in electrical engineering. My grandfather, L. Wesley Mayder, graduated from the University at Berkeley in 1939 with a Bachelor of Science degree in engineering. My mom's brother (my uncle), Isam Qubain, graduated from the University of California at Berkeley with a Bachelor of Science degree in electrical engineering. My Dad's brother (another uncle), Noel Mayder, graduated from the University of California at Berkeley in 1967 with a Bachelor of Science degree in engineering. My mom's brother, (yet another uncle) Edward Qubain, graduated from the University of California at Los Angeles with a Bachelor of Science degree in electrical engineering.

4. In 1974, two of my uncles, Isam Qubain, and Edward Qubain founded Best IC Laboratories in Sunnyvale, California. In 1979, my father, Gary Mayder joined them as a principal owner and V.P. of Engineering. Best IC Laboratories had offices in Austin, Texas, Singapore, and Penang, Malaysia. The business of Best IC Laboratories focused on testing memory devices. Best IC Laboratories was sold to DTS (Digital Test Systems) in 2000. DTS' business was focused mainly on testing logic devices. The purchase of Best IC Laboratories allowed the combined companies to test both memory and logic devices. I worked at Best IC

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

Decl. Romi Mayder Supp. Mot.
Summ . Adj. & Mod. Prelim. Inj.

1

Case No. 5:07-cv-04330-RMW (HRL)

1   Laboratories while I was in high school and also during summers when I was in college.

2   Accordingly, before ever starting work for Verigy (and even before starting work for Agilent as

3   well as for HP), I had over ten years of experience in the ATE field and I had been part of my

4   conversations with my dad, with my uncles and even with my grandfather about the challenge of

5   increasing the throughput of automated test equipment by increasing testing parallelism. I have

6   been thinking about that problem since I was in my teens. I am now 37 years old.

7                          **THE TRO STORY**

8           5.      I was provided with redacted and incomplete copies of the proposed TRO along

9   with the Pochowski declaration, the Hahn Lai declaration, the Andy Lee declaration, and the Ira

10  Levanthal declaration by email. These five documents along with other documents were sent to

11  me directly from Melinda Morton, Esq., counsel for plaintiff. Attached as Exhibits 1 and 2 are true

12  and correct copies of the two emails that Ms. Morton sent to me on August 22, 2007 with these

13  redacted documents attached.

14          6.      Attached as Exhibit 3 is a true and correct copy of the redacted Pochowski

15  declaration that was provided to me by Ms. Morton. ALL the exhibits of the Robert Pochowski

16  declaration read as follows:

17                  ***"FILED UNDER SEAL".***

18          7.      Attached as Exhibit 4 is a true and correct copy of the redacted Hahn Lai

19  declaration that Mr. Morton provided to me. ALL the exhibits of the Hahn Lai declaration read as

20  follows:

21                  ***"FILED UNDER SEAL".***

22          8.      Attached as Exhibit 5 is a true and correct copy of the redacted Ira Levanthal

23  declaration that was provided to me by Ms. Morton. ALL the exhibits of the Ira Levanthal

24  declaration read as follows:

25                  ***"FILED UNDER SEAL".***

26          9.      Attached as Exhibit 6 is a true and correct copy of the redacted Andy Lee

27  declaration that was provided to me by Ms. Morton. ALL the exhibits of the Andy Lee declaration

28  read as follows:

