1   DANIEL J. BERGESON, Bar No. 105439                      **PUBLIC VERSION**
    dbergeson@be-law.com
2   MELINDA M. MORTON, Bar No. 209373
    mmorton@be-law.com
3   MICHAEL W. STEBBINS, Bar No. 138326
    mstebbins@be-law.com
4   BERGESON, LLP
    303 Almaden Boulevard, Suite 500
5   San Jose, CA 95110-2712
    Telephone:  (408) 291-6200
6   Facsimile:  (408) 297-6000

7   Attorneys for Plaintiff
    VERIGY US, INC.

8

9                   UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13  VERIGY US, INC, a Delaware Corporation,        Case No. C07 04330 RMW (HRL)

14                  Plaintiff,                      **VERIGY'S MOTION FOR SUMMARY
                                                    ADJUDICATION OF ITS 1ST CLAIM
15          vs.                                     FOR RELIEF FOR BREACH OF
                                                    CONTRACT AND 12TH CLAIM FOR
16  ROMI OMAR MAYDER, an individual;               RELIEF FOR DECLARATORY RELIEF;
    WESLEY MAYDER, an individual; SILICON          MEMORANDUM OF POINTS AND
17  TEST SYSTEMS, INC., a California Corporation;   AUTHORITIES**
    and SILICON TEST SOLUTIONS, LLC, a
18  California Limited Liability Corporation,       Date:  October 17, 2008
    inclusive,                                      Time:  9:00 a.m.
19                                                  Ctrm.:  6, 4th Fl.
                    Defendants.                     Judge:  Hon. Ronald M. Whyte
20

21                                                  Complaint Filed:    August 22, 2007
                                                    Trial Date:         None Set
22

23  AND RELATED CROSS-ACTIONS

24

25                     **PUBLIC VERSION OF**

26                    **HIGHLY CONFIDENTIAL**

27           **DOCUMENT SUBMITTED UNDER SEAL**

28

# TABLE OF CONTENTS

I.     STATEMENT OF ISSUES TO BE DECIDED (N.D. Cal. Civ. L.R. 7-4(a)(3)) ............... 1

II.    INTRODUCTION AND BACKGROUND ........................................................................ 1

III.   STATEMENT OF FACTS NOT GENUINELY DISPUTED ............................................ 3

    A.    Mayder's Employment with Verigy ........................................................................ 3

    B.    While Employed By Verigy, Mayder Founded STS LLC. ...................................... 7

    C.    While Employed By Verigy, Mayder Used Verigy's Information For the
       Benefit of STS LLC. ............................................................................................... 7

    D.    Procedural History ................................................................................................ 11

IV.    ARGUMENT. .................................................................................................................. 12

    A.    Verigy is Entitled to Summary Adjudication on its First Claim for Relief as
       There are no Disputed Material Facts as to Liability ........................................... 13

         1.    Mayder Breached Section 1 of the ARCIPD by Misappropriating
            Verigy's "Confidential Information." ........................................................ 13

         2.    Mayder Breached Section 2 of the ARCIPD by Failing to Disclose
            and Assign to Verigy His Rights to the ██████ and the
            Provisional Patent Application ................................................................... 16

         3.    Labor Code Section 2870 Does Not Preclude Assignment Of The
            Verigy Material To Verigy Pursuant To The ARCIPD. ........................... 19

         4.    Verigy Need Not Provide Evidence of Actual Damages for Purposes
            of This Motion ............................................................................................ 22

    B.    Verigy is Entitled to Summary Adjudication on its Twelfth Claim for Relief ..... 23

V.     CONCLUSION ................................................................................................................ 25

1

## TABLE OF AUTHORITIES

2

3    **Federal Cases**

4

*Anderson v. Liberty Lobby, Inc*
5          477 U.S. 242 (1986) ................................................................................ 12

6    *Cadence Design Systems, Inc. v. Bhandari*
      2007 WL 3343085 (N.D. Cal. Nov. 8, 2007)...................................... 17, 19, 21
7

*Celotex Corp. v. Catrett*
8          477 U.S. 317 (1986) ................................................................................ 12

9    *Eisenberg v. Insurance Co. of North America*
      815 F.2d 1285 (9th Cir. 1987)............................................................. 12, 13
10

*Goodyear Tire & Rubber Co. of Akron Ohio v. Miller*
11         22 F.2d 353 (9th Cir.  1927)................................................................ 24

12   *Hauck Mfg. Co. v. Astec Indus., Inc.*
      376 F. Supp. 2d 808 (E.D.Tenn. 2005) ............................................... 14
13

*HiRel Connectors, Inc. v. U.S*
14         2006 WL 3618008 (C.D. Cal. July 18, 2006) ..................................... 14

15   *Iconix, Inc. v. Tokuda*
      457 F.Supp.2d 969 (N.D. Cal. 2006) .............................................. 17, 22
16

*McCoy Assocs., Inc. v. Nulux, Inc.*
17         218 F. Supp. 2d 286, 293-94 (E.D.N.Y. 2002) ................................. 22

18   *Schwan-Stabilo Cosmetics GMBH & Co. v. Pacificlink Int'l Corp.*
      401 F. 3d 28 (2005)................................................................................. 22
19

*Sit-Up Ltd. v. IAC/InterActive Corp.*
20         2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ..................................... 23

21   *State of Cal., on Behalf of California Dept. of Toxic Substances Control v. Campbell*
      138 F.3d 772 (9th Cir. 1998)................................................................ 13
22

*Stevens v. Bankers. Ins. Co.*
23         970 F.Supp. 769 (N.D. Cal. 1997) ...................................................... 22

24   *ViChip Corp. v. Lee*
      438 F.Supp.2d 1087 (N.D. Cal. 2006) ................................................ 17

25

26

27

28

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C07 04330 RMW (HRL)

**State Cases**

*Ajaxo Inc. v. E\*Trade Group, Inc.*
    135 Cal. App. 4th 21 (2005)....................................................................14

*Allis-Chalmers Corp. v. City of Oxnard*
    126 Cal.App.3d 814, (1981)....................................................................23

*Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*
    116 Cal. App. 4th 1375 (2004)................................................................13

*Bernier v. Merrill Air Engineers*
    770 A.2d 97 (Me. 2001) ....................................................................14, 15

*Cubic Corp. v. Marty*
    185 Cal.App.3d 438 (1986)................................................17, 18, 19, 20

*Famous Players-Lasky Corp. v. Ewing*
    49 Cal.App. 676 (1920)...........................................................................24

*Robinson v. Raquet*
    1 Cal.App.2d 533 (1934).........................................................................22

*Shaw v. Regents of University of California*
    58 Cal.App.4th 44 (1997)........................................................................23

*Sweet v. Johnson*
    169 Cal.App.2d 630 (1959).....................................................................22

*Zahler v. Columbia Pictures Corp.*
    180 Cal.App.2d 582 (1960).....................................................................23

**State Statutes**

California Labor Code § 2860.........................................................................23, 24

California Labor Code § 2870...........................................................19, 20, 21, 22

**Federal Rules**

Fed. R. Civ. Pro. Rule 56(d)(2) .............................................................................13

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES    Case No. C07 04330 RMW (HRL)

**NOTICE OF MOTION AND MOTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on Friday, October 17, 2008, at 9:00 a.m., or as soon thereafter as the matter may be heard before the Hon. Ronald M. Whyte, United States District Judge, in Courtroom 6 of the United States District Court for the Northern District of California, San Jose Division, 280 South First Street, San Jose, California, plaintiff Verigy U.S., Inc. ("Verigy"), shall and hereby does move the Court for (1) summary adjudication of liability on its first claim for relief for breach of contract (2) partial summary adjudication of its twelfth claim for relief for declaratory relief, as t the ▮▮▮▮ technology.

