| | |
|---|---|
| JACK RUSSO (State Bar No. 96068)<br>TIM C. HALE (State Bar No. 114905)<br>JOHN KELLEY (State Bar No. 100714)<br>RUSSO & HALE LLP<br>401 Florence Street<br>Palo Alto, CA 94301<br>Telephone: (650) 327-9800<br>Facsimile: (650) 327-3737<br>Email: jrusso@computerlaw.com<br><br>Attorneys for Defendants<br>WESLEY MAYDER<br>ROMI MAYDER<br>SILICON TEST SOLUTIONS LLC<br>SILICON TEST SYSTEMS INC | **PUBLIC VERSION** |

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| VERIGY US, INC., a Delaware Corporation,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>ROMI OMAR MAYDER, an individual; WESLEY MAYDER, an individual; SILICON TEST SYSTEMS, INC., a California Corporation; and SILICON TEST SOLUTIONS, LLC, a California Limited Liability Corporation, inclusive,<br><br>　　　　　　Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 5:07-cv-04330-RMW (HRL)<br><br>**DECLARATION OF ROMI MAYDER IN OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION OF BREACH OF DUTY OF LOYALTY AND CFAA CLAIMS**<br><br>**Date: October 3, 2008**<br>**Time: 9:00 a.m.**<br>**Ctrm: 6**<br>**Before the Hon. Ronald Whyte**<br><br>Complaint Filed: August 22, 2007<br>Trial Date: December 8, 2008 (jury trial)<br>(Defendants have elected to reserve their jury trial rights under F.R.C.P., Rule 38) |

Contains Material Designated

**HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY**

Under Stipulated Protective Order

Document Filed Under Seal

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj    Case No. 5:07-cv-04330-RMW (HRL)

I, Romi Mayder, declare under penalty of perjury as follows:

1. The matters stated herein are true and correct of my personal knowledge, unless stated on information and belief, which matters I believe to be true. I could and would competently testify to the matters set forth herein if called as a witness.

## RICH FAMILY HISTORY IN THE ATE INDUSTRY

2. My father and uncles have worked in the ATE (automatic test equipment) industry since the 1970s. I started working with them in the ATE industry when I was 16 years old—more than 20 years ago. Accordingly, I have worked in the ATE (automatic test equipment) industry for over 20 years. I have held positions such as semiconductor process engineer, manufacturing engineer, applications engineer, marketing engineer, project manager, design engineer, expert design engineer, president, and chief executive officer throughout my career in the ATE industry.

3. I graduated from the University of California at Berkeley in 1992 with a Bachelor of Science degree in electrical engineering. My father, Gary Mayder, graduated from the University of California at Berkeley in 1965 with a master's of science degree in electrical engineering. My grandfather, L. Wesley Mayder, graduated from the University at Berkeley in 1939 with a Bachelor of Science degree in engineering. My mom's brother (my uncle), Isam Qubain, graduated from the University of California at Berkeley with a Bachelor of Science degree in electrical engineering. My Dad's brother (another uncle), Noel Mayder, graduated from the University of California at Berkeley in 1967 with a Bachelor of Science degree in engineering. My mom's brother, (yet another uncle) Edward Qubain, graduated from the University of California at Los Angeles with a Bachelor of Science degree in electrical engineering.

4. In 1974, two of my uncles, Isam Qubain, and Edward Qubain founded Best IC Laboratories in Sunnyvale, California. In 1979, my father, Gary Mayder joined them as a principal owner and V.P. of Engineering. Best IC Laboratories had offices in Sunnyvale CA, Austin Texas, Singapore, and Penang Malaysia. The business of Best IC Laboratories focused on testing memory devices. Best IC Laboratories was sold to DTS (Digital Test Systems) in 2000. DTS' business was focused mainly on testing logic devices. The purchase of Best IC Laboratories allowed the combined companies to test both memory and logic devices.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj    1    Case No. 5:07-cv-04330-RMW (HRL)

1  5. I worked at Best IC Laboratories while I was in high school and also during
2  summers when I was in college. Accordingly, before ever starting work for Verigy US, Inc.
3  ("Verigy") (and even before starting work for Agilent as well as for HP), I had over ten years of
4  experience in the ATE field and I had been part of my conversations with my dad, with my uncles
5  and even with my grandfather about the challenge of increasing the throughput of automated test
6  equipment by increasing testing parallelism. I have been thinking about that problem since I was
7  in my teens. I am now almost 38 years old.