# *"FILED UNDER SEAL"*.

10.     I have NEVER been served the FULL, unredacted TRO with all of the referenced materials. My previous lawyers at Mount & Stoelker, P.C. never advocated with opposing counsel or otherwise with the Court that the Protective Order designations be lifted so that I could be allowed to read the entire unredacted TRO and certainly not with all of the referenced materials. I fired those lawyers. One of the first things that my new attorneys at Russo & Hale LLP sought was to allow me to read the entire unredacted TRO.   This took many cycles with Melinda Morton, Esq. counsel for plaintiff, and I was provided with copies of the emails exchanged where Mr. Russo sought to allow me to have a full, unredacted copy of the TRO.   While I might have been shown certain documents at my deposition, I still have not received a full unredacted copy of all of the referenced materials because Ms. Morton has taken the position that her marking of certain items and exhibits as "Highly Confidential" under the Court's Protective Order prevents me from doing so. Thus, I do not know if my past activities under the TRO would have changed if I were allowed to read the FULL Court Order with all of the referenced materials, but I do know that I would have consulted in detail with regard to whether there was any potential for being held in contempt and that consultation never happened because my former lawyers told me that they could really not tell me what was in the various documents that comprise the Court's TRO. Nor was I able to consult with anyone else either. I still have not been able to do so (though I understand that Mr. Russo recently was able to convince Ms. Morton that under his supervision and only in his office can I now read certain items that comprise some of the referenced materials in the Court's TRO. Obviously, this comes far too late in this case and it should have been allowed months if not nearly a year ago.   I say this because I have utmost respect for the Court and I never knowingly or intentionally violated any part of the Court's Order as I understood it.

## THE PLAINTIFF'S OVERZEALOUS USE OF THE PROTECTIVE ORDER

11.     I was asked to sign Exhibit A of the Protective Order just before my first deposition. Exhibit A of the Protective Order was given to me by Ms. Morton while I was seated to take my deposition. My attorney at the time, Dan Mount, instructed me to sign Exhibit A of the Protective Order in order to start to my deposition. The Protective Order itself was not provided to

1   me at the depositon, nor was it provided to me by Ms. Morton or by anyone else after the

2   deposition.

3          12.    I frankly do not understand why Ms. Morton or why Mr. Mount did not provide the

4   Protective Order to me before and though I can say, with certainty, that I have not violated the

5   Protective Order, I now understand how the Protective Order has been used by the Plaintiff's

6   counsel in an overzealous fashion to bar me from seeing important items in this litigation including

7   the very purported trade secrets which Plaintiff claims I already know of and which comprise the

8   "metes and bounds" of the Court's original TRO as well as the Court's later-issued Preliminary

9   Injunction.

**THE CONTEMPT MOTION BROUGHT IN BAD FAITH**

11          13.    I believe that Verigy brought the motion of contempt against me in bad faith.

12   Verigy marked several documents referenced by the TRO as

*"FILED UNDER SEAL"*.

14   Accordingly, I believe Verigy intentionally denied me the opportunity to read the FULL,

15   unredacted TRO while at the same time, Verigy aggressively brought a motion to the Court

16   claiming I was violating a Court Order which Verigy knew I was not allowed to read!

17          14.    Verigy submitted evidence of a press release allegedly issued by defendants in their

18   sur-reply of the contempt motion.  Verigy claims that this press release was a violation of the TRO

19   by the defendants.  However, Verigy knows full well that the press release did not come from the

20   defendants but rather from the lawyers at Mount & Stoelker.  Attached as Exhibit 7 is a true and

21   correct copy of an email from Mr. Kevin Pasquinelli of Mount & Stoelker to Ms. Morton

22   containing the press release that Mr. Pasquinelli and his firm said was proper and that would be

23   issued.  It was one of the defendants, namely me, who withdrew the press release the following

24   morning and who took steps to assure that it was not republished.  In effect, I have been blamed

25   for something that my former lawyers told me was acceptable and which I had no idea could

26   become part of a contempt motion or could otherwise be viewed as violating the Court's Order.

27          15.    Verigy claimed that I brazenly sent an email asking Verigy to sign an NDA with

28   STS and this was a violation of the TRO.  However, the properties window of that document

1  clearly shows that Kevin Pasquinelli, my former counsel, was the author of the NDA. Attached as

2  Exhibit 8 is a true and correct copy of the NDA (non disclosure agreement) drafted by Kevin

3  Pasquinelli. Attached as Exhibit 9 is a true and correct copy of the properties window of that

4  document.