This motion is based on this notice of motion and motion, the supporting memorandum of points and authorities, the declaration of Michael Stebbins (the "Stebbins Decl."), the complete files and records in this action, and such additional evidence and argument as may hereafter be presented.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     STATEMENT OF ISSUES TO BE DECIDED (N.D. Cal. Civ. L.R. 7-4(a)(3))**

1.     Whether Verigy is entitled to judgment as a matter of law on the First Claim for Relief for breach of contract because there are no genuine issues of material fact to be tried with respect to the liability portion of such claim for relief because defendant Romi Mayder breached his Agreement Regarding Confidential Information and Proprietary Developments ("ARCIPD").

2.     Whether Verigy is entitled to judgment as a matter of law on the Twelfth Claim for Relief for declaratory relief because there are no genuine issues of material fact to be tried with respect to such claim for relief.

**II.     INTRODUCTION AND BACKGROUND**

This case involves the misappropriation of Verigy's valuable trade secrets and confidential information by Romi Mayder, a former Verigy employee, by the new companies he formed, Silicon Test Solutions, LLC ("STS LLC") and Silicon Test Systems Inc. ("STS, Inc.") (collectively, the "STS Entities"), and by Romi Mayder's brother and co-conspirator, defendant Wes Mayder, who invested in both STS Entities, was a member of STS LLC and a board member of STS, Inc.

There are many disputed facts in this case, but as to the single question at issue in this

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C07 04330 RMW (HRL)

motion—whether Mayder breached his contract with Verigy—there are none.  It is undisputed that
Mayder entered into the "Agreement Regarding Confidential Information and Proprietary
Developments" ("ARCIPD") with Verigy, a company that provides memory testing solutions for the
semiconductor industry.  It is undisputed that Verigy, like thousands of other high technology
companies in Silicon Valley and elsewhere, wanted to protect confidential information developed
through substantial investment and time.  It is undisputed that any confidential information that
Mayder learned as a Verigy employee was to be used only for Verigy's business.  It is undisputed
that Mayder used Verigy's confidential information for his own purposes and not for his work at
Verigy.  And it is undisputed that Mayder secretly developed a product based on his work at Verigy
and drafted a provisional patent application for this technology while still employed at Verigy.

Romi Mayder's breaches were knowing, willful and flagrant.  They began mere days after
Mayder signed the ARCIPD, and continued for the next several months.  They occurred while
Mayder continued to work on Verigy's research and development efforts for the product he intended
to steal.  They occurred while Mayder discouraged his Verigy team members from pursuing the
Verigy project for NOR testing—a market he eventually targeted for his own business.  And these
breaches occurred, not by accident, but deliberately, as Mayder made attempts to cover his tracks by
asking his supplier's sales representative to keep his activities "confidential."

Assignment and confidentiality agreements such as the ARCIPD reinforce the basic tenet
and codified law that inventions made by an employee that relate to the business or research of the
employer belong to the employer.  Mayder's misconduct represents the clearest form of breach:
while still employed at Verigy, he took a Verigy project, modified it slightly, and created his own
company to sell it.  Accordingly summary adjudication should be granted in Verigy's favor as to
liability on the First Claim for Relief for breach of contract and for summary adjudication of the
Twelfth Claim for Relief.[1]

---

[1]   Verigy moves for summary adjudication of these claims only to the extent described in this
motion.  There are other aspects of Verigy's First and Twelfth claims that are not included in this
motion due to possibly disputed issues of fact.  Verigy expressly reserves the right to pursue the
other aspects of these claims at trial.

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES                Case No. C07 04330 RMW (HRL)

III.     STATEMENT OF FACTS NOT GENUINELY DISPUTED

     A.     Mayder's Employment with Verigy.

     Verigy designs, develops, manufactures and sells advanced test systems and solutions for the semiconductor industry.  (Leventhal Decl. in Supp. of Verigy's Ex Parte Appl. for TRO ("Leventhal August 22, 2007 Decl."), ¶ 3.  One of Verigy's stated goals is to enable "designers and manufacturers to lower cost-of-test and improve their competitiveness."  (Stebbins Decl., ¶ 2, Ex. A.)  Verigy is a spin-off from Agilent Technologies, Inc. ("Agilent") and successor-in-interest to certain of Agilent's intellectual property.  (Leventhal August 22, 2007 Decl. at ¶ 1.)  Agilent is a spin-off from Hewlett Packard Company ("HP") and successor-in-interest to certain of HP's intellectual property.  (*Id.*)

     Romi Mayder was continuously employed from June 15, 1998 to September 21, 2006 by Verigy and its predecessors, Agilent and HP, and became a Verigy employee on June 1, 2006. (Declaration of Manuel Guerzoni (Docket No. 6) ("Guerzoni Decl."), ¶¶2, 3, Ex. A.)  In consideration for the ARCIPD and in performance of its obligations to Mayder, Verigy continued to employ Mayder until September 21, 2006 and ███████████████████████.  (*See* Decl. of Romi Mayder, October 11, 2007 (Docket No. 55.), ¶ 37, Ex. A; Stebbins Decl., ¶ 3, Ex. B.)

     On May 6, 2006, as a condition of his employment with Verigy, Mayder was required to sign, and did sign, the ARCIPD.  (Guerzoni Decl., ¶ 3, Ex. B.)  The ARCIPD contains the following pertinent provisions:

> 1.     This Agreement concerns trade secrets, confidential business and technical information, and know-how not generally known to the public which will become known to or acquired or produced by me in connection with my employment by Verigy (hereinafter "Confidential Information.")  Confidential Information includes, without limitation, information on Verigy organizations and structure; staffing; finance; strategic plans; information on employee performance, compensation, assignments; information on research and development, manufacturing and marketing; as well as information which Verigy receives from third parties under an obligation of confidentiality.  Confidential Information also includes information of the foregoing types that I received during any period of employment with Agilent Technologies, Inc., whether such information relates to Agilent or is or was received from third parties under an obligation of confidentiality.  I agree: (a) to use such Confidential Information only in the performance of Verigy duties; (b) to hold such Confidential Information in confidence and trust; and (c) to use all reasonable precautions to ensure that such Confidential Information is not disclosed to unauthorized persons or used in an unauthorized manner, both during and after my employment with Verigy.

2.    This Agreement also concerns inventions or discoveries (whether or not patentable), designs, works of authorship, mask works, improvements, data, processes, computer programs and software (herein called "Proprietary Developments") that are conceived or made by me alone or with others while I am employed by Verigy or that relate to the research and development or the business of Verigy.  Such Proprietary Developments are the sole property of Verigy, and I agree: (a) to disclose them promptly to Verigy; (b) to assign them to Verigy; and (c) to execute all documents and cooperate with Verigy in all necessary activities to obtain patent, copyright, mask works and/or trade secret protection in all countries, at Verigy US, Inc.'s expense.

3.    The product of all work performed by me during and within the scope of my Verigy employment including, without limitation, any reports, documents drawings, computer programs, devices and models, including all copies thereof, will be the property of Verigy and Verigy will have the sole right to use, sell, license, publish or otherwise disseminate or transfer rights in such a work product.

4.    I will not remove any Verigy property from Verigy premises without Verigy US, Inc.'s permission

5.    Upon termination of my employment with Verigy, I will return all Verigy property to Verigy unless Verigy authorizes me in writing to retain such property.

(*Id.*)

On June 1, 2006, the day Verigy started operations, an email was sent to all Verigy employees reminding them not to share confidential company information.  (Declaration of Amy Price, ¶ 2, Ex. A.)  The email states, *inter alia*:

Although much work has been done to separate Verigy from Agilent, many Verigy employees will continue to have access to Agilent's internal information. As a Verigy employee you are required by the Standards of Business Conduct not to misuse that access.