**PRIOR WORK EXPERIENCE**

6. I worked with the following memory manufacturers while employed at Schlumberger for over 5 years: Spansion (AMD and Fujitsu), Micron, Intel, Toshiba, Samsung, Hynix (Hyundai), Quimonda (Infineon), Vanguard, Mitsubishi. I worked on the specification and design of probe cards and load boards for these memory customers.

7. I worked with the following memory manufacturers while employed at Best IC labs for over 4 years: Samsung, Hynix (Hyundai), Spansion (AMD and Fujitsu) and Quimonda (Infineon). I worked on the specification and design of probe cards and load board for these memory customers.

**THE [redacted] PROJECT**

8. Straube & Associates is an electronic sales representative that helps its principals to sell and market its products. Straube & Associates has extensive experience helping to sell ATE related products to its principal's potential customers. According to the testimony of Chris Straube, Straube and Associates always represents itself as a separate company from its principal's company. In fact, Andy Lee at Agilent expressed to me his desire that he did not want to deal with two independent companies, Honeywell and Straube & Associates, for the [redacted] task. He wanted to work with only one company, Honeywell. The first time that I approached Chris Straube regarding a custom ASIC to be used for [redacted] was on April 23, 2006, when I sent him an email while I was employed at Agilent. Attached at Exhibit A is a true and correct copy of that email. In that email, I describe [redacted] [redacted] of the publicly available Honeywell HRF-SW1020 switch. Dr. Blanchard previously

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj   2   Case No. 5:07-cv-04330-RMW (HRL)

1  opined that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ of the HRF-SW1020 switch.  This

2  newly discovered e-mail is consistent with Dr. Blanchard's opinion regarding the origin of ▬

3  ▬▬▬▬▬▬▬.  However, this email is inconsistent with Wei Wei's opinion regarding the

4  origin of ▬▬▬▬▬▬▬▬.

5      9.     In the April 2006 time frame, Thomas Ramanko of Honeywell provided Agilent

6  with the technical specifications for ▬▬▬▬▬▬▬▬▬ data sheet.  Verigy customer

7  information was not used to specify ▬▬▬▬▬▬▬▬.  Rather, Honeywell defined the best

8  ASIC that it could design based on the HRF-SW1020 switch, a publicly available Honeywell

9  switch.  This approach was chosen by Agilent management to accelerate the development schedule

10 of ▬▬▬▬▬▬▬.  I understood the data sheet to reflect publicly available information about

11 standard Honeywell technology, not confidential Verigy information.

12     10.    Thomas Ramanko is an applications engineer at Honeywell.  Jeff Kriz is a design

13 engineer at Honeywell who is a recipient the H.W. Sweatt Engineer-Scientist award.  Attached as

14 Exhibit B is the business card of Jeff Kriz.  On information and belief, Thomas Ramanko, an

15 applications engineer, was assigned ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

16 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ of the HRF-SW1020 publicly available

17 switch.  However, the Picasso ASIC that STS was developing was defined to be a custom ASIC

18 and consequently was not managed by Honeywell's applications engineers but rather by

19 Honeywell's expert design engineers, including Mr. Kriz.

20     11.    On May 9, 2006, mere days after the ▬▬▬▬▬▬▬▬ data sheet was dated,

21 Edmundo Dela Puente, John Andberg, Pam Stellmacher, and Romi Mayder, four Agilent

22 employees, signed the inventor's declaration for the ▬▬▬ patent application, known as the `140

23 application in this action.  Attached as Exhibit C is a true and correct copy of those inventor

24 declarations.  On information and belief, all four of these employees have submitted many patent

25 applications to the USPTO, and all four know of their obligation to disclose the best mode to

26 practice the invention as well as all necessary information for one skilled in the art to practice the

27 invention.  These four employees signed the ▬▬▬ inventor's declaration mere days after the

28 ▬▬▬▬▬▬▬▬ data sheet was drafted.  The ▬▬▬ patent application number is

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj     3        Case No. 5:07-cv-04330-RMW (HRL)

1  US20070247140 and a true and copy of this patent application is attached as Exhibit D.  Attached
2  as Exhibit E is a true and correct copy of the file wrapper for this patent application.

3      12.    During the ▮ project, I worked from home as I have for many years, with my
4  employers' blessing and consent.  I regularly transfer files from one computer to another computer
5  by emailing the files to myself by using an email account such as my Yahoo! email account.  I had
6  access to all the ▮ documents from my home computer during the time that I worked on the
7  project.  Contrary to Verigy's efforts to mischaracterize my actions, I did not email or download
8  the ▮ documents for the purpose of furthering my own business.  I had possession of such
9  documents at home because of my pattern of working at home.