5       16.    Ms. Morton claimed that I violated the TRO by downloading and accessing a

6  document from the computer system of Chris Straube. She stated that the TRO CLEARLY

7  defined that document as trade secret of Verigy since it was attached to the redacted Andy Lee

8  declaration as an exhibit. However, once again she knew full well that I was not allowed to read

9  the exhibits of the Andy Lee declaration since all the exhibits were marked as

10                              **_"FILED UNDER SEAL"._**

11  How was I supposed to know that the document that I downloaded and accessed from the

12  computer system of Chris Straube was actually alleged to be trade secret of Verigy? I am

13  convinced that Verigy and its counsel knew that marking the various portions of the TRO as

14  "attorney's eyes only" under the Protective Order would lead to a "trap" and that I would end up

15  being caught in that "trap" and that is precisely what has occurred in this case.

16                          **ACTIVITIES UNDER THE TRO**

17       17.    Dan Mount informed me, based on Dr. Blanchard's expert opinion, I could

18  continue to develop Flash Enhancer. Also, Dan Mount informed that the TRO was designed to

19  maintain the "status quo." At the time the TRO was entered, I was already engaged in

20  design/development activity with Honeywell as well as sales activities with Spansion and Intel.

21  Dan Mount informed me that continuing work with Honeywell, Spansion, and Intel under the TRO

22  was proper because that was the status quo that the TRO was supposed to maintain.

23       18.    Again, had I been allowed to see the entire unredacted TRO with all unredacted

24  exhibits and had I been able to have a meaningful conversation with Dr. Blanchard and with

25  others about the scope of the Court's TRO, I am certain that I would have asked my lawyers to

26  seek clarification of the Court's TRO and I am sure that I would not have allowed my former

27  lawyers to agree successively and repetitively to extensions of time in which the TRO remained

28  in force.

## DEFENDANTS' REPLY MOTION WAS GROSSLY INADEQUATE

19.    There is an ambiguity in my declaration that I submitted for the contempt motion. The declaration states that Dr. Blanchard told me that my activities under the TRO were proper. However, it was actually Dan Mount of Mount & Stoelker who told me my activities under the TRO were proper based on what Dr. Blanchard had said. I did not notice this lack of clarity earlier and I am especially sorry that I did not realize sooner how the Protective Order was affirmatively being used in an overzealous fashion by plaintiff's counsel to keep me in the dark.

20.    I was informed by my previous counsel, Kevin Pasquinelli, that the defendants' reply brief would explain to the Court that defendants were not given the opportunity to read the FULL, unredacted TRO. However, I have recently reviewed the Court's version of the defendants' reply brief submitted by defendants. The brief does not even attempt to explain to the Court that many critical documents referenced by the TRO were marked "FILED UNDER SEAL".

21.    I believed then (and now) that I was in compliance with the Court's TRO but I did not state in my declaration in opposition to the contempt motion that I was in compliance with the TRO because of three reasons:

(a)  I could not and did not understand how I could say that I was in compliance with a document which I could not read most of the pages of and I was told that making such a statement was a "legal conclusion" in any event and not for me to state;

(b)  My previous counsel told me that I was not qualified to draw such a legal conclusion and thus could not make a statement as such; and

(c)  My previous counsel told me that such a statement would not be a statement of fact. It would be my opinion and opinions are not allowed in declarations.

22.    It is my understanding that the only two people of the defendants' team who have read the full unredacted TRO (up to changing to my new counsel, Russo and Hale, LLP) were Kevin Pasquinelli and Dan Mount.

23.    I was never informed by my previous counsel that I had the right to an evidentiary hearing where I could have explained all these things to the Court. I was never informed that I had

1   the right to a jury trial for the contempt of court motion. I was never informed that my previous

2   counsel stipulated to several extensions of the TRO.