(*Id.*)  The email goes on to define "confidential information" and prohibit its disclosure:

Other than in the performance of your work for Agilent and/or Verigy, you shall not use or disclose to any person or entity any confidential information of Agilent (whether in written, oral, electronic or other form), which is obtained from Agilent or otherwise prepared or discovered either in your work for Agilent and/or Verigy, through access to Agilent Assets/Systems, or while on Agilent premises. As used herein, the term "confidential information" shall include, without limitation, all information designated by Agilent as confidential, all information or data concerning or related to Agilent's products (including the discovery, invention, research, improvement, development, manufacture, or sale thereof), processes, or general business operations (including sales costs, profits, pricing methods, organization and employee lists) and any information obtained through access to any Information Assets/Systems (including computers, networks, voicemail, etc.) which, if not otherwise described above, is of such a nature that a reasonable person would believe it to be confidential or proprietary.

- 4 -

1

2   (*Id.*)  Finally, the email states:  "Access is granted solely to facilitate your work for Agilent and/or

3   Verigy, and is limited to those specific Assets/Systems and time periods that you have been

4   authorized for."  (*Id.*)

5           Verigy's Standards of Business Conduct state, in pertinent part, that:

6           All nonpublic information, including financial data and projections, proprietary and
        technical information, . . . must only be used for company business purposes.  You
7           have an obligation to use all reasonable efforts to safeguard Verigy's nonpublic
        information.  You may not disclose nonpublic information to anyone outside of the
8           company, except when disclosure is required by law or when disclosure is required
        for business purposes and appropriate steps have been taken to prevent misuse of
9           that information.

10  (*Id.*, ¶ 3, Ex. B (Standards of Business Conduct).)  Characteristically, when questioned in

11  deposition regarding Verigy's Standards of Business Conduct, Mayder claimed he had never seen

12  them.  (Stebbins Decl., ¶ 4, Ex. C (STS Depo. Tr. at 233:9-12).)

13          Mayder was employed by Verigy as a hardware design engineer in the Memory Test

14  Division from June 1, 2006 until September 21, 2006.  (Guerzoni Decl., ¶2; Declaration of Ira

15  Leventhal in support of Verigy's Ex Parte Application for Temporary Restraining Order, etc.

16  ("Leventhal Decl., August 22, 2007"), ¶ 9.) (Docket No. 9)  Part of Mayder's work for Verigy was

17  to investigate technology and develop specifications for an ASIC eventually called the ███████

18  ███. (Declaration of Romi Mayder in Response to Order to Show Cause ("Mayder Decl.,

19  October 11, 2007") (Docket No. 55) ¶19; Leventhal Decl., August 22, 2007, ¶ 9.)  His

20  responsibilities included developing a request for quote ("RFQ") to be sent to vendors to solicit

21  proposals for implementing the design and manufacturing the ███████████. (*Id.*)

22          Verigy sent the RFQ for the ███████████ (and accompanying technical specification)

23  (███████████ to ███████████████. (Lee Decl., ¶ 6, Ex. A.)  The

24  ███████████ is explicitly marked "Agilent Confidential."  (*Id.*)  The ███████████ includes

25  "information on employee… assignments; information on research and development,

26  manufacturing and marketing," and thus falls within the ARCIPD's definition of "Confidential

27  Information."  (*Id.*; Guerzoni Decl., ¶ 3, Ex. B.)  The ███████████ was sent pursuant to the

28

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES                    Case No. C07 04330 RMW (HRL)

1    nondisclosure agreement between ██████████ and Verigy.  (Lee Decl., ¶ 6; Stebbins Decl., ¶¶ 5

2    and 6, Ex. D and E.)

3           ██████████ responded to the ██████████ on May 17, 2006.  (Stebbins Decl., ¶ 7, Ex.

4    F.)  The response includes additional information about the planned "research and development,

5    manufacturing and marketing" for the ██████████.  (*Id.*; Guerzoni Decl., ¶ 3, Ex. B.)  The

6    ██████████ response, which quotes extensively from the ██████████, states that "Information

7    contained within this document [sic] subject to confidentiality agreements executed between

8    ██████████ and Agilent."  (Stebbins Decl., ¶7, Ex. F.)  Mayder received ██████████ response to

9    the ██████████ on May 17, 2006, less than a month before he co-opted Verigy's RFQ for his

10   own use, so he cannot now claim that he was not on notice that the RFQ was confidential.  (*Id.* at

11   4414.)

12          As part of his work for the ██████████, Mayder reviewed a spreadsheet showing

13   customer requirements and diagrams for Verigy's planned switch configuration for the ██████████

14   ██████████ (the middle portion of each diagram between the dotted lines).  (Lai Suppl. Decl., ¶ 4.)  The

15   diagrams contain information from Verigy's customers that was not publicly available.  (*Id.*)  For

16   example, ██████████████████████████████████████████████████████

17   ██████████████████████████████████████████████.  (*Id.*, ¶

18   4, Ex. 2.)  The spreadsheet also contains confidential information.  As the document's author

19   stated, ████████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████  (Lai Suppl. Decl., ¶

22   2.)  This document is the epitome of a detailed customer list, including customer requirements and

23   internal recommendations that were the results of years of research and experience.  (Lai Decl., ¶

24   3.)  Further, the customer information in this spreadsheet was only shared pursuant to non-

25   disclosure agreements.  (*Id.*)  Indeed, Mayder's own declarant, ██████████████████████

26   ██████████████████████████████████████████████████████

27   ██████████████████ (Weber Decl., ¶ 6.) (Docket No. (none-submitted under seal)

28

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES                    Case No. C07 04330 RMW (HRL)

1   In addition, as part of Mayder's work on the ████████████ Mayder evaluated whether

2   the ASIC should address NOR memory as well as NAND memory, and he specifically evaluated

3   and examined schematics for NOR fanout for ████████ semiconductor devices.  (Stebbins Decl.,

4   ¶ 8, Ex. G.)  However, mere weeks before his theft of the ████████████ (and possibly while

5   already planning his new business), Mayder advised the Verigy team that NOR would be too

6   difficult to include in the current project due to an alleged need for increased density.  (*Id.*)

7       **B.       While Employed By Verigy, Mayder Founded STS LLC.**

8       In early June 2006, Mayder contacted Robert Pochowski, a former Agilent executive who

9   was not a Verigy employee, about the possibility of forming a business together.  (Mayder Decl.,

10  October 11, 2007, ¶¶23, 28; Declaration of Robert Pochowski in Support of Verigy's Ex Parte

11  Application for a Temporary Restraining Order, etc. ("Pochowski Decl., August 22, 2007")

12  (Docket No. 11) ¶ 4.)

13      On June 8, 2006, Mayder met with Pochowski and asked him to invest in a company he

14  was starting.  In an apparent attempt to cause confusion as to his affiliation with Agilent/Verigy,

15  Mayder named his competing company "Silicon Test Solutions," the name of one of the divisions

16  at Agilent that Mayder worked for.  (Pochowski Decl., August 22, 2007, ¶¶4-6; Stebbins Decl., ¶

17  9, Ex. H.)  On June 15, 2006, Mayder registered the domain name "silicontest.com" with Network

18  Solutions for his new company.  (Mayder Decl., October 11, 2007, ¶32; Stebbins Decl., ¶ 10, Ex.

19  I.)  Mayder was the administrator for the website.  *Id.*

20      On September 8, 2006, Silicon Test Solutions, LLC was registered with the California

21  Secretary of State.  (*Id.*, ¶11, Ex. J.)

22      **C.       While Employed By Verigy, Mayder Used Verigy's Information For the
             Benefit of STS LLC.**

23

24      In early June 2006, mere weeks after signing the ARCIPD with Verigy that affirmatively

25  stated he was not authorized at any time to use or disclose confidential Verigy information, that

26  Verigy had the sole right to disseminate all work performed by him, and that he was not authorized

27  to remove Verigy property from its premises without Verigy's permission, Romi Mayder began

28  emailing confidential Verigy documents to his home computer, using his Yahoo email account to

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES              Case No. C07 04330 RMW (HRL)

1  cover up his activities.  (Stebbins Decl. ¶ 12, Ex. K.) (Romi Mayder Depo.Tr.,  211-213) and Ex. L

2  (Romi Mayder Depo. Ex. 29).)  Among the documents Mayder emailed to himself were the RFQ

3  and specification for the Verigy ██████████.  (*Id.* and at Ex. K (Romi Mayder Depo Tr.,

4  211-213; 215-221);  Declaration of Andrew Lee in support of Verigy's Ex Parte Application for

5  Temporary Restraining Order, etc. ("Lee Decl.") (Docket No. 8), ¶ 6, Ex. A); Morton Decl.,

6  August 22, 2007, ¶4, Ex. B and C; Pochowski Decl., August 22, 2007, ¶¶19-20, Ex. I and J.)

7  Mayder revised it slightly, ███████████████████████████████████████

8  ███████████████████ (Stebbins Decl., ¶ 12, Ex. K (Romi Mayder Depo.Tr., at 215:16-217:16;

9  218:14-221:5) and Ex. M (Romi Mayder Depo Ex. 30.)