10      13.    I attended the deposition of Edmundo Dela Puente where he described his
11  involvement with the ▮ project as "limited."  Attached as Exhibit F is a true and copy of an
12  excerpt of Edmundo DeLa Puente's testimony to that effect.  I attended the deposition of John
13  Andberg where he described his involvement in the ▮ project being limited to a total of 10
14  hours.  Attached as Exhibit G is an excerpt of John Andberg's testimony to that effect.

15      14.    Prior to filing the ▮ patent application, I conducted a patent search to
16  determine what opportunity Agilent would have to file patents in the field of resource sharing
17  probe cards.  It was determined that several patents had already been filed in the space, including
18  but not limited to US5736850 which was assigned to Teradyne, an Agilent competitor.  Attached
19  as Exhibit H is a true and correct copy of this patent.  This patent was granted in 1998.  Another
20  known patent in the field of resource sharing probe cards was/is US6366112 which was/is assigned
21  to Micron, an Agilent customer.  This patent was granted in 2002.   Attached as Exhibit I is a true
22  and correct copy of this patent. Another known patent in the field of resource sharing probe cards
23  was and is US6798225 which was and is assigned to FormFactor, a strategic partner of Agilent.
24  This patent was granted in 2004. Attached as Exhibit J is a true and correct copy of this patent.  I
25  attended the deposition of John Andberg where he testified that this patent search was in fact done
26  by me prior to starting the ▮ project.  Attached as Exhibit K is a true and correct copy of an
27  excerpt of John Andberg's testimony to that effect.

28      15.    Communications with third parties regarding the ▮ project were handled

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj     4     Case No. 5:07-cv-04330-RMW (HRL)

1  by Andy Lee of Agilent. Mr. Lee worked with both Straube & Associates and Honeywell, two
2  independent companies. Andy Lee sent the ▮▮▮ documents, including the ▮▮▮ data
3  sheet, by email to Chris Straube of Straube and Associates, with no non-disclosure agreement or
4  expectation of confidentiality in place. Attached as Exhibit L is a true and correct copy of an
5  excerpt of the Chris Straube testimony to that effect.

6      16. By the end of May, 2006, I was informed by Anca Georgescu, the ▮▮▮
7  manager, that Agilent was not interested in pursuing the ▮▮▮. Among the reasons that
8  she cited was ▮▮▮
9  ▮▮▮ She also mentioned that ▮▮▮



13  ▮▮▮. Rather, I felt that the technology if anything would
14  be complementary to Agilent's/Verigy's, and did not believe that I was ever taking actions that
15  were against my employer's best interests. On information and belief, by supercharging their
16  testers with STS's Flash Enhancer technology, Verigy could actually sell more testers and
17  potentially increase its market share against its primary competitor, Advantest. Verigy would
18  potentially be able to sell its testers supercharged with Flash Enhancer technology to customers
19  who are currently not purchasing Verigy's testers because of cost reasons.

20      17. On June 1, 2006, Verigy was formed and new passwords and usernames were
21  needed by Verigy employees to access confidential information stored in the company's e-rooms.
22  I never obtained a username or password to access Verigy confidential information. Consequently,
23  after June 1, 2006, I did not access any Verigy confidential information from their computer
24  systems. The only Agilent documents that I continued to use were already located on my home
25  computer. On September 26, 2006, because I had just terminated my employment with Verigy, I
26  upgraded the operating systems of my home computer to remove any Agilent/Verigy documents
27  from that computer system.
28  //

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠
R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj     5     Case No. 5:07-cv-04330-RMW (HRL)

1    18.    I understand that Verigy alleges that I started emailing files to my home computer
2  in anticipation of my departure from Verigy. This is false. I already had access to Agilent
3  documents from my home computer for many years, although I no longer have access to these
4  documents, and have not had such access since mere days after I terminated my employment with
5  Verigy.

6    19.    I understand the Verigy alleges that Amy Price sent me an email on June 1, 2006. I
7  do not know Amy Price. I do not recall receiving any emails from Amy Price ever. I have never
8  met Amy Price. In fact, I have never heard of the name Amy Price until Verigy filed its motion of
9  summary adjudication for breach of loyalty. Her name does not even appear in the original
10 complaint filed on August 22, 2007.