3          24.    Overall, I submit to the Court that I never knowingly or intentionally violated the

4   Court's TRO or any of the other Orders of the Court, that I have never been willfully

5   disobedient, and that I have never understood (until now and only through new counsel at Russo

6   & Hale LLP) what my rights are, what should have occurred in this case, and what did not occur

7   which I believe has caused a miscarriage of justice with regard to the extension of the

8   Preliminary Injunction.

9                        **PUBLICLY AVAILABLE INFORMATION**

10         25.    I have located and I have read a number of recently published patent applications

11  and other publications which demonstrate that the general concept for Flash Enhancer is publicly

12  disclosed. I do also know that the general concept I had for what became my STS product pre-

13  dated Verigy, pre-dated Agilent, and pre-dated HP and I never signed any agreement conveying

14  any of my pre-employment inventions to any of those companies. Nor have I ever appropriated

15  anything from Verigy, nor was my product something that occurred at Verigy or that occurred

16  other than through much hard work by me after leaving Verigy and much hard work by

17  Honeywell and for which STS has paid Honeywell over $650,000 to have that work done for

18  STS.

19         26.    The company that I (and I alone) started and which eventually became STS, Inc. is

20  on the verge of collapse financially because Verigy has been able to bar me and STS from

21  generating any revenues from any potential customers. Indeed, I have (through my attorneys at

22  Russo & Hale LLP) asked for clarification from opposing counsel that I can engage in my

23  profession of even just providing professional services (for revenue) with third-parties who use

24  automated test equipment but I have been told that the Verigy lawyers have objected to my

25  engaging in my profession (and in which I have over 20 years of experience) because they believe

26  that such service activities would constitute "marketing" in violation of the Court's Preliminary

27  Injunction. I believe it is, in fact, simply a way to starve me and my family and prevent me and

28  my company from being in a position to defend itself in this litigation.

## BOB POCHOWSKI'S CREDIBILITY

27.　　In Mr. Pochowski's original declaration submitted to the Court on August 22, 2007, he stated that he made an "alarming" discovery in December 2006 (shortly after I fired him) by opening the properties page of the WORD documents that I emailed to him. He claimed to have discovered that the documents were authored by Agilent. I was present for his depositions. During his first deposition, he stated the documents contained information that was easily obtainable from customers. However, during his second deposition, he claimed that he knew he was in possession of confidential documents from Agilent back in June 2006 and that the information in the documents was very difficult to obtain and that he considered the information to be confidential. Yet, however, in January 2007 (again, shortly after I fired him) he asked Grenville Hughes of Honeywell if Honeywell would make a "similar sort of chip" (to the Flash Enhancer) for his other company, Attest Technologies. Attached as Exhibit 10 is a true and correct copy of an email sent to me by Grenville Hughes summarizing the requests of Bob Pochowski made in January 2007. Clearly, in January 2007, Mr. Pochowski thought that he and I were not using Agilent confidential information to define the Flash Enhancer. I am not sure what reason why (other than perhaps some type of agreement he has reached with Verigy as Verigy has refused and marked as "joint privileged" all communications with Mr. Pochowski) Mr. Pochowski has changed his testimony about the use or non-use of Agilent confidential information while he was employed as Vice President of Silicon Test Solutions, LLC and even thereafter. Clearly, though, he has changed his story and it is not truthful. (Indeed, both Mr. Pochowski and I sought and obtained legal counsel from Heather Flick, Esq. of San Francisco in September of 2006 for the purpose of assuring that there would be no problem in going forward and she provided that advice to both of us and for the benefit of STS LLC; there is not a single email or other communication from her to me suggesting otherwise and I do have emails that I sent to her in connection with her legal review of this).

## STS COMPETITORS

38.　　There are several competitors of STS who have products that are functionally equivalent to the STS Flash Enhancer. In fact, it was Dave McMann of Intel who stated in his deposition testimony that Intel would not buy additional testers from Verigy if the STS Flash

1    Enhancer were not available. In such a hypothetical situation, he stated that Intel would buy the

2    TRE (Tester Resource Expander) solution from Formfactor. Formfactor is as a strategic partner of

3    Verigy (Agilent). Attached as Exhibit 11 is a press release written by Formfactor describing their

4    strategic partnership with Verigy (Agilent). The URL for this press release is as follows:

5    http://findarticles.com/p/articles/mi_m0EIN/is_2004_Sept_9/ai_n6186924.