10         On June 12, 2006, during his work day at Verigy, Mayder emailed the altered specification

11  to Pochowski, without benefit of a nondisclosure agreement, from his private email account at

12  ███████████████.  (Mayder Decl., October 11, 2007, ¶28; Stebbins Decl., ¶12, Ex. K

13  (Romi Mayder Depo.Tr., at 211:6-12) and Ex. L (Romi Mayder Depo. Ex. 29); Pochowski Decl.,

14  August 22, 2007, ¶ 7, Ex. A.) Mayder described the document as ████████████████

15  ██████████████████████████ (*Id.*)  The properties window for the RFQ

16  Mayder sent to Pochowski shows it was an Agilent document.  (Pochowski Decl., August 22,

17  2007, ¶18, 19, Ex. I.)  The document is virtually identical to a document Mayder created for

18  Verigy.  (*Cf.* Pochowski Decl., August 22, 2007, Ex. A *with* Lee Decl., August 22, 2007, Ex. A;

19  *see also* Morton Decl., August 22, 2007, ¶4, Ex. B (a redline comparison of the two documents).)

20  The documents even have the same typographical and grammatical errors.  (Morton Decl., August

21  22, 2007, ¶4.)

22         On June 14, 2006, during his work day at Verigy, Mayder sent Pochowski ████████

23  ██████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████████

25  ███████████ (Pochowski Decl., Aug. 22, 2007, ¶9, Ex. B.) ████████████████████████

26  ██████████ (*Id.*) ███████████████████████████████████████████

27  ███████████████████████████████████████████████████ *Id.* The

28  properties windows for both documents show they were Agilent documents.  (Pochowski Decl.,

- 8 -



1   August 22, 2007, ¶¶9, 18-20, Ex. I, J.)  A comparison of the ██████████████████████

2   ████████████████████████████ (which Mayder worked on at Verigy) shows the two

3   documents with identical layouts, section headings, information structure, and typographical

4   errors.  (*Cf*. Lee Decl., ¶6, Ex. A *with* Pochowski Decl., Aug. 22, 2007, ¶9, Ex. B; *see also*, Morton

5   Decl., Aug. 22, 2007, ¶5, Ex. C (a redline comparison of the two documents).)  Mayder has

6   admitted ████████████████████████████████████████████████████████████████

7   ████████████████████ Stebbins Decl. ¶ 12, Ex. K (Romi Mayder Depo. Tr. 185:7-15).)

8           On June 20, 2006, during his work day at Verigy, Mayder emailed ████████████████

9   ████████████████████████████████████████████████████████

10  (Pochowski Decl., Aug. 22, 2007, ¶ 10, Ex. C.)

11          On June 22, 2006, during his work day at Verigy, Mayder informed ████████████

12  ████████████████████████████, that ████████████████████████████████████████

13  ████████████████████ (Stebbins Decl., ¶ 15, Ex. N (Ex. 193 to Straube Depo.Tr.))  Mayder said

14  that ████████████████████████████████████████████, and asked ████████████

15  ██████████████ for him.  (*Id*.)

16  ████████████████████████ (*Id*.) ████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████ (*Id*.) ██

19  ████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████

21          On June 26, 2006, during his workday, Mayder emailed to Pochowski ████████████

22  ████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████ (Pochowski Decl., August 22, 2007, ¶ 11, Ex. D) ██████████

24  ████████████████████████████ (Stebbins Decl., ¶12, Ex. K (Mayder Depo Tr.

25  223:14-224:15).)  His admission is confirmed by the document's properties window, which show

26  the author of the document to be Hanh Lai of Agilent.  (Pochowski Decl., August 22, 2007, ¶21,

27  Ex. K.).  Further, the spreadsheet has the same typographical errors as the original Verigy

28  document, and the diagrams appear to be identical to confidential documents created at Verigy.

1   (*Cf.* Pochowski Decl., August 22, 2007, Ex. D *with* Declaration of Ken Hanh Duc Lai In Support

2   of Plaintiff's Ex Parte Application for TRO, etc. ("Lai Decl., Aug. 22, 2007") Ex. A; *see also*, Lai

3   Decl., Aug. 22, 2007, (Docket No. 7) ¶¶3-7, Ex. B-D; Declaration of Ken Hanh Duc Lai In

4   Support of Plaintiff's Reply and Supplemental Brief Re OSC Re Preliminary Injunction ("Lai

5   Decl., Nov. 16, 2007") (Docket No. 100) ¶¶2-4.)  Mayder admitted ██████████████████

6   ████████████████████████████████████ (Stebbins Decl., ¶ 12, Ex. K.

7   (223:14-18; 225:23-226:8.).)

8       On June 30, 2006, during his work day at Verigy, Mayder emailed ██████████████

9   ████████████████████████████ (Stebbins Decl., ¶ 16, Ex. O,

10  Exhibits 149, 150 to Straube Depo. Tr.).) ████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ██████ (Mayder Decl., October 11, 2007, ¶38.) ████████████████████████

13  ████████████████████████████████ (Pochowski November 15,

14  2007 Decl., ¶¶ 17, 18, Exs. 7, 8.)

15      On August 6, 2006, Mayder emailed ████████████████████████

16  ████████████████████ (Pochowski Decl. in support of Plaintiff's

17  Reply and Supplemental Papers re: Preliminary Injunction  ("Pochowski Decl., November 16,

18  2007") (Docket No. 97), ¶ 8, Ex. 1); Lai Decl., November 16, 2007, ¶¶5-6, Ex. 3 and 4; Stebbins

19  Decl., ¶¶ 12, 17, Ex. K (Romi Mayder Depo.Tr. at 232:15-234:7) and Ex. P (Romi Mayder Depo.

20  Exhibit 33).

21      On at least two of these occasions (June 26 and August 6, 2006), Mayder ████████

22  ████████████████████████████████████████████████████

23  ██████████████████ (Pochowski Decl., August 22, 2007, ¶ 11, Ex. D; Pochowski Decl.,

24  November 16, 2007, ¶ 8, Ex. 1.)

25      On August 27, 2006, Mayder sent a draft patent application for ██████████████

26  ████████████████████████ to Pochowski.  (Pochowski Decl., August 22, 2007, ¶ 13, Ex.

27  F.)  The document is marked "Memory Test Division," the Verigy division that Mayder worked in

28  at the time.  (*Id.*; Stebbins Decl., ¶ 18, Ex. Q.)



1

2

3 (Pochowski Decl., August 22,

4 2007, ¶ 13, Ex. F.)

5 (*Id.*)

6 (*Id.*)

7 (*Id.*)

8

9

10 (Pochowski Decl. Ex. G.)

11 (Stebbins Decl., Ex. R.)