11   20.    I believed, then, and still believe, today, that I am in compliance with my Verigy
12 employment agreement for the following reasons:

13   a.    Andy Lee, an Agilent senior employee, forwarded the ▮▮▮▮ documents to at least
14         one third party (Straube and Associates) without an NDA; I did not understand
15         Agilent to be treating that information as its confidential information. I had no
16         reason to believe that information was in fact confidential. I was the author of that
17         information and I knew that I obtained that information from publicly available
18         sources.
19   b.    I drafted a patent application to assign my work on the ▮▮▮▮ project in favor of
20         Agilent. Three other Agilent employees reviewed the patent application that I
21         drafted and listed themselves as co-inventors. After my employment ended with
22         Verigy, I proceed to file an additional two patent applications related to the ▮▮▮▮
23         project in favor of Verigy, at Verigy's request. Those patent application numbers
24         are as follows: US20080143364 and US20080143363.
25   c.    I could find no confidential markings on any documents that I sent to Robert
26         Pochowski after performing a review of the documents in electronic format. Mr.
27         Straube also testified that he did not find confidential markings on the documents
28         that Mr. Lee sent him regarding the ▮▮▮▮ project. See, Exhibit M hereto.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj    6    Case No. 5:07-cv-04330-RMW (HRL)

1          d.      I received advice from Mr. Pochowski, a former mentor, a former officer of Agilent
2                  and founder of Versatest, that I was not violating my employment agreement with
3                  Verigy.

## CONTACTING ROBERT POCHOWSKI

4

5      21.     After the ▓▓▓ project was cancelled, I contacted a long-time trusted friend,
6   mentor, founder of Versatest, and ex-officer of Agilent, Robert Pochowski, to discuss the
7   opportunity of developing a solution in the probe card resource sharing market.  Mr. Pochowski
8   was skeptical of my comments that Verigy was not interested in this market space even after I tried
9   to convince Agilent management that is was a good idea.  I proceeded to forward information
10  related to the ▓▓▓ project to Mr. Pochowski as he requested.  After his review of the documents,
11  he was appalled that Agilent did not want to pursue developing a solution in this market.  I did not
12  change the logo on the documents because I was forwarding ▓▓▓ documents to Mr. Pochowski
13  for his review at his request. I checked the designation of the documents to determine if there were
14  any confidential markings on the documents, I could not find any.  In fact, I attended the
15  deposition of Chris Straube where he testified that he too could not find any confidential markings
16  on the any of the ▓▓▓ documents.  Attached as Exhibit N is a true and correct copy of an excerpt
17  of the testimony of Chris Straube to that effect.

18     22.     My home is located only a 10-minute drive from the Agilent/Verigy work site.  In
19  the June 2006 to September 2006 time frame, my wife was 6-to-9-months pregnant with my
20  unborn daughter, Claire.  My wife's pregnancy had developed complications, and the well-being
21  of both my wife and the baby were a real concern at this stage.  Consequently, I would drive home
22  almost every day to check up on my wife and unborn daughter.  While at home, I would send e-
23  mails to Bob Pochowski regarding STS.  I do not believe that I sent any emails related to STS to
24  Bob Pochowski from my work computer.

25     23.     In June 2006, I also sought legal advice regarding starting STS.  While, I do not
26  recall the date of receiving this legal advice, I did send an email to Chris Straube on June 22, 2006
27  at 12:38 p.m., indicating that I did in fact receive legal advice.  Attached as Exhibit O is a true and
28  correct copy of that e-mail which I sent to Chris Straube.  I understood that I could take actions to

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj    7    Case No. 5:07-cv-04330-RMW (HRL)

1  start my new company even while employed at Agilent so long as it was not a competing venture
2  and given Agilent/Verigy's decision to not enter the probe card resource sharing market space, I
3  did not believe that it would view STS as competing.

4      24.    On June 15, 2006, I registered the domain silicontest.com publicly. I could have
5  registered the domain by private registration and thereby hidden my name from public records.
6  However, I chose not to do that because I did not feel I was acting improperly in any manner

7      25.    In December 2006, I fired Mr. Pochowski for trying to take my brother's proposed
8  share of the company. He responded by suggesting that he would get me back by initiating a law
9  suit against STS with Verigy as the plaintiff.