6    The following is a quote from that Formfactor press release dating from 2004:

7        "Our partnership with Agilent leverages FormFactor's wafer probe technologies
         to produce the high parallelism required for low-cost, high-throughput flash wafer
8        level final test," said Larry Levy, director of flash product marketing for
         FormFactor, Inc.
9

10   **I do not understand why and I cannot understand how Verigy claims that STS will induce**

11   **irreparable harm to Verigy when one of Verigy's strategic partners is offering a competing**

12   **solution to the STS Flash Enhancer.** Attached as Exhibit 12 is a press release from Formfactor

     advertising the TRE (Tester Resource Expander) solution back in 2003. The following is a quote
13
     from that Formfactor press release:
14

15       The combination of the Advantest T5377 and FormFactor PH150 probe cards'
         TRE capabilities enables expansion of the system's native 64-device-in-parallel
16       capability to test up to 256 devices in parallel utilizing FormFactor's large-area,
         high-pin-count wafer probe cards.

17   The URL for this press release is is as follows:

18   http://findarticles.com/p/articles/mi_m0EIN/is_2003_Dec_3/ai_110823702.

19       31.    For the aforementioned reasons, I am asking that the Court modify the Preliminary

20   Injunction by allowing me to provide professional services to any company in the field of

21   automated test equipment and that the Court also allow me to sell Flash Enhancer for non-Verigy

22   equipment applications since such sales have no effect on Verigy equipment and cannot possibly

23   give rise to any damage to Verigy. I would agree to escrow 15% of the gross revenues from such

24   sales into an interest-bearing escrow account pending the outcome of this litigation and I would

25   also agree that such escrow can remain intact until after the Court rules following the trial in this

26   action. Without these changes, I do not see how defendants will be able to finance a proper

27   defense in this action and I do not understand why Verigy should be allowed to "win" this case

28   simply by starving me and my company from having the funds needed to defend ourselves.

1    I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct.  This declaration has been executed on July 10, 2008 in Palo Alto,

3   California.

4                                                    _____/s/_____
                                                     Romi Mayder
5

6    I attest under penalty of perjury that concurrence in the filing of this document has been

7   obtained from Romi Mayder.

8        Dated: July 10, 2008         By:    _____/s/_____
                                                     Jack Russo
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 7

**From:**    Kevin M. Pasquinelli
**Sent:**    Wednesday, March 05, 2008 3:38 PM
**To:**    Mindy Morton
**Cc:**    Kevin M. Pasquinelli; Michelle McManus
**Subject:** FW: final update

Mindy,

I have reviewed the release on Google finance. In order to alleviate any of your concerns regarding STS's representations concerning the Court's order, my client will be posting the following updated release.

Kevin

### UPDATE: US Court Denies Injunction Sought by Verigy

SAN JOSE, Calif.--(PR-USA)--Verigy (NASDAQ:VRGY - News), a spinoff of Agilent Technologies (NYSE: A), on February 29, 2008, was denied its request to permanently prohibit defendants Romi Omar Mayder, Wesley Mayder, Silicon Test Systems, Inc. and Silicon Test Solutions, LLC (STS) from bringing STS products to the Automated Test Market (ATE) market.

Instead, the Court granted a limited injunction, prohibiting STS from marketing or selling its products for five (5) months. The prohibition expires on July 29, 2008. The Court held that a limited injunction was proper because Mr. Mayder, STS?s founder and CEO, received a ?head start? by beginning work on his new venture while still employed at Verigy. The Court reasoned that a non-permanent, temporary, limited injunction was appropriate because ?there is publicly-available information regarding implementation of fan-out technology and the fact that STS?s products are directed toward different customer requirements? than Verigy.

Specifically the US court found that Romi Mayder could have developed STS products without the ?benefit of Verigy trade secrets by referring to publicly available references regarding fan-out technology and collecting and integrating STS customer requirements.? Silicon Test Systems highly values its intellectual property, and is very pleased with the court?s decision. The public version of the order is available at http://www.ecf.cand.uscourts.gov/.

**About Silicon Test Systems**
Silicon Test Systems a California Corporation founded in December 2006. STS is funded by several deep pocket investors with extensive experience in the semiconductor industry.