12

13 (Pochowski

14 November 15, 2007 Decl., ¶ 11, Ex. 3.)

15

16 (*Compare id.* with Pochowski Decl., August 22, 2007, ¶ 13, Ex. F.)

17 **D. Procedural History**

18 On August 22, 2007, after Verigy's investigation revealed that Mayder had misappropriated

19 and was using Verigy's trade secrets, Verigy filed this action and sought a temporary restraining

20 order ("TRO"). The TRO was granted on August 24, 2007 and remained in force until replaced by a

21 five (5) month preliminary injunction granted by this Court on February 29, 2008. (Docket No.

22 171.) In the preliminary injunction order, the Court found:

23

24 Mayder's work on ▮▮▮▮▮ falls within the scope of Proprietary Developments conceived or made by him while he was employed by Verigy. Similarly, at least

25 until the time Mayder left Verigy in September 21, 2006, there is little question based on the evidence presented to date that ▮▮▮▮ does so as well. . . . Thus, the evidence of record demonstrates that Mayder was most likely obligated to assign

26 ▮▮▮▮▮▮▮▮▮▮▮▮ to Verigy because (1) ▮▮▮▮ was a research project commenced at the direction of Verigy, (2) the information

27 upon which ▮▮▮ is based was collected, compiled and created by Verigy as part of the ▮▮▮▮ project, and (3) the ARCIPD required Mayder to disclose and

28 assign to Verigy Proprietary Developments he made while he was employed by

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES          Case No. C07 04330 RMW (HRL)

1    Verigy that related to "the research and development or business of Verigy."
     Therefore, for purposes of this motion, the court finds that features found in ████
2    data sheets or other documentation up to September 2006 are likely to belong to
     Verigy under the ARCIPD

3

4    (Preliminary Injunction Order at 18:4-18.)  The Court's opinion went on to discuss the similarities

5    between the RFQs for the ███████████████████ (*Id.* at 18:19-19:5) and the ████████

6    ██████████████ (*Id.* at 19:7-21:3), finally concluding that STS's "Picasso product was based

7    upon the trade secret combination of technical components set forth above customized with the use

8    of Verigy's customer requirements" (*Id.* at 23:11-12) and that █████████ . . . is substantially

9    based upon Verigy's trade secrets [and] . . . is, at the very least, ████████████████████

10   ██████████████████ (*Id.* at 23:19-22.)  The preliminary injunction was extended for

11   another four (4) months by subsequent order, dated May 20, 2008, which found Mayder and STS,

12   Inc. in contempt of the TRO.  (Docket No. 212.)

13   **IV.     ARGUMENT**

14           Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment when "the

15   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

16   affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

17   party is entitled to judgment as a matter of law."  Material facts are those that might affect the

18   outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute as

19   to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

20   verdict for the nonmoving party.  *Id.*

21           As the moving party, Verigy bears the initial burden of identifying evidence showing the

22   absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

23   Once it has done so, the burden shifts to Defendants to set forth specific facts showing a genuine

24   issue.  *Anderson*, 477 U.S. at 250.  A mere "scintilla" of evidence will not suffice; the non-moving

25   party must show that the fact-finder could reasonably find for the non-moving party.  *Id.* at 251.

26   "If the evidence is merely colorable. . . or is not significantly probative, summary judgment may

27   be granted."  *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987)

28   (citing *Anderson*, 477 U.S. at 251).

The same standards and criteria apply to motions for summary adjudication. *State of Cal., on Behalf of California Dept. of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998)*. Summary adjudication may be rendered on the issue of liability, even if a genuine issue exists as to the amount of damages. Fed. R. Civ. Pro. Rule 56(d)(2).

Verigy moves for summary adjudication of its First Claim for Relief for breach of contract on the issue of liability. Verigy also moves for summary adjudication of its Twelfth Claim for Relief for declaratory relief.

### A.    Verigy is Entitled to Summary Adjudication on its First Claim for Relief as There are no Disputed Material Facts as to Liability

The elements of a cause of action for breach of contract are "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.*, 116 Cal. App. 4th 1375, 1391 (2004) (citation omitted). Defendants have never disputed the existence of the ARCIPD or the terms. (Stebbins Decl., ¶ 12, Ex. K (37:5-40:7.) Further, there cannot be any genuine issue of fact as to Verigy's performance pursuant to the ARCIPD, because the only performance required of Verigy by the ARCIPD was employing and paying Mayder. Mayder has admitted that he was an employee of Verigy and that he was paid compensation. (Decl. of Romi Mayder, October 11, 2007 (Docket No. 55.), ¶ 37, Ex. A.) Nor can there be any dispute on this motion regarding the fact of damages, given that Verigy's motion is addressed to liability only and that, in any event, nominal damages are presumed for breach of contract. *See* Cal. Civ. Code § 3360; *See also* Section III (A) (c), infra. The only remaining question, therefore, is whether the conduct described above constitutes a breach of the ARCIPD. On that point, the evidence is unambiguously conclusive.

### 1.    Mayder Breached Section 2 of the ARCIPD by Misappropriating Verigy's "Confidential Information."

The ARCIPD unambiguously prohibits use of "Confidential Information" for any purpose other than "in the performance of Verigy duties." (Guerzoni Decl., ¶ 3, Ex. B.) Mayder agreed

1

2    (a) to use such Confidential Information only in the performance of Verigy duties;
     (b) to hold such Confidential Information in confidence and trust; and (c) to use all
     reasonable precautions to ensure that such Confidential Information is not disclosed
     to unauthorized persons or used in an unauthorized manner, both during and after
3    my employment with Verigy.

4    (*Id.*)  The ARCIPD defines "Confidential Information" as including, without limitation,

5    "information on Verigy organizations and structure;" "strategic plans;" "assignments; information

6    on research and development, manufacturing and marketing; as well as information which Verigy

7    receives from third parties under an obligation of confidentiality."  (*Id.*).  Thus, if Mayder used or

8    disclosed information that fits within the ARCIPD's definition of "Confidential Information" for

9    reasons other than the performance of his Verigy duties, Mayder breached the ARCIPD *even if the*

10   *information does not qualify as a "trade secret" under the UTSA.*

11        California courts have recognized that a breach of contract action is viable where disclosed

12   information does not qualify as a "trade secret" under the UTSA provided that the information is

13   protected by a confidentiality agreement.  *HiRel Connectors, Inc. v. U.S,* CV01-11069 DSFVBKX,

14   2006 WL 3618008 *1 (C.D. Cal. July 18, 2006) ("Plaintiff's claim for breach of contract survives

15   even if it is based solely on disclosure of the information….[that] the Court has already determined

16   are not protectable as trade secrets."); *Ajaxo Inc. v. E*Trade Group, Inc.,* 135 Cal. App. 4th 21, 62 n.

17   38 (2005) ("breach of contract cause of action may be available where disclosed information does

18   not qualify as a 'trade secret' under the UTSA…if the information is protected under a

19   confidentiality or nondisclosure agreement."); *see also, Hauck Mfg. Co. v. Astec Indus., Inc.,* 376 F.

20   Supp. 2d 808, 814-15 (E.D.Tenn. 2005) (defendant can breach confidentiality agreement by

21   appropriating confidential information that is not a trade secret); *Bernier v. Merrill Air Engineers,*

22   770 A.2d 97, 103 (Me. 2001) ("The confidential knowledge or information protected by a restrictive

23   covenant need not be limited to information that is protected as a trade secret by the UTSA").

24        There can be no dispute that Mayder breached Section 1 of the ARCIPD.  Mayder has

25   admitted to using several documents to jumpstart his STS business, which, by definition, could not

26   have been used for Verigy duties.  He admitted to using ████████████, which included

27   information on "research and development, manufacturing and marketing."  (Stebbins Suppl. Decl.,

28   Ex. K at 186:3-7; 211:6-213:5; 215:16-19; 220:14-221:1.)  ████████████ is explicitly marked

- 14 -

1  "Agilent Confidential."  (*Id.*) ███████████████ includes "information on employee…

2  assignments; information on research and development, manufacturing and marketing," and thus

3  falls within the ARCIPD's definition of "Confidential Information."  (*Id.*; Guerzoni Decl., ¶ 3, Ex.