## MY EXIT FROM VERIGY

11     26.    I terminated my employment with Verigy on or about September 21, 2006. I
12 participated in an exit interview with my boss at the time, Preet Paul Singh. I answered all his
13 questions honestly and truthfully. I explained to him that I was leaving Verigy to start my own
14 business. We reviewed and jointly created a list of what information that I had accessed at Agilent
15 that he believed was sensitive to Verigy. He never mentioned the ▮▮▮▮ project or any
16 technologies related to the ▮▮▮▮ project. Attached as Exhibit P is a true and correct copy of my
17 exit interview form.

## POST-VERIGY ACTIVITES

19     27.    After terminating with Verigy, I continued to work at Century 21 as a realtor, which
20 I had done for six years while employed at Agilent/Verigy with their knowledge and consent.

21     28.    When I established the STS web site, I made it publicly accessible and described all
22 of our product offerings. I filed public documents with the State of California and the County of
23 Santa Clara to open a business in the semiconductor test industry with my name clearly listed on
24 the statement of information. I did not attempt to cover up this business venture.

25     29.    In November 2006, a couple of months after I left from Verigy, at Verigy's request,
26 I wrote six additional patent applications for Verigy from the office of STS, without an NDA in
27 place with Verigy. While writing these patent applications, I was contacted by Verigy personnel
28 on my cell phone which had a recording identifying the phone number as belonging to STS.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj   8   Case No. 5:07-cv-04330-RMW (HRL)

1  Several Agilent/Verigy employees called me at that number during this time period, and would
2  have known of STS from such calls.

### MY HOME COMPUTER

30. At or about one month prior to Verigy filing the complaint of this lawsuit, I had already made copies of my computer hard drives at my own expense at the request of Verigy. The forensic specialist produced search results based on search terms from Verigy. Verigy was unhappy with such search results because the search results showed that I was not in possession of any Verigy documents. In fact, the $17,000 dollars that Verigy spent to search my computers a second time only confirmed that I in fact had no Verigy documents. Thus, this claim of expense/damage by Verigy was for an effort that was unnecessary. I already testified that I upgraded the operating systems on my home computer mere days after I left Verigy employment because I regularly worked from home and my computer had many Agilent documents on it that I understood I should not retain possession of.

31. I attended a discovery motion hearing in which the Honorable Judge Lloyd presided. During the hearing, Verigy claimed that I had tampered with my hard drives and Verigy asked Judge Lloyd to appoint a special master and have a forensic specialist search my hard drives again. However, Judge Lloyd made it clear that if Verigy wanted to have this done, Verigy would have to pay the cost since STS had already paid the cost for the first forensic specialists to search the hard drives. Judge Lloyd in fact ordered Verigy to pay the cost and gave Verigy 30 days to complete their searches of the hard drives. The results of this search once again showed that STS was not in possession of the documents that Verigy was seeking.

### THE REAL DISPUTE IN THIS MATTER

32. I make the statement of this paragraph on information and belief. If the Flash Enhancer stand-alone ASIC really was simply an evolution of the proposed ▇▇▇ (a piece of the ▇▇▇), there probably would be no lawsuit. The major NAND manufacturers such as Micron, Samsung, Sandisk, Hynix, and Toshiba have already developed an equivalent product or method to the ▇▇▇ which included the proposed ▇▇▇ Hence, keeping the ▇▇▇ off the market would not really benefit Verigy US, Inc's sales of testers.

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj    9    Case No. 5:07-cv-04330-RMW (HRL)

1 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

4 The ▓▓▓▓▓▓▓ as described in the patent application US20070247140, was really an attempt to sell Verigy's NOR focused test systems for NAND applications by increasing the throughput of NAND devices and thereby making the Verigy's test system cheaper for testing NAND devices. Now, Verigy US Inc. has a competitive problem. The Flash Enhancer directly targets NOR applications (an application that the ▓▓▓▓▓ could not address.) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ while STS pays only $100 US dollars for each Flash Enhancer stand alone ASIC. Spending a few million dollars for litigation to slow STS down for a few quarters makes good business sense for Verigy US. Inc. Attached as Exhibit Q is true and correct copy of the Final Test Report April 2008 issue. On page 3, the editor discusses this current competitive litigation.

   33. On information and belief, and for the reasons identified in this declaration, I do not believe that I have breached my duty of loyalty to Verigy and I do not believe that I have accessed any Verigy computer systems without proper authorization.

   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed on September 9, 2008 in San Jose, California.

                   _____
                   Romi Mayder

RUSSO & HALE LLP
Palo Alto, California
www.computerlaw.com ℠

R. Mayder Decl. Supp. Opp. Pl.'s Mot. Summ. Adj 10 Case No. 5:07-cv-04330-RMW (HRL)