*Kevin Pasquinelli, Esq.*
Mount & Stoelker P.C.
RiverPark Tower, Suite 1650
333 W San Carlos
San Jose, CA 95110
Tel: (408) 279-7000 x1126
Fax: (408) 998-1473
e-mail: kpasquinelli@mount.com

This e-mail, and any attachments thereto, is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify Mount & Stoelker, P.C. at (408) 279-7000 and permanently delete the original and any copy of any e-mail and any printout thereof.

# EXHIBIT 8

## Non-Disclosure Agreement Regarding Confidential and Proprietary Information

This Mutual Nondisclosure Agreement (the "Agreement") is made and entered into as of the Effective Date and by and between the Parties set forth below.

| Parties: | Silicon Test Systems | Verigy |
|---|---|---|
| Full Legal Names: | Silicon Test Systems, Inc. | Verigy US, Inc. |
| Business Entity Types: | Corporation | Corporation |
| Addresses: | 3031 Tisch Way<br>Suite 309<br>San Jose, CA | 10100 N. Tantau Avenue<br>Cupertino, CA<br>95014 |

| **Effective Date:** | |
|---|---|
| **Definition of Confidential Information:** | "Confidential Information" means any and all technical and non-technical information of a confidential or proprietary nature provided by Silicon Test Systems ("STS") to Verigy US, Inc ("Verigy"), including but not limited to (a) patent applications, (b) trade secrets, (c) other proprietary information such as ideas, concepts, know-how, designs, prototypes, techniques, devices, material samples, sketches, drawings, works of authorship, mask works, software programs and source documents, processes, equipment, algorithms, research, benchmark results, procurement requirements, investors, employees, contractual relationships, business forecasts, revenue projections, sales and merchandising, business plans, marketing plans, prices, customer information, product requirements, product specifications, product features, and information related to the current, future, and proposed products and services of STS, those products and services including but not limited to STS Flash Enhancer. |
| **Purpose of Agreement:** | Verigy agrees that it will use Confidential Information for no purpose other than pursuing or continuing a business relationship with STS related to the implementation of STS Flash Enhancer technology at Spansion. If STS agrees that Verigy may use the Confidential Information for some other purpose, then such other purpose must be described in a written amendment executed by the authorized representatives of each Party. Under no circumstances is Confidential Information disclosed *solely* under this Agreement to be used in litigation against STS. Notwithstanding anything contained in this Agreement, neither Party is obligated to disclose any Confidential Information to the other Party. |
| **Term and Termination:** | This Agreement will terminate the earlier of (a) ten (10) days after written notice of termination is given by either Party to the other |

|  | Party, or (b) three (3) years from the Effective Date. Unless the Parties' authorized representatives have agreed otherwise in writing, Verigy shall (a) immediately cease all use of Confidential Information, and (b) destroy and provide written certification of such destruction, or return to STS all or any portion of the Confidential Information, regardless of form. |
|---|---|
| **Confidentiality Period:** | Verigy's duty to protect Confidential Information pursuant to this Agreement expires when such information is or becomes subject to one or more of the exclusions set forth in Section 5 hereof. |

1. **Scope of Agreement:** This Agreement governs Confidential Information disclosed during the term of this Agreement. This Agreement shall also apply to any Affiliate of a Party that has a bonafide need to know for the Purpose; however, under no circumstances shall an Affiliate be a competitor of STS (including but not limited to Form Factor Inc.). "Affiliate" shall mean any entity of which more than fifty percent (50%) of the stock or other equity interests entitled to vote for the election of directors or an equivalent governing body owns, is owned by, or is under common control with, a Party hereto, for so long as such ownership exits.

2. **Markings:**
   a. If Confidential Information is embodied in tangible material, it must be labeled as "Confidential" or bear a similar legend.
   b. If Confidential Information is disclosed orally or visually, it should be identified as such at the time of disclosure. If not identified at disclosure then the information can be identified as Confidential Information by STS sending an email or letter within 30 days of the communication of the Confidential Information identifying it as such.