4  B.) ██████████████ was transmitted pursuant to the nondisclosure agreement between

5  ████████ and Agilent, Verigy's predecessor.  (Lee Decl., ¶ 6; Stebbins Decl., ¶¶ 5&6, Ex. D&E.)

6  Mayder used the █████ customer requirements spreadsheet and accompanying block

7  diagrams for STS LLC, and these documents contained information related to research and

8  development, manufacturing and marketing, as well as information received from third parties under

9  an obligation of confidentiality, thus meeting the ARCIPD's definition of "Confidential

10  Information."  (Lai Decl., ¶¶ 3,7.)  As the spreadsheet's author stated, ███████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████████

13  ████████████████████████████  (Lai Suppl. Decl., ¶ 2.)  This document is

14  the epitome of a detailed customer list, including customer requirements and internal

15  recommendations that were the results of years of research and experience.  (Lai Decl., ¶ 3.)

16  Further, the customer information in this spreadsheet was only shared pursuant to non-disclosure

17  agreements.  (*Id.*) ███████████████████████████████████

18  ████████████████████████████████████████████████

19  (Weber Decl., ¶ 6.) ██████████████ based on the spreadsheet similarly contain "Confidential

20  Information," including information from Verigy's customers that was not publicly available.  (Lai

21  Suppl. Decl., ¶ 4.)  For example, ████████████████████████████

22  ████████████████████████████████████████

23  ██████████  (*Id.*, ¶ 4, Ex. 2.) ████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████  (Reply Decl. of Hanh Lai, Docket No.100, ¶ 2-4, Ex. 1; Morton Decl., Ex. B.

26  (Mayder Deposition at 185:7-15).)

27  Mayder also sent a product roadmap to Pochowski from his STS email account, and this

28  product roadmap contained information ████████████████████████████

- 15 -

1  ██████████████████████████████████████████████████████████████

2  (Pochowski Suppl. Decl., Ex. 1; Lai Suppl. Decl.¶¶ 5,6.)  This product roadmap was incorporated

3  into ██████████████████████████████████ (again, that was explicitly marked

4  confidential).  (Reply Decl. of Hanh Lai at ¶ 5-6, Ex. 4.)

5       Further, ████████████████████████████████████████████████

6  ██████████

7  ██████████████████████████████████████████████

8  ████████████

9  ██████████████████████████

10  ██████████

11  ██████████

12  ████████████████████

13  ██████████████████████████████

14  ██████████

15  (Stebbins Decl., Ex. K at 185:7-15.)  ████████████████████████████████████

16  ██████████████████████████ to jumpstart his own business, thus breaching his contract

17  with Verigy.

18          **2.    Mayder Breached Section 2 of the ARCIPD by Failing to Disclose and
                Assign to Verigy His Rights to the ██████████████ and the Provisional
19              Patent Application.**

20          It also cannot be disputed that Mayder breached the ARCIPD by failing to disclose to

21  Verigy and to assign his rights to the ██████████████████████████████, and any

22  related intellectual property developed during his employment with Verigy (collectively the

23  "Verigy Material") to Verigy pursuant to section 3 of the ARCIPD.

24          Section 3 of the ARCIPD provides:

25          This Agreement also concerns inventions or discoveries (whether or not
            patentable), designs, works of authorship, mask works, improvements, data,
26          processes, computer programs and software (herein called "Proprietary
            Developments") that are conceived or made by me alone or with others while I am
27          employed by Verigy or that relate to the research and development or the business
            of Verigy.  Such Proprietary Developments are the sole property of Verigy, and I
28          agree: (a) to disclose them promptly to Verigy; (b) to assign them to Verigy; and

1       (c) to execute all documents and cooperate with Verigy in all necessary activities to

2   obtain patent, copyright, mask works and/or trade secret protection in all countries, at Verigy US, Inc.'s expense.

3   Guerzoni Decl. ¶ 9. Ex. B.

4       Courts have consistently enforced an employer's ownership rights with respect to

5   inventions that fall within the scope of a valid invention assignment agreement.  For example, in

6   *Iconix, Inc. v. Tokuda,* 457 F.Supp.2d 969 (N.D. Cal. 2006), two employees left Iconix and started

7   a competing company whose product, consisting of a slideshow and website, was derived from the

8   employees' work at Iconix and "directly aimed at an area that Iconix was seeking to exploit, based

9   upon a feature that it was seeking to implement."  *Id.* at 985.  This Court determined that the

10  employees' invention was conceived, developed, and reduced to practice by the employees while

11  they were employed by Iconix and, therefore, that they were required to assign the invention to

12  Iconix pursuant to their proprietary information agreements.  *Id.* at 987-993.

13      In *Cadence Design Systems, Inc. v. Bhandari*, No. C07-00823 MHP, 2007 WL 3343085

14  (N.D. Cal. Nov. 8, 2007), an employee of LSI, while still working at LSI, partnered with others to

15  form a new company to develop and market EDA technology.  Ultimately, this new venture

16  developed a proposed EDA system that could be used to simulate a variety of different integrated

17  circuits, including the ASICs developed by LSI, and applied for and received a patent on this

18  invention.  This Court determined that LSI was the rightful owner of this patent pursuant to the

19  invention assignment agreement signed by the employee because the patent "related to" LSI's

20  business.  Specifically, the patent related to EDA tools, LSI's business relied on EDA tools to

21  manufacture ASICs, and the design and development of EDA tools was also part of LSI's

22  business.  *Id.* at *4-*8, *see also ViChip Corp. v. Lee,* 438 F.Supp.2d 1087, 1094-1095 (N.D. Cal.

23  2006) (employer was rightful owner of certain technology underlying a provisional patent

24  application where employee worked on technology while employed by employer and the

25  employment agreement, which provided that inventions "that *result* from work performed by

26  [employee] for [ViChip]" are expressly assigned to ViChip, required assignment to the employer)

27  (emphasis in original); *Cubic Corp. v. Marty,* 185 Cal.App.3d 438 (1986) (employer entitled to

28  summary adjudication of its claim for declaratory relief as to ownership of a patent for an

- 17 -

1  invention created by an employee while working at the company on basis that the invention came

2  within the scope of the invention and secrecy agreement signed by the employee, pursuant to

3  which the employee agreed, among other things, to assign to the company "all such ideas,

4  processes, inventions, improvements, developments and discoveries coming within the scope of

5  Company's business or related to Company's products or . . . any research, design experimental or

6  production work carried on by Company, or . . . any problems specifically assigned to Employee,

7  conceived alone or with others during this employment, and whether or not conceived during

8  regular working hours").

9  　　　　As in the decisions cited above, any portion of the Verigy Material developed by Mayder

10  prior to September 22, 2006 falls squarely within the terms of the ARCIPD and must be assigned

11  to Verigy.  It is undisputed that Mayder began developing the Verigy Material, including

12  specifically the ███████████,[2] ████████████████████████████████

13  ███████████ while still employed by Verigy.  It is not genuinely disputed that Mayder based the

14  Verigy Material on Verigy documents and research.  The Court found that "Mayder's work on

15  ███████████ falls within the scope of Proprietary Developments conceived or made by him while

16  he was employed by Verigy.  Similarly, at least until the time Mayder left Verigy in September

17  21, 2006, there is little question based on the evidence presented to date that ████ does so as

18  well."  (Prelim. Inj. Order at 18.)  Thus, it cannot be disputed that the Verigy Material relates " to

19  the research and development or the business of Verigy" and should have been assigned to Verigy

_____

21  [2]　Although Verigy has presented extensive evidence in the preliminary injunction briefing that
22  the ███████████ is simply a modified version of the ███████████ this is a disputed fact, and
   so for purposes of this motion, Verigy seeks relief and assignment only as to the ███████████ as
23  it existed during Mayder's employment at Verigy.  Verigy reserves its rights to seek relief and
   assignment of ███████████ and related intellectual property at trial.