3. **No Warranties:** ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS" WITHOUT WARRANTY OR GUARANTEE OF ANY KIND AS TO ITS ACCURACY, COMPLETENESS, OPERABILITY, FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR ANY OTHER WARRANTY, EXPRESS, IMPLIED, OR STATUTORY. STS SHALL NOT BE LIABLE TO RECIPIENT FOR ANY DAMAGE, LOSS, EXPENSE, OR CLAIM OF LOSS OF ANY KIND OR CHARACTER (INCLUDING WITHOUT LIMITATION, DIRECT, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE, SPECIAL, INCIDENTAL, RELIANCE) ARISING FROM VERIGY'S USE OF OR RELIANCE ON STS'S CONFIDENTIAL INFORMATION. STS DOES NOT REPRESENT THAT ITS CONFIDENTIAL INFORMATION IS FREE FROM ANY VIRUSES, BUGS OR OTHER DEFECTS.

4. **Duty of Care:** Verigy shall protect Confidential Information with the highest degree of care to prevent the unauthorized use, dissemination or publication of the Confidential Information.
   a. Unless expressly authorized by STS in writing, Verigy shall not disclose any Confidential Information to any third party and shall limit use of such Confidential Information solely to Jim Herr, employee of Verigy.

b.  When communicating Confidential Information to Verigy, STS will use commercially reasonable efforts to communicate the Confidential Information solely to Jim Herr, employee of Verigy. After receipt of the Confidential Information:

i.  If in material form (either through original receipt from STS in material form or after printing out an electronic copy)

1.  Mr. Herr will maintain the document locked in a file cabinet, or other lockable storage mechanism, when not in use.

2.  Mr. Herr may remove the document from locked storage solely for the purpose of pursuing or continuing a business relationship with STS related to the implementation of STS Flash Enhancer technology at Spansion (in compliance with the "purpose" section above). When in use, outside of locked storage, Mr. Herr will remain in personal possession of the document at all times and may not display the document to anyone.

3.  Mr. Herr will make no copies of the document.

ii.  If in electronic form, such as emails, attachments to emails, or electronic files on a storage medium such as a CD or flash memory stick:

1.  Mr Herr will maintain the Confidential Information on his local hard drive.

2.  Mr. Herr may make a copy of the Confidential Information only if he immediately destroys the original. The copy will be maintained with the same degree of care as the original, as per the Agreement.

3.  Mr. Herr will not forward the Confidential Information, in whole or part, to any other Verigy employee, agent, contractor, or Affiliate.

4.  Mr. Herr will not forward the Confidential Information, in whole or part, to any third party.

5.  Mr. Herr will not delete any records of "sent to" or "received from" emails or copies of documents.

c.  Verigy agrees to immediately notify STS upon discovery of any loss or unauthorized disclosure of any Confidential Information.

d.  Verigy shall not reverse engineer, disassemble, or decompile any products, prototypes, software, or other tangible objects that embody the Confidential Information. Under no circumstances will Verigy reverse engineer, or disassemble any design, mask, layout, or any other technical feature embodied in the Flash Enhancer semiconductor chip.

e.  The locked storage unit, and any computer(s) used by Mr. Herr, which are the property of Verigy, will be subject to audits by third party upon demand by STS, given 10 days notice.

5.  **Exclusions**: This Agreement imposes no obligation upon Verigy with respect to any information it can conclusively demonstrate (a) was in its rightful possession

on or before receipt from STS; (b) is or becomes a matter of public knowledge through no fault of Verigy; (c) is rightfully received by Verigy from a third party without a duty of confidentiality; or (d) is independently developed by Verigy without use of, access or reference to, any Confidential Information.

6. **Compelled Disclosure**: In the event that Verigy receives a request or demand to disclose all or any part of the Confidential Information under the terms of a subpoena, an order issued by a court of competent jurisdiction or authorized governmental agency, or disclosure of all or any part of the Confidential Information is otherwise required by law or to establish the rights of either Party under this Agreement, Verigy may comply with such request or demand or make such disclosure only if Verigy:

    a. Asserts the privileged and confidential nature of such Confidential Information against the third party seeking disclosure;

    b. Promptly notifies STS in writing of any such requirement or order to disclose prior to the disclosure of such Confidential Information; and

    c. Reasonably cooperates with STS regarding STS's efforts, if any, to protect against any such disclosure and/or obtain a protective order narrowing the scope of such disclosure and/or use of such Confidential Information.

    d. Except as my ultimately be required by such court order or law, Verigy's obligations with regard to such Confidential Information, as set forth above, will remaining full force and effect.