1  pursuant to the express terms of the ARCIPD.

2  ### 3. Labor Code Section 2870 Does Not Preclude Assignment Of The Verigy Material To Verigy Pursuant To The ARCIPD.

3  California Labor Code § 2870, subject to a few limited exceptions, provides that an

4  employer is entitled to assignment of inventions falling within the scope of a valid invention

5  assignment agreement.  Inventions excluded from assignment include those which the employee

6  develops entirely on his or her own time without using the employer's equipment, supplies,

7  facilities, or trade secret information *unless* the invention either (1) relates at the time of

8  conception or reduction to practice to the employer's business, or actual or demonstrably

9  anticipated research or development of the employer; or (2) results from any work performed by

10  the employee for the employer.  Labor Code § 2870; *see also Cubic,* 185 Cal.App.3d at 452 ("To

11  avoid rendering the language mere surplusage, we construe the statutory language [of Labor Code

12  § 2870] to cover both the situation where the invention comes within the scope of the employer's

13  business (actual or demonstrably anticipated) and the situation where the invention was not within

14  the usual scope of the employer's business but resulted from work the employee did for the

15  employer. If either situation is present, then the employer has a right to the invention under an

16  assignment agreement.").  The law is clear that the employee bears the burden of establishing that

17  his or her invention falls within one of these exceptions.  *See Cubic,* 185 Cal.App.3d at 451 (*citing*

18  Labor Code § 2872); *see also Cadence Design Systems,* 2007 WL 3343085, at *5.

19  Here, Mayder cannot meet this burden.  It is indisputable that the Verigy Material relates to

20  Verigy's business and/or Verigy's research and development.  Verigy engaged in months of

21  research or development for the ███████████.  (Mayder Decl.[Oct. 11], ¶¶ 13-17; Wei Decl.

22  App. II.) ██████████████████████████████████████████

23  ███████████████████████████████████████████████

24  ███████████████ (Mayder Decl.[Oct. 11], ¶¶ 13, 14, 13-21.)  Mayder admits ██████

25  ██████████████████████████████████ (*Id.* at ¶ ██.)

26  Mayder also admits that ████████████████████████ (*Id.* at ¶ ██.)  Mayder

27  also admits that ████████████████████████████████

28

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES                    Case No. C07 04330 RMW (HRL)

1  ████████████████████████████████████████████████████████████

2  ███████████████████████████ (Stebbins Decl., ¶ 12, Ex. K (307:9-309:25.)  This

3  research and development work on the ████████████ ultimately served as the basis for Mayder's

4  development of the ████████████████ of the STS Entities.  Again, Mayder admits that he

5  used and copied documents from the ████████████ to jumpstart his work on the ████████████

6  (Stebbins Decl, ¶ 12, Ex. K (185.7-15.)  Mayder  attempted to characterize his work on ████████████

7  ████████████████████ as something other than research and development, but this

8  distinction is simply not credible—████████████████████████████████████

9  ████████████████████████████████████████████████████

10  ████████ (Stebbins Decl., ¶ 12, Ex. K (309:2-5; 308:21-309:25.)  As the Verigy Material is based

11  on and incorporates Verigy's work on the ████████████████████████ it cannot be

12  disputed that such product relates to Verigy's business and/or research and development.

13         Even if the Court were to assume that Verigy's activities with respect to the ████████████

14  ██████████████ did not constitute "research and development," Mayder cannot defeat the

15  second prong of Section 2870 -- that his product "results from *any* work performed by the

16  employee for the employer."  Labor Code § 2870 (a) (emphasis added).   The undisputed material

17  facts demonstrate that ████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████ Thus, it cannot be disputed that any work performed by Mayder on the ████████

21  ████ or any other portion of the Verigy Material results from work performed by Mayder for

22  Verigy.  Indeed, ████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████ (Stebbins Decl, ¶ 20, Ex. S.)

25         Whether or not Verigy is currently engaged in developing a product based on ████████████

26  ████ is irrelevant to this analysis.  The law is clear that Verigy need not show that it was in the

27  business of designing and developing the precise subject matter of Mayder's inventions, *See Cubic*

28  *Corp. v. Marty,* 185 Cal. App.3d, at 445.  As recently stated by this Court:

- 20 -

1
2
3
4
5
6
7
8
9
10
11

Courts interpreting employee assignment agreements in the context of section 2870 have construed the "related to" phrase broadly. *Cubic Corp v. Marty,* 229 Cal.Rptr. 438 (Cal.Ct.App.1986). In *Cubic,* the employee signed an invention agreement which assigned all inventions "coming within the scope Company's business or related to Company's products or to any research, design experimental or production work carried on by Company." *Id.* at 444, 229 Cal.Rptr. 828. The employee invented an electronic warfare simulator, which the employer did not yet have in its product line. The warfare simulator was a stand-alone product which did not necessarily have to be used in conjunction with the employer's pilot training programs. *Id.* at 447, 229 Cal.Rptr. 828. The court held that the employee's invention was related to the employer's business and its assignment was enforceable in light of section 2870. *Id.* at 451-452, 229 Cal.Rptr. 828 The court found that the employee presented his invention to the employer as "something to enhance" the employer's existing product line; that he designed the warfare simulator to function with the employer's pilot training program; and that the patent application stated the "preferred embodiment" of the invention was the employer's pilot training program. The employee himself recognized that his invention was related to his employer's business. *Id.* at 447, 229 Cal.Rptr. 828.

12

*Cadence Design Systems,* 2007 WL 3343085, at *5. Thus, the key facts are that Verigy engaged

13

in months of research and development on the ██████████████████████████, much of

14

which Mayder himself performed, and that ████████████████████████████████████

15

██████████████████████████████

16

Further, there is evidence that Mayder performed at least some work related to the

17

development of the ████████ during his workday at Verigy and using Verigy equipment.

18

Mayder admitted ████████████████████████████████████████████████████████

19

████████████████████████████ (Mayder Decl., October 11, 2007, ¶28; Stebbins

20

Decl., ¶12, Ex. K (Romi Mayder Depo.Tr., at 211:6-12) and Ex. L (Romi Mayder Depo. Ex. 29);

21

Pochowski Decl., August 22, 2007, ¶ 7, Ex. A.) ████████████████████████████████

22

████████████████████████████████████████████████████████████

23

████████████ (Stebbins Decl., ¶ 12, Ex. K at 227:18-229:21 and ¶ 14, Ex. M.) Many of the

24

emails Mayder sent to Pochowski and ████████ in June 2006 were sent during his work day at

25

Verigy.[3]  (*See* Section II(C), supra.) This additional evidence is in itself sufficient to take

26

_____

27
28

[3]  Any claim Mayder may make that he was on his lunch break, sent the emails from home, or took that day off must be substantiated by evidence of this, as he bears the burden of proving the Verigy Material falls into one of the exceptions listed in Labor Code §2870.

VERIGY'S MOTION FOR SUMMARY ADJUDICATION OF ITS 1ST AND 12TH CLAIMS FOR RELIEF;
MEMORANDUM OF POINTS AND AUTHORITIES              Case No. C07 04330 RMW (HRL)

Mayder's invention outside of the scope of Section 2870. *See, e.g., Iconix*, at 989-990 (evidence that employees used company computers to send e-mail messages and instant messages related to the conceptualization, design, software, operation, and business of the employee's new company from company computers during business hours demonstrated that employees did not develop the invention entirely on their own time without use of the employer's resources).