7. **Return or Destruction of Confidential Information**: Within ten (10) days of STS's written request, irrespective of reason, Verigy shall (a) cease all use of Confidential Information, and (b) destroy and provide written certification of such destruction, or return to STS all or any portion of the Confidential Information, regardless of form.

8. **No other rights:** Confidential Information remains at all times the property of STS. Verigy does not acquire any intellectual property rights under this Agreement or any other rights whether express, implied, or by estoppel, except the limited right to use the Confidential Information for the Purpose set forth above.

9. **Independent Development:** Verigy will not make, have made, use, or sell for any purpose any products, concepts, systems, or techniques, or other items using, incorporating or derived from any Confidential Information of STS, unless otherwise agreed to in writing signed by the duly authorized representatives of both Parties. Notwithstanding the above, nothing in this Agreement will be construed to preclude either Party from developing, purchasing, using, marketing, licensing, or selling any independently developed product, concept, system, or technique, related to the Confidential Information.

10. **No Other Obligations:** This Agreement does not create any obligations other than those expressly stated herein, including without limitation, any obligation for the Parties to proceed with any transaction between them, and each Party reserves the rights, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity or any contemplated relationship. Accordingly, this Agreement does not constitute a binding agreement to enter into any definitive agreement.

11. **Import and Export Restrictions:** Verigy shall adhere to all applicable U.S. and other governmental agencies' export laws and regulations, and shall not import, export or re-export, or release, directly or indirectly, Confidential Information to any individual or entity, unless properly authorized by such governmental agencies. These import and export requirements shall survive any expiration or termination of this Agreement.

12. **Notices:** All notices required under this Agreement will be in writing and will be delivered by personal delivery or electronic mail, and will be deemed to have been given upon personal delivery, five (5) days after deposit in the mail, or upon acknowledgement of receipt of electronic transmission.

13. **Governing Law:** This Agreement is made under and shall be construed according to the laws of the State of California, excluding conflict of law rules. The Parties specifically exclude from application to this Agreement the United Nations Convention on Contracts for the International Sale of Goods.

14. **Equitable Remedies:** Verigy acknowledges that its breach of this Agreement may cause irreparable damage and herby agrees that STS shall be entitled to seek injunctive relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.

15. **General Provisions:** Neither party may assign this Agreement without the prior written consent of the other party. Any attempt to transfer all or part of either Party's rights or obligatios without such consent shall be null and void and of no effect. This Agreement may be executed in multiple counterparts, each of which shall constitute a signed original. Any facsimile or electronic image of this Agreement or writing referenced herein shall be valid and acceptable for all purposes as if it were an original. The Parties do not intent that any agency or partnership relationship be created between them by this Agreement. Each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. However, in the event that any provision of this Agreement becomes or is declared illegal by any court of competent jurisdiction, or becomes otherwise unenforceable, such provision shall be deemed deleted from this Agreement and the remainder of this Agreement shall remain in full force and effect. Any obligation or provision hereunder that by its nature should survive will survive any termination or expiration of this Agreement.

16. **Entire Agreement:** This Agreement sets forth the entire agreement and understanding between the Parties as to the protection of the Confidential Information disclosed during the term of this Agreement and supersedes and merges all prior oral and written agreements, discussions and understandings between them. No waiver or modification of any provision of this Agreement shall be binding unless made in writing and signed by an authorized representative of each party.

The Parties hereto by their duly authorized representatives have executed this Agreement.

**Verigy US Inc.**                    **Silicon Test Systems, Inc.**

_____

Authorized Signature

_____

Print Name

_____

Title

_____

Date

**Verigy US Inc.**

_____

Jim Herr Signature

_____

Date

_____

Authorized Signature

_____

Print Name

_____

Title

_____

Date

# EXHIBIT 9