Accordingly, Labor Code § 2870 does not provide an exception to Romi Mayder's obligation to assign his invention to Verigy pursuant to the express terms of the ARCIPD, and he has breached the ARCIPD by failing to do so.

### 4. Verigy Need Not Provide Evidence of Actual Damages for Purposes of This Motion.

Summary adjudication of the liability component of a breach of contract claim is appropriate even where damages are uncertain. *See, e.g.*, *Schwan-Stabilo Cosmetics GMBH & Co. v. Pacificlink Int'l Corp.*, 401 F. 3d 28, 32 (2005); *Stevens v. Bankers. Ins. Co.*, 970 F.Supp. 769, 774 (N.D. Cal. 1997). Indeed, "summary judgment should be granted where, as here, the existence of a contract and its breach have been established regardless of the certainty of breach. *McCoy Assocs., Inc. v. Nulux, Inc.*, 218 F. Supp. 2d 286, 293-94 (E.D.N.Y. 2002).[4]

In California, "[i]n actions for breach of contract nominal damages are presumed to follow as a conclusion of law from proof of the breach. (*"Robinson v. Raquet,* 1 Cal.App.2d 533, 544 (1934). As stated in *Sweet v. Johnson* 169 Cal.App.2d 630, 632–633 (1959) (internal citations omitted),

> "A plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him, [citation], since the defendant's failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages. The maxim that the law will not be concerned with trifles does not, ordinarily, apply to violation of a contractual right. [Citation.] Accordingly, nominal damages, which are presumed as a matter of law to stem merely from the breach of a contract [citation], may properly be awarded for the violation of such a right. [Citation.]

---

[4]  Although the present motion is addressed to liability only, it is worth noting that Verigy has suffered substantial damages as a result of Mayder's breach of the ARCIPD. Verigy's damages expert, Bonnie Goldsmith, is expected to testify at trial to that effect.

1     Because Verigy is only moving for summary adjudication on the issue of Mayder's

2 liability for breach of contract, the availability of nominal damages for breach satisfies the fourth

3 element of the claim. *Sit-Up Ltd. v. IAC/InterActive Corp.*, 2008 WL 463884, *15 (S.D.N.Y. Feb.

4 20, 2008). The amount of damages is an issue of fact for the jury at trial. *Id.*

5          **B.      Verigy is Entitled to Summary Adjudication on its Twelfth Claim for Relief**

6     Verigy's Twelfth Claim for Relief seeks a declaration that, pursuant to California Labor

7 Code Section 2860 and the ARCIPD, Verigy is the rightful owner of the "Disputed Material."

8 Complaint at Paragraphs 112-121. For purposes of this motion, Verigy seeks a declaration that

9 Verigy is the owner of the Verigy Material, as defined and discussed, *supra,* because the

10 development occurred during Mayder's employment with Verigy and resulted from research and

11 development he performed for Verigy. Accordingly, he was obligated to assign his work to

12 Verigy pursuant to the express terms of the ARCIPD.

13     As a controversy currently exists between Verigy and Defendants as to their respective

14 rights regarding the Verigy Material, and the undisputed material facts reflected in the breach of

15 contract arguments reflected above demonstrate that Verigy is the rightful owner of such material,

16 Verigy is entitled to the declaration requested regarding its ownership rights. *See, e.g., Shaw v.*

17 *Regents of University of California,* 58 Cal.App.4[th] 44, 53 (1997) (an action for declaratory relief

18 is appropriate to determine the legal rights and duties of the parties to a written contract and this

19 can be determined on summary judgment); *Allis-Chalmers Corp. v. City of Oxnard,* 126

20 Cal.App.3d 814, 818, n. 3 (1981) (summary judgment is appropriate in declaratory relief actions).

21     It is well-established that "[e]verything which an employee acquires by virtue of his

22 employment, except the compensation which is due to him from his employer, belongs to the

23 employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of

24 his employment." Labor Code § 2860. This principle has been invoked to establish the

25 employer's ownership of inventions developed by employees who were hired to invent. *See e.g.,*

26 *Zahler v. Columbia Pictures Corp.,* 180 Cal.App.2d 582, 589 (1960) ("Where an employee creates

27 something as part of his duties under his employment, the thing created is the property of his

28 employer unless, of course, by appropriate agreement, the employee retains some right in or with

- 23 -

1  respect to the product."); *Famous Players-Lasky Corp. v. Ewing,* 49 Cal.App. 676, 679-680 (1920)

2  (where defendant was employed to improve a light and worked on an invention conceived by a

3  manager of the employer, the invention belonged to the employer).

4       In *Goodyear Tire & Rubber Co. of Akron Ohio v. Miller,* 22 F.2d 353, 355-356 (9th Cir.

5  1927), for example, the Ninth Circuit determined that the employer was the rightful owner of an

6  invention and entitled to assignment either pursuant to the assignment contract signed by the

7  employee or by virtue of the employment relationship because the employee had worked on the

8  invention in the employer's shop, with facilities supplied by the employer, and while being

9  compensated by the employer for his time.  The court stated:

10      We are of the opinion, not only that plaintiff is entitled to specific performance of
the formal contract of assignment, but, without it, it would still be entitled to
11  substantially the same relief by reason of the implications of the primary contract of
employment.  It is not a case of one who, being employed for a general service,
12  makes an invention on the side, outside of his line of duty. Defendant was
employed exclusively in a department, the function of which was to improve old
13  and discover new processes and devices. *Such was the service for which he was
paid, and while so employed he was, in the regular course of his employment,
14  assigned to the specific task of developing a device to perform the very function for
which the invention in suit is adapted.* We can see no distinction between a case
15  where one is originally employed for the limited purpose of solving a specific
mechanical problem and another case where he is employed generally to concern
16  himself with such problems and during the course of employment and within the
scope thereof, is assigned to a specific one. In either case the fruits of his endeavor
17  belong to his employer.

18  *Goodyear Tire & Rubber,* 22 F.2d at 356 (emphasis added).

19       As in the cases above, Mayder was assigned to and did work on a project at Verigy which

20  ultimately gave rise to the development of the Verigy Material.  As demonstrated above, Mayder

21  was a Research and Development Engineer and the "lead tech" on the ▮▮▮▮▮▮.  He did

22  months of research on technologies that could be used for the development and manufacture of a

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  Enamored with the project, Mayder largely created the technical specifications for ▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮, all the while having access to Verigy's confidential

26  customer requirements and benefitting from the company's talent, hard won relationships, and

27  enormous depth and breadth of knowledge in the automated testing equipment industry.  While the

28  ▮▮▮▮▮▮▮ was still pending with ▮▮▮▮▮, after learning that Verigy would be choosing

1  not to exploit the ██████████ business opportunity at this time, Mayder decided to hijack

2  that opportunity for himself and began some three months of work while still at Verigy to

3  establish a new company, solicit investors and to rework the existing design for ██████████ that

4  was to be his new company's only product.  As this Court has recognized, defendants' product

5  ██████████████████ (Preliminary Injunction Order at 23.)

6      As demonstrated by Verigy's showing in connection with its breach of contract arguments

7  hereinabove, there are no material undisputed facts that would stand in the way of summary

8  adjudication on the Twelfth Claim for Relief.  And, therefore, Verigy is entitled to a declaration

9  that Mayder's work relating to the ██████████ while at Verigy prior to September 21, 2006, as

10  well as the Verigy Material belongs to Verigy.

11  **V.    CONCLUSION**

12      For the foregoing reasons, Verigy's motion for summary adjudication of its first and

13  twelfth claims for relief should be granted.

14  Dated:  September 12, 2008                 BERGESON, LLP

15

16                                              By:_____/s/_____
                                                    Michael W. Stebbins
17
                                              Attorneys for Plaintiff
18                                            VERIGY US, INC.

19

20

21

22

23

24

25

26

27

